# EXHIBIT A

EXHIBIT A

**ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF THE SELLER AMERICAN CAPITAL CORPORATION FOR THE CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS CONTRACT**

# AGREEMENT OF SALE AND PURCHASE

## MIRAMAR

**THIS AGREEMENT OF SALE AND PURCHASE** ("Agreement") made this ____ day of NOVEMBER, 2005 between **AMERICAN CAPITAL CORPORATION,** a corporation organized and existing under the laws of the State of Rhode Island, (hereinafter called "Seller"), having a place of business at 646 Bellevue Avenue, Newport, Rhode Island 02840 and **TIM L. BLIXSETH** and **EDRA BLIXSETH,** husband and wife, doing business as Yellowstone Yacht Club or assigns (hereinafter collectively called "Purchasers" or "Buyers") of 71-534 Sahara Road, Rancho Mirage, CA 92270.

**WHEREAS,** Seller is the owner of those certain three (3) parcels of real property consisting of approximately eight (8) acres, located in Newport, Rhode Island, being more particularly described in Exhibit A attached hereto and made a part hereof,(the "Real Property") together with all easements, rights of way, privileges, appurtenances and rights to same, if any, belonging and enuring to the benefit of such real property; and

**WHEREAS,** the Seller is the owner of the following "Personal Property", to wit: the personal property described in Exhibit B attached hereto and made a part hereof; and

**WHEREAS,** all right, title and interest in and to the Real Property and the Personal Property, together with any and all of the rights and appurtenances appertaining thereto, are hereinafter collectively referred to as the "Subject Property"; and



ERS

**WHEREAS,** Purchasers desire to purchase all of the Subject Property and all right, title and interest therein, and Seller desires to sell and assign the Subject Property to Purchasers for the price and pursuant to the terms, conditions and upon the representations and warranties hereinafter set forth;

**NOW THEREFORE,** in consideration of the premises, the mutual promises herein contained and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto, each intending to be legally bound, do hereby represent, warrant, covenant and agree as follows:

1. Recitations. The recitations set forth in the preamble of this Agreement are true and correct and are incorporated herein by this reference.

2. Sale of Subject Property. Seller shall sell, transfer, assign and convey to Purchasers at the "Closing," as hereinafter defined, the Subject Property, and Purchasers shall accept such conveyance, subject to the conditions hereof and upon the warranties and representations herein made.

3. Agreement Date. The date of this Agreement shall be the latter of (i) the date on which the Purchasers sign this Agreement; or (ii) the date on which the Seller signs this Agreement, as set forth immediately under the Purchasers' and Seller's signatures below (the "Agreement Date").

4. Purchase Price. The purchase price to be paid by Purchasers to Seller for the Subject Property shall be TWENTY FIVE MILLION DOLLARS ($25,000,000.00) ("Purchase Price"). The Purchase Price shall be allocated to the Subject Property as set forth on Exhibit C attached hereto and made a part hereof.

5. Method of Payment.

(a) The Purchase Price shall be paid as follows:

(i) Simultaneously with the execution of this Agreement, Purchaser shall deliver to Escrow Agent a deposit in the amount of ONE MILLION TWO HUNDRED FIFTY THOUSAND DOLLARS ($1,250,000.00) ("Deposit"), which Deposit shall be held in escrow by Escrow Agent in an interest bearing account pending "Closing" (as hereinafter defined) or earlier termination of this Agreement. The Deposit and any interest earned thereon, if any, shall be applied to the Purchase Price at Closing.

(ii) At Closing, the balance of the Purchase Price shall be paid by Purchasers to Seller (subject to proration and adjustment as provided in this Agreement) payable by wire transfer of good federal funds ("Cash Portion").

6. Permitted Encumbrances. The sale of the Subject Property is being made, and Purchasers shall take title subject to the following ("Permitted Encumbrances"):

(a) Taxes for the year of Closing and subsequent years (subject, however, to adjustment pursuant to Section 13 hereof) and outstanding assessments, if any (subject, however, to adjustment pursuant to Section 14 hereof);

(b) Provisions of existing building and zoning laws, restrictions and regulations of all governmental authorities having jurisdiction;

(c) With respect to Parcel II of Exhibit A (the "Carriage House"), the month to month oral tenancies of Maria Tomaiolo (Unit #2) and Jane Price (Unit #3);

(d) Riparian rights of others in and to the waters of any stream and/or river crossing the Real Property;

(e) Utility Easement as set forth in Book 215 at page 454 of the Newport Land Evidence Records (a copy of said easement marked A-1 is attached hereto and made a part hereof;

(f) Rights of others in and to the Cliff Walk and Ynazga Court;



BRS

(g) Any right, title and interest of others including but not limited to title and ownership held or asserted by the State of Rhode Island in and to land below historic high tide.

7. <u>Title Review and Condition of Property/Inspection Contingency.</u>

Seller represents that title to the Subject Property will be good, marketable and insurable, subject only to the Permitted Encumbrances. The Purchasers, at their sole cost and expense, shall cause a title search to be conducted regarding the Subject Property within ten (10) days of the Agreement date (the "Title Search Date"). If the Purchasers shall have any objection to the status of the title, Purchasers shall notify Seller within five (5) days of the Title Search Date of such objections or defects, and the action reasonably believed by Purchasers to be required of Seller in order to render such objections or defects cured or accessible to Purchasers. If such objections and/or defects to the title reflect any condition which would render title to the Subject Property to be other than good and marketable, as herein provided, then Seller shall have until fifteen (15) days of the Title Search Date to cure the objections and/or defects and, if within said period Seller shall not have cured such objections and/or defects, the Purchasers shall have the right in their sole and absolute discretion to either either (i) terminate this Agreement by written notice to Seller, whereby the Escrow Agent shall immediately return the Deposit to Purchasers, together with any interest earned thereon, and this Agreement shall terminate and become null and void and the parties hereto shall be released and discharged of all further claims and objections each to the other, or (ii) accept Seller's title to the Subject Property subject to such objections and/or defects with no reduction in the Purchase Price. The Seller shall have no affirmative obligation to clear the title or the conditions of the Subject Property in the event objections are raised by the Purchasers but shall cooperate with the Purchasers in an attempt to do so. Purchasers, at their sole cost and expense, shall also investigate the condition of the Real Property including, but not limited to, defects in the Real Property, and investigation of the environmental condition of the



