# EXHIBIT M

UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

CA NO 06-90S

AMERICAN CAPITAL CORPORATION,

Plaintiff

vs.

TIMOTHY L. BLIXSETH; EDRA BLIXSETH; and MORTGAGE GUARANTEE & TITLE CO.,

Defendants

DEPOSITION OF NANCY WADDELL, a witness called on behalf of the Defendants, pursuant to Massachusetts Rules of Civil Procedure, before Susan E. Wilson, Registered Professional Reporter and Notary Public in and for the State of Rhode Island, at the Law Offices of Hodosh, Spinella & Angelone, 1 Turks Head Place, Suite 1050, Providence, Rhode Island, on Wednesday, November 1, 2006, commencing at 10:15 a.m.

C.J. REPORTING
A5 Colonial Drive, No. 7
Andover, Massachusetts 01810
978.409.9090
www.cjreporting.com



APPEARANCES:

THOMAS ANGELONE, ESQUIRE
Hodosh, Spinella & Angelone
1 Turks Head Place, Suite 1050
Providence, RI 02901-1516
On Behalf of the Plaintiff.

BRIAN VOKE, ESQUIRE
Campbell, Campbell, Edwards & Conroy
One Constitution Plaza
Boston, MA 02129
617-241-3000/FAX 617-241-5115
On Behalf of the Defendants.

Also Present: Guido Salvadore





INDEX

DEPONENT Nancy Waddell

| | PAGE |
|---|---|
| DIRECT EXAMINATION BY MR. VOKE | 5 |





EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notice of Taking Deposition | 11 |
| 2 | Zoning Certificate | 26 |
| 3 | Subagent Commission Agreement | 34 |
| 4 | Letter Dated August 25, 2005 To Tim Blixseth from Harry Kojolan | 51 |
| 5 | Newport Zoning Board of Review Appeal | 54 |
| 6 | Rhode Island Real Estate Sales Disclosure Form Rhode Island Association of Realtors | 63 |
| 7 | Rhode Island Real Estate Sales Disclosure Form Rhode Island Association of Realtors - Carriage House | 63 |
| 8 | Andolfo Appraisal Associates, Inc. Real Estate Appraisal, 646 Bellevue Avenue, Newport, Rhode Island | 77 |

STIPULATIONS

It is hereby stipulated and agreed by and between counsel for the respective parties that the deponent will read and sign the deposition transcript and that the notarization of the deponent's signature is waived.

It is further stipulated and agreed that all objections, except as to form, and motions to strike are reserved until the time of trial.

NANCY WADDELL,
a witness called on behalf of the Defendants, having first been duly sworn, deposes and says as follows:

DIRECT EXAMINATION

BY MR. VOKE:

Q. Can you state your full name for the record.

A. **Nancy Zipp, Z-I-P-P, Waddell, W-A-D-D-E-L-L.**

Q. What is your current address?

A. **99 Mohawk Drive, Portsmouth, Rhode Island**





**02871.**

Q. Have you ever sat for a deposition before?

A. **Yes, I have.**

Q. On how many occasions?

A. **Twice.**

Q. The stenographer seated at the end of the table is going to take down the questions that I ask and she is going to take down your responses. If you would just please indicate yes or no when you intend to do so rather than a slang abbreviation.

A. **Okay.**

Q. If you don't understand any of my questions, let me know. Otherwise, I'm going to assume that the answer that you have given is in response to the question that I have asked. Is that clear?

A. **Yes.**

Q. If you don't understand my questions, you will let me know?

A. **I will let you know.**

Q. Where are you employed?

A. **Miramar Estate, Bellevue Avenue, Newport, Rhode Island.**





Q. Who is your actual employer?

A. **Great American Nursing Centers pays me.**

Q. Is that a company?

A. **Yes.**

Q. What do you do for Great American Nursing Centers?

A. **I'm the general manager, and I oversee the operation of the various entities that the owner owns.**

Q. You are the general manager of the nursing center?

A. **I'm the general manager of all the entities that Mr. Panteleakis owns which includes several companies.**

Q. What companies are those?

A. **American Capital Corporation, Newport Medical Developers, Inc., Groton Medical Park Associates. The list can go on.**

Q. Okay. What is Mr. Panteleakis' role in these companies?

A. **Mr. Panteleakis is the president and sole director of his companies.**

Q. Has he been removed as the acting president of any of these companies?





A. **Mr. Panteleakis became ill about seven years ago.**

Q. Has he remained as the president of these companies?

A. **Yes. When Mr. Panteleakis was well, he made all of the decisions.**

Q. What decisions does he make now with respect to these companies?

A. **He doesn't make decisions. He is consulted, but he does not make final decisions.**

Q. What do you mean "he is consulted"?

A. **He is informed of everything that has taken place since his illness.**

Q. Do you have power of attorney for Mr. Panteleakis?

A. **I do.**

Q. Since when have you had power of attorney for him approximately?

A. **I can't be sure of the exact date. Approximately five years ago.**

Q. The agreement for purchase and sale with respect to Miramar which is the subject of this lawsuit, did you sign that agreement?

MR. VOKE: Absolutely.
(Witness confers with Attorney Angelone.)
A. **I would like to add that I make the decisions and also after dealing with another trustee of Mr. Panteleakis.**
Q. Who is that?
A. **That's Joan Williams.**
Q. Who is she employed by?
A. **Great American Nursing Centers, Inc.**
Q. She is a trustee?
A. **She is a trustee as well as Guido Salvadore.**
Q. A trustee of Mr. Panteleakis' estate?
A. **Yes.**
Q. But you are the only one with power of attorney?
A. **I have power of attorney.**
Q. Do you have to consult with Joan Williams and Guido Salvadore concerning any decisions?
A. **Yes, we do. We meet before the final decisions are made.**
Q. In this case before the agreement for sale and purchase was signed, did you meet with





Joan Williams and Guido Salvadore?
A. **Yes.**
Q. Before the real estate disclosure forms at issue in this case were signed, did you meet with Joan Williams and Guido Salvadore about those?
A. **I met with Guido Salvadore.**
Q. The Miramar property, that's located on Bellevue Avenue in Newport?
A. **Yes.**
Q. How long have you worked for Great American Nursing Centers in overseeing the Miramar property?
A. **I have worked for Andrew Panteleakis and his various companies for over 32 years. I have been paid by Great American Nursing Centers, Inc., since, I believe, sometime after his stroke.**
Q. Who were you paid by prior to that?
A. **Newport Medical Developers.**
Q. At Great American Nursing Centers do you report to anybody?
A. **The only people I report to are the trustees.**





Q. Are you related to Mr. Panteleakis in any way?
A. **No. No.**
Q. Is Mr. Salvadore related to him in any way as far as you understand?
A. **No.**
Q. What about Joan Williams?
A. **No.**
Q. Do you have any ownership interest in any of Mr. Panteleakis' companies?
A. **No, I don't.**
Q. With respect to the agreement for purchase and sale between American Capital Corporation and the Blixseths, did you have any financial interest in the outcome of that sale?
A. **No.**
Q. Do you know who, if anyone, did other than American Capital Corporation?
A. **Guido Salvadore.**
Q. What interest did he have in that sale?
A. **He is the operating broker. He is the operating broker. We didn't have a real estate agent involved.**





Q. So he was the operating real estate broker?
A. **Yes.**
Q. Was there a written agreement for Mr. Salvadore to be the broker for that property?
A. **I believe so. I believe so.**
Q. When was that signed approximately?
A. **I would say sometime late 2002 maybe.**
Q. Is Mr. --
A. **I'm not sure about that date.**
Q. Is Mr. Salvadore a licensed real estate broker as far as you understand?
A. **As an attorney, he is entitled to be the real estate agent involved.**
Q. That's your understanding?
A. **Yes.**
Q. Is Mr. Salvadore employed by any of Mr. Panteleakis' companies?
A. **Mr. Panteleakis -- Mr. Salvadore represents our legal matters and any and all potential sales.**
Q. Is he an employee?
A. **No. He sends bills.**
Q. What commission was agreed upon for the

sale of the Miramar property for Mr. Salvadore in the event it was sold to the Blixseths?
A. **I believe it was six percent.**
Q. Six percent of the purchase price?
A. **Yes.**
Q. Did anybody else have a financial interest in the outcome of the sale other than Mr. Salvadore and American Capital Corporation?
A. **No.**
Q. How long has the Miramar property been up for sale?
A. **I don't like to guess. I think it was around 2003 we started talking about marketing the property.**
Q. When you say we started marketing, who are you referring to?
A. **The trustees.**
Q. Are there any documents created concerning these discussions that you had about selling the property?
A. **We started to -- not we. I started to meet with a rep from Christie's who referred me**





**to a real estate company.**
Q. Who was the representative of Christie's?
A. **I'm sorry. I don't recall her name. It would be in my records.**
Q. What records would those be?
A. **It was a woman. My daily notes from that period of time.**
Q. You would keep notes of the person that you contacted?
A. **Yes. I would have her name in my day planner. It was a while ago. I just can't recall her name.**
Q. You were referred to a real estate company. What real estate company was that?
A. **That was Lila Delman Real Estate.**
Q. Lila Delman?
A. **Yes.**
Q. Where is Lila Delman Real Estate located?
A. **Narragansett in Newport, Rhode Island.**
Q. Who did you deal with there?
A. **Melanie Delman.**
Q. Anybody else?
A. **No.**
Q. Did you have discussions with Lila Delman





as to what the potential sales price was with the property?
A. **Melanie Delman, yes.**
Q. Did you have discussions with Melanie Delman as to what use could be made of the property under the existing zoning?
A. **We didn't discuss it.**
Q. Did you discuss whether the property could be developed commercially?
A. **We never discussed that.**
Q. Did you ever have any discussions as to whether the property could be developed commercially with anybody?
A. **No. If you have seen Miramar, you would know it doesn't lend itself easily for commercial.**
Q. Why is that?
A. **Businesses?**
Q. Why is that?
A. **Why is it?**
Q. Yes.
A. **It's a colonial city. Have you ever been there?**
Q. No. I have never been there. You say it





could not be used for commercial purposes?
A. **I didn't say it couldn't be used. I didn't say that.**

MR. VOKE: Can you read back her answer.

(The question and answer was read back by the court reporter as follows:
"QUESTION: Did you ever have any discussions as to whether the property could be developed commercially with anybody?
"ANSWER: No. If you have seen Miramar, you would know it doesn't lend itself easily for commercial.")

Q. If I had seen Miramar, I would know that the property doesn't lend itself to commercial development?
A. **Not development but to -- when I think of commercial, I think of stores.**
Q. Did you have any discussions about developing the property for condominiums

with Melanie Delman?
A. **I believe so.**
Q. Did you have those discussions with anybody else?
A. **No.**
Q. Tell me about the discussions that you had with Melanie Delman about developing Miramar for condominiums?
A. **I can't recall our discussion. She was one of the first people that I had spoken to at that time.**
Q. Tell me everything that you recall.
A. **That's what I recall.**
Q. What did she say to you?
A. **It depends on what the purpose is that someone might come and be interested in buying it. Many of the estates in Newport on Bellevue Avenue have been condominiumized.**
Q. In the historic district?
A. **Yes.**
Q. Did you follow up with Melanie Delman about developing the property for condominiums?
A. **No.**





Q. Did you list the property for sale with Lila Delman Real Estate?
A. **We never had a contract with her.**
Q. Did you ever list it with her?
A. **We never had a contract with her. We didn't come to an agreement.**
Q. Did you have any discussions with anybody from that real estate entity about the zoning for the property?
A. **About the zoning?**
Q. Yes.
A. **The zoning R-60. It was always R-60.**
Q. R-60 meaning what as far as you understood?
A. **As I understood R-60 to mean regarding Miramar is that it was only one area that could be developed on the property and that was a separate lot.**
Q. You said, "It was always R-60." What do you mean by R-60?
A. **Well, I'd have to check with the zoning board and the zoning regulations to find out what that exactly means.**
Q. I want to know what your understanding was.
A. **I don't have an understanding of it.**





Q. You didn't have any understanding of what R-60 zoning was?
A. **I am not a zoning planner. If I knew it was R-60 and I had a question about it, I would call the city hall and find out.**
Q. Back in about 2003 when you said about trying to sell the property, you had no understanding as to what R-60 zoning meant for the property?
A. **It wasn't important to me.**
Q. Did you have an understanding as to what the permitted uses were for the property?
A. **I never really thought about it, to tell you the truth. It had always been used the same way for the 32 something years that I was there.**
Q. As the vice president of American Capital Corporation and acting with power of attorney as the president of American Capital Corporation, you have no understanding as to what the permitted uses were for the Miramar property when you went to sell it?

MR. ANGELONE: I object to





the form. Can I have that read back, please.

(The last question was read back by the court reporter as requested.)

MR. ANGELONE: I object to the form. You can answer that question.

THE WITNESS: Didn't I already answer it?

MR. ANGELONE: Answer it again, then.