BRS

Real Property, including the existence of lead based paint, and a determination of whether the existence or violation of any local, state or federal statutes, ordinances, laws or restrictions would unduly interfere with the Purchasers use of the Real Property as allowed in an R-60 zone. Purchasers shall have five (5) days from the Title Search Date to complete their investigation of the condition of the Real Property ("Inspection Period"). On or before the expiration of the Inspection Period, Purchasers shall notify Seller in writing of any objections Purchaser may have arising from Purchaser's inspection and investigation of the Subject Property ("Objection Notice"), Such Objection Notice shall include the actions reasonably believed by Purchasers to be required of Seller in order to render such objections and/or defects cured or acceptable to Purchasers. Seller shall have ten (10) days after the end of the Inspection Period to cure defects pertaining to the condition of the Real Property. If within said ten (10) day period Seller shall not have cured the defects pertaining to the condition of the Real Property, then Purchasers shall have the right in their sole and absolute discretion to either (i) terminate this Agreement by written notice to Seller, whereby the Escrow Agent shall immediately return the Deposit to Purchasers, together with any interest earned thereon, and this Agreement shall terminate and become null and void and the parties hereto shall be released and discharged of all further claims and objections each to the other, or (ii) accept the condition of the Subject Property subject to such defects with no reduction in the Purchase Price. The Seller shall have no affirmative obligation to remedy the conditions of the Real Property in the event objections are raised by the Purchasers but shall cooperate with the Purchasers in an attempt to do so. Purchasers, at their sole cost and expense, have the right at all reasonable times and upon reasonable notice, to conduct on site inspections of the Real Property and physical inspections and tests of the Real Property during the Inspection Period, including, without limitation, the right to enter and inspect all portions of the Real Property (the "Review Items"); provided, however, Purchasers agree not to unreasonably interfere with the operations of the Seller currently occupying the Real Property or any portion thereof. Seller hereby agrees to fully cooperate with Purchasers in providing access to the Real Property. Purchasers



GRS

shall indemnify Seller from any physical damage to the Subject Property and persons and injury resulting from Purchasers' entry on the premises during the Review Period. Mortgage Guarantee & Title Co., wholly owned subsidiary of First American Title Company, 450 Veterans Memorial Parkway, East Providence, Rhode Island 02915 shall be appointed as the Title Insurance Agent for purposes of preparing and issuing the title commitment and title insurance policy.

8. Use of Purchase Money Funds. To enable the Seller to make conveyance as herein provided, the Seller may at the time of the Closing use the purchase money or any portion thereof to clear the title of any or all encumbrances.

9. Representations and Warranties. As an inducement to Purchasers to execute this Agreement and to close the transactions contemplated hereby and to pay the Purchase Price therefor, Seller represents and warrants to Purchasers as follows:

(a) Neither the entering into this Agreement nor the Closing will constitute a violation or breach by Seller of any contract, agreement, understanding or instrument to which it is a part or by which Seller or the Subject Property is bound; or will result in the violation of any applicable law, order, rule or regulation of any governmental or quasi-governmental authority. The party executing this Agreement on behalf of the Seller is authorized to do so and to consummate the terms and provisions hereof on behalf of the Seller.

(b) Seller has the full right, power and authority to execute, perform and consummate this Agreement without any further consents or joinders from any other person, firm or corporation and doing so will not violate any provision of law or result in a breach of or constitute a default under any contract or agreement to which Seller is a party or Seller and/or the Subject Property may be bound.

(c) All Personal Property set forth on Exhibit B attached hereto and made a

part hereof, fixtures and equipment attached or appurtenant to the Subject Property is owned by the Seller and at Closing shall be conveyed to Purchasers free of all liens and encumbrances, other than the Permitted Encumbrances.

(d) To the best of Seller's knowledge, there is no pending litigation or claim which affects or which might affect the Subject Property. To the best of the Seller's knowledge, none of the Subject Property has been designated as wetlands by the Department of Environmental Management. To the best of Seller's knowledge, there is no threatened litigation, investigation or threatened claim which affects or might affect the Subject Property.

(e) To the best of Seller's knowledge, there is no pending or threatened condemnation or similar proceeding affecting the Subject Property or any portion thereof, nor has Seller any knowledge that any such action is presently contemplated.

(f) Seller is neither a "foreign person" nor a "foreign corporation" (as those terms are defined in Section 1445 of the Internal Revenue Code of 1954, as amended.)

(g) From and after the Agreement Date, the Subject Property will be kept in the same order and repair as exists on the Agreement Date, reasonable wear and tear and damage by fire or casualty excepted.

(h) Seller is not a party to and the Subject Property is not affected by, any service, maintenance or other property management agreements, or any contracts or other agreements or commitments of any kind which will not be cancelled prior to Closing.

(i) From and after the date hereof, Seller will refrain from making any material changes upon or about the Subject Property, other than as may be required by this Agreement.

GRS

January 16, 2006

10. Closing Date. The Closing Date shall be ~~December 20, 2005,~~ or such other date as mutually agreed upon by the parties. The Closing shall take place at 10:00 o'clock a.m. on the Closing Date, at the office of the Registry of Deeds in Newport, Rhode Island, or at such other time and place as may be agreed to by the parties in writing, time being of the essence.

A. At the Closing, Seller shall:

(i) deliver a Warranty Deed conveying the Real Property to Purchasers or their nominee in substantially the form attached hereto as Exhibit D;

(ii) deliver a Bill of Sale conveying the Personal Property to Purchasers or their nominee.

(iii) deliver to Purchasers the Residence Lease duly executed by Andrew Panteleakis, a copy of which marked Exhibit E is attached hereto and made a part hereof.

(iv) deliver to Purchasers or their nominee a certification of non-foreign status of Seller under Section 1445 of the Internal Revenue Code.

B. At the Closing, Seller shall:

(i) deliver to Purchasers (a) a Certificate of Good Standing issued by the Rhode Island Secretary of State and the Rhode Island Division of Taxation (b) the Certificate of the Secretary of Seller certifying as to the resolutions adopted by the Board of Directors and/or the Stockholders of Seller authorizing the execution of this Agreement, the Deed and Bill of Sale, all in form and substance satisfactory to counsel to Purchasers.

C. The closing of the transaction is contingent upon the Escrow Agent being ready and able to issue a Standard Owners Title Insurance Policy, subject only to the

Permitted Encumbrances and the conditions of title not objected to during the Inspection Period.

11. Insurance. Seller shall keep the Subject Property insured, at its expense, until the delivery of the Deed, against loss by fire with extended coverage provisions in the presently insured sum. In case of any loss, the Seller shall pay over or assign to the Purchasers upon payment of the balance of the Purchase Price in cash, all sums recovered on account of said insurance, or the Purchasers may, at their option, terminate this Agreement and the Deposit shall be refunded to the Purchasers, unless the Seller shall have restored the Subject Property to its former condition.

12. Water and Utilities; Adjustments. All charges for water, electric and gas supplied to the Subject Property prior to Closing, shall be paid by the Seller. Water charges are to be pro-rated as of the Closing Date.

13. Taxes. Real estate taxes assessed against the Subject Property as of December 31 of the calendar year immediately preceding the calendar year in which the delivery of the Deed occurs are to be pro-rated on a calendar year basis; the Seller paying pro rata for the period from the beginning of the agreed upon adjustment year to the date of delivery of the Deed and Buyer paying or assuming the balance of these taxes. All other taxes which are a lien upon the Subject Property shall be paid by the Seller at the time of the delivery of the Deed.

14. Assessments. Any assessments constituting a lien on the Subject Property are payable over a period of more then one (1) year shall be apportioned in such manner that the Seller shall pay installments due during the calendar years prior to the year in which the Deed is delivered and the installments due for the year in which the Deed is delivered shall be apportioned in the same manner as provided with respect to the Subject Property tax apportionment.