A. **Would you repeat back to me what was just said.**

(The last question was read back by the court reporter as follows:

"QUESTION: As the vice president of American Capital Corporation and acting with power of attorney as the president of American Capital Corporation, you have no understanding as to what the

A. **It is residential.**
Q. You knew that residential zoning did not permit a club to be opened up on the Miramar property; isn't that right?
A. **I would not know that.**
Q. Did you have an understanding that a club could not be opened up on the Miramar property?
A. **I would not know that. We have many places on Bellevue Avenue that serve in different capacities other than personal residences.**
Q. You said that you had asked Tim Moore to obtain a zoning certificate?
A. **Not a zoning certificate. Perhaps we had hired him in regard to reducing our property taxes. And we were told if we combined two of the parcels, that would reduce the property taxes. That's unrelated to this.**
Q. Did you receive anything in writing from Tim Moore with respect to the city's view as to what the intended use of the property -- strike that.
A. **No.**





Q. Did you receive any documents from Tim Moore with respect to what the permitted uses of the property were under the Newport --
A. **Not that I recall.**
Q. -- zoning? Just one ground rule.
A. **I can't recall.**
Q. Just one ground rule. It will get you out of here faster. If you wait until I finish the question before you respond, you will get home sooner. Okay?
A. **Not a problem.**
Q. Harry Kojoian's role at Miramar, what was that?
A. **Harry Kojoian has a background in accounting. He has a firm grasp of income, expenses. Any kinds of numbers that I might need or require I would ask Harry.**
Q. Is he the business manager for Miramar?
A. **You could say that. We don't actually have titles, but that's what he does. And he implements any decisions that I make regarding any issue especially of important matters that may come up on a day-to-day**





**basis.**
Q. Getting back to the zoning of the property, did you understand that the zoning of Miramar was limited to the use as a single-family dwelling?
A. **It is a single-family dwelling.**
Q. Did you understand that the purpose was limited to a single-family dwelling?
MR. ANGELONE: Object to the form. You can answer that.
Q. Let me restate it. Did you understand that as far as the City of Newport was concerned that the permitted use of the property was limited to a single-family dwelling?
MR. ANGELONE: Object.
Q. You can answer.
MR. ANGELONE: You know the reason why I'm objecting is because the City of Newport's understanding is far more than single family. That's why I'm objecting.
Q. Let me be more specific then. 646 Bellevue Avenue, that's the mansion, correct?
A. **Correct.**





Q. You have three parcels of property?
A. **We have three parcels.**
Q. Did you understand that as far as the City of Newport was concerned, that the use of that 646 Bellevue Avenue, which is Miramar, was limited to a single-family dwelling?
A. **Not really because Mr. Panteleakis used Miramar as his headquarters for his various companies. His carriage house has four apartment units.**
Q. That's not 646 Bellevue Avenue. That's a separate address, correct?
A. **648.**
Q. Other than Lila Delman Real Estate, did you have any discussions with any other real estate agents about listing the Miramar property for sale?
A. **Yes.**
MR. ANGELONE: Is this before the P and S agreement?
MR. VOKE: Yes. Before.
MR. ANGELONE: Before the P and S agreement.
A. **Gustave White.**

Q. Is that an agency?
A. **Yes, it is. Gustave White Real Estate Agency or Company associated with Sotheby's.**
Q. Anybody else?
A. **No.**
Q. Who did you deal with at Gustave White?
A. **Sid Gorham, Chris West.**
Q. Anybody else?
A. **No. That's it.**
Q. Tell me what discussions you had with Sid Gorham about listing the property for sale?
A. **I consulted them. They came. We eventually came to an agreement, and a contract was signed.**
Q. The contract, is that what was produced earlier this week in response to the document requests of the Blixseths to American Capital Corporation, if you know?
A. **I don't know.**
Q. The contract with Gustave White, that was for a listing of the property?
A. **Yes.**
Q. Were they supposed to use marketing efforts





to sell the property?
A. **Yes.**
Q. Did you sign any agreements with anybody else?
A. **No.**
MR. ANGELONE: That question was prior to?
MR. VOKE: That was prior to. I should have clarified that.
MR. ANGELONE: These are all prior to.
Q. Is this a copy of that agreement?
A. **It appears to be the one.**
MR. VOKE: Mark that as the next item, please.
(Subagent Commission Agreement marked as Exhibit No. 3 for identification.)
MR. ANGELONE: For the record, that's a subagent commission agreement?
MR. VOKE: It is.
Q. Did you have any discussions with Sid Gorham about what types of buyers would be





interested in the three parcels of property that were owned by American Capital on Bellevue Avenue?
A. **What types of individuals?**
Q. Yes. Or corporations.
A. **We didn't discuss that.**
Q. Did they tell you what they thought they could sell the property for?
A. **I don't recall a certain number. We talked about the number we wanted.**
Q. Which was what?
A. **The number of 25 million was placed on the main estate alone not including the carriage house.**
Q. Tell me everything that you recall discussing with Sid Gorham about the sale of the three parcels of property?
A. **I couldn't possibly remember.**
Q. I want you to tell me everything that you recall.
A. **Sid would call me, explain to me the individual that he would be bringing by. We asked to have a qualifying paper stating that a person, any person that was coming**





**to look at the property would be able to afford the price. We wanted to sell the property quietly at that time and did not want any signs of any sort placed in front of the property.**
Q. Were any real estate disclosure forms prepared for any prospective purchasers other than the Blixseths?
A. **No.**
Q. Did American Capital Corporation ever fill out any real estate disclosure forms that were provided to any Realtor other than the ones that were delivered to the Blixseths?
A. **Not that I recall.**
Q. Have you checked?
A. **I don't need to. I did the disclosure form for Mr. Blixseth. I do know that.**
Q. If one was done for somebody else, you believe you would know about it?
A. **I would have it. I would know about it. I would have signed it.**
Q. What documents, if any, did American Capital Corporation provide to Gustave White with respect to the property?

A. Any documents that would have been submitted to or given to Gustave White would have come from American Capital's attorney, Guido Salvadore.
Q. Do you know what those documents were?
A. Just the contracts.
Q. Have you seen any document other than Exhibit 3?
A. Not that I can recall.
Q. For example, was any information given about what the taxes were on the property?
A. Yes. That was a simple thing. They would ask. That was a simple thing.
Q. Was it provided in written form or did you sit down and there were some questions asked of you and put down on paper by Gustave White's people?
A. Probably. I can't remember. That was a while ago.
Q. Do you have any copies of any property listing sheets that Gustave White prepared for the property?
A. Property listing. The only document I recall is the contract that was signed I





believe it was for one year with Guido.
Q. Do you have any documents that were prepared by Gustave White that refer to the property?
A. I don't have those, if there are any.
Q. Do you know whether there are any?
A. I don't.
Q. Do you know whether Mr. Salvadore has them?
A. I don't.
Q. None were delivered to American Capital Corporation as far as you know?
A. I can't recall.
Q. Have you searched to see if there are any recently?
A. We have gone through the records that we do have, but in relocating our offices from Miramar to a new location, we don't have those files, if they were even in existence.
Q. When did you relocate?
A. January 2006.
Q. Tell me what discussions you recalled having with Sid Gorham about the three parcels of property owned by American





Capital on Bellevue Avenue that he would tell you that he had a qualified buyer and then bring them by?
A. He would tell me that he had a qualified buyer. He would fax their qualifying letter either to me or to Mr. Salvadore and then we would set up an appointment.
Q. Were any offers made on the property, written offers?
A. No.
Q. Did you ever have any conversations with Tim Blixseth?
A. Yes.
Q. On how many occasions?
A. Three.
Q. When, approximately?
A. Late in September 2005 he came to visit Miramar. Late October 2005 he came to visit Miramar. January 12 he called me at home.
Q. Let's start from the January 12. That's January 12, 2006?
A. 2006.
Q. Tell me everything that you recall about





that conversation.
A. It was a few days prior to closing. I thought he was calling me to tell me that a representative would be coming to view Miramar. It was just a few days before the closing. He called and he asked me if I would be interested in continuing on working for his company. He also asked me if my husband would be interested in also working for him. What else did he tell me?
He said that he would like to have, if it was possible, to have the beds arranged so that he and his family would be able to stay at Miramar the evening of the 17th, the date of closing. He said he would be arriving at 12 o'clock and he said, Since I will then be the owner, I would like to stay. And I said that would be fine. I would make the arrangements. And then he also added, By the way, I have been told by my people that I greatly overpaid for Miramar.
He also said that he intended to bring the property back to its

original grandeur and that he could -- he had visions of turning the carriage house into a luxury spa.
Q. Are you finished?
A. **That was the conversation.**
Q. What did you say to him?
A. **I said that I would think about the offer. I could not answer for my husband. I would have to talk to him. I said it was an exciting idea in my mind. I don't remember my exact words, but the idea of bringing the grounds outside as well as the inside back to its original beauty was very exciting.**
Q. What did you say about his vision of a spa for the carriage house?
A. **I thought that could be a great idea.**
Q. What was the offer he made to you?
A. **The offering?**
Q. You said he offered you a job?
A. **Yes.**
Q. Did he tell you what the job was?
A. **He didn't explain it precisely. He said to continue on managing it and he wanted it to**





**be a full-time position.**
Q. Did he offer you a salary?
A. **He asked me what I was making now and he said he would match it.**
Q. What was that?
MR. ANGELONE: You don't have to tell him your salary.
MR. VOKE: It's important. I need to know what it is. I'm not going to tell anybody else.
A. **I'm not sure about that. It's over 100,000.**
Q. In terms of the offer to your husband, was he willing to match your husband's salary?
A. **Yes, but we didn't talk about it any longer because I couldn't speak for my husband.**
Q. Does your husband earn over 100,000?
A. **No.**
Q. Let's go to the late October visit to Miramar by Mr. Blixseth?
A. **Mr. Blixseth and Mrs. Blixseth came.**
Q. By the way, that telephone conversation, was anyone else on the phone on January 12 or it was just you and Mr. Blixseth?





A. **Yes. It was early in the morning, twenty after eight is when I think he called.**
Q. In October of 2005 Tim Blixseth and his wife met you?
A. **Yes.**
Q. At Miramar?
A. **Yes.**
Q. Tell me what discussions took place then.
A. **The discussion was strictly about seeing the property. They didn't ask to see the carriage house. They only asked to see the main house.**
Q. Tell me everything that you recall that was said?
A. **During the tour?**
Q. Yes.
A. **I couldn't possibly remember. It's a very large building. We are talking a finished basement and three floors.**
Q. Tell me what you recall about the nature of the conversation. Were you describing the features of the house?
A. **To be quite frank with you, there wasn't as much conversation the day that**





**Mrs. Blixseth came with him to see the property. She was very interested in seeing the kitchen and the unrestored basement kitchen. It was just a general tour like I have given many, many times to different people that had come through the building over the many years. It was strictly about the condition of the property.**
Q. Anything else discussed?
A. **No. I think we talked about was there a closer airport than Green to Miramar because he had his own jet and he was hoping there was something a little, you know, closer than Green, which is thirty minutes away.**
Q. Anything else discussed?
A. **We didn't talk about anything else.**
Q. Did anybody else meet with him at the property?
A. **The chef was in the kitchen not for a discussion, but just to say hello. My husband, Jeff, and Harry Kojoian were in the building.**

Q. Are you aware whether Mr. Kojoian had any discussions with the Blixseths during that visit?
A. I don't believe so.
Q. Are you aware that your husband had any discussion with the Blixseths during that visit?
A. No. Harry and Jeff were together in the office that they were working in.
Q. Let's go to the September 2005 meeting.
A. That was the original visit where Mr. Blixseth came with another gentleman from California.
Q. Do you know who that gentleman was?
A. I have it in my book. I can't remember his name. He was a music producer or something like that.
Q. Tell me everything that you recall about what discussions there were at that time?
A. Mr. Blixseth and this person came in, asked me to give the tour. I believe Guido was present that day also. We went through the building. We talked about the various rooms and the history of the property. I





can't think of anything significant about any conversations. In going through it, he seemed to be very happy with what he saw.
Q. I need you to tell me everything that you recall about what the discussions were that day.
A. It was about the building. We talked about the various rooms, the Widener family, the architect who designed the building, the whole relationship to the Titanic. It was background information of historical significance. We talked about that. It was just general conversation. That's what we talked about.
Q. What did Mr. Blixseth say to you?
A. Well, there was just discussion between myself, his music friend and himself -- I mean myself. We talked about the third floor. We talked about the furnishings, what were unique and original to the building. Just general information.
Q. Did Mr. Blixseth tell you what he intended to do with the property?
A. No. He and his friend said that they were





going to step outside after we had gone through the property and then they would be coming back in. He came in. And Miramar has a grand foyer and there is a table and four chairs around the table where I had gone over to sit. Mr. Salvadore had gone downstairs to talk to Harry and Jeff briefly, and he came in and he sat down with his friend. And he said something about it was a magnificent building and he said, Do you want to start talking before your attorney comes back? And I said, No. No. Guido will be right back and we should wait until he comes and joins us. And he did shortly thereafter.

And he said, I'm going to write a number down on a piece of paper, and if you are agreeable to it, then that is fine, but I'm not going to negotiate, period. I'll give you one number, he said, and I -- before that -- let me go back.

Before he got to this point, he asked me why the carriage house wasn't part of the sale. And I said to him it was





because the owner intends to live in the carriage house. And he said, I would only want the property if it included the carriage house and all of the furnishings. He wrote the number down on a little piece of paper of his own and he said, If you are agreeable, fine. If not, I'll go my way and you go your way, or something to that nature.

So he wrote the number down, showed it to Mr. Salvadore and to me and we smiled. He put it back in his pocket and then he was going to leave. In addition to that, he had a CD with him and he asked if we could play it on the CD player in the ballroom and he did. He said, You people are the first to hear this recording. And I will be on the Today Show tomorrow morning and you will hear this music. We listened to it. And after our meeting around the table, then they went their way and Guido was going to get back to him.
Q. So the CD was just some music?
A. It was his music.

Q. Okay.
A. **His music. It had to do with Hurricane Katrina.**
Q. Was there any discussion of Yellowstone Club World?
A. **Not to me.**
Q. What discussions have you had with Mr. Kojoian about any conversations he had with Mr. Blixseth?
A. **Harry didn't have many conversations. Harry is the person who first contacted Mr. Blixseth having seen an article in the Wall Street Journal and the magnificence of the buildings that he supposedly handles and owns. Harry, as I'm sure you are aware, sent a letter and some information regarding Miramar.**
Q. Has Harry Kojoian told you whether he had any conversations with Tim Blixseth?
A. **Yes. Each time he would hear from him, if he called him to arrange -- well, he called him back and said he was very happy about the information that he had sent him and asked him if we were under a contract with**





**any real estate firm at that point and we were not and he said, Well, don't sign anything. I'd like to come and see the property. And then he scheduled a meeting with Harry sometime in September, and then it was confirmed for the day that he came.**
Q. That's the day he met with you?
A. **Yes.**
Q. Has Harry told you whether he had any discussions with Mr. Blixseth about Yellowstone Club World?
A. **No.**
Q. Has Harry Kojoian told you how many times he talked to Mr. Blixseth on the telephone?
A. **He probably did. I mean, it was maybe three times, two times.**
Q. Do you know whether Harry Kojoian ever met with Mr. Blixseth?
A. **Harry met him the day that he came to see the property.**
Q. So that would have been September of 2005?
A. **Yes. Harry was in the building the day that he and his wife came in October.**
Q. Did you see a copy of Harry Kojoian's





letter to Mr. Blixseth before it was sent out to him?
A. **I didn't.**
Q. Did you see it afterwards?
A. **Yes.**
Q. When did you see it?
A. **I saw it when this case came around. I was aware of it. I hadn't seen it.**
MR. VOKE: Go ahead and mark that.
(Letter Dated August 25, 2005 to Tim Blixseth from Harry Kojoian marked as Exhibit No. 4 for identification.)
Q. I'll show you what has been marked as Exhibit 4. Is that the letter that you are referring to?
A. **Yes.**
Q. The document that is with it, what is that?
A. **This?**
Q. Yes.
A. **This is a picture taken or a copy of a picture taken of some of the rooms in**





**Miramar.**
Q. Was that some marketing materials that were developed for the property?
A. **No. I think these were pictures that we had in Miramar itself.**
Q. Did you have any discussions with Harry Kojoian at any point in time about the letter that was marked as Exhibit 4?
A. **Before?**
Q. Ever.
A. **That he sent the letter.**
Q. Have you had any discussions with Harry Kojoian about Exhibit 4?
A. **Exhibit 4, the letter?**
Q. Yes.
A. **I was aware that the letter was sent out. He asked me if I thought that it was a good idea that he sent the letter to Mr. Blixseth. He said, I also sent a picture or postcard, I believe it was, and some information regarding Miramar. And he sent it I think overnight. And I said that was a good idea because I come in later in the day, he saw it and he thought it was**

something that they might be interested in and so he sent the letter.
Q. So you had one conversation with him?
A. At that time.
Q. Have you had any other conversations with him about the letter?
A. No.
Q. You said "at that time." That suggested to me that you may have had another conversation.
A. I did not actually see the letter that he had sent up to Mr. Blixseth. I was aware that he had sent it the day that he had sent it.
Q. Since you have seen the letter, have you had any discussions with Harry Kojoian about the letter?
A. Only in that I'm aware of the letter. I asked him to send our attorneys a copy of the letter that he had sent.
Q. Are you aware of any efforts by American Capital Corporation to modify the zoning for the property where Miramar is?
MR. ANGELONE: When?