15. Notices. All notices as required in this Agreement must be in writing. All

notices shall be by certified mail, by telegram, or by delivering it personally. The telegram or certified letter will be effective upon sending. The personal certified letter will be effective upon delivery to the other party. Each party must accept the certified mail or telegram sent by the other party. Notices to the Purchasers and Seller shall be addressed to the address that appears in this Agreement.

16. Notices to Purchasers. Purchasers of real estate in the State or Rhode Island are legally obligated to comply with all local real estate ordinances.

17. Default:

A. Purchasers' Default. If Purchasers breach any of their representations, warranties, covenants, or obligations under this Agreement, Seller may give ten (10) days' written notice to Purchasers of such breach. If Purchasers' default is not cured within ten (10) days of receipt of such notice, the Seller shall have the right to terminate this Agreement and retain the Deposit together with the interest earned thereon, if any, such right to be without prejudice to the right of Seller to require specific performance or the payment of other damages, or to pursue any remedy, legal or equitable, which shall accrue by reason of such default.

B. Seller's Default. If Seller breaches any of its representations, warranties, covenants, or obligations under this Agreement, Purchaser may give ten (10) days' written notice to Seller of such breach. If Seller's default is not cured within ten (10) days of receipt of such notice, the Purchasers shall have the right to terminate this Agreement and retain the Deposit together with the interest earned thereon, if any, such right to be without prejudice to the right of Purchasers to require specific performance or the payment of other damages, or to pursue any remedy, legal or equitable, which shall accrue by reason of such default.

18. Wetland Disclosure Pursuant to R.I.G.L. Section 2-1-26. All or part of the Subject Property may have been previously determined by the Rhode Island



GRS

Department of Environmental Management to be a coastal wetland, a fresh water wetland, pond, marsh, riverbank or swamp, as those terms are defined in Chapter 1 of Title 2 of the Rhode Island General Laws. (See Addendum A).

19. Lead Warning. Purchasers acknowledge that they have been notified that the Subject Property was built prior to 1978 and that such property may present exposure to lead from lead based paint that may place young children at risk of developing lead poisoning. The Seller has provided to Purchasers and Purchasers acknowledge receipt from Seller of the Lead Warning Statement. Except as set forth in the Lead Warning Statement, it is understood that no representations have been made by or on behalf of Seller concerning the presence or absence of such lead based materials. Purchasers acknowledge that, in certain circumstances, Purchaser may incur obligations to remove such lead-based materials pursuant to the laws of the State of Rhode Island and/or local law, by-law, ordinance or regulation. Purchasers hereby acknowledge and agree to accept and assume any such obligations as of the Closing Date.

20. Condition of the Subject Property.

(a) Full possession of the Subject Property, free of all tenants and occupants, except as otherwise provided herein, is to be delivered at the Closing in the same condition as it now is, reasonable wear and tear and damage by fire or casualty excepted. PURCHASERS ACKNOWELDGE THAT PURCHASERS HAVE INSPECTED, HAVE CAUSED TO BE INSPECTED, OR WILL CAUSE TO BE INSPECTED PRIOR TO CLOSING THE SUBJECT PROPERTY, ARE FULLY AWARE OF ITS PRESENT CONDITION, UNDERSTAND THAT THE SALE IS WITHOUT ANY REPRESENATION OR WARRANTY OF ANY TYPE EXPRESS OR IMPLIED (INCLUDING WITHOUT LIMITATION THE FACT THAT NO REPRESEN-TATIONS OR WARRANTIES ARE BEING MADE IN CONNECTION WITH THE SUBJECT PROPERTY, THE CONDITION OF ANY IMPROVEMENTS THEREON, THE SOIL

JRS

CONDITION, COMPACTION OR BEARING ABILITY THEREOF, ANY ENVIRONMENTAL OR HAZARDOUS WASTE MATERIAL CONDITION, THE INCOME TO BE DERIVED FROM THE SUBJECT PROPERTY, OR THE COMPLIANCE OF THE SUBJECT PROPERTY WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS), AND ARE PURCHASING THE SUBJECT PROPERTY AS IS, WHERE IS, AND WITH ALL FAULTS, WITHOUT ANY OBLIGATION ON THE PART OF SELLER TO TAKE ANY ACTIONS OR DO ANY THINGS. SELLER HEREBY DISCLAIMS ALL WARRANTIES WITH RESPECT TO THE SUBJECT PROPERTY, INCLUDING, WITHOUT LIMITATION, WARRANTIES AS TO MERCHANTABILITY, QUALITY AND SUITABILITY; AND PURCHASERS HEREBY WAIVE ANY RIGHT TO RESCIND OR REFORM THIS AGREEMENT BEFORE OR AFTER PERFORMANCE HEREUNDER.

(b) The provisions of this Section 20 shall survive the Closing.

21. Occupation of Subject Property by Seller After Closing. Apartment Unit No. 1 located in the so-called "Carriage House" portion of the Subject Property is presently occupied by Seller and/or its stockholder, Andrew Panteleakis. It is agreed that for a period of two (2) years from and after the date of the delivery of the Deed, Seller and/or Andrew Panteleakis shall be allowed to continue to occupy said Apartment Unit No. 1 at no cost or expense to Seller or Andrew Panteleakis as provided in the Residence Lase referred to in Section 10 A (iii) of this Agreement. If at any time during this two-year period Seller and/or its stockholder, Andrew Panteleakis, vacates the property, the provisions of this Section 21 shall no longer apply. Seller and/or its stockholder, Andrew Panteleakis, agree not to unreasonably interfere with the operations of the Purchasers relating to Subject Property or any portion thereof during this two-year period and shall indemnify and hold free and harmless Purchasers and its affiliates or assigns from any loss, damage and liability (including court costs and attorney's fees) arising from any claim made against Seller and or its Stockholder as a result of or in any way arising from, relating to, or

GRS

and or its Stockholder as a result of or in any way arising from, relating to, or connected with Seller's acts or omissions while occupying the Subject Property.

At the Closing, Purchasers shall

(i) deliver to Seller appropriate documentation acceptable to counsel to Seller enabling Seller to continue to use and occupy the Subject Property as it has in the past for a period up to and including January 15, 2006 to the exclusion of Purchasers rent free; provided, however, all charges for water, electric and gas supplied to the Subject Property while occupied by Seller shall be borne by Seller; provided further, the adjustment for real estate taxes and assessments, if any, shall also be made as if the closing occurred on January 15, 2006.

22. No Assignment; Nominees. This Agreement may not be assigned by Purchasers without the Seller's prior written consent, excepting however, that Purchasers upon seven (7) days prior notice to Seller, may request Seller to execute and deliver the Quitclaim Deed to Purchasers' nominee. However, The Purchaser may assign this Agreement to a 1031 accommodator or affiliate for the purpose of completing a 1031 transaction.