MR. VOKE: At any point in time.
A. Well, what I was referring to earlier when we hired Tim Moore to consider the possibility of combining Miramar and the extra lot to reduce the taxes, that's the only time.
Q. That was just to reduce the taxes, not to modify the zoning?
A. Yes.
MR. VOKE: Let's take a break for a minute.
(Recess taken.)
MR. VOKE: Let's mark the Newport Zoning Board of Review Appeal as the next item.
(Newport Zoning Board of Review Appeal marked as Exhibit No. 5 for identification.)
Q. I'm going to show you Newport Zoning Board of Review Appeal by American Capital Corporation dated -- the certification from a John Murphy of 28 -- it doesn't say what





year.
MR. ANGELONE: I will stipulate it's November.
Q. November 28 it looks like 1994. Have you seen that document before?
A. Yes.
Q. When?
A. Well, it was when Mr. Randal, who owns Clarendon Court, intended to sell a part of his property to a husband and wife and they were requesting a variance.
Q. What do you mean they were requesting a variance?
A. They were intending to build a house on Mr. Randal's parcel that was next to the Miramar property and they wanted a variance to build closer to the property line.
Q. So there was some -- the city had some hearings on it?
A. Actually, when we didn't agree to a variance, all of a sudden the issue ended.
Q. So what was your involvement in that whole process?
A. The only involvement I had was in hiring an





attorney to represent our interest and to be sure that the variance wasn't granted, that we were not in agreement with it.
Q. Did Mr. Panteleakis ask you to handle this issue?
A. Yes.
Q. Were you overseeing Miramar at that point in time?
A. Mr. Panteleakis was well. He made all of the decisions regarding every issue that came into play. I assisted him.
Q. So he was well back in 1994?
A. Yes.
Q. For example, this appeal, would you have received a copy of it from the attorney that you hired?
A. The office, yes. We would have received it. I would have seen it.
Q. Do you recall whether you had any discussions with Mr. Panteleakis about the whole application for a variance from Mr. Randal?
A. Maybe you should repeat the question.
Q. Do you recall having any conversations with

Mr. Panteleakis about the variance application by Mr. Randal?
A. **Yes.**
Q. Tell me what you recall?
A. **I recall Mr. Panteleakis asking me to call Pat Hayes, Jr., to have him represent our interest regarding this application for a variance.**
Q. Was this at the appeal process or the initial stages when the variance was going before the Newport Historic District Commission?
A. **It was at the very beginning.**
Q. So you asked the lawyer Pat Hayes to represent American Capital Corporation before the Newport Historic Commission on the variance application by Randal?
A. **I called Pat Hayes and asked him to represent our interests in preventing the variance from being granted.**
Q. The group that would grant the variance would be the Newport Historic District Commission, correct?
A. **According to this, yes.**





Q. At any point in time did you ever have any discussions with Mr. Panteleakis about what the Miramar property could be used for if it was sold?
A. **I never had a conversation like that with him.**
Q. Do you know whether anybody else ever did?
A. **We didn't talk about it.**
Q. The Miramar property, you knew that that was within the Newport Historic District, correct?
A. **Yes.**
Q. How long did you know that?
A. **I have always known it.**
Q. Since you started working for Mr. Panteleakis?
A. **I have always known it even prior to working for him.**
Q. What was your understanding as to the fact that a piece of property was located within the Newport Historic District?
A. **I didn't know all the regulations or the rules or anything that would pertain to what it stood for. The one thing that I**





**was very aware of is the exterior of the buildings could not be altered.**
Q. What do you mean "the exterior of the buildings could not be altered"?
A. **Well, you couldn't put an addition on, for example, without having to go before whatever board would be involved in deciding whether it was appropriate. But I know because so many of the buildings on Bellevue Avenue, the larger estates and so forth, many of them have been converted into condominiums, but the exterior of the building continues to remain the same.**
Q. So it was your understanding that the historic district was trying to preserve the exterior of all the buildings in that neighborhood?
A. **The historic district is probably about 80 percent, if not more, of the entire City of Newport.**
Q. It was your understanding that at least the historic district insofar as they were regulating property in the neighborhood of Miramar was trying to keep the exterior of





the properties on Bellevue Avenue in the same condition that they were in?
A. **Bellevue Avenue and nearly all other avenues in Newport.**
Q. Living in Portsmouth, is there a local newspaper that you would read?
A. **Yes.**
Q. What was that?
A. **The Newport Daily News.**
Q. Would you read in the Newport Daily News about properties that were within the historic district and applications they made to the Historic District to try to change the exterior of their property?
A. **I can't recall any.**
Q. You can't recall ever over the years reading anything in that nature?
A. **Not really.**
Q. You can't recall any controversies with any property owners in the historic district in terms of what they wanted to do with the property and the regulations of the Historic District Commission?
A. **The only times that I can recall in recent**

**years of anything, for example, is the New York Yacht Club was in a historic district and they did apply to put an addition onto their kitchen and their dining room and that was granted ultimately. I'm aware of that one personally. I can't recall any other in recent years.**
Q. Insofar as you knew there was a Newport Historic District and you knew there was a commission that would regulate any renovations to the exterior of buildings?
A. **I'm aware that there's a Historic District Commission.**
Q. Yes.
A. **Am I aware of all of their rules and regulations, no.**
Q. You were generally aware?
A. **That there is one.**
Q. That there is a Historic District Commission and that they have some rules and regulations that govern the exteriors of buildings lying within the historic district, correct?





A. **Yes.**
Q. And that could affect what the property owner did with the property, correct?
A. **Yes.**
Q. Did you ever tell Tim Blixseth that the property was in the historic district?
A. **I don't believe so. I don't believe he ever asked.**
Q. Do you know whether anybody else at American Capital Corporation ever told Mr. or Mrs. Blixseth that the three parcels of property that were addressed in the agreement for purchase and sale were located within the Newport Historic District?
A. **I don't believe so.**
Q. Now, the companies that Mr. Panteleakis owns, are any of those other properties within the Newport Historic District?
A. **No.**
Q. Have you ever owned any property within the Newport Historic District?
A. **No.**
Q. Did Mr. Panteleakis own any other property





personally within the historic district?
A. **No.**

MR. VOKE: Let's go ahead and mark these two items as Exhibit 6 and 7.

(Rhode Island Real Estate Sales Disclosure Form Rhode Island Association of Realtors marked as Exhibit No. 6 for identification.)

(Rhode Island Real Estate Sales Disclosure Form Rhode Island Association of Realtors - Carriage House marked as Exhibit No. 7 for identification.)

MR. VOKE: Six is the real estate disclosure form for the mansion and the adjacent unimproved lot. And Number 7 is the carriage house.
Q. I'll show you what has been marked as Exhibits 6 and 7. Can you identify Exhibit 6 for me?
A. **Real Estate Sales Disclosure Form for**





**American Capital.**
Q. For the mansion?
A. **For the mansion and the adjacent lot. And the other?**
Q. Number 7 is the Real Estate Disclosure Form by American Capital for the carriage house?
A. **Yes.**
Q. Did you sign both Exhibit 6 and 7?
A. **Yes.**
Q. You signed Mr. Panteleakis' name?
A. **Yes.**
Q. Was there some meeting with the trustees before you signed these real estate disclosure forms?
A. **Yes.**
Q. Who was present at the meeting?
A. **Mr. Salvadore and myself.**
Q. Does it require a vote of two out of three trustees?
A. **Yes.**
Q. What is the trust agreement?
A. **I'm not sure if I'm at liberty to answer that.**

MR. ANGELONE: Wait a

minute.
A. **There is a trust.**
MR. ANGELONE: I don't know.
Q. There's a written trust agreement?
A. **Yes.**
Q. And you have a copy of it?
A. **No.**
Q. Who has it?
A. **Our attorney would have it, Guido Salvadore.**
MR. ANGELONE: I'm not sure if there could be nondisclosures. Ask him tomorrow.
MR. VOKE: It's not a big deal right now.
MR. ANGELONE: I didn't think it was.
Q. The real estate disclosure forms, let's address the one Exhibit 6. The form itself, where did that originate from?
A. **It's my understanding from talking to American Capital's attorney, Guido Salvadore --**
MR. ANGELONE: You can't





disclose what you and the attorney talked about. That's privileged. You can't do that. American Capital has not waived the privilege, so I have to be a little careful about that. You can just put it another way. Do you understand you can't say what you talked to your attorney about? That's privileged.
THE WITNESS: Okay.
Q. The real estate disclosure form was provided to you by Mr. Salvadore?
A. **The real estate disclosure form was provided to Mr. Salvadore by Gustave White.**
Q. Did Gustave White have anything to do with the agreement for sale and purchase concerning the Blixseths?
A. **No.**
Q. Who prepared Exhibit 6?
A. **I answered it with Guido Salvadore.**
Q. What effort did you make, if any, to determine whether this was an appropriate form itself without any information in it?
MR. ANGELONE: Object to the form, the word "appropriate."





Q. Let me ask it this way. What information did you have that the Rhode Island Real Estate Disclosure Form marked as Exhibit 6 was the current form used by Rhode Island Association of Realtors when you filled it out?
A. **It was the current form that had been requested.**
Q. It's your understanding that Mr. Salvadore asked Gustave White for a current form?
A. **Yes.**
Q. Did you speak with Gustave White about the real estate disclosure form?
A. **No.**
Q. Who did you have discussions with about what information needed to be included in the real estate disclosure form that were provided to the Blixseths?
A. **Most of the information on that form is information that I knew off the top of my head. There are some things that I may have called Harry to ask specifically. I knew we had upgraded the electrical service, and I wanted to be sure of the**





**amperage before we put it down. Any information that I didn't know I would call to have Harry make a call or to find out. But most of the information I knew.**
Q. Insofar as the real estate disclosure forms marked 6 and 7 are concerned, it was your understanding that Guido Salvadore was acting as a real estate sales agent for the property in conjunction to these forms?
A. **He was operating as the attorney handling the sale.**
Q. And also getting a real estate commission on the sale?
A. **Correct.**
Q. You said that Mr. Guido Salvadore is one of the trustees for Mr. Panteleakis' estate and that you had discussions with him in his capacity as a trustee concerning the real estate disclosure forms?
A. **Yes.**
Q. Can you tell me what those discussions were?
A. **Well, they weren't any different. We filled out the disclosure form together.**

Q. Was there any discussion about including in the real estate disclosure form the fact that the property was located within the Newport Historic District?

A. **No. These forms were prepared and handed to me for signature. If they asked on the form that it was in a historic district, I would have said yes.**

Q. What effort did you make to determine whether the form marked Exhibit 6 and 7 was the current form approved by the Rhode Island Association of Realtors?

A. **What effort did I make?**

Q. Yes.

A. **I did nothing.**

Q. What effort did you make to determine whether the Exhibit 6 and 7 complied with Rhode Island law?

MR. ANGELONE: Object to the form of that.

A. **I did nothing.**

Q. If you were buying a piece of property in the Newport Historic District and you were from outside of Rhode Island, would it be





important to you as a buyer to know what the Newport Historic District meant to a property owner?

MR. ANGELONE: Object to the form.

A. **If I was going into another state to purchase property in a historic district, whether it's Rhode Island or any other state in the country, I would expect my attorney who was going to do all of the review and research and in his due diligence time would determine any factors that might relate to something that was a concern or importance to me.**

Q. Perhaps you can answer my question.

MR. ANGELONE: I think she did.

A. **I think I did.**

Q. If you were from out of state and you were buying a piece of property in the Newport Historic District, would it be important for you to know that the property was within a historic district?

MR. ANGELONE: Object to the





form. Read that question back.

(The last question was read back by the court reporter as follows: "QUESTION: If you were from out of state and you were buying a piece of property in the Newport Historic District, would it be important for you to know that the property was within a historic district?")

MR. ANGELONE: I think the form is bad. Can you answer that the way it's worded?

A. **How can I answer the Newport Historic District if I'm aware of it? I have always known it. I've lived there for so long.**

Q. If you didn't know that the piece of property lay within the historic district and the historic district could govern what you did with the property, you would want to know that, wouldn't you?

MR. ANGELONE: Object to the





form.

A. **Yes. And I would ask my attorney when he reviewed my application to buy, I would ask him to find out any information that was relevant, which certainly included if you weren't aware.**

MR. VOKE: I move to strike everything after yes.

Q. After the agreement for purchase and sale dated November 2005 was signed, was there some process at American Capital where that agreement had to be approved by the board of directors?