23. No Recording of Agreement. The Parties hereto agree that neither this Agreement nor any memorandum or notice thereof shall be recorded in any registry of land evidence records or other filing place. Purchasers further agree that the recording of this Agreement, or any memorandum or short form thereof, by or at the instance of Purchasers or any agent of Purchasers shall constitute, at Seller's election, a default by Purchasers hereunder. Upon Seller's giving notice of such default to Purchasers, this Agreement shall terminate and be of no further force or effect and the recording of such notice shall be deemed sufficient and ad equate notice to third parties that this Agreement is void and of no further force and effect.



GRS

24. Appointment of Escrow. Seller and Purchasers hereby constitute Mortgage Guarantee & Title Co. as Escrow Agent, and Escrow Agent by signing the acceptance set forth below agrees to assume and perform the duties of Escrow Agent under and pursuant to the provisions of this Agreement. The Escrow Agent shall deposit all sums received by it in an interest bearing account in a national bank having an office in Providence, Rhode Island.

The Escrow Agent shall not be held liable for any action taken or omitted under this Section so long as it has acted in good faith and without negligence. The Escrow Agent shall have no responsibility to inquire into or determine the genuineness, authenticity, or sufficiency of any documents or instruments submitted to it in connection with its duties under and pursuant to the Escrow.

The Escrow Agent shall be entitled to deem the signatories of any documents or instruments submitted to it pursuant to the Escrow as being those purported to be authorized to sign such documents or instruments and shall be entitled to rely upon the genuineness of the signature of such signatories without inquiry and without requiring substantiating evidence of any kind. The Escrow Agent shall be entitled to refrain from taking any action contemplated by this Escrow in the event that it becomes aware of any disagreement between Seller and Purchasers as to any material facts or as to the happening of any contemplated event precedent to such action.

The Escrow Agent may resign as such following the giving of fifteen (15) days prior written notice to Seller and Purchasers. Similarly, the Escrow Agent may be removed and replaced following the giving of fifteen (15) days prior written notice to the Escrow Agent by Seller and Purchasers, acting jointly. In either event, the Escrow Agent shall deliver the property then comprising the Escrow to a successor Escrow Agent appointed by Seller and Purchasers by a written notice executed by Seller and Purchasers and filed with the Escrow Agent.

SEE PAGE 18A FOR THE ADDITIONAL PARAGRAPHS TO THIS SECTION 24.

25. Like Kind Exchange. Anything herein to the contrary notwithstanding, Seller instead of selling the Subject Property as a direct sale or Purchaser instead of purchasing the Subject Property as a direct purchase, may each elect to do a so-

called Section 1031 like kind exchange. The parties agree to cooperate with the other to effect such like kind exchange but neither party shall be required to incur any cost or liability as a result of such cooperation. The failure of any such exchange to qualify as an exchange under Section 1031 shall not constitute grounds for rescission by either party and shall not be deemed to be a failure of consideration.

25. Confidentiality. Purchasers and Seller each mutually covenant and agree to keep this Agreement and the transactions contemplated hereby confidential and until the Closing shall not disclose the same to any third parties. This provision shall survive the termination of this Agreement.

26. Joint Effort. The drafting of this Agreement represents the joint effort of Seller and Purchasers and nothing herein shall be construed or weighed more heavily against any of the parties on the basis that such party may have been responsible for the drafting of such provision.

27. Entire Agreement. This Agreement and the documents referred to herein contain the entire agreement between the parties with respect to the transactions contemplated hereby, and no modification hereof shall be effective unless in writing and signed by the party against which it is sought to be enforced.

28. Further Action. Each of the parties hereto shall use such party's best efforts to take such actions as may be necessary or reasonably requested by the other parties hereto to carry out and consummate the transactions contemplated by this Agreement.

29. Expenses. Purchasers agree to pay escrow fees, title examination and title insurance fees and recording fees. Purchasers also agree to pay the cost of documentary stamps to be affixed to the deed up to an amount not to exceed $100,000.00. Each of the parties hereto shall otherwise bear such party's own expenses in connection with this Agreement and the transactions contemplated

hereby.

30. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Rhode Island applicable in the case of agreements made and to be performed entirely within such State.

31. TIME IS OF THE ESSENCE. THE PARTIES HERETO ACKNOWELDGE THAT FOR ALL PROVISONS OF THIS AGREEMENT, TIME IS OF THE ESSENCE.

32. Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

33. Real Estate Broker. The parties warrant to each other that no real estate broker is involved in this transaction.

**IN WITNESS WHEREOF**, the parties have hereunto set their hands and seals on the date set forth beside their respective signatures.

SELLER:

AMERICAN CAPITAL CORPORATION

By ______________________

Its President

Date: 11-23-05

PURCHASERS:

______________________

Timothy L. Blixseth

Date: 11/21/05

______________________

Edra Blixseth

Date: 11/21/05

doing business as
Yellowstone Yacht Club

ESCROW AGENT:

Mortgage Guarantee & Title Co.

By ______________________

CHRISTOPHER J. MONTALBANO



BRS

Its VICE PRESIDENT

Date: 11/22/05

BRS

STATE OF RHODE ISLAND
COUNTY OF NEWPORT

In _______________ on the ______ day of _________, 2005 before me personally appeared ______________________, ____________ of **AMERICAN CAPITAL CORPORATION**, by me known and known by me to be the party executing the foregoing instrument, and he/she acknowledged said instrument, by him/her executed, to be his/her free act and deed and the free act and deed of **AMERICAN CAPITAL CORPORATION** .

___________________________________
Notary Public
My Commission Expires:__________

STATE OF
COUNTY OF

In _______________ on the ______ day of _________, 2005 before me personally appeared **TIM L. BLIXSETH** and **EDRA BLIXSETH,** doing business as Yellowstone Yacht Club, by me known and known by me to be the parties executing the foregoing instrument, and they acknowledged said instrument, by them executed, to be their free act and deed.

___________________________________
Notary Public
My Commission Expires:__________



eRS

24. ADDITIONAL PARAGRAPHS

In the event of a dispute concerning the disposition of the Deposit, the Escrow Agent shall have the right at any time to deposit any cash funds held by it under this Agreement with the clerk of the court of general jurisdiction of the county in which the Real Property is located. The Escrow Agent shall be relieved and discharged of all further obligations and responsibilities hereunder.

The parties acknowledge that the Escrow Agent is acting solely as a stakeholder at their request and for their convenience, that the Escrow Agent shall be deemed to be the agent of both parties; and that the Escrow Agent shall not be liable to any of the parties for any act or omission on its part unless in violation of the provisions of this Agreement or taken or suffered in bad faith, in willful disregard of this Agreement or involving gross negligence.

# ADDENDUM A

**An Explanation of the Wetlands Disclosure Requirements:** Rhode Island law requires that the Purchasers be notified prior to the sale of real estate if it has been designated as wetlands by the Department of Environmental Management. Each city and town has maps of designated wetlands. These maps are of a scale that makes it very difficult to identify an individual parcel of real estate. There are many properties which contain wetlands, but about which no previous determination has been made. Wetlands are defined according to the type of plant life which is present, or according to whether the Subject Property is subject to flooding. The legal definition of wetlands also includes a buffer area ranging from 50 feet to 200 feet from edge of a biological wetlands. It is a highway runoff, drainage ditch effluent, earth, rock, burrow, gravel, sand, clay, peat or other materials of effluent upon; divert water flows into or out of; dike; dam; divert; change; add to or take from or OTHERWISE ALTER a wetland without a written approval from the State.