A. **The trustees.**

Q. The trustees had to approve it?

A. **Yes.**

Q. That's the trustees of the estate of Mr. Panteleakis?

A. **Yes.**

Q. When did that take place approximately?

A. **It was prior to the signing of the documents.**

Q. The trustees voted prior to the signing of the document?

A. **Yes. To agree to sell.**
Q. Was there a meeting of the trustees to approve the agreement of sale and purchase?
A. **At the same time, yes.**
Q. When was that approximately?
A. **I'd have to go back in my notes. We meet periodically throughout the year.**
Q. Was there a formal document prepared?
A. **Prepared to decide that we were going to close or sign a document?**
Q. Approving the agreement of sale and purchase of the trustees.
A. **I'm not aware of a paper stating that it was approved, but we did meet.**
MR. ANGELONE: This is before so the record is clear?
MR. VOKE: Yes. This is before.
A. **Right. We did it.**
MR. ANGELONE: I understand. I want the record to be clear. I didn't mean to interrupt you.
A. **We met before to determine that we would accept the sale and go forward and I signed**





**it.**
Q. What about the actual written agreement, the agreement of sale and purchase, was that agreement approved by the trustees?
A. **Yes.**
Q. Before it was signed by you?
A. **Yes.**
Q. When was that meeting?
A. **I couldn't remember. I'm not even sure there was an actual meeting where we went into a room. We are talking about three people, one who was seldom present.**
Q. The board of directors of American Capital Corporation had not approved the agreement at that time when it was signed, correct?
A. **Mr. Panteleakis is the sole director of American Capital Corporation.**
Q. Was there a vote of the board of directors --
A. **The board of directors is --**
Q. You have to wait until I finish.
MR. ANGELONE: You have to wait.
Q. Was there a vote of the board of directors





at a later date after the agreement for sale and purchase was signed approving that agreement?
A. **I can't recall before or after.**
Q. Did you ever have any conversations with Andy Hawes?
A. **Yes.**
Q. When?
A. **I had one conversation with Mr. Hawes in December 2005. I can't remember the date, but he called me and I was at Miramar, and at that time he asked me if I would consider working for Mr. Blixseth.**
Q. Was that the extent of the conversation?
A. **Yes.**
Q. Do you know if anyone else had any discussions with Andy Hawes other than Mr. Salvadore?
A. **I don't believe anyone else did.**
Q. Did anyone ever tell you prior to January 17, 2006 what Mr. Blixseth intended to do with the property?
A. **We didn't talk about it.**
Q. So no one told you what he intended to do





with the property?
A. **He told me what he intended to do. He told me, as I mentioned earlier, that he was intending to bring it back to its original grandeur, to have exact reproductions of what had been there at the beginning of the early 1900's when the building was --**
Q. I know what we talked about.
A. **That's what we talked about.**
Q. We talked about the conversation that you had with Mr. Blixseth. Did anybody else tell you about any conversations they had with Mr. Blixseth about what he intended to do with the property?
MR. ANGELONE: This is exclusive of you talking to your lawyer.
A. **No.**
Q. Did you ever speak with any other representatives of Timothy Blixseth other than Mr. Hawes?
A. **No.**
MR. VOKE: I'm going to mark the Andolfo Appraisal Associates, Inc., report with Bates Numbers 81 through 149 as

the next exhibit.
(Andolfo Appraisal Associates, Inc. Real Estate Appraisal 646 Bellevue Avenue, Newport, Rhode Island marked as Exhibit No. 8 for identification.)
Q. Have you seen Exhibit 8 before, please?
A. **I haven't seen it recently, no. It's an appraisal.**
Q. Had you seen it in the past?
A. **Possibly. I most likely did.**
Q. What was the appraisal done for?
A. **It was refinancing.**
Q. With Citizens Bank?
A. **Citizens.**
Q. Back in 2001?
A. **Uh-huh.**
Q. Is that a yes?
A. **Yes.**
Q. All of the papers concerning that refinancing would have been directed to you in your capacity as the overseer of Miramar?





A. **Yes.**
Q. And as the person having power of attorney for Mr. Panteleakis at that time, you would have signed the documents with respect to the refinancing in Mr. Panteleakis' name?
A. **Yes. I would have.**
Q. Did you have any other appraisals done for property other than the ones marked Exhibit 8?
A. **Over the years?**
Q. Yes.
A. **I'm sure there may have been appraisals over the years, yes.**
Q. Where would they be?
A. **We no longer have those.**
Q. Any prospective purchasers of the Miramar property, what documents, if any, were they given with respect to the property?
MR. ANGELONE: Is this prior to?
MR. VOKE: Yes.
MR. ANGELONE: November of 2005?
MR. VOKE: Yes.





A. **We didn't give any documents.**
Q. You didn't give any documents to any prospective purchasers?
A. **No. If someone came and asked questions about the building, I would give them that information.**
Q. Has American Capital Corporation received any offers on the property?
A. **At this time we are marketing it.**
Q. I understand that. Have you received any offers on the property?
A. **We are not going to receive any until this week.**
Q. So none have been received?
A. **None.**
Q. They are being received when?
A. **Friday.**
Q. What information were you aware of back in 2005 that the three parcels of property that are addressed in the agreement for sale and purchase could be used for a club?
A. **Am I aware of?**
Q. Yes.
A. **I don't know.**





Q. Are you aware of any information to suggest that the property which is addressed in the agreement for sale and purchase could have been used as a club?
A. **I don't know.**
Q. Had American Capital Corporation undertaken any investigation at any point in 2005 that would suggest to you that the property could be used as a club?
A. **No.**
Q. Did any of the trustees of American Capital Corporation suggest to you that the property, which is the subject of this lawsuit, could be used as a club by Mr. Blixseth?
A. **No.**
Q. Did any of those trustees indicate to you that the property could not be used as a club by Mr. Blixseth?
A. **No.**
Q. You have seen the letter dated August 25 from Harry Kojoian to Tim Blixseth?
A. **Yes.**
Q. You have seen that portion of the letter

that says that the property, the Miramar property, should fit into Mr. Blixseth's business model flawlessly?

A. **I have seen the letter.**

Q. And you have read that language?

A. **I have read that language.**

Q. Are you aware of whether there were any documents at American Capital that would support the notion that the property could be used as part of Yellowstone World Club?

MR. ANGELONE: Object to the form.

A. **No.**

Q. Are you aware of any information that was in the possession of American Capital Corporation that would support Harry Kojoian's statement that the property should fit into Mr. Blixseth's business model flawlessly?

MR. ANGELONE: Object to the form. You can answer that.

A. **No.**

Q. Did Mr. Kojoian ever discuss with you the conditions for his representation to





Mr. Blixseth that the property should fit into Mr. Blixseth's business model flawlessly?

MR. ANGELONE: Is that before the accident?

MR. VOKE: At any time.

A. **I need to have you repeat the question, please.**

Q. Did Harry Kojoian ever discuss with you the basis for his representation in his letter of August 25, 2005 to Tim Blixseth that the property should fit into Mr. Blixseth's business model flawlessly?

MR. ANGELONE: Object to the form. You can answer that. This is either before or after the P and S.

A. **No.**

MR. VOKE: No further questions.

(Whereupon the deposition concluded at 12:33 p.m.)





C E R T I F I C A T E

STATE OF RHODE ISLAND

I, Susan E. Wilson, Registered Professional Reporter and Notary Public in and for the State of Rhode Island, do hereby certify that the foregoing transcript of the deposition of Nancy Z. Waddell, having been duly sworn, on Wednesday, November 1, 2006, is true and accurate to the best of my knowledge, skill, and ability.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 21st day of November, 2006.

SUSAN E. WILSON, CSR, RPR
My commission expires:
November 1, 2009

PLEASE NOTE: THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.

**0**

**01810** [1] - 1:22
**02129** [1] - 2:7
**02871** [1] - 6:1
**02901-1516** [1] - 2:4
**06-90S** [1] - 1:3

**1**

**1** [7] - 1:15, 1:16, 2:3, 4:3, 11:11, 83:11, 83:20
**100,000** [2] - 42:12, 42:17
**1050** [2] - 1:16, 2:3
**10:15** [1] - 1:17
**11** [1] - 4:3
**12** [5] - 39:19, 39:21, 39:22, 40:16, 42:23
**12:33** [1] - 82:22
**149** [1] - 76:24
**17** [1] - 75:21
**17th** [1] - 40:15
**1900's** [1] - 76:7
**1994** [2] - 55:4, 56:12

**2**

**2** [4] - 4:4, 26:16, 26:18, 27:20
**2001** [3] - 25:10, 26:3, 77:17
**2002** [1] - 16:8
**2003** [2] - 17:15, 23:6
**2005** [13] - 4:6, 39:17, 39:18, 43:3, 45:10, 50:21, 51:12, 72:10, 75:10, 78:23, 79:19, 80:7, 82:11
**2006** [7] - 1:16, 38:21, 39:22, 39:23, 75:21, 83:11, 83:16
**2007** [1] - 10:18
**2009** [1] - 83:20
**21st** [1] - 83:15
**25** [5] - 4:6, 35:12, 51:11, 80:21, 82:11
**26** [1] - 4:4
**28** [2] - 54:24, 55:4

**3**

**3** [3] - 4:5, 34:18, 37:8
**30(b)(6)** [1] - 11:16
**32** [2] - 14:15, 23:15
**34** [1] - 4:5

**4**

**4** [7] - 4:6, 25:17, 51:14, 51:17, 52:8, 52:13, 52:14

**5**

**5** [3] - 3:6, 4:9, 54:19
**51** [1] - 4:8
**54** [1] - 4:10

**6**

**6** [12] - 4:11, 63:4, 63:10, 63:22, 63:23, 64:8, 65:19, 66:18, 67:3, 68:6, 69:10, 69:17
**617-241-3000/FAX** [1] - 2:8
**617-241-5115** [1] - 2:8
**63** [2] - 4:13, 4:17
**646** [5] - 4:20, 31:22, 32:5, 32:11, 77:4
**648** [1] - 32:13

**7**

**7** [11] - 1:22, 4:14, 63:5, 63:15, 63:19, 63:22, 64:5, 64:8, 68:6, 69:10, 69:17
**77** [1] - 4:21

**8**

**8** [4] - 4:18, 77:7, 77:8, 78:9
**80** [1] - 59:18
**81** [1] - 76:24

**9**

**978.409.9090** [1] - 1:23
**99** [1] - 5:24

**A**

**A-N-A-N-I-A** [1] - 10:4
**a.m** [1] - 1:17
**A5** [1] - 1:22
**abbreviation** [1] - 6:11
**ability** [1] - 83:13
**able** [2] - 36:1, 40:14
**Absolutely** [1] - 13:1
**accept** [1] - 73:24
**accident** [1] - 82:5
**According** [1] - 57:24
**accounting** [1] - 30:16
**accurate** [1] - 83:12
**act** [1] - 12:13
**acting** [4] - 7:23, 23:18, 24:20, 68:8
**actual** [3] - 7:1, 74:2, 74:10
**add** [1] - 13:3
**added** [1] - 40:20
**addition** [3] - 48:13, 59:5, 61:4
**address** [3] - 5:23, 32:12, 65:19
**addressed** [3] - 62:12, 79:20, 80:2
**adjacent** [2] - 63:19, 64:3
**admissions** [2] - 25:16, 25:18
**affairs** [1] - 10:22
**affect** [1] - 62:2
**afford** [1] - 36:2
**afterwards** [1] - 51:4
**agency** [1] - 33:1
**Agency** [1] - 33:3
**agent** [3] - 15:24, 16:14, 68:8
**agents** [1] - 32:16
**ago** [4] - 8:2, 8:21, 18:11, 37:19
**agree** [2] - 55:20, 73:1
**agreeable** [2] - 47:18, 48:7
**agreed** [5] - 5:3, 5:9, 11:23, 12:2, 16:24
**agreement** [29] - 8:22, 8:24, 11:16, 13:23, 15:12, 16:3, 22:6, 32:20, 32:23, 33:14, 34:12, 34:21, 56:3, 62:13, 64:21, 65:4, 66:15, 72:9, 72:12, 73:3, 73:11, 74:2, 74:3, 74:4, 74:14, 75:1, 75:3, 79:20, 80:3
**Agreement** [2] - 4:5, 34:17
**agreements** [1] - 34:3
**ahead** [4] - 25:19, 26:13, 51:9, 63:3
**airport** [1] - 44:12
**alone** [1] - 35:13
**altered** [2] - 59:2, 59:4
**American** [58] - 7:2, 7:5, 7:16, 9:6, 9:8, 9:10, 9:18, 10:8, 10:13, 10:22, 11:5, 11:7, 11:8, 11:9, 11:15, 11:19, 12:6, 12:14, 12:16, 12:22, 13:9, 14:11, 14:16, 14:21, 15:13, 15:19, 17:9, 23:17, 23:19, 24:18, 24:22, 26:22, 28:5, 28:7, 28:17, 33:19, 35:2, 36:10, 36:22, 37:3, 38:10, 38:24, 53:21, 54:22, 57:15, 62:10, 64:1, 64:6, 65:22, 66:3, 72:11, 74:13, 74:17, 79:7, 80:6, 80:11, 81:8, 81:15
**AMERICAN** [1] - 1:5
**amperage** [1] - 68:1
**Anania** [1] - 10:4
**AND/OR** [1] - 83:22
**Andolfo** [3] - 4:18, 76:23, 77:2
**Andover** [1] - 1:22
**Andrew** [1] - 14:14
**Andy** [2] - 75:6, 75:17
**ANGELONE** [41] - 2:2, 11:4, 12:1, 23:24, 24:6, 24:10, 25:14, 27:9, 31:9, 31:15, 31:17, 32:19, 32:22, 34:6, 34:10, 34:19, 42:6, 53:24, 55:2, 64:24, 65:3, 65:11, 65:16, 65:24, 66:23, 69:19, 70:4, 70:16, 70:24, 71:13, 71:24, 73:15, 73:20, 74:22, 76:15, 78:19, 78:22, 81:11, 81:20, 82:4, 82:14
**Angelone** [3] - 1:15, 2:3, 13:2
**ANSWER** [1] - 20:14
**answer** [14] - 6:15, 20:5, 20:6, 24:7, 24:9, 31:10, 31:16, 41:8, 64:22, 70:15, 71:14, 71:16, 81:21, 82:15
**Answer** [1] - 24:10
**answered** [1] - 66:19
**ANY** [2] - 83:21, 83:22
**apartment** [1] - 32:10
**appeal** [2] - 56:14, 57:9
**Appeal** [4] - 4:10, 54:15, 54:18, 54:22
**APPEARANCES** [1] - 2:1
**application** [5] - 56:21, 57:2, 57:7, 57:17, 72:3
**applications** [1] - 60:12
**APPLY** [1] - 83:21
**apply** [1] - 61:3
**appointment** [1] - 39:7
**appraisal** [2] - 77:10, 77:13
**Appraisal** [5] - 4:18, 4:19, 76:23, 77:2, 77:4
**appraisals** [2] - 78:7, 78:12
**appropriate** [3] - 59:8, 66:21, 66:24
**approve** [2] - 72:15, 73:3
**approved** [5] - 69:11, 72:12, 73:14, 74:4, 74:14
**Approving** [1] - 73:11
**approving** [1] - 75:2
**architect** [1] - 46:9
**area** [1] - 22:15
**arrange** [1] - 49:21
**arranged** [1] - 40:13
**arrangements** [1] - 40:20
**arriving** [1] - 40:16
**article** [1] - 49:12
**assisted** [1] - 56:11
**associated** [1] - 33:3
**Associates** [4] - 4:18, 7:18, 76:23, 77:3
**Association** [6] - 4:13, 4:16, 63:8, 63:13, 67:5, 69:12
**assume** [1] - 6:15
**attention** [1] - 28:9
**Attorney** [1] - 13:2
**attorney** [25] - 8:15, 8:18, 12:10, 12:13, 12:20, 13:16, 13:17, 16:13, 23:19, 24:21, 26:8, 26:11, 27:7, 37:4, 47:12, 56:1, 56:15, 65:9, 65:22, 66:1, 66:7, 68:10, 70:10, 72:2, 78:2
**attorneys** [2] - 28:3, 53:19
**August** [4] - 4:6, 51:11, 80:21, 82:11
**authorized** [1] - 12:17
**Avenue** [14] - 4:20, 6:23, 14:9, 21:18, 29:10, 31:23, 32:5, 32:11, 35:3, 39:1, 59:10, 60:1, 60:3, 77:5
**avenues** [1] - 60:4
**aware** [23] - 25:8, 25:23, 45:1, 45:5, 49:16, 51:8, 52:16,