Purchasers should be particularly concerned with the wetlands designation if they plan to build, or add onto, a building on the real estate WHEN THE REAL ESTATE IS SERVED BY AN INDIVIDUAL SEPTIC DISPOSAL SYSTEM. If you are buying an existing building that is served by a municipal sewage system, this disclosure may only be a concern to you if the Subject Property is designated as being in a wetland and you are building an addition or a new structure on the Subject Property.

GRS

## EXHIBIT A

Certain real estate situated on the easterly side of Bellevue Avenue in the City of Newport, State of Rhode Island, and certain tangible personal property located thereon, all more particularly described as follows:

PARCEL I: That certain lot or parcel of land, all with buildings and improvements thereon. situated in the City of Newport, State of Rhode Island, and known as "Edgecliff" located on the "Cliffs" and bounded northerly partly by a court leading to Bellevue Avenue, and partly by land now or lately of Helen A.P. Merriman; easterly by the Atlantic Ocean; southerly by Parcel III, hereinafter described, and westerly by Parcel II, hereinafter further described, and containing about 49,493 square feet of land, be the same more or less, or however otherwise bounded and described. Together with a one half of the fee of the land embraced in what is designated as "Court Extension" on that plat referred to in, and made a part of, that certain deed from Joseph I. Bailey to George W. Wales, dated July 21, 1869, and recorded in the Land Evidence Records of said City of Newport in Deed Book 40 at page 445.

PARCEL II: That certain lot or parcel of land, all with buildings and improvements thereon. situated in the City of Newport, State of Rhode Island, and bounded westerly in front by Bellevue Avenue, northerly by Yznaga Avenue, easterly partly by a court and partly by Parcel I, hereinafter described, and southerly by Parcel III, hereinafter described, or however otherwise bounded and described.

PARCEL III: That certain lot or parcel of land, all with buildings and improvements thereon. situated in the City of Newport, State of Rhode Island, and bounded westerly by Bellevue Avenue, southerly by land now or lately of Garnett C. Douglas; easterly by the Atlantic Ocean; and northerly by Parcels I and II, hereinabove described.

JRS

## EXHIBIT B

### LIST OF PERSONAL PROPERTY

### FIRST FLOOR - OFFICE AND BATHRROM

### (OFFICE)

Seth Thomas Grandfather Clock

Side Chest

Louis XV Commode

Two Arm Chairs in Blue leather upholstery

Table near Bookcase

Chandelier

Louis XV Style Single Drawer
Side Table

Desk & Two Blue leather chairs

Two Pedestals together with Figurine

Chesterfield Sofa

End table Near Sofa

Two Asian Chairs

Empire Revival Bronze & Marble Standish

Wood Library Step Ladder

Misc. Books

### (BATHROOM)

Mirror

### (DIANA ROOM)

Pool Table

Brown Chair

Table

One Blue Leather Chair

One Asian Lamp

Long Table towards the Loggia

Mahogany Bar

Lamp

Louis XV Style Chair

Asian Desk

Two Lamps

Three arm chairs that are arranged
around the table with matching sofa



GRS

[INTENTIONALLY DELETED]

Japanese occasional table with knarled root form base

Japanese Screen

Round Table

Chandelier

Two Sconces

Chippendale Style Chair

Louis XV Style Daybed

**(RIGHT LOGGIA OFF DIANA ROOM)**

Blue Daybed

Pair of Chippendale Mirrors

Suite of Chairs

Louis XIV Style Fountain

Cast Iron Cranes

Three glass top tables

Mirror towards the front of room

Oak Blanket Chest

Red Two Door Armoire

Table in Center

One Urn on stand

Sofa Inlaid with Mother of Pearl

Asian Bird Cage minus the cage

Lighting Fixture

**(RIGHT FOYER)**

Two (2) Large Vases

Pair of Small Urns

Root Chair

Two (2) Stands for Vases

Pair of Large Painting of Maidens

Painting in Gold Frame

**(FRONT FOYER)**

Desk

Stand

Two (2) Drawer Chest

Black Side Cabinet

Swan Table

Large Vase

Display case with Cherubs

Plaster Figurine and Column

Two (2) Statues

GRS

## (FRONT FOYER CENTER)

Bird Cage
Desk
Pair of Black Side Cabinets
Pair of Lighting Fixtures
Two (2) Painted Vases on stands
Mantel Clock
Large Clock
Bronze Center Table with Marble Top

Four (4) Chairs
Four (4) Glazed Planters
Metal Figure
Two (2) Lions
Two (2) Dogs
Suit of Armor
Marble Table White
Chandelier

## (FOYER NEAR ELEVATOR)

Cabinet
Wall Clock
Orange Arm Chair
Painting

Figurine
One (1) Chandelier
Vase on marble top plant stand

## (DINING ROOM)

Screen on Wall, Cut to fit in wall
Four (4) Large Vases

Clock, Louis XV Style
Small Round Table

Two (2) Gold Cane Plant Stands

Two (2)Large Vases

Mantel Clock on Fireplace

Large Dining Room Table

Two (2) Leather Wing Chairs

Pair of Chandeliers

Cherub Display Case

Asian Screen

Fire Place Andirons

Eight (8) Dining Room Chairs

Pair of Metal Candle Holders

Two (2) Floor Brass Torchieres

**(LEFT LOGGIA OFF DINING ROOM)**

Two (2) Blue Urns

Two (2) Marble Wall Consoles

Display Cabinet

Swan Handle Vase on Pedestal

Large White Wicker Furniture

Three (3) Mirrors

Assorted Cups and Saucers

Light Fixture

**(BALLROOM)**

Two (2) Candelabras on south fireplace mantel

Table Between White Couches
Andiron and Fire Fender

Painting

Three White Couches

Carpet
Pair of Black Painted Urns

Four (4) Cane Chairs with round table

Coffee Table in front of sofa

Table, Inlaid Top

Mantel Clock (on North Fireplace)

White Marble Bust

Piano

Two (2) Vases on stands near piano

Two (2) Drawer Oval End Table

Wedding Scene Painting

Kingwood game Table

Dolphin Table

Andirons and Fire Fender (on south fireplace)

Louis XV Style Clock

Three (3) marble top Pedestal Stands

Tapestry Bench for piano

Print

Print of Prince Albert

Two (2) Black Chairs

Bird

Rose Colored Marble Pedestal

Two (2) Tapestry Chairs

Black Arm Chair

Side Cabinet on East wall

White Marble Bust Girl with Curls

Small Cane Love Seat

Two (2) White Wingback Chairs

Wood Figurine

Sofa

Pair of Needle Point Chairs

Mantel Clock (on south fireplace)