53:12, 53:18, 53:21, 59:1, 61:6, 61:13, 61:16, 61:18, 71:17, 72:6, 73:13, 79:18, 79:22, 80:1, 81:7, 81:14

**B**

**background** [2] - 30:15, 46:11
**bad** [1] - 71:14
**ballroom** [1] - 48:16
**Bank** [3] - 27:15, 27:19, 77:15
**basement** [2] - 43:19, 44:4
**basis** [2] - 31:1, 82:10
**Bates** [1] - 76:24
**beauty** [1] - 41:13
**became** [1] - 8:1
**beds** [1] - 40:13
**beginning** [2] - 57:13, 76:6
**Behalf** [2] - 2:4, 2:8
**behalf** [3] - 1:12, 5:14, 11:18
**Bellevue** [14] - 4:20, 6:23, 14:9, 21:18, 29:10, 31:22, 32:5, 32:11, 35:3, 39:1, 59:10, 60:1, 60:3, 77:4
**best** [1] - 83:12
**between** [3] - 5:3, 15:13, 46:16
**big** [1] - 65:14
**bills** [1] - 16:23
**Blixseth** [35] - 4:7, 36:17, 39:12, 42:20, 42:21, 42:24, 43:3, 44:1, 45:12, 45:20, 46:15, 46:22, 49:9, 49:12, 49:19, 50:10, 50:14, 50:18, 51:1, 51:12, 52:19, 53:12, 62:5, 62:11, 75:13, 75:21, 76:11, 76:13, 76:19, 80:15, 80:19, 80:22, 82:1, 82:11
**BLIXSETH** [2] - 1:8
**Blixseth's** [4] - 81:2, 81:18, 82:2, 82:12
**Blixseths** [9] - 15:14, 17:3, 33:18, 36:8, 36:13, 45:2, 45:6, 66:16, 67:18
**Board** [4] - 4:9, 54:15, 54:17, 54:21
**board** [7] - 22:21, 59:7, 72:12, 74:13, 74:18, 74:20, 74:24
**book** [1] - 45:15
**bookkeeper** [1] - 10:3
**bookkeeper's** [1] - 9:24
**Boston** [1] - 2:7
**bottom** [1] - 28:4
**break** [1] - 54:12
**BRIAN** [1] - 2:6
**briefly** [1] - 47:8
**bring** [3] - 39:3, 40:24, 76:4
**bringing** [2] - 35:22, 41:11
**broker** [5] - 15:22, 15:23, 16:1, 16:4, 16:12
**build** [2] - 55:14, 55:17
**building** [12] - 43:18, 44:7, 44:24, 45:23, 46:7, 46:9, 46:21, 47:10, 50:22, 59:13, 76:7, 79:5
**buildings** [7] - 49:14, 59:2, 59:4, 59:9, 59:16, 61:12, 61:23
**business** [8] - 10:21, 12:18, 12:19, 30:19, 81:3, 81:18, 82:2, 82:13
**Businesses** [1] - 19:18
**buy** [1] - 72:3
**buyer** [3] - 39:2, 39:5, 70:1
**buyers** [1] - 34:24
**buying** [4] - 21:17, 69:22, 70:20, 71:7
**BY** [3] - 3:5, 5:18, 83:22

**C**

**C.J** [1] - 1:21
**CA** [1] - 1:3
**California** [1] - 45:13
**Campbell** [2] - 2:6
**capacities** [1] - 29:11
**capacity** [2] - 68:18, 77:23
**CAPITAL** [1] - 1:5
**Capital** [45] - 7:16, 9:6, 9:8, 10:14, 10:22, 11:6, 11:8, 11:15, 11:19, 12:6, 12:14, 12:16, 12:22, 15:13, 15:19, 17:9, 23:17, 23:20, 24:19, 24:22, 26:23, 28:5, 28:8, 28:18, 33:19, 35:2, 36:10, 36:23, 38:10, 39:1, 53:22, 54:22, 57:15, 62:10, 64:1, 64:6, 66:3, 72:11, 74:13, 74:17, 79:7, 80:6, 80:11, 81:8, 81:15
**Capital's** [2] - 37:3, 65:22
**careful** [1] - 66:4
**Carriage** [2] - 4:17, 63:14
**carriage** [10] - 32:9, 35:14, 41:2, 41:16, 43:11, 47:23, 48:2, 48:4, 63:20, 64:6
**carrying** [1] - 10:21
**case** [3] - 13:23, 14:4, 51:7
**CC** [1] - 28:4
**CD** [3] - 48:14, 48:15, 48:23
**center** [1] - 7:11
**Centers** [12] - 7:2, 7:6, 9:10, 9:18, 10:8, 10:23, 11:5, 11:9, 13:9, 14:12, 14:17, 14:21
**certain** [1] - 35:9
**certainly** [1] - 72:5
**Certificate** [2] - 4:4, 26:15
**certificate** [10] - 25:9, 25:11, 26:1, 26:21, 26:24, 27:14, 27:22, 28:12, 29:13, 29:14
**CERTIFICATION** [1] - 83:21
**certification** [1] - 54:23
**certify** [1] - 83:8
**CERTIFYING** [1] - 83:23
**chairs** [1] - 47:5
**change** [1] - 60:14
**check** [1] - 22:20
**checked** [1] - 36:15
**checks** [1] - 10:3
**chef** [1] - 44:21
**Chris** [1] - 33:8
**Christie's** [2] - 17:24, 18:2
**Citizens** [4] - 27:15, 27:19, 77:15, 77:16
**city** [3] - 19:22, 23:5, 55:18
**City** [6] - 28:12, 28:18, 31:12, 31:19, 32:3, 59:19
**city's** [1] - 29:21
**Civil** [1] - 1:13
**Clarendon** [1] - 55:9
**clarified** [1] - 34:9
**clear** [3] - 6:17, 73:16, 73:21
**close** [1] - 73:10
**closer** [3] - 44:12, 44:15, 55:17
**closing** [3] - 40:2, 40:6, 40:15
**Club** [4] - 49:5, 50:11, 61:2, 81:10
**club** [7] - 29:3, 29:6, 79:21, 80:4, 80:9, 80:14, 80:19
**CO** [1] - 1:9
**colonial** [1] - 19:22
**Colonial** [1] - 1:22
**combined** [1] - 29:17
**combining** [1] - 54:5
**coming** [3] - 35:24, 40:4, 47:3
**commencing** [1] - 1:17
**commercial** [5] - 19:16, 20:1, 20:17, 20:20, 20:22
**commercially** [3] - 19:9, 19:13, 20:12
**Commission** [8] - 4:5, 34:16, 57:12, 57:16, 57:23, 60:23, 61:14, 61:21
**commission** [5] - 16:24, 34:20, 61:11, 68:12, 83:19
**companies** [12] - 7:14, 7:15, 7:20, 7:22, 7:24, 8:4, 8:8, 14:15, 15:10, 16:18, 32:9, 62:17
**Company** [1] - 33:3
**company** [5] - 7:3, 18:1, 18:13, 18:14, 40:8
**complied** [1] - 69:17
**concern** [1] - 70:14
**concerned** [3] - 31:12, 32:4, 68:6
**concerning** [5] - 13:19, 17:20, 66:16, 68:18, 77:21
**concluded** [1] - 82:22
**condition** [2] - 44:8, 60:2
**conditions** [1] - 81:24
**condominiumized** [1] - 21:19
**condominiums** [4] - 20:24, 21:8, 21:23, 59:12
**confers** [1] - 13:2
**confirmed** [1] - 50:6
**conjunction** [1] - 68:9
**Conroy** [1] - 2:6
**consent** [1] - 27:5
**consider** [2] - 54:4, 75:13
**Constitution** [1] - 2:7
**consult** [1] - 13:18
**consulted** [3] - 8:10, 8:12, 33:13
**contacted** [2] - 18:9, 49:11
**continue** [1] - 41:24
**continues** [1] - 59:13
**continuing** [1] - 40:7
**contract** [7] - 22:3, 22:5, 33:15, 33:16, 33:21, 37:24, 49:24
**contracts** [1] - 37:6
**CONTROL** [1] - 83:22
**controversies** [1] - 60:19
**conversation** [12] - 40:1, 41:5, 42:22, 43:21, 43:24, 46:13, 53:3, 53:10, 58:5, 75:9, 75:14, 76:10
**conversations** [9] - 39:11, 46:2, 49:8, 49:10, 49:19, 53:5, 56:24, 75:5, 76:12
**converted** [1] - 59:11
**copies** [1] - 37:20
**copy** [6] - 34:12, 50:24, 51:23, 53:19, 56:15, 65:6
**CORPORATION** [1] - 1:5
**Corporation** [34] - 7:16, 9:7, 9:9, 10:14, 11:15, 11:19, 12:7, 12:15, 12:23, 15:14, 15:19, 17:10, 23:18, 23:20, 24:19, 24:23, 26:23, 28:5, 28:8, 28:18, 33:19, 36:10, 36:23, 38:11, 53:22, 54:23, 57:15, 62:10, 74:14, 74:17, 79:7, 80:6, 80:12, 81:16
**corporations** [1] - 35:5
**correct** [9] - 12:8, 12:20, 31:23, 32:12, 57:23, 58:11, 61:24, 62:3, 74:15

Correct [5] - 12:9, 12:21, 12:24, 31:24, 68:14
correction [1] - 27:13
counsel [2] - 5:3, 11:17
country [1] - 70:9
court [5] - 20:7, 24:4, 24:15, 25:21, 71:3
COURT [1] - 1:1
Court [1] - 55:9
created [1] - 17:20
CSR [1] - 83:19
current [5] - 5:23, 67:4, 67:7, 67:10, 69:11

D

Daily [2] - 60:9, 60:10
daily [1] - 18:6
date [5] - 8:20, 16:10, 40:15, 75:1, 75:10
Dated [2] - 4:6, 51:11
dated [3] - 54:23, 72:10, 80:21
day-to-day [1] - 30:24
days [2] - 40:2, 40:5
deal [3] - 18:20, 33:7, 65:15
dealing [1] - 13:4
dealt [1] - 27:1
December [1] - 75:10
decide [1] - 73:9
deciding [1] - 59:8
decisions [11] - 8:6, 8:7, 8:9, 8:11, 12:18, 12:19, 13:4, 13:20, 13:22, 30:22, 56:10
Defendants [4] - 1:10, 1:13, 2:8, 5:15
delivered [2] - 36:13, 38:10
Delman [12] - 18:15, 18:16, 18:18, 18:21, 18:24, 19:3, 19:5, 21:1, 21:7, 21:22, 22:2, 32:14
deponent [1] - 5:4
DEPONENT [1] - 3:2
deponent's [1] - 5:7
deposes [1] - 5:16
DEPOSITION [1] - 1:12
deposition [5] - 5:5, 6:2, 11:14, 82:21, 83:9
Deposition [2] - 4:3, 11:10
describing [1] - 43:21
DESCRIPTION [1] - 4:2
designations [1] - 11:17
designed [1] - 46:9
determine [5] - 66:21, 69:9, 69:16, 70:12, 73:23
developed [5] - 19:9, 19:12, 20:12, 22:16, 52:3
Developers [2] - 7:17, 14:20
developing [3] - 20:24, 21:7, 21:23
development [2] - 20:20, 20:21
different [3] - 29:10, 44:6, 68:23
diligence [1] - 70:12
dining [1] - 61:5
direct [1] - 9:19
DIRECT [3] - 3:5, 5:17, 83:22
directed [3] - 28:8, 28:19, 77:22
DIRECTION [1] - 83:23
director [2] - 7:22, 74:16
directors [5] - 72:13, 74:13, 74:19, 74:20, 74:24
disclose [1] - 66:1
Disclosure [7] - 4:12, 4:15, 63:7, 63:12, 63:24, 64:5, 67:3
disclosure [16] - 9:2, 14:3, 36:6, 36:11, 36:16, 63:18, 64:14, 65:18, 66:10, 66:12, 67:13, 67:17, 68:5, 68:19, 68:24, 69:2
discuss [5] - 19:7, 19:8, 35:6, 81:23, 82:9
discussed [3] - 19:10, 44:10, 44:17
discussing [1] - 35:16
Discussion [1] - 27:12
discussion [7] - 21:9, 43:9, 44:22, 45:6, 46:16, 49:4, 69:1
discussions [29] - 12:22, 17:21, 18:24, 19:4, 19:11, 20:10, 20:23, 21:3, 21:6, 22:7, 32:15, 33:11, 34:23, 38:22, 43:8, 45:2, 45:19, 46:5, 49:7, 50:10, 52:6, 52:12, 53:16, 56:20, 58:2, 67:15, 68:17, 68:21, 75:17
District [18] - 57:11, 57:22, 58:10, 58:21, 60:13, 60:23, 61:10, 61:13, 61:20, 62:15, 62:19, 62:22, 69:4, 69:23, 70:2, 70:21, 71:9, 71:17
district [16] - 21:20, 59:15, 59:18, 59:22, 60:12, 60:20, 61:3, 61:24, 62:6, 63:1, 69:7, 70:7, 70:23, 71:12, 71:20, 71:21
DISTRICT [2] - 1:1, 1:2
document [8] - 33:18, 37:7, 37:23, 51:20, 55:5, 72:24, 73:8, 73:10
documents [13] - 17:20, 28:17, 30:1, 36:22, 37:1, 37:5, 38:2, 72:22, 78:4, 78:17, 79:1, 79:2, 81:8
DOES [1] - 83:21
done [6] - 27:14, 27:16, 27:18, 36:18, 77:13, 78:7
down [9] - 6:7, 6:8, 37:15, 37:16, 47:8, 47:17, 48:5, 48:10, 68:1
downstairs [1] - 47:7
Drive [2] - 1:22, 5:24
due [1] - 70:11
duly [2] - 5:15, 83:10
During [1] - 43:15
during [2] - 45:2, 45:6
dwelling [5] - 31:5, 31:6, 31:8, 31:14, 32:6