Set Four (4) Sconces

Needle Point Love Seat

Clock with Cherubs (on South Fireplace)

Two (2) Candelabras on north fireplace mantel

Metal Venus with Stand

Louis XV Style Desk

Oval Dining Table with Eight (8) high back upholstered chairs

Bisque Figurines

Three (3) Chandeliers

JRS

[INTENTIONALLY DELETED]

**(KITCHEN)**

Table and Chairs in Kitchen

Assorted Cut Glass

Silver

**(GREEN ROOM AND BATHROOM)**

Pair of Oval Side Tables with two (2) drawers

Vanity Table in Bathroom

Mirror

Two (2) Lamps

Six (6) Gold upholstered Chairs

One (1) Plant Urn

Two (2) Brass Floor Racks

Louis XVI Style marketry and marble top chest of drawers

Screen

**(WINE CELLAR/BASEMENT)**

Free Standing Wall Library with Painting

Red Marble Clock

**(TRADE ROOM/HALL AND STORAGE ROOM)**

Louis XVI Style Wall Panel

Marble Console Table

Fire Place

Stand

Louis XV Style Marble Top Dresser

Mirror

Sofa in Storage Room

Paintings in Vault

Swedish Oven

**(ACCOUNTING OFFICE)**

Chesterfield Sofa

Side Table

Table

Desk

**(STAIRWAY-FIRST FLOOR)**

Chandelier

Two (2) Stands

Tapestry on Wall

Two (2) Sconces

Chair

Two (2) Vases

Love Seat

**(CANE BEDROOM-SECOND FLOOR)**

Bedroom Set

Six (6) Wall Sconces

**(SITTING ROOM NEXT TO CANE BEDROOM
SECOND FLOOR)**

Miscellaneous Furniture (One (1) sofa, one (1) leather chair, two (2) side tables, Two (2) lamps

**(CHILDREN'S ROOM)**

Miscellaneous Furnishings

Four (4) Wall Sconces

Black Table and lamp

Miscellaneous Decorations

**(WHITE ROOM)**

Buffet

Six (6) Sconces

One (1) Carpet

Miscellaneous Furniture

Chandelier

**(RIGHT HALLWAY)**

Two (2) large Vases on stands

Bottle Vase

Chandelier

Mirror

Love Seat

**(UPSTAIRS OFFICE)**

Coffee Table with Metal

Two Circular Tables

Desk

Marble Top Table

Six (6) Sconces

Mirror

Andirons in Fireplace

Two (2) Headboards

Lamp

**(AP'S BEDROOM)**

Two (2) Marble Top Chests

Two (2) Side Tables

Two (2) Desks

One (1) Mirror Vanity Table

Bronze Figurine

Four (4) Wall Sconces

Marble Top TV Cabinet

Two (2) Mirrors

**(BROWN BEDROOM)**

Marble Top Chest

Game Table

Furniture

Girl in Bonnet

Six (6) Wall Sconces

**(WHITE BEDROOM)**

Desk

End Table

Side Cabinets

Miscellaneous Furniture

Lamp Base

Low Table Marble

Small Desk

Bed

Six (6) Wall Sconces

Chandelier

**(DRESSING ROOM)**

Furniture

Four (4) Wall Sconces

**(SITTING ROOM & BATHROOM)**

Four (4) Wall Sconces

Pedestal

Bust in Bathroom

Miscellaneous Furniture

**(BRASS BEDROOM)**

Pair of Small Marble Top Chests

Brass Bed

Table

One (1) Marble Top Chest

Three (3) Part Settee

Low Table

Six (6) Sconces

(CORRIDOR-SECOND FLOOR)

Marble Top Display Cabinet

Two (2) Suede Arm Chairs

Two (2) Vases and stands

Drawer Marble Top Chest

Mantel Clock

Oil on Canvas

Two (2) White Figures of Diana

Pair of Black Urns

Four (4) Louis XV Style Four Blue Velvet Chairs

Side Server

Two (2) Mirrors

Pair of Small Marble Top Chests

Louis XVI Style Sofa and Side chair

Three (3)

Mirror

Four (4) Wall Sconces

Chandelier

Louis XV Style Display Cabinet

Pair of Window Benches

Mantel Clock

Miscellaneous Furniture

(UPSTAIRS OFFICE/SMALLER OFFICE)

Dutch Desk

Table

| | |
|---|---|
| Six (6) Arm Chairs | Settee |
| Corner Cabinet | Settee |
| Cabinet | William IV Style Desk |
| Two (2) Wall Sconces | |

**(BIRD BEDROOM)**

| | |
|---|---|
| Two (2) Small Marble Top Dressers | Headboard |
| Small leather Sofa | Desk |
| Arm Chair | Miscellaneous Furnishings |
| Two (2) Wall Sconces | Chest of Drawers with Mable Top |
| Lights in Corridor | |

**(THIRD FLOOR)**

| | |
|---|---|
| Two Chairs | Rocking Chair |
| Four Side Chairs | Two Tier Server |
| Side Cabinet | Eighteen Chairs |
| Two Chairs | Bedroom Set |
| Chest and Headboard | Two Asian Chairs |

Desk

Table

**EXHIBIT D**

**WARRANTY DEED**

It, **AMERICAN CAPITAL CORPORATION**, a duly organized Rhode Island corporation ("Grantor"), for consideration paid, grants to **TIM L. BLIXSETH** and **EDRA BLIXSETH,** husband and wife, doing business as Yellowstone Yacht Club, of Rancho Mirage, California 92270 **WITH WARRANTY COVENANTS:**

that real estate situated on the easterly side of Bellevue Avenue in the City of Newport, State of Rhode Island, all more particularly described as follows:

PARCEL I: That certain lot or parcel of land, all with buildings and improvements thereon. situated in the City of Newport, State of Rhode Island, and known as "Edgecliff" located on the "Cliffs" and bounded northerly partly by a court leading to Bellevue Avenue, and partly by land now or lately of Helen A.P. Merriman; easterly by the Atlantic Ocean; southerly by Parcel III, hereinafter described, and westerly by Parcel II, hereinafter further described, and containing about 49,493 square feet of land, be the same more or less, or however otherwise bounded and described. Together with a one half of the fee of the land embraced in what is designated as "Court Extension" on that plat referred to in, and made a part of, that certain deed from Joseph I. Bailey to George W. Wales, dated July 21, 1869, and recorded in the Land Evidence Records of said City of Newport in Deed Book 40 at page 445.

PARCEL II: That certain lot or parcel of land, all with buildings and improvements thereon. situated in the City of Newport, State of Rhode Island, and bounded westerly in front by Bellevue Avenue, northerly by Yznaga Avenue, easterly partly by a court and partly by Parcel I, hereinafter described, and southerly by Parcel III, hereinafter described, or however otherwise bounded and described.

PARCEL III: That certain lot or parcel of land, all with buildings and improvements thereon. situated in the City of Newport, State of Rhode Island, and bounded westerly by Bellevue Avenue, southerly by land now or lately of Garnett C. Douglas; easterly by the Atlantic Ocean; and northerly by Parcels I

and II, hereinabove described.