E

early [2] - 43:1, 76:7
earn [1] - 42:17
easily [2] - 19:15, 20:17
EDRA [1] - 1:8
Edwards [1] - 2:6
effectively [1] - 12:23
effort [4] - 66:20, 69:9, 69:13, 69:16
efforts [2] - 33:24, 53:21
eight [1] - 43:2
either [2] - 39:6, 82:15
electrical [1] - 67:23
employed [8] - 6:22, 9:6, 9:9, 9:17, 10:7, 10:10, 13:8, 16:17
employee [1] - 16:22
employer [1] - 7:1
end [1] - 6:6
ended [1] - 55:21
entire [1] - 59:19
entities [2] - 7:8, 7:12
entitled [1] - 16:13
entity [1] - 22:8
especially [1] - 30:23
ESQUIRE [2] - 2:2, 2:6
estate [30] - 9:2, 13:13, 14:3, 15:24, 16:1, 16:11, 16:14, 18:1, 18:13, 18:14, 22:8, 32:16, 35:13, 36:6, 36:11, 50:1, 63:18, 64:13, 65:18, 66:10, 66:12, 67:13, 67:17, 68:5, 68:8, 68:12, 68:16, 68:19, 69:2, 72:17
Estate [15] - 4:11, 4:14, 4:19, 6:23, 18:15, 18:18, 22:2, 32:14, 33:2, 63:6, 63:11, 63:24, 64:5, 67:3, 77:3
estates [2] - 21:17, 59:10
evening [1] - 40:15
event [1] - 17:2
eventually [1] - 33:14
exact [3] - 8:20, 41:11, 76:5
exactly [1] - 22:22
EXAMINATION [2] - 3:5, 5:17
example [4] - 37:10, 56:14, 59:6, 61:1
except [1] - 5:9
exciting [2] - 41:10, 41:14
exclusive [1] - 76:16
Excuse [1] - 12:24
Exhibit [26] - 11:11, 25:17, 26:16, 26:18, 27:19, 34:17, 37:8, 51:14, 51:17, 52:8, 52:13, 52:14, 54:19, 63:4, 63:9, 63:15, 63:22, 64:8, 65:19, 66:18, 67:3, 69:10, 69:17, 77:6, 77:8, 78:8
exhibit [2] - 11:14, 77:1
Exhibits [1] - 63:22
existence [1] - 38:19
existing [1] - 19:6
expect [1] - 70:9
expenses [1] - 30:17
expires [1] - 83:19
explain [3] - 9:12, 35:21, 41:23
extent [1] - 75:14
exterior [7] - 59:1, 59:3, 59:12, 59:16, 59:24, 60:14, 61:12
exteriors [1] - 61:22
extra [1] - 54:6

F

fact [2] - 58:19, 69:2
factors [1] - 70:12
family [8] - 31:5, 31:6, 31:8, 31:14, 31:20, 32:6, 40:13, 46:8
far [7] - 15:5, 16:12, 22:13, 31:12, 31:19, 32:3, 38:11
faster [1] - 30:9
fax [1] - 39:5
features [1] - 43:22
few [2] - 40:2, 40:5
files [1] - 38:18
fill [1] - 36:10
filled [2] - 67:5, 68:24
final [2] - 8:10, 13:21
financial [2] - 15:15, 17:7
fine [3] - 40:19, 47:19, 48:7
finish [2] - 30:9, 74:21
finished [2] - 41:4, 43:18
firm [2] - 30:16, 50:1
first [5] - 5:15, 11:13, 21:10, 48:17, 49:11
fit [4] - 81:2, 81:18, 82:1, 82:12
five [1] - 8:21
flawlessly [4] - 81:3, 81:19, 82:3, 82:13
floor [1] - 46:19
floors [1] - 43:19
follow [1] - 21:22
follows [5] - 5:16, 20:8, 24:16, 25:22, 71:4
foregoing [1] - 83:8
FOREGOING [1] - 83:21
Form [7] - 4:12, 4:15, 63:7, 63:12, 63:24,

64:5, 67:3
form [31] - 5:10, 24:1, 24:7, 31:10, 36:16, 37:14, 63:18, 65:19, 66:10, 66:12, 66:22, 66:24, 67:4, 67:7, 67:10, 67:13, 67:17, 67:19, 68:24, 69:2, 69:7, 69:10, 69:11, 69:20, 70:5, 71:1, 71:14, 72:1, 81:12, 81:21, 82:15
formal [1] - 73:8
forms [10] - 9:2, 14:3, 36:6, 36:11, 64:14, 65:18, 68:5, 68:9, 68:19, 69:5
forth [2] - 11:20, 59:11
forward [1] - 73:24
four [2] - 32:9, 47:5
foyer [1] - 47:4
frank [1] - 43:23
Friday [1] - 79:17
friend [3] - 46:17, 46:24, 47:9
front [1] - 36:4
full [2] - 5:19, 42:1
full-time [1] - 42:1
furnishings [2] - 46:19, 48:4

G

general [6] - 7:7, 7:10, 7:12, 44:4, 46:13, 46:21
generally [1] - 61:18
gentleman [2] - 45:12, 45:14
given [5] - 6:16, 37:2, 37:10, 44:5, 78:18
Gorham [5] - 33:8, 33:12, 34:24, 35:16, 38:23
govern [2] - 61:22, 71:21
grand [1] - 47:4
grandeur [2] - 41:1, 76:5
grant [1] - 57:21
granted [3] - 56:2, 57:20, 61:5
grasp [1] - 30:16
Great [13] - 7:2, 7:5, 9:9, 9:17, 10:7, 11:4, 11:5, 11:7, 11:9, 13:9, 14:11, 14:16, 14:21
great [1] - 41:17
greatly [1] - 40:22
Green [2] - 44:12, 44:15
Groton [1] - 7:17
ground [2] - 30:6, 30:8
grounds [1] - 41:12
group [1] - 57:21
GUARANTEE [1] - 1:9
guess [1] - 17:14
guide [1] - 9:18
Guido [18] - 2:11, 11:21, 13:11, 13:19, 14:1, 14:5, 14:7, 15:20, 37:4, 38:1, 45:21, 47:13, 48:22, 65:9, 65:22, 66:19, 68:7, 68:15
Gustave [13] - 32:24, 33:2, 33:7, 33:21, 36:23, 37:2, 37:17, 37:21, 38:3, 66:13, 66:14, 67:10, 67:12

H

hall [1] - 23:5
hand [1] - 83:15
handed [1] - 69:5
handle [1] - 56:4
handles [1] - 49:14
handling [1] - 68:10
happy [2] - 46:3, 49:22
Harry [30] - 4:8, 9:23, 10:10, 11:22, 30:13, 30:15, 30:18, 44:23, 45:8, 47:7, 49:10, 49:11, 49:15, 49:18, 50:5, 50:9, 50:13, 50:17, 50:19, 50:22, 50:24, 51:13, 52:6, 52:12, 53:16, 67:22, 68:3, 80:22, 81:16, 82:9
Hawes [4] - 75:6, 75:9, 75:17, 76:20
Hayes [3] - 57:6, 57:14, 57:18
Head [2] - 1:15, 2:3
head [1] - 67:21
headquarters [1] - 32:8
hear [3] - 48:17, 48:19, 49:20
hearings [1] - 55:19
hello [1] - 44:22
hereby [2] - 5:2, 83:8
hereunto [1] - 83:15
himself [1] - 46:17
hired [6] - 26:7, 26:22, 27:4, 29:15, 54:4, 56:16
hiring [1] - 55:24
historic [16] - 21:20, 59:15, 59:18, 59:22, 60:12, 60:20, 61:2, 61:23, 62:6, 63:1, 69:7, 70:7, 70:23, 71:12, 71:20, 71:21
Historic [19] - 57:11, 57:16, 57:22, 58:10, 58:21, 60:13, 60:23, 61:10, 61:13, 61:20, 62:14, 62:19, 62:22, 69:4, 69:23, 70:2, 70:21, 71:8, 71:16
historical [1] - 46:11
history [1] - 45:24
Hodosh [2] - 1:15, 2:3
home [2] - 30:11, 39:20
hoping [1] - 44:14
House [2] - 4:17, 63:14
house [13] - 32:9, 35:14, 41:2, 41:16, 43:11, 43:12, 43:22, 47:23, 48:2, 48:4, 55:14, 63:20, 64:6
Hurricane [1] - 49:2
husband [9] - 9:22, 40:9, 41:8, 42:13, 42:16, 42:17, 44:23, 45:5, 55:10
husband's [1] - 42:14

I

idea [5] - 41:10, 41:11, 41:17, 52:18, 52:23
identification [8] - 11:12, 26:17, 34:18, 51:15, 54:20, 63:10, 63:16, 77:7
identify [2] - 26:19, 63:22
ill [2] - 8:1, 10:16
illness [1] - 8:14
implements [1] - 30:22
importance [1] - 70:14
important [6] - 23:10, 30:23, 42:8, 70:1, 70:21, 71:10
IN [1] - 83:14
Inc [8] - 4:19, 7:17, 9:10, 11:9, 13:9, 14:17, 76:23, 77:3
included [3] - 48:3, 67:16, 72:5
includes [1] - 7:13
including [2] - 35:13, 69:1
income [1] - 30:16
incorrect [1] - 27:17
indicate [2] - 6:10, 80:17
individual [1] - 35:22
individuals [1] - 35:4
information [18] - 37:10, 46:11, 46:21, 49:16, 49:23, 52:21, 66:22, 67:1, 67:16, 67:19, 67:20, 68:2, 68:4, 72:4, 79:6, 79:18, 80:1, 81:14
informed [1] - 8:13
initial [1] - 57:10
initialed [1] - 11:20
inside [1] - 41:12
Insofar [4] - 28:7, 28:17, 61:9, 68:5
insofar [1] - 59:22
intend [1] - 6:10
intended [8] - 29:22, 40:24, 46:22, 55:9, 75:21, 75:24, 76:2, 76:13
intending [2] - 55:14, 76:4
intends [1] - 48:1
interest [6] - 15:9, 15:15, 15:21, 17:7, 56:1, 57:7
interested [7] - 9:23, 21:16, 35:1, 40:7, 40:9, 44:2, 53:1
interests [1] - 57:19
interrupt [1] - 73:22
investigation [1] - 80:7
involved [5] - 9:15, 10:1, 15:24, 16:14, 59:7
involvement [3] - 9:20, 55:22, 55:24
ISLAND [2] - 1:2, 83:3
Island [22] - 1:15, 1:16, 4:11, 4:12, 4:14, 4:15, 4:21, 5:24, 6:24, 18:19, 63:6, 63:8, 63:11, 63:13, 67:2, 67:4, 69:12, 69:18, 69:24, 70:8, 77:6, 83:7
issue [6] - 9:3, 14:4, 30:23, 55:21, 56:5, 56:10
item [2] - 34:15, 54:16
items [1] - 63:4
itself [6] - 19:15, 20:16, 20:19, 52:5, 65:20, 66:22

J

January [7] - 10:18, 38:21, 39:19, 39:21, 39:22, 42:23, 75:20
Jeff [4] - 9:22, 44:23, 45:8, 47:7
Jeffrey [2] - 9:22, 10:7
jet [1] - 44:13
Jill [1] - 10:4
Joan [5] - 13:7, 13:18, 14:1, 14:5, 15:7
job [2] - 41:20, 41:22
John [1] - 54:24
joins [1] - 47:14
Journal [1] - 49:13
Jr [1] - 57:6

K

Katrina [1] - 49:3
keep [2] - 18:8, 59:24
kinds [1] - 30:17
kitchen [4] - 44:3, 44:4, 44:21, 61:4
knowing [1] - 9:24
knowledge [2] - 27:4, 83:12
known [3] - 58:14, 58:17, 71:18
Kojoian [18] - 4:8, 9:23, 10:10, 11:22, 30:15, 44:23, 45:1, 49:8, 49:18, 50:13, 50:17, 51:13, 52:7, 52:13, 53:16, 80:22, 81:23, 82:9
Kojoian's [3] - 30:13, 50:24, 81:17

L

language [2] - 81:5, 81:6
large [1] - 43:18
larger [1] - 59:10
last [4] - 24:3, 24:14, 25:20, 71:2
late [2] - 16:8, 42:19
Late [2] - 39:17, 39:18
law [1] - 69:18
Law [1] - 1:15
lawsuit [3] - 8:24, 9:3, 80:14
lawyer [2] - 57:14, 76:16
lay [1] - 71:20
least [1] - 59:21

leave [1] - 48:13
legal [1] - 16:20
lend [3] - 19:15, 20:16, 20:19
Letter [2] - 4:6, 51:11
letter [20] - 39:6, 49:16, 51:1, 51:17, 52:8, 52:11, 52:14, 52:16, 52:18, 53:2, 53:6, 53:11, 53:15, 53:17, 53:18, 53:20, 80:21, 80:24, 81:4, 82:10
liberty [1] - 64:22
licensed [1] - 16:11
likely [1] - 77:12
Lila [6] - 18:15, 18:16, 18:18, 18:24, 22:2, 32:14
limited [4] - 31:4, 31:8, 31:14, 32:6
line [1] - 55:17
list [3] - 7:18, 22:1, 22:4
listened [1] - 48:20
listing [5] - 32:16, 33:12, 33:22, 37:21, 37:23
live [1] - 48:1
lived [1] - 71:18
Living [1] - 60:5
local [1] - 60:5
located [5] - 14:8, 18:18, 58:20, 62:14, 69:3
location [1] - 38:17
look [2] - 26:8, 36:1
looking [1] - 25:15
looks [1] - 55:4
luxury [1] - 41:3
lying [1] - 61:23