Said premises are conveyed subject to:

(a) Provisions of existing building and zoning laws, restrictions and regulations of all governmental authorities having jurisdiction;

(b) Existing tenancies in favor of Andrew Panteleakis (Unit No. 1 - Carriage House), Maria Tomaiolo (Unit No. 2 - Carriage House) and Jane Brice (Unit No. 3 - Carriage House);

(c) Utility easement as set forth in Book 215 at page 454 of the City of Newport Land Evidence Records;

(d) Riparian rights of others in and to the waters of any stream and/or river crossing the premises;

(e) Rights of others in and to the Cliff Walk and Ynazga Court;

(f) Any right, title and interest of others including but not limited to title and ownership held or asserted by the State of Rhode Island in and to land below historic high tide. and

(g) Real Estate ta xes assessed as of December 31, 2004.

This transfer is such that no R.I.G.L. 44-30-71.3 withholding is required as Grantor is a Rhode Island resident as evidenced by affidavit.

The undersigned hereby certifies that this transfer is in compliance with the smoke detector and carbon detector law as provided in R.I.G.L. 23-28.35-1, et seq., as amended.

**IN WITNESS WHEREOF, AMERICAN CAPITAL CORPORATION** has caused this instrument to be executed and delivered by its officer thereunto duly authorized this ___ day of ________________, 2005.

Executed in presence of: AMERICAN CAPITAL CORPORATION

_________________________ By _________________________
Its

STATE OF RHODE ISLAND
COUNTY OF NEWPORT

In Newport on the ______ day of ________, 2005 before me personally appeared ____________________, ___________ of **AMERICAN CAPITAL CORPORATION** , by me known and known by me to be the party executing the foregoing instrument, and he/she acknowledged said instrument, by him/her executed, to be his/her free act and deed and the free act and deed of **AMERICAN CAPITAL CORPORATION** .

______________________________
Notary Public
My Commission Expires:_________

**EXHIBIT E**

**RESIDENCE LEASE**

| | |
|---|---|
| **LESSORS:** | **Tim L. Blixseth** and<br>**Edra Blixseth,** doing business as Yellowstone Yacht Club<br>71-534 Sahara Road<br>Rancho Mirage, CA 92270 |
| **LESSEE** | **Andrew Panteleakis**<br>Unit #1 (Carriage House), 646 Bellevue Avenue<br>Newport, Rhode Island 02840 |
| **TERM:** | TWO YEARS (12/20/05 - 12/19/07) |
| **RENT:** | None |

ARS

**EXHIBIT E**

**RESIDENCE LEASE**

**THIS RESIDENCE LEASE** made and entered into as of the 20th day of December, 2005, by and among **TIM L. BLIXSETH** and **EDRA BLIXSETH**, doing business as Yellowstone Yacht Club, of 71-534 Sahara Road, Rancho Mirage, California 92270, hereinafter called the "Lessor" and **ANDREW PANTELEAKIS**, of Unit #1 (Carriage House), 646 Bellevue Avenue, Newport, Rhode Island 02840, hereinafter called the "Lessee".

**W I T N E S S E T H:**

That the Lessors, for good and valuable consideration acknowledged by Lessors to having been received from Lessee, do hereby lease unto said Lessee those certain premises designated as Unit #1 (Carriage House), 646 Bellevue Avenue, Newport, Rhode Island 02840, hereinafter sometimes called the "leased premises".

**TO HAVE AND TO HOLD** the leased premises unto the Lessee for and during the term of two (2) years beginning on the 20th day of December, 2005 and ending on the 19th day of December, 2007, rent free.

1. The Lessee shall use the leased premises as a private dwelling for the Lessee and for no other purposes.

2. The Lessee shall take good care of the leased premises including the setting of glass in windows and doors, and upon termination of this Lease as provided herein, shall peaceably surrender the leased premises to the Lessors, their heirs, executors, administrators or assigns, in as good condition as the same now are, ordinary wear and tear and damage by fire or other casualty excepted. The Lessee acknowledges that the following fixtures and equipment are now in or on the leased premises: Stove, refrigerator, dishwasher, washer and dryer. Lessee agrees not to remove said fixtures and equipment from the leased premises.

3. The Lessors may enter the leased premises at all reasonable times for the purpose of examining the condition thereof and to make such repairs as the Lessors may deem necessary; any repairs required because of the negligence or willful conduct of the Lessee may be made by the Lessors at the Lessee's expense, the amount thereof to be payable by the Lessee within thirty (30) days of receipt of



GRS

invoice by Lessee. On or after November 1, 2007, Lessors shall have the right to enter the leased premises and show the same to prospective purchasers and/or tenants at all reasonable times.

4. The Lessee will not make or permit to be made (a) any disturbing noises, nor do or permit any acts which would unreasonably interfere with the rights, comfort or conveniences of others, and (b) inscribed, engraved or affixed to any part of the interior of the leased premises or in the interior of the windows of the leased premises, any signs, advertisements, notices, door plates or similar items without the written permission of Lessors first had and obtained. The Lessee shall not (a) keep any dog, cat, bird or other animal or pet on the leased premises, and (b) make any alterations, additions, or improvements on the leased premises nor paint or paper the walls thereof without the written consent of the Lessors first had and obtained,.

5. Except as specifically set forth herein, the Lessors neither make nor have made any representation of any kind with respect to the leased premises or the condition thereof. The Lessee accepts the leased premises as being in good and satisfactory condition at the time hereof and upon the taking of possession by the Lessee so accepts the leased premises as of the time of such taking of possession.

6. The Lessors shall not be liable to the Lessee or to the Lessee's invitees or licensees for any damage caused either to person or to property by reason of failure of water supply, electric current, mechanical refrigeration or heating or by reason of rain, snow, ice, sleet, fire, frost, storms and accidents or by reason of any acts or omission, negligence, or otherwise of the Lessors or their agents or servants.

7. In the event that the leased premises are totally destroyed by fire or other casualty, this Lease shall terminate.

8. This Lease shall not be assigned by the Lessee, nor shall the Lessee be permitted to sublet the leased premises. This Lease shall automatically terminate if, and only if, Lessee during the lease term shall vacate the leased premises.

9. This Lease shall, without further act on the part of the Lessee, be subject and subordinate to the lien of any mortgage and/or deed of trust, or other encumbrance which may now exist upon, or which may hereafter be placed by the Lessors, their heirs, executors, administrators and assigns, upon the leased premises or property including the leased premises.

10. To the extent permitted by law, it is agreed that Lessors shall not be liable, and the Lessee shall hold the Lessors harmless from liability for any injuries to the Lessee and/or any person on the leased premises , through or under Lessee including, without limitation, Lessee's family, agents,

employees, invitees or guests, or for any loss or damage to any personal property belonging to Lessee and/or any such persons.

11. Without obtaining the prior written consent of the Lessors, Lessee shall not change any existing locks nor place any additional locks on any doors to the leased premises.