**M**

MA [1] - 2:7
magnificence [1] - 49:13
magnificent [1] - 47:10
mall [1] - 28:7
main [2] - 35:13, 43:12
manager [4] - 7:7, 7:10, 7:12, 30:19
managing [1] - 41:24
mansion [4] - 31:23, 63:18, 64:2, 64:3
mark [5] - 26:13, 51:9, 54:14, 63:4, 76:22
Mark [1] - 34:14
marked [15] - 11:10, 26:15, 34:17, 51:13, 51:16, 52:8, 54:18, 63:9, 63:15, 63:21, 67:3, 68:6, 69:10, 77:6, 78:8
marketing [5] - 17:16, 17:17, 33:24, 52:2, 79:9
marking [1] - 11:14
Markoff [2] - 26:22, 27:3
Massachusetts [2] - 1:13, 1:22
match [2] - 42:4, 42:14
materials [1] - 52:2
matters [2] - 16:20, 30:24
mean [8] - 8:12, 22:14, 22:19, 46:18, 50:15, 55:12, 59:3, 73:22
meaning [1] - 22:13
MEANS [1] - 83:22
means [1] - 22:22
meant [3] - 23:8, 28:22, 70:2
Medical [3] - 7:17, 14:20
meet [7] - 13:21, 13:24, 14:5, 17:23, 44:19, 73:6, 73:14
meeting [8] - 45:10, 48:20, 50:4, 64:12, 64:16, 73:2, 74:8, 74:10
Melanie [6] - 18:21, 19:3, 19:4, 21:1, 21:7, 21:22
mentioned [1] - 76:3
merging [1] - 26:8
met [8] - 14:7, 28:3, 43:4, 50:7, 50:17, 50:19, 73:23
might [4] - 21:16, 30:18, 53:1, 70:13
million [1] - 35:12
mind [1] - 41:10
minute [2] - 54:12, 65:1
minutes [1] - 44:16
Miramar [53] - 6:23, 8:23, 9:11, 9:16, 9:20, 10:2, 12:5, 14:8, 14:12, 17:1, 17:12, 19:14, 20:15, 20:18, 21:8, 22:15, 23:22, 25:2, 28:20, 28:23, 29:4, 29:7, 30:13, 30:19, 31:4, 32:5, 32:8, 32:16, 38:17, 39:18, 39:19, 40:5, 40:14, 40:22, 42:20, 43:6, 44:12, 47:3, 49:17, 52:1, 52:5, 52:21, 53:23, 54:5, 55:16, 56:7, 58:3, 58:9, 59:24, 75:11, 77:24, 78:16, 81:1
model [4] - 81:3, 81:19, 82:2, 82:13
modify [2] - 53:22, 54:9
Mohawk [1] - 5:24
Moore [9] - 26:12, 27:2, 27:3, 27:6, 27:7, 29:12, 29:21, 30:2, 54:4
Moore's [1] - 27:16
morning [2] - 43:1, 48:19
MORTGAGE [1] - 1:9
Most [1] - 67:19
most [2] - 68:4, 77:12
motions [1] - 5:10
move [1] - 72:7
MR [67] - 3:6, 5:18, 11:4, 11:13, 12:1, 13:1, 20:4, 23:24, 24:6, 24:10, 25:14, 25:19, 26:13, 27:9, 27:11, 31:9, 31:15, 31:17, 32:19, 32:21, 32:22, 34:6, 34:8, 34:10, 34:14, 34:19, 34:22, 42:6, 42:8, 51:9, 53:24, 54:1, 54:11, 54:14, 55:2, 63:3, 63:17, 64:24, 65:3, 65:11, 65:14, 65:16, 65:24, 66:23, 69:19, 70:4, 70:16, 70:24, 71:13, 71:24, 72:7, 73:15, 73:17, 73:20, 74:22, 76:15, 76:22, 78:19, 78:21, 78:22, 78:24, 81:11, 81:20, 82:4, 82:6, 82:14, 82:18
Murphy [1] - 54:24
music [6] - 45:16, 46:17, 48:19, 48:23, 48:24, 49:2
must [1] - 27:4

**N**

name [6] - 5:19, 9:24, 18:3, 18:10, 18:12, 45:16, 64:10, 78:5
names [1] - 9:21
NANCY [2] - 1:12, 5:13
Nancy [4] - 3:2, 5:21, 11:23, 83:9
Narragansett [1] - 18:19
nature [3] - 43:20, 48:9, 60:17
nearly [1] - 60:3
need [5] - 30:18, 36:16, 42:9, 46:4, 82:7
needed [1] - 67:16
negotiate [1] - 47:19
neighborhood [2] - 59:17, 59:23
never [7] - 19:10, 19:24, 22:3, 22:5, 23:13, 25:4, 58:5
new [1] - 38:17
New [1] - 61:2
Newport [36] - 4:9, 4:20, 6:23, 7:16, 14:9, 14:20, 18:19, 21:17, 28:13, 28:19, 30:4, 31:12, 32:4, 54:15, 54:17, 54:21, 57:11, 57:16, 57:22, 58:10, 58:21, 59:20, 60:4, 60:9, 60:10, 61:9, 62:14, 62:19, 62:22, 69:4, 69:23, 70:2, 70:20, 71:8, 71:16, 77:5
Newport's [1] - 31:19
News [2] - 60:9, 60:10
newspaper [1] - 60:6
next [5] - 11:20, 34:15, 54:16, 55:15, 77:1
NO [2] - 1:3, 4:2
nondisclosures [1] - 65:12
none [1] - 79:14
None [2] - 38:10, 79:15
NOT [1] - 83:21
notarization [1] - 5:6
Notary [2] - 1:14, 83:6
NOTE [1] - 83:21
notes [3] - 18:6, 18:8, 73:6
nothing [2] - 69:15, 69:21
notice [1] - 11:14
Notice [2] - 4:3, 11:10
notion [1] - 81:9
November [8] - 1:16, 55:3, 55:4, 72:10, 78:22, 83:11, 83:16, 83:20
number [7] - 35:9, 35:10, 35:12, 47:17, 47:20, 48:5, 48:10
Number [2] - 63:19, 64:5
Numbers [1] - 76:24
numbers [1] - 30:17
Nursing [12] - 7:2, 7:5, 9:10, 9:18, 10:8, 10:22, 11:5, 11:9, 13:9, 14:12, 14:16, 14:21
nursing [1] - 7:10

**O**

o'clock [1] - 40:16
object [2] - 23:24, 24:6
Object [10] - 31:9, 31:15, 66:23, 69:19, 70:4, 70:24, 71:24, 81:11, 81:20, 82:14
objecting [2] - 31:18, 31:21
objections [1] - 5:9
obtain [2] - 26:23, 29:13
obtained [1] - 27:23
occasions [2] - 6:4, 39:14
October [4] - 39:18, 42:19, 43:3, 50:23
OF [6] - 1:2, 1:12, 83:3, 83:21, 83:22, 83:23
offer [4] - 41:7, 41:18, 42:2, 42:13
offered [1] - 41:20
offering [1] - 41:19
offers [4] - 39:8, 39:9, 79:8, 79:11
office [4] - 27:3, 27:16, 45:9, 56:17
officers [1] - 10:13
Offices [1] - 1:15
offices [1] - 38:16
One [1] - 2:7
one [18] - 13:15, 21:9, 22:15, 30:6, 30:8, 34:13, 36:18, 38:1, 47:20, 53:3, 58:24, 61:6, 61:19, 65:19, 68:15, 74:12, 75:9, 75:24
ones [2] - 36:13, 78:8
opened [2] - 29:3, 29:7
operating [4] - 15:22,

15:23, 16:1, 68:10
**operation** [1] - 7:8
**opinions** [1] - 25:5
**original** [5] - 41:1, 41:13, 45:11, 46:20, 76:4
**originate** [1] - 65:20
**Otherwise** [1] - 6:14
**outcome** [2] - 15:15, 17:8
**outside** [3] - 41:12, 47:1, 69:24
**overnight** [1] - 52:22
**overpaid** [1] - 40:22
**oversee** [2] - 7:7, 12:5
**overseeing** [4] - 9:16, 10:2, 14:12, 56:7
**overseer** [2] - 28:20, 77:23
**oversees** [1] - 9:13
**own** [3] - 44:13, 48:6, 62:24
**owned** [3] - 35:2, 38:24, 62:21
**owner** [5] - 7:9, 40:18, 48:1, 62:3, 70:3
**owners** [1] - 60:20
**ownership** [1] - 15:9
**owns** [5] - 7:9, 7:13, 49:15, 55:8, 62:18

**P**

**p.m** [1] - 82:22
**PAGE** [2] - 3:4, 4:2
**paid** [2] - 14:16, 14:19
**Panteleakis** [26] - 7:13, 7:21, 8:1, 8:5, 8:16, 10:16, 12:11, 12:17, 13:5, 14:14, 15:1, 16:19, 32:7, 56:4, 56:9, 56:20, 57:1, 57:5, 58:2, 58:16, 62:17, 62:24, 72:18, 74:16, 78:3
**Panteleakis'** [7] - 7:19, 13:13, 15:10, 16:18, 64:10, 68:16, 78:5
**paper** [5] - 35:23, 37:16, 47:17, 48:6, 73:13
**papers** [1] - 77:21
**paperwork** [1] - 28:15
**parcel** [1] - 55:15
**parcels** [9] - 26:9, 29:17, 32:1, 32:2, 35:1, 35:17, 38:24, 62:11, 79:19
**Park** [1] - 7:18
**part** [3] - 47:24, 55:9, 81:10
**Particularly** [1] - 28:11
**parties** [1] - 5:4
**past** [1] - 77:11
**Pat** [3] - 57:6, 57:14, 57:18
**pays** [1] - 7:2
**people** [8] - 9:17, 14:23, 21:10, 37:17, 40:21, 44:6, 48:16, 74:12
**percent** [3] - 17:4, 17:5, 59:19
**Perhaps** [2] - 29:14, 70:15
**period** [2] - 18:7, 47:20
**periodically** [1] - 73:7
**permit** [1] - 29:3
**permitted** [6] - 23:12, 23:21, 25:1, 25:6, 30:2, 31:13
**person** [7] - 18:8, 27:1, 35:24, 45:20, 49:11, 78:2
**personal** [1] - 29:11
**personally** [2] - 61:7, 63:1
**persons** [1] - 11:18
**pertain** [1] - 58:23
**phone** [1] - 42:23
**picture** [3] - 51:23, 51:24, 52:20
**pictures** [1] - 52:4
**piece** [7] - 47:17, 48:5, 58:20, 69:22, 70:20, 71:7, 71:19
**place** [3] - 8:14, 43:8, 72:20
**Place** [2] - 1:16, 2:3
**placed** [2] - 35:12, 36:4
**places** [1] - 29:9
**Plaintiff** [2] - 1:6, 2:4
**planner** [2] - 18:11, 23:3
**play** [2] - 48:15, 56:11
**player** [1] - 48:15
**Plaza** [1] - 2:7
**PLEASE** [1] - 83:21
**pocket** [1] - 48:12
**point** [8] - 28:9, 47:22, 50:1, 52:7, 54:1, 56:7, 58:1, 80:7
**portion** [1] - 80:24
**Portsmouth** [2] - 5:24, 60:5
**position** [1] - 42:1
**possession** [1] - 81:15
**possibility** [1] - 54:5
**possible** [1] - 40:12
**Possibly** [1] - 77:12
**possibly** [2] - 35:18, 43:17
**postcard** [1] - 52:20
**potential** [2] - 16:20, 19:1
**power** [10] - 8:15, 8:18, 12:10, 12:13, 12:20, 13:15, 13:17, 23:18, 24:20, 78:2
**precisely** [1] - 41:23
**Prepared** [1] - 73:9
**prepared** [6] - 36:7, 37:21, 38:3, 66:18, 69:5, 73:8
**Present** [1] - 2:11
**present** [3] - 45:22, 64:16, 74:12
**preserve** [1] - 59:15
**president** [10] - 7:21, 7:23, 8:3, 9:8, 12:14, 12:16, 23:17, 23:19, 24:18, 24:21
**preventing** [1] - 57:19
**price** [3] - 17:5, 19:1, 36:2
**privilege** [1] - 66:4
**privileged** [2] - 66:2, 66:8
**problem** [1] - 30:12
**Procedure** [1] - 1:13
**process** [3] - 55:23, 57:9, 72:11
**produced** [1] - 33:16
**producer** [1] - 45:16
**Professional** [2] - 1:14, 83:6
**properties** [3] - 60:1, 60:11, 62:18
**property** [115] - 12:6, 12:8, 14:8, 14:13, 16:5, 17:1, 17:12, 17:16, 17:22, 19:2, 19:6, 19:8, 19:12, 20:11, 20:19, 20:24, 21:23, 22:1, 22:9, 22:16, 23:7, 23:9, 23:12, 23:22, 25:2, 25:6, 25:9, 26:2, 26:9, 28:24, 29:4, 29:8, 29:16, 29:18, 29:22, 30:3, 31:2, 31:13, 32:1, 32:17, 33:12, 33:22, 34:1, 35:1, 35:8, 35:17, 36:1, 36:3, 36:5, 36:24, 37:11, 37:20, 37:22, 38:4, 38:24, 39:8, 40:24, 43:10, 44:2, 44:9, 44:20, 45:24, 46:23, 47:2, 48:3, 50:4, 50:20, 52:3, 53:23, 55:10, 55:16, 55:17, 58:3, 58:9, 58:20, 59:23, 60:14, 60:20, 60:22, 62:2, 62:3, 62:6, 62:12, 62:21, 62:24, 68:9, 69:3, 69:22, 70:3, 70:7, 70:20, 70:22, 71:7, 71:11, 71:20, 71:22, 75:22, 76:1, 76:14, 78:8, 78:17, 78:18, 79:8, 79:11, 79:19, 80:2, 80:8, 80:13, 80:18, 81:1, 81:2, 81:9, 81:17, 82:1, 82:12
**Property** [1] - 37:23
**prospective** [3] - 36:7, 78:16, 79:3
**provide** [1] - 36:23
**provided** [5] - 36:12, 37:14, 66:11, 66:13, 67:18
**Providence** [2] - 1:16, 2:4
**Public** [2] - 1:14, 83:6
**purchase** [14] - 8:22, 13:24, 15:12, 17:5, 62:13, 66:15, 70:7, 72:9, 73:3, 73:12, 74:3, 75:2, 79:21, 80:3
**purchasers** [3] - 36:7, 78:16, 79:3
**purpose** [2] - 21:15, 31:7
**purposes** [1] - 20:1
**pursuant** [2] - 1:13, 11:15
**put** [6] - 37:16, 48:12, 59:5, 61:3, 66:5, 68:1

**Q**

**qualified** [2] - 39:2, 39:4
**qualifying** [2] - 35:23, 39:5
**QUESTION** [4] - 20:9, 24:17, 25:23, 71:5
**questions** [6] - 6:7, 6:14, 6:19, 37:15, 79:4, 82:19
**quietly** [1] - 36:3
**quite** [1] - 43:23