12. The Lessee, performing all the terms, covenants and conditions of this Lease on his part to be performed, shall quietly enjoy the leased premises.

13. All notices given pursuant hereto by the Lessors and Lessee to the other shall be mailed, postage prepaid, first class mail, at the respective addresses set forth above. Lessors agree a copy of all notices addressed to Lessee shall be sent to Guido R. Salvadore, Esq., 10 Weybosset Street, Suite 905, Providence, Rhode Island 02903.

14. Lessee is responsible to arrange for the removal of rubbish, trash, garbage and refuse, not less frequently than weekly.

15. Notwithstanding anything to the contrary contained herein, the Lessee agrees to promptly pay and be responsible for, all utilities (except for water and sewer) and without limiting the generality of the foregoing, heating bills and electrical bills.

**IN WITNESS WHEREOF**, the parties have executed this Residence Lease the day and year first written above.

**LESSEE ACKNOWLEDGES HAVING READ THE FOREGOING LEASE AND RECEIPT OF A COMPLETED COPY THEREOF.**

LESSORS: LESSEE:

____________________________
Tim L. Blixseth

____________________________
Andrew Panteleakis

____________________________
Edra Blixseth
d/b/a Yellowstone Yacht Club

STATE OF RHODE ISLAND
COUNTY OF NEWPORT

In Newport on the ______ day of _______________, 2005 before me personally appeared **TIM L. BLIXSETH** and **EDRA BLIXSETH**, d/b/a Yellowstone Yacht Club, by me known and known by me to be the

parties executing the foregoing instrument, and they acknowledged said instrument, by them executed, to be their free act and deed.

________________________________
Notary Public
My Commission Expires:_________

STATE OF RHODE ISLAND
COUNTY OF NEWPORT

In Newport on the ______ day of _______________, 2005 before me personally appeared **ANDREW PANTELEAKIS**, by me known and known by me to be the party executing the foregoing instrument, and he acknowledged said instrument, by him executed, to be his free act and deed.

________________________________
Notary Public
My Commission Expires:_________

KNOW ALL MEN BY THESE PRESENTS, that we ROY S. PENNER and RUTH M. PENNER, husband and wife, living in the City of Newport, County of Newport, State of Rhode Island, (hereinafter called the Grantors), for consideration paid, receipt whereof is hereby acknowledged, grant to NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY, a corporation duly established according to the law (hereinafter called the Grantee), its successors and assigns forever with QUITCLAIM COVENANTS, the right and easement to construct, reconstruct, operate, maintain, replace and remove, for the transmission of intelligence by electricity, a line of two (2) poles with the necessary wires, cables, anchors, guys, equipment and appurtenances attached thereto, over, across and upon the Grantors' land situated on the easterly side of Bellevue Avenue in the City of Newport, County of Newport and State of Rhode Island. Said poles and wires are to be located between an existing garage and the main building on the Grantors' land; the locations of said poles and wires are to be agreed upon by the Grantors and the Grantee and the locations shall be established by and upon the erection thereof by the Grantee.

The Grantors' said land being a part of that certain tract or parcel conveyed by deed from THE DIOCESE OF RHODE ISLAND dated July 20, 1964 and duly recorded in the Records of Land Evidence in said City of Newport in Book 211 at page 387.

Also the right and easement from time to time to trim and keep trimmed such trees and bushes as necessary for the safe and proper operation of said poles and wires and to renew, replace and otherwise change said poles and wires and each and every part thereof, but not the general location, and to pass over and across said land to and from said poles and wires for all the above purposes.

And, THE DIOCESE OF RHODE ISLAND, a corporation established under the laws of the State of Rhode Island, mortgagee named in that certain mortgage to it given by ROY S. PENNER, and wife RUTH M. PENNER, and duly recorded with the Records of Mortgage Evidence in said City of Newport on July 20, 1964, in Book 198 at page 166 for the consideration aforesaid; does hereby remise, release and forever QUITCLAIM unto said NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY its successors and assigns, all its right, title and interest under said mortgage in and to the rights and easement herein conveyed, but said mortgage shall remain a valid security on the remainder of the premises therein conveyed.

And, RHODE ISLAND HOSPITAL TRUST COMPANY, a corporation organized under the laws of the State of Rhode Island, and having its principal offices in the City of Providence, mortgagee named in that certain mortgage to it given by ROY S. PENNER and wife RUTH M. PENNER and duly recorded with the Records of Mortgage Evidence in said City of Newport on May 21, 1965, in Book 201 at page 127, for the consideration aforesaid, does hereby remise, release and forever QUITCLAIM unto said NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY, its successors and assigns, all its right, title and interest under said mortgage in and to the rights and easement herein conveyed, but said mortgage shall remain a valid security on the remainder of the premises therein conveyed.

WITNESS our hands and seal this 8th day of December 1965.

In The Presence Of:

Edgar E. Fyeden — Roy S. Penner

Edgar E. Fyeden — Ruth M. Penner

The consideration for this grant does not exceed ... [illegible]

EXHIBIT A-1

Nov-19-2008 03:57pm From-GANCI [illegible] +4018483174 T-811 P.003/007 F-085

In Witness Whereof, THE DIOCESE OF RHODE ISLAND has caused its corporate seal to be hereto affixed and these presents to be signed by its proper officers for that purpose duly authorized this 9th day of December 1965.

In The Presence Of:

By John W. Walt
Title Treasurer

And By
Title

In Witness Whereof, the RHODE ISLAND HOSPITAL TRUST COMPANY has caused its corporate seal to be hereto affixed and these presents to be signed by its proper officers, for the purpose duly authorized this 10th day of December 1965.

In The Presence Of:

By
Title Vice President

And By H.P. [illegible]
Title Asst. Secy.

State of Rhode Island
County of Newport ss
In Newport, in said County on the 8th day of December 1965. Then personally appeared before me the above named ROY S. PENNER and RUTH M. PENNER, known to me and known by me to be the persons who executed the foregoing instrument and acknowledged the same to be their free act and deed.
My Commission Expires:

June 30, 1966

William J. Ashegan
Notary Public

State of Rhode Island
County of Providence ss
In Providence, in said County on the 9th day of December 1965, before me personally appeared the above named John W. Walt and, known to me and known by me to be the persons executing the foregoing instrument and acknowledged said instrument by him executed to be their free act and deed and the free act and deed of THE DIOCESE OF RHODE ISLAND.
My Commission Expires:

June 30, 1966

Notary Public

State of Rhode Island
County of Providence ss
In Providence, in said County on the 10th day of December 1965, before me personally appeared the above named [illegible] Vice President and H.P. [illegible] Asst Secy, known to me and known by me to be the persons executing the foregoing instrument and acknowledged said instrument to be their free act and deed and the free act and deed of said RHODE ISLAND HOSPITAL TRUST COMPANY.
My Commission Expires:
My Commission Expires June 30, 1966

Notary Public

455

RECEIVED IN NEWPORT, R.I. FOR RECORD December 14, 1965

11 H. 72 M. A. M. AND RECORDED BY
[signature]
CITY CLERK

EXHIBIT A-1