**R**

**R-60** [10] - 22:12, 22:13, 22:14, 22:18, 22:19, 23:2, 23:4, 23:8, 28:22
**Randal** [4] - 55:8, 56:22, 57:2, 57:17
**Randal's** [1] - 55:15
**rather** [1] - 6:11
**read** [12] - 5:5, 20:4, 20:7, 24:1, 24:3, 24:14, 25:20, 60:6, 60:10, 71:2, 81:5, 81:6
**Read** [1] - 71:1
**reading** [1] - 60:17
**real** [26] - 9:2, 14:3, 15:23, 16:1, 16:11, 16:14, 18:1, 18:13, 18:14, 22:8, 32:15, 36:6, 36:11, 50:1, 63:17, 64:13, 65:18, 66:10, 66:12, 67:13, 67:17, 68:5, 68:8, 68:12, 68:19, 69:2
**Real** [14] - 4:11, 4:14, 4:19, 18:15, 18:18, 22:2, 32:14, 33:2, 63:6, 63:11, 63:24, 64:5, 67:2, 77:3
**really** [3] - 23:13, 32:7, 60:18
**Realtor** [1] - 36:12
**Realtors** [6] - 4:13, 4:16, 63:9, 63:14, 67:5, 69:12
**reason** [1] - 31:18
**recalled** [1] - 38:22
**receive** [3] - 29:20, 30:1, 79:12
**received** [7] - 28:16, 56:15, 56:17, 79:7, 79:10, 79:14, 79:16
**recent** [2] - 60:24, 61:8
**recently** [2] - 38:14, 77:9
**Recess** [1] - 54:13
**record** [8] - 5:20, 25:15, 26:18, 27:10, 27:12, 34:20, 73:16, 73:21
**recorded** [2] - 25:9, 26:1
**recording** [1] - 48:17
**records** [3] - 18:4, 18:5, 38:15

reduce [4] - 26:9, 29:18, 54:6, 54:8
reducing [2] - 27:8, 29:15
refer [1] - 38:3
referred [2] - 17:24, 18:13
referring [4] - 17:18, 27:19, 51:18, 54:3
refinancing [6] - 27:15, 27:24, 28:16, 77:14, 77:22, 78:5
reflect [1] - 25:15
regard [1] - 29:15
regarding [9] - 22:14, 26:6, 27:8, 28:15, 30:23, 49:17, 52:21, 56:10, 57:7
Registered [2] - 1:14, 83:5
regulate [1] - 61:11
regulating [1] - 59:23
regulations [5] - 22:21, 58:22, 60:22, 61:17, 61:22
relate [1] - 70:13
related [2] - 15:1, 15:4
relationship [1] - 46:10
relevant [1] - 72:5
relocate [1] - 38:20
relocating [1] - 38:16
remain [1] - 59:13
remained [1] - 8:3
remember [7] - 35:18, 37:18, 41:10, 43:17, 45:15, 74:9, 75:10
removed [1] - 7:23
renovations [1] - 61:12
rep [1] - 17:24
repeat [3] - 24:12, 56:23, 82:7
report [3] - 14:22, 14:23, 76:24
REPORTER [1] - 83:23
Reporter [2] - 1:14, 83:6
reporter [5] - 20:8, 24:4, 24:15, 25:21, 71:3
REPORTING [1] - 1:21
reports [1] - 12:8
represent [4] - 56:1, 57:6, 57:15, 57:19
representation [2] - 81:24, 82:10
representative [2] - 18:2, 40:4
representatives [1] - 76:19
represents [1] - 16:19
REPRODUCTION [1] - 83:22
reproductions [1] - 76:5
request [2] - 25:16, 25:17
requested [2] - 24:5, 67:8
requesting [2] - 55:11, 55:12
requests [1] - 33:18
require [2] - 30:18, 64:18
research [1] - 70:11
reserved [1] - 5:11
residences [1] - 29:11
residential [3] - 28:23, 29:1, 29:2
respect [8] - 8:8, 8:23, 15:12, 29:21, 30:2, 36:24, 78:4, 78:18
respective [1] - 5:4
respond [1] - 30:10
response [2] - 6:16, 33:17
responses [1] - 6:9
restate [1] - 31:11
Review [4] - 4:10, 54:15, 54:18, 54:22
review [1] - 70:11
reviewed [1] - 72:3
RHODE [2] - 1:2, 83:3
Rhode [22] - 1:15, 1:16, 4:11, 4:12, 4:14, 4:15, 4:21, 5:24, 6:24, 18:19, 63:6, 63:7, 63:11, 63:12, 67:2, 67:4, 69:11, 69:18, 69:24, 70:8, 77:5, 83:7
RI [1] - 2:4
role [2] - 7:19, 30:13
Ronald [1] - 26:22
room [2] - 61:5, 74:11
rooms [3] - 45:24, 46:8, 51:24
RPR [1] - 83:19
rule [2] - 30:6, 30:8
Rule [1] - 11:16
rules [3] - 58:23, 61:16, 61:21
Rules [1] - 1:13
runs [1] - 9:11

## S

salary [3] - 42:2, 42:7, 42:14
sale [25] - 8:22, 13:23, 15:13, 15:16, 15:21, 17:1, 17:8, 17:13, 22:1, 32:17, 33:12, 35:16, 47:24, 62:13, 66:15, 68:11, 68:13, 72:9, 73:3, 73:11, 73:24, 74:3, 75:2, 79:21, 80:3
Sales [5] - 4:11, 4:14, 63:7, 63:12, 63:24
sales [3] - 16:21, 19:1, 68:8
Salvadore [30] - 2:11, 11:22, 13:12, 13:19, 14:1, 14:5, 14:7, 15:4, 15:20, 16:4, 16:11, 16:17, 16:19, 17:2, 17:9, 37:4, 38:8, 39:6, 47:6, 48:11, 64:17, 65:10, 65:23, 66:11, 66:13, 66:19, 67:9, 68:7, 68:15, 75:18
SAME [1] - 83:22
sat [2] - 6:2, 47:8
saw [3] - 46:3, 51:7, 52:24
Schedule [1] - 11:21
scheduled [1] - 50:4
seal [1] - 83:15
searched [1] - 38:13
seated [1] - 6:6
see [12] - 25:13, 28:4, 38:13, 43:10, 43:11, 44:1, 50:3, 50:19, 50:24, 51:4, 51:6, 53:11
seeing [2] - 43:9, 44:3
seek [1] - 25:5
seldom [1] - 74:12
sell [8] - 23:7, 23:23, 25:3, 34:1, 35:8, 36:2, 55:9, 73:1
selling [1] - 17:22
send [1] - 53:19
sends [1] - 16:23
sent [13] - 49:16, 49:23, 51:1, 52:11, 52:16, 52:18, 52:19, 52:22, 53:2, 53:12, 53:13, 53:14, 53:20
separate [2] - 22:17, 32:12
September [4] - 39:17, 45:10, 50:5, 50:21
serve [1] - 29:10
service [1] - 67:24
set [3] - 11:20, 39:7, 83:15
seven [2] - 8:1, 10:17
Seven [1] - 10:18
several [1] - 7:14
sheets [1] - 37:21
shortly [1] - 47:15
show [5] - 25:17, 26:18, 51:16, 54:21, 63:21
Show [1] - 48:18
showed [1] - 48:11
Sid [6] - 33:8, 33:11, 34:23, 35:16, 35:21, 38:23
sign [8] - 5:5, 8:24, 9:3, 12:17, 34:3, 50:2, 64:8, 73:10
signature [2] - 5:7, 69:6
signed [14] - 13:24, 14:4, 16:7, 33:15, 36:21, 37:24, 64:10, 64:13, 72:10, 73:24, 74:6, 74:15, 75:2, 78:4
significance [1] - 46:12
significant [1] - 46:1
signing [2] - 72:21, 72:23
signs [1] - 36:4
simple [2] - 37:12, 37:13
single [6] - 31:5, 31:6, 31:8, 31:14, 31:20, 32:6
single-family [5] - 31:5, 31:6, 31:8, 31:14, 32:6
sit [2] - 37:15, 47:6
six [1] - 17:4
Six [2] - 17:5, 63:17
skill [1] - 83:13
slang [1] - 6:11
smiled [1] - 48:12
sold [2] - 17:2, 58:4
sole [2] - 7:21, 74:16
someone [2] - 21:16, 79:4
sometime [3] - 14:17, 16:8, 50:5
sooner [1] - 30:11
sorry [1] - 18:3
sort [1] - 36:4
Sotheby's [1] - 33:4
spa [2] - 41:3, 41:15
specific [1] - 31:22
specifically [1] - 67:22
Spinella [2] - 1:15, 2:3
spoken [1] - 21:10
stages [1] - 57:10
stands [3] - 11:21, 11:22, 11:23
start [2] - 39:21, 47:11
started [5] - 17:15, 17:17, 17:23, 58:15
state [5] - 5:19, 70:6, 70:9, 70:19, 71:6
State [2] - 1:14, 83:7
STATE [1] - 83:3
statement [1] - 81:17
STATES [1] - 1:1
stating [2] - 35:23, 73:13
stay [2] - 40:14, 40:18
stenographer [1] - 6:6
step [1] - 47:1
stipulate [1] - 55:3
stipulated [2] - 5:2, 5:8
stood [1] - 58:24
stores [1] - 20:22
Street [1] - 49:13
strictly [2] - 43:9, 44:8
strike [3] - 5:10, 29:23, 72:7
stroke [2] - 10:19, 14:18
Subagent [2] - 4:5, 34:16
subagent [1] - 34:20
subject [2] - 8:23, 80:13
subjects [1] - 11:20
submitted [1] - 37:2
sudden [1] - 55:21
suggest [3] - 80:1, 80:8, 80:12
suggested [1] - 53:8
Suite [2] - 1:16, 2:3
support [2] - 81:9, 81:16
supposed [1] - 33:24
supposedly [1] - 49:14
SUSAN [1] - 83:19
Susan [2] - 1:13, 83:5
sworn [2] - 5:15, 83:10

## T

table [4] - 6:7, 47:4, 47:5, 48:21
taxes [7] - 26:10, 27:8, 29:16, 29:18, 37:11, 54:6, 54:8
telephone [2] - 42:22, 50:14
terms [2] - 42:13,

60:21
testify [1] - 11:18
THE [6] - 24:8, 66:9, 83:21, 83:22, 83:22, 83:23
thereafter [1] - 47:15
third [1] - 46:18
thirty [1] - 44:15
THIS [1] - 83:21
THOMAS [1] - 2:2
three [11] - 32:1, 32:2, 35:1, 35:17, 38:23, 43:19, 50:16, 62:11, 64:18, 74:11, 79:19
Three [1] - 39:15
throughout [1] - 73:7
Tim [18] - 4:7, 26:12, 27:1, 27:3, 27:6, 27:7, 27:16, 29:12, 29:21, 30:1, 39:12, 43:3, 49:19, 51:12, 54:4, 62:5, 80:22, 82:11
TIMOTHY [1] - 1:8
Timothy [1] - 76:19
Titanic [1] - 46:10
TITLE [1] - 1:9
titles [1] - 30:21
TO [1] - 83:21
Today [1] - 48:18
together [3] - 26:9, 45:8, 68:24
Tom [1] - 12:24
tomorrow [2] - 48:18, 65:13
took [2] - 28:14, 43:8
top [1] - 67:20
tour [3] - 43:15, 44:5, 45:21
TRANSCRIPT [1] - 83:21
transcript [2] - 5:5, 83:9
trial [1] - 5:11
true [1] - 83:11
trust [3] - 64:21, 65:2, 65:4
trustee [5] - 13:5, 13:10, 13:11, 13:13, 68:18
trustees [14] - 14:24, 17:19, 64:12, 64:19, 68:16, 72:14, 72:15, 72:17, 72:23, 73:2, 73:12, 74:4, 80:11, 80:17
truth [1] - 23:14
try [1] - 60:13
trying [3] - 23:7, 59:15, 59:24
Turks [2] - 1:15, 2:3
turning [1] - 41:2
twenty [1] - 43:1
Twice [1] - 6:5
two [5] - 26:8, 29:17, 50:16, 63:4, 64:18
types [2] - 34:24, 35:4

U

ultimately [1] - 61:6
UNDER [1] - 83:22
under [3] - 19:6, 30:3, 49:24
understood [2] - 22:13, 22:14
undertaken [1] - 80:6
unimproved [1] - 63:19
unique [1] - 46:20
UNITED [1] - 1:1
units [1] - 32:10
UNLESS [1] - 83:22
unrelated [1] - 29:19
unrestored [1] - 44:3
up [7] - 17:12, 21:22, 29:3, 29:7, 30:24, 39:7, 53:12
upgraded [1] - 67:23
uses [4] - 23:12, 23:21, 25:1, 30:3

V

variance [12] - 55:11, 55:13, 55:16, 55:21, 56:2, 56:21, 57:1, 57:8, 57:10, 57:17, 57:20, 57:21
various [6] - 7:8, 11:17, 14:15, 32:8, 45:23, 46:8
vice [4] - 9:8, 12:16, 23:17, 24:17
view [2] - 29:21, 40:4
vision [1] - 41:15
visions [1] - 41:2
visit [6] - 39:17, 39:19, 42:19, 45:3, 45:7, 45:11
VOKE [28] - 2:6, 3:6, 5:18, 11:13, 13:1, 20:4, 25:19, 26:13, 27:11, 32:21, 34:8, 34:14, 34:22, 42:8, 51:9, 54:1, 54:11, 54:14, 63:3, 63:17, 65:14, 72:7, 73:17, 76:22, 78:21, 78:24, 82:6, 82:18
vote [3] - 64:18, 74:18, 74:24
voted [1] - 72:23
vs [1] - 1:7

W

W-A-D-D-E-L-L [1] - 5:22
WADDELL [2] - 1:12, 5:13
Waddell [9] - 3:2, 5:21, 9:22, 10:7, 11:23, 12:3, 12:5, 83:10
wait [4] - 30:9, 47:14, 74:21, 74:23
Wait [1] - 64:24
waived [2] - 5:7, 66:3
Wall [1] - 49:13
Wednesday [2] - 1:16, 83:11
week [2] - 33:17, 79:13
West [1] - 33:8
WHEREOF [1] - 83:14
White [12] - 32:24, 33:2, 33:7, 33:21, 36:24, 37:2, 37:21, 38:3, 66:13, 66:14, 67:10, 67:12
White's [1] - 37:17
whole [3] - 46:10, 55:22, 56:21
Widener [1] - 46:8
wife [3] - 43:4, 50:23, 55:10
Williams [5] - 13:7, 13:18, 14:1, 14:5, 15:7
willing [1] - 42:14
Wilson [2] - 1:14, 83:5
WILSON [1] - 83:19
WITNESS [3] - 24:8, 66:9, 83:14
Witness [1] - 13:2
witness [2] - 1:12, 5:14
woman [1] - 18:6
word [1] - 66:24
worded [1] - 71:15
words [1] - 41:11
World [3] - 49:5, 50:11, 81:10
write [1] - 47:17
writes [1] - 10:3
writing [1] - 29:20
written [5] - 16:3, 37:14, 39:9, 65:4, 74:2
wrote [2] - 48:5, 48:10
www.cjreporting.com [1] - 1:23

Y

Yacht [1] - 61:2
year [3] - 38:1, 55:1, 73:7
years [12] - 8:2, 8:21, 10:17, 10:18, 14:15, 23:15, 44:7, 60:16, 61:1, 61:8, 78:10, 78:13
Yellowstone [3] - 49:4, 50:11, 81:10
York [1] - 61:2
yourself [1] - 10:14

Z

Zipp [1] - 5:21
ZIPP [1] - 5:21
zoning [28] - 19:6, 22:9, 22:10, 22:12, 22:20, 22:21, 23:2, 23:3, 23:8, 25:5, 25:8, 25:11, 25:24, 26:6, 26:21, 26:23, 27:22, 28:11, 28:22, 28:23, 29:2, 29:13, 29:14, 30:6, 31:2, 31:3, 53:22, 54:9
Zoning [6] - 4:4, 4:9, 26:15, 54:15, 54:17, 54:21