# EXHIBIT T

UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

CA NO 06-90S

AMERICAN CAPITAL CORPORATION,

Plaintiff

vs.

TIMOTHY L. BLIXSETH; EDRA BLIXSETH; and MORTGAGE GUARANTEE & TITLE CO.,

Defendants

30(b)(6) DEPOSITION OF GUIDO SALVADORE, a witness called on behalf of the Defendants, pursuant to Rhode Island Rules of Civil Procedure, before Susan E. Wilson, Registered Professional Reporter and Notary Public in and for Rhode Island, at the Law Offices of Hodosh, Spinella & Angelone, PC, One Turks Head Place, Providence, Rhode Island, on Friday, March 30, 2007, commencing at 11:46 a.m.

C.J. REPORTING
A5 Colonial Drive, No. 7
Andover, Massachusetts 01810
978.409.9090
www.cjreporting.com



APPEARANCES:

THOMAS ANGELONE, ESQUIRE
Hodosh, Spinella & Angelone
1 Turks Head Place, Suite 1050
Providence, RI 02901-1516
On Behalf of the Plaintiff.

BRIAN VOKE, ESQUIRE
Campbell, Campbell, Edwards & Conroy
One Constitution Plaza
Boston, MA 02129
617-241-3000/FAX 617-241-5115
On Behalf of the Defendants.





I N D E X

DEPONENT Guido Salvadore


| | PAGE |
|---|---|
| DIRECT EXAMINATION BY MR. VOKE | 5 |






E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | 30(b)(6) Notice of Deposition of the Person Most Knowledgeable Regarding the Subject Matters Described in the Attached Schedule A | 6 |
| 2 | Letter Dated April 6, 2006 | 21 |
| 3 | Outline of Purchase Agreement for Miramar and Adjacent Two Lots Including Carriage House | 21 |
| 4 | Group Of Documents | 21 |
| 5 | Letter Dated March 1, 2007 | 38 |
| 6 | Bills | 49 |
| 7 | Checks | 49 |
| 8 | Real Estate Auction Bidder's Information Packet, Miramar Estate, Newport, Rhode Island | 49 |

STIPULATIONS

It is hereby stipulated and agreed by and between counsel for the respective parties that the deponent will read and sign the deposition transcript and that the notarization of the deponent's signature is waived.

It is further stipulated and agreed that all objections, except as to form, and motions to strike are reserved until the time of trial.

GUIDO SALVADORE,

a witness called on behalf of the Defendants, having first been duly sworn, deposes and says as follows:

DIRECT EXAMINATION

BY MR. VOKE:

Q. Can you state your full name for the record, please.
A. **Guido R. Salvadore, S-A-L-V-A-D-O-R-E.**
Q. Are you appearing here today pursuant to a Rule 30(b)(6) deposition notice?
A. Yes.





Q. Served upon American Capital Corporation?
A. Yes.

MR. VOKE: Go ahead and mark that.

(30(b)(6) Notice of Deposition of the Person Most Knowledgeable Regarding the Subject Matters Described in the Attached Schedule A marked as Exhibit No. 1 for identification.)

Q. Mr. Salvadore, you had your deposition taken in this case previously?
A. Yes.
Q. So you understand the rules?
A. Yes.
Q. Can you just identify what has been marked as Exhibit 1.
A. **It's a 30(b)(6) Notice of Deposition of the Person Most Knowledgeable Regarding the Subject Matters Described in the Attached Schedule A.**
Q. Are you the person who was produced in response to that Schedule A and all the





matters set forth there?
A. Yes.

MR. ANGELONE: Just for the record, all of the documents relative to damages and/or mitigation of damages, if I can use that term, have been previously produced, except for today which we did produce the package.

MR. VOKE: Thanks.

Q. Mr. Salvadore, what is your current role with American Capital Corporation?
A. **My current role?**
Q. Yes.
A. **I have always considered myself as the attorney for American Capital Corporation.**
Q. Do you serve as a trustee for Mr. Panteleakis in some capacity?
A. **I do now, but I wasn't the trustee at the time of the dealings with the Blixseths. The trustees, if you want the names, I'll give them to you.**
Q. Just explain the trustee relationship that you have with Mr. Panteleakis and tell us when that started for you.





A. **I don't know the exact date, but I replaced Karen DelPonte who was designated as the independent trustee, and she had asked me -- she had the power to appoint a successor, and she asked me if I would act as her successor because she had personal demands in her family. Her mother was very ill and her father, and she had a lot of demands on her. And she said if something happened to Mr. Panteleakis, if he should die, she said, I wouldn't be able to carry out my functions. I wouldn't be available. So I considered it and then I agreed to replace her, and she signed the necessary documents to do that.**
Q. When you say that you are a trustee, what are you a trustee of?
A. **I'm a trustee of the so-called Andrew Panteleakis Trust - 1997.**
Q. Is it Angel?
A. **Andrew.**
Q. Andrew?
A. **A-N-D-R-E-W, Panteleakis, P-A-N-T-E-L-E-A-K-I-S.**
Q. You said 1997?

A. **That's the title of it. The Andrew Panteleakis Trust - 1997.**
Q. Generally, what duties and responsibilities do you as a trustee have under that agreement as far as you understand, that is the trust agreement?
MR. ANGELONE: This is well beyond the 30(b)(6) scope of deposition. You know that. I mean, if you feel you want to answer that, you technically don't have to. He didn't ask for any of this in Schedule A.
Q. Let me ask it this way. Do the powers and duties under the trust give you authority to sell assets that are owned by Mr. Panteleakis?
A. **My recollection is that the powers and duties of the trustees, they have the power to manage his estate.**
Q. Were you involved as a trustee in the decision to sell the Miramar property when it was sold last year?
A. **You mean to the --**
Q. Mr. Ford.
A. **Mr. Ford, yes, I was the trustee at that**





**time.**
Q. So the trustees were involved in that sale in terms of giving their permission to sell the property to Mr. Ford under the terms and conditions under which he purchased Miramar?
A. **My recollection is yes.**
Q. So what is your understanding as to your duties and responsibilities under that trust agreement that you referred to, the Andrew Panteleakis Trust - 1997?
A. **To manage the -- we are the trustees of his estate. And whatever assets that are in that estate, we have the authority to manage.**
Q. Does it have to be a vote of the trustees?
A. **There's a provision in the document that says that you need the vote of the independent trustee and one of the other two trustees.**
Q. Who are the other two trustees? One is Nancy Waddell?
A. **Nancy Waddell and Joan Williams.**
Q. So back in 2006, January 2006, the trustees would have been Joan Williams, Karen DelPonte and Nancy Waddell?
A. **Yes.**





Q. You took over when?
A. **Subsequent to that date. I can get the date for you, but I don't have it at this time.**
Q. In terms of you need the vote of the independent trustee and one of the other two trustees, does it have to be in writing, the vote?
A. **You mean does the document say it has to be in writing?**
Q. Yes.
A. **I don't believe the document says that. I'm not sure, but it would be in writing. It should be in writing anyway.**
Q. Was it in writing in this case for the sale of Miramar?
MR. ANGELONE: To whom?
MR. VOKE: To Mr. Ford.
A. **Yes. There was a trustee certificate that was delivered.**
Q. What about with respect to -- American Capital Corporation owned Miramar property, correct?
A. **Yes.**
Q. So was the vote of the trustees to sell





Miramar to Mr. Ford, is that a vote to authorize the vote of Mr. Panteleakis' shares to vote to sell the property to Mr. Ford?
MR. ANGELONE: Object to the form.
A. **My understanding is that the trustees would be the stockholders. Whoever is the trustees of the trust would be the stockholders of American Capital because the stock of American Capital is in the trust.**
Q. So when were you appointed trustee approximately, this year?
A. **It would be --**
Q. Or in 2006?
A. **It would have been 2006.**
Q. Before you took over as trustee, the shares of stock in American Capital were in the names of Joan Williams, Nancy Waddell and Karen DelPonte --
MR. ANGELONE: Object to the form.
Q. -- as trustees for Mr. Panteleakis' estate?
A. **The way I can answer that is that the shares of American Capital Corporation were in the**

name of the Andrew Panteleakis Trust - 1997.
Q. So back in January 1 of 2006 before you took over, the shares of American Capital Corporation were held by the Andrew Panteleakis Trust?
A. Yes.
Q. With the right of the trustees to vote those shares?
A. Yes.
Q. Who is on the board of directors now of American Capital Corporation?
A. The board of directors would be Andrew Panteleakis. He is the sole director. If you look at the articles of -- not the articles. If you look at the bylaws, the original bylaws didn't provide for a board of directors. Under Rhode Island law, you don't have to have a board of directors, but he has been acting as the sole director.
Q. He has been acting as the sole director?
A. Yes. He was the sole director and he was the sole stockholder prior to the time that he transferred his stock of American Capital Corporation into his trust. Since that time,





nothing has changed. He would still be treated as the sole director.
Q. Was Mr. Panteleakis acting as the director of American Capital Corporation when the Miramar property was sold to Mr. Ford?
A. I guess you would say technically, yes. It wasn't needed. The corporation didn't need a board of directors. If you look at the bylaws, you are going to see that it's just the corporation that operates through its stockholders. That's not uncommon when you have a sole stockholder.
Q. Was Mr. Panteleakis, in fact, functioning as a director of the corporation when the property was sold to Mr. Ford?
A. What do you mean by "functioning"?
Q. Carrying out the duties and the responsibilities of a director of a corporation.
A. Mr. Panteleakis had a stroke, so the trustees were acting as the stockholders and they were performing their duties as stockholders under the trust.
Q. So you mean he was incapacitated because of





the stroke?
A. Well, I think you would say that. Although, he would not want anyone -- he would not admit that.
MR. VOKE: Off the record.
(Discussion off the record.)
Q. Is the vote of trustees of the Andrew Panteleakis Trust - 1997, is that included within the documents produced, the third request for production?
A. I believe so. There's a January 11.
MR. ANGELONE: No. This is for the Ford sale now.
THE WITNESS: Oh, Ford?
MR. VOKE: Yes.
THE WITNESS: Was it produced? I don't think it was produced here with you. Why should it be?
MR. VOKE: Because we asked for all the documents associated with the sale.
THE WITNESS: Not this sale. Not the Ford sale. We are interested in the Blixseth sale.





MR. ANGELONE: No. He asked for the Ford sale. This is the stuff we produced for the Ford sale.
THE WITNESS: Off the record. Do you mind?
MR. VOKE: Go ahead.
(Discussion off the record.)
Q. Mr. Salvadore, there is a trust certificate voting to approve the sale of the Miramar property to Mr. Ford?
A. Yes, there is.
Q. As best you can, can you describe what the contents generally say. In other words, is it a vote of the trustees or a vote of shares to approve the sale?
A. No. It's a trustee certificate affirming the -- let's see. My recollection is it would have a provision affirming the execution and delivery of the agreement, the execution and delivery of all of the documents called for under the agreement and approving the sale.
Q. Who prepared the agreement for sale with the trust set up by Mr. Ford to purchase the

Miramar properties?
A. **We dealt with -- let's see. The best way I can describe it, there were two transactions with Ford. There were two. We were dealing with Ford through a broker called Gustave White, Sid Gorham and Gustave White. It was his customer. We negotiated -- we were in the process of negotiating a sale with them. An agreement -- eventually there was an agreement prepared. He was represented by an attorney in New York, Eric Altman, A-L-T-M-A-N. We had asked for $25 million just for the mansion. The same approach we had taken with the Blixseths.**
My recollection is that he came back and offered 20 million. I countered with 22 million, and I proceeded to draft an agreement. I proceeded to draft an agreement and I sent it to Eric Altman but nothing happened. David Ford, I was told, was in Africa or Europe. He was away. And then he came back and they requested to have their team of engineers and people that he wanted to inspect the property first and that





team -- he signed a confidentiality agreement, my recollection is, and they were allowed -- they went through the building.
And after that, I received, and I have it here, on August -- on or about August 24, 2006, I received an outline of a purchase agreement for Miramar and the adjacent two lots, including the carriage house, and the purchase price was 15 million. Deposit upon signing contract 750,000. Payable at closing 14,250,000. Payable in cash 3,500,000.
Then they wanted us to hold a first mortgage of $10,500,000. The terms of the first mortgage -- at this stage, Brian, the terms of the first mortgage were ten years, seven percent interest only, payable annually, principal balance is $10,500,000 payable at end of year ten.
Then he goes on to say in this outline "The following changes in proposed draft contract: Paragraph Number: Paragraph Number 7, No inspection contingencies. Paragraph Number 11, Close





date to be September 28, 2006. Paragraph 14, Real estate taxes assessment date change to 12/31/05." Then he writes "A-2, Life estate in carriage house two units. Utilities and interior repairs to be paid by seller/holder of estate. The other terms of the draft 'Purchase Contract' as proposed are subject to final review of buyer's attorney." Let me just go a little bit back. His first offer of I think it was 20 million --
Q. Was that in writing?
A. **Well, there's a letter here addressed to me April 6, 2006. It comes from Gustave White. And it says, "He is proposing a down payment of $2 million with annual payments for nine years of $2 million, for a total purchase price of $20 million. Interest at five percent is to be paid annually on the outstanding balance."**
Then it goes on. "Rather than presenting you with a formal contract, which would have taken time for his lawyers to draft, he wanted me to make this proposal on an informal basis to see if we can arrive





at mutually agreeable terms of purchase. He is off to Africa this afternoon for ten days, so my ability to contact him is limited but I do have voice and E-mail possibilities.
"I believe he is very serious about buying and that this is certainly a valid offer with a buyer who wants to live in and improve the property versus a developer who will subdivide and condo the house. Therefore, I encourage you to consider the offer and structure a response."
Q. Does that have a Bates stamp number on it?
A. **No.**
MR. VOKE: I don't have that.
MR. ANGELONE: Neither do I.
A. **Neither does he. I dug this out in preparation for this. I mean, I wasn't aware, but I found this letter.**
Q. Can I see it?
A. **Sure. That was their first proposal, Brian. Then subsequent to that first proposal, I went back and made that -- I said 22 million as a counter. And in my counter I also was willing to give them financing. Not at five**

percent. I said seven percent with an amortization schedule. I think it was based on a 30-year amortization with a ten-year balloon, something like that. Anyway, they came back with this. That is the result -- what you are looking at there now is the result of an offer made after they had his inspection team inspect the building.

MR. VOKE: If we can just get copies of those.

(Recess taken.)

(Letter Dated April 6, 2006 marked as Exhibit No. 2 for identification.)

(Outline of Purchase Agreement for Miramar and the Adjacent Two Lots Including Carriage House marked as Exhibit No. 3 for identification.)

(Group of Documents marked as Exhibit No. 4 for identification.)

Q. Mr. Salvadore, with respect to the purchase





and sale agreement between American Capital Corporation and Mr. Ford, were you the attorney for American Capital Corporation working with Mr. Ford's lawyer, that is Mr. Altman?
A. Yes. I was the attorney, but Mr. Altman then told me that Mr. Ford felt that he didn't need a New York lawyer to handle this and so he stepped out of the picture and I believe Altman referred him to Adler, Pollock & Sheehan.
Q. In any event, whatever lawyer represented Mr. Ford, you were representing American Capital Corporation?
A. Yes, I was.
Q. Did you prepare paperwork for American Capital Corporation to be presented to Mr. Ford in the form of Rhode Island Real Estate Disclosure Forms?
A. Yes. There was an agreement with Mr. Ford and I believe you have it.
Q. Were there two real estate disclosure forms that were provided to Mr. Ford?
A. I think there were four or five. There were





five.
Q. Five?
A. Uh-huh.
Q. Why five?
A. Well, I was told out of an abundance of caution that when you deal with an apartment building that you should have a separate disclosure form for each unit.
Q. The carriage house that had four units in there, you provided four disclosures for that?
A. Yes.
Q. You did that on behalf of American Capital Corporation?
A. Yes. And also one for the mansion. I should say that with respect to that 15 million dollar proposal and offer, that we decided to reject it and then we dealt with Sheldon Good after that.
Q. I'll get back to that. I'm trying to get an understanding of your role in the sale. The real estate disclosure forms, the five separate real estate disclosure forms issued by American Capital to Mr. Ford had been





marked as part of Exhibit Number 1?

MR. ANGELONE: I have it as Exhibit Number 4.

Q. Excuse me. Exhibit Number 4.
A. I don't know what exhibit it is.
Q. Quickly take a look through the documents that have been produced and they have Bates stamps down the bottom of those and produced by Mr. Angelone's office. We have marked those as group Exhibit 4, and it's my understanding from your counsel that all of the real estate disclosure forms issued by American Capital to Mr. Ford will be contained within that group of documents. If you can just confirm that for us.

MR. ANGELONE: 0405.

A. Yes. Those are the five disclosure forms.
Q. They are all part of Exhibit Number 4?
A. Yes.
Q. And you prepared those?
A. Yes. I prepared them. My secretary typed them up.
Q. Where did you get those disclosure forms from?

A. **I called the Realtors Association and asked them to give me the most recent disclosure forms that they had. They asked me if I was a broker, and I said, I'm an attorney. And they said, We don't give them to attorneys anymore. You have to get it through a broker. So I called the broker friend of mine and asked him to get me disclosure forms and he did.**

Q. Did you review the Rhode Island Real Estate Disclosure Statute in preparation for filling out those forms?

A. **I thought I was pretty familiar with it by this time. I don't know if I specifically reviewed it, but I went by the disclosure form given to me.**

Q. When did you first review the Rhode Island Real Estate Disclosure Statute approximately?

A. **After the Blixseth lawsuit was brought.**

Q. Mr. Salvadore, with respect to the real estate disclosure forms provided to Mr. Ford, American Capital Corporation disclosed that the property was located in a historic district, correct?





A. **Yes.**

Q. That is that the three separate parcels of property were all located within a historic district was disclosed?

A. **Yes.**

Q. American Capital Corporation provided the statutory notice required by the Rhode Island Real Estate Disclosure Statute that "Property located in a historic district may be subject to construction, expansion or renovation limitations. Contact the local building inspection officials for details."

A. **That's included in the document.**

Q. Why did you include that in there?

A. **It was in the document that was given to me.**

Q. I understand it's in there. It's in all five disclosures?

A. **Yes.**

Q. That were prepared by you on behalf of American Capital and delivered to the Fords?

A. **Yes.**

Q. My question to you is why did you put that in there?

MR. ANGELONE: Objection to





the form of the question. That assumes he put it in.

A. **Isn't it part of the printed form?**

MR. ANGELONE: Please let me play lawyer and you be witness. Can you read the question back, please.

Q. Let me ask it over again. Why did you provide forms with that language in it for the five different disclosures provided by American Capital to Mr. Ford?

A. **I took the form that was the most recent form that I was advised that they were using, and I completed it in accordance with the form. It's part of the printed form.**

Q. So you only included it because it was in the form?

A. **No. I think I even added some language to it, didn't I, someplace.**

Q. I'm having a little trouble reading this copy. That would be, for example, if we take the disclosure starting with Bates Stamp Number 405, it says at the top "for the mansion and unimproved adjacent lot"?

A. **Yes.**





Q. If we turn to Bates Stamp Page 406 under Zoning there's some disclosure information there about the effect of property being in the historic district, right?

MR. ANGELONE: Object to the form.

A. **Yes. There is language there. It says, if the property -- yes.**

Q. Since there is an objection, I have to ask the question again. I don't believe there's anything wrong with it, but I'll ask it again.

With respect to Exhibit 4, Bates Stamped Pages 406, Paragraph 15, the language, "If the subject property is located in a historic district, that fact must be disclosed to the buyer together with the notifications. The property located in a historic district may be subject to construction, expansion or renovation limitations. Contact the local building inspection official for details."

So there's a reference in Paragraph 15, and the other location where

you added some information is on Bates Stamp Page 409. Under about halfway down the page it says, "Additional notices\disclosure information"?
A. Yes.
Q. It says, "The mansion and the unimproved lot are located within the Newport Historic District. As required by Chapter 5-20.8(2) (XXIII) of Title V of the Rhode Island General Laws of 1956 as amended, you are hereby notified that property located in a historic district may be subject to the construction, expansion and renovation limitations. Contact the local building inspection official for details."
The language on Page 409, Bates Stamp 409 of the real estate disclosure to Mr. Ford that starts on Bates Stamp Page 405 of Exhibit 4, why did you put that particular language in there?
A. 406 you mean?
Q. It starts on 405.
A. What does?
Q. The disclosure starts.





A. I thought the disclosure is over here (indicting). You read item 15.
Q. Let me back up. The disclosure form for the mansion and unimproved lot is Bates Stamped Page 405 through 406, correct?
A. Yes.
Q. That's all part of Exhibit Number 1?
A. Yes.
MR. ANGELONE: Exhibit Number 4.
Q. Exhibit Number 4. Directing your attention to Page 409 where you have the additional notice and disclosure information and you have in there the language that I quoted a moment ago which starts off with "The mansion and unimproved lot are located" --
A. Yes. You don't have to read it.
Q. -- "within the Newport Historic District," why did you include that language?
A. I included that language because the language you read under Item 15 said that I'm supposed to give notice.
Q. So it was your understanding --
A. So this was the notice.





Q. It was your understanding that it was required by the Rhode Island law to provide that notice?
A. I would assume it was because this form says that I'm supposed to give notice of that fact, so I made -- I tried to comply with that provision by putting it on Bates 409.
Q. Without going through the four other disclosures you provided, they all have the same language?
A. Yes.
Q. As the disclosure for the mansion?
A. Yes.
Q. After January 17, 2006, when the Blixseths did not close on the three properties at Miramar, what efforts were made by American Capital Corporation during that time period up until June 1 to sell the property?
A. Well, Gustave White and Sid Gorham, they learned that the property, the sale did not go through and so did Melanie Delman of Lila Delman Real Estate. They had both been sort of involved in trying to market the property prior to the Blixseths being involved. They





called and the property -- I can't say definitely, but several times there were calls made and arrangements were made to show the property to some of their customers. But the only one that really showed an interest in buying it was David Ford, and that was the only one that it reached the point where we -- I drafted an agreement and sent it as I testified before.
Q. You said was it Marion Delman?
A. Melanie.
Q. Melanie. Excuse me. Melanie Delman.
A. Gustave White is the representative for Sotheby's, and Lila Delman, they are the representative for Christie's in this area.
Q. Who at American Capital Corporation was dealing with Melanie Delman and Lila Delman?
A. She would call me or Nancy Waddell.
Q. When did American Capital Corporation tell them to put the three parcels of property at Miramar back on the market?
MR. ANGELONE: Object to the form.
A. We never told them to put it back on the

market. There were no listing agreements with them. They knew the property was being -- was available for sale and they had customers that they would call us.

Q. So did American Capital Corporation ever have a listing agreement with any Realtor from January of 2006 up until the time the property was sold last November to market and sell the property?

A. Yes.

Q. Who was the listing with?

A. Sheldon Good.

Q. Is that listing agreement here? Was that provided?

A. I don't know if it's in that big package that you have. I have no idea.

MR. ANGELONE: It's right here.

Q. We have the agreement for sale by sealed bid.

MR. ANGELONE: Who do you think it's between? It's between Sheldon and American Capital.

Q. Mr. Salvadore, let me ask you this. Other than the document that's been marked as part





of Exhibit Number 4, which is the sealed, it says, "Agreement for sale by owner by sealed bids." It was signed July 21, 2006. Was there ever a listing agreement that American Capital Corporation had with any Realtor to list the property for sale?

A. During what period of time?

Q. Prior to the signing of this document, "Agreement for sale by owner by sealed bids," which is part Exhibit 4.

A. We had a listing agreement with Gustave White, but that's back in 2004, could be 2003 and 2004, in that area.

Q. So during the time period of January 17, 2006 through July 20, 2006, there was no -- you didn't have any contract with any Realtor listing the three Miramar properties for sale?

A. No.

Q. No, American Capital Corporation did not?

A. No. We were in negotiations with Sheldon Good for many, many months.

Q. Who was doing the negotiations?

A. I was.





Q. What were the negotiations with Sheldon Good over these many months?

A. We have to go back to, I would say, the early part of 2005 is when we first dealt with Sheldon Good. And Sheldon Good, their approach to selling properties is a little different from the customary broker's listing. They are an internationally known firm, and they sell -- they are famous for selling special-type properties, and they were referred to us by a broker in Kentucky who told us about Sheldon Good. And they are out of Chicago.

Alan Kravitz and Michael Fine came to Rhode Island and met with us in the early maybe May, my guess is around May of 2005. And we proceeded to negotiate with them the terms of that listing agreement. During the course of our negotiations with them, we received -- I received word about the Blixseths, Timothy Blixseth, so those negotiations stopped. We were almost at a point of signing an agreement with them when that stopped. And that would be probably, I





don't know, September of 2005.

And so from September 2005 through the early part of 2006, we had no dealings with Sheldon Good because we were involved with the Blixseth deal. When that failed, we then -- we talked about going back with Sheldon Good.

Q. Who is we?

A. Nancy Waddell, myself, and Mr. Panteleakis himself, too. We talked about going back to Sheldon Good, but then we had a call from Sid Gorham saying that he had a customer who was a partner of or past partner of Goldman Sachs and he now was the manager of a hedge fund and he was interested in seeing Miramar. I think I testified previously as to that part of the transaction.

Q. That's Mr. Ford?

A. With Mr. Ford. Yes. And so without going through all of that again, I will say that the deal with Ford, he offered the 15 million, we rejected it, and then we went back with Sheldon Good and it still took some time to agree on the final terms with Sheldon

Good and agree upon the brochure that they would use in marketing the property and some of those provisions that are in the bid package.

While we were in negotiations with Sheldon Good, and I believe we had already signed an agreement with them, I then received a phone call from David Ford. He said he was willing to pay 16 million for the property and take it as is. It would be a simple transaction, just take it as is. He had already done his inspections and investigations, but we had been -- we had signed with Sheldon Good.

We spoke with them about it, and they said that we should proceed to market the property as we had planned with Sheldon Good. David Ford in his conversation with me made a point of saying, I want you to know that I'm not going to bid for the property through the process that Sheldon Good uses in selling the property. I'm not going to submit a bid.

Well, the fact of the matter





is that after all the bid packages were sent out to those people who asked for them and the bids came in for the property, we had a meeting, Nancy, myself, and I don't know if Jeff and Harry were present, but we had a meeting with Alan Kravitz and Michael Fine who came to Rhode Island from Chicago to explain to us the bids that they had received and what their recommendation was as to what we should do. The bids that we had received, I don't have them, but I think that they were furnished. A list of all of those bids were furnished to my knowledge, so you know those.

MR. ANGELONE: I think we did, yes.

(Letter Dated March 1, 2007 marked as Exhibit No. 5 for identification.)

Q. Mr. Salvadore, we have marked as Exhibit 5 a three-page document which is a cover letter from Mr. Angelone to myself dated March 1, 2007 and it says, "Enclosed please find the other bids on Miramar." Then there's two pages. The first one starts out listing





Stuart Zimmer from Saddle River, New Jersey, and then the second page ends with R.C. Cambre of Denver, Colorado. Do you see that?

A. Yes.

Q. Who prepared that document?

A. I believe this was prepared by Sheldon Good.

Q. Mr. Ford, in fact, did not bid on the property as part of the sealed bids, correct?

A. He did not bid. He said he wouldn't and he didn't.

Q. So what happened after you had this discussion with the folks at American Capital as to what to do with the information provided in the sealed bid process?

A. Well, at that meeting, at that same meeting with Michael Fine and Alan Kravitz, we discussed the bids, and their opinion was that Stuart Zimmer's bid was probably the best bid that they had.

Q. The one for 15 million?

A. The one for 13 million. The one for 15 million they said that they didn't believe that that was a good bid, but that they would contact him and give all of these -- they





would give everyone a chance, they said, to up their bid. The matter of David Ford came up at that meeting and there was a discussion as to who should contact David Ford, whether I should or whether they would. It was agreed that they would. I thought I should have, but that's okay. Because he had called me, but they felt that they were handling the sale and they said, We will contact him and we won't tell him what the bids are, but we will tell him that if he intends to make a bid, he can still do that. And so they did. And then they got back to us and said that he had bid -- I'm sorry.

They got back to us and said that yes, he was going to submit a bid and they were going to overnight him the bid package, which they did. And then they came back and we were told that they had -- Ford had said that he would bid 17 -- his bid would be 17.5 million but that in the bid package there was a quick incentive provision that if the buyer would close within ten days, that they would get a two percent

discount. I'm sorry. It said one percent discount.

Mr. Ford, in making his offer, said that he wanted a two percent discount if he would close within ten days. And we agreed to that, and we went to a closing within the ten-day period. His bid was the highest and best bid that we had.

Q. Mr. Ford's original introduction to you was from Gustave White?

A. Yes. Gustave White.

Q. American Capital Corporation never listed the property with Gustave White or Sotheby's?

A. No. We did not relist it with them. Our plan was to go with Sheldon Good. From the beginning we had made up our mind. As I said, we got interrupted because we got the call from Sid Gorham that he had a potential buyer, so we waited to see what would happen.

Q. When did you get the call from Sid Gorham approximately?

A. Did I give you the letter dated April 6?

Q. You gave me the letter dated April 6, 2006.

A. It would have been prior to that, shortly





prior to that because in his letter he says, "I had a long talk with David Ford today. He and his fiancée both thought Miramar was a spectacular estate," et cetera. It would have been prior to that time.

Q. When he made the 20 million dollar offer on the property in April of 2006, you rejected that, correct, and you counteroffered at 22 million dollars?

A. He made a 20 million dollar offer with financing terms, five percent interest.

Q. As set forth in Exhibit 2?

A. Yes. I counteroffered at 22, but my counteroffer gave him financing terms. But all of this was subject to inspection.

Q. What was the reason, as far as you understand it, as to the drop in price from the 20 million dollars down to the 17.5 million dollars?

A. The drop in price from 20 million to 15 million?

Q. No. Mr. Ford eventually bought the property for $17,500,000?

A. I know but he dropped his price from 20





million to 15 million after they had inspected the property. And then just prior to Sheldon Good -- after Sheldon Good was involved in the marketing of the property, he called me and he offered 16 million. And as I explained before, I spoke to Sheldon Good and they said, Let's go forward. We are almost there. Let's finish what we are doing and see what happens. If he is interested in the property, their feeling was if he is interested in the property, he will be there.

Q. Did Sheldon Good advertise the sealed bid auction in any newspapers?

A. Oh, yes.

Q. Or magazines?

A. Yes. They had tremendous coverage. We agreed to pay them $160,000 for their marketing efforts. They demanded that we pay them for whatever they did and they would -- they claimed they had a budget and they would advertise. They had a process that they went through.

Q. Did you get copies of the advertising?

A. No, but we saw their efforts. They did a





magnificent job.

Q. You didn't get copies of any of the advertising?

A. It's hard for me, Brian, to tell you whether I did or I didn't. But I know that Sheldon Good is a classy outfit. They are good.

Q. With your counsel's assent, will you check if you received any, and if you did, will you forward them to me, please?

A. I'd have to -- for me to get all of that information that you want, I'll probably have to call Mike Fine and Sheldon Good.

Q. Can you do that?

A. That's fine.

MR. ANGELONE: We are not going to agree to do anything. He will make the appropriate request and we will go from there. We are not doing this -- we are not ad-libbing here. There are rules. We have suspended them at various times throughout this.

Q. As far as you understand, if there was any advertising done for the sale of the three Miramar properties during calendar year 2006

was done by Sheldon Good as part of the sealed bid auction process?
A. **I think that's a fair statement.**
Q. And there was, for example, the property was never advertised just directly for sale by any Realtor outside of the sealed bid auction process that Sheldon Good was presenting for you?
A. **Michael Fine is a Realtor. He is a Realtor.**
Q. Did Michael Fine advertise the property?
A. **He works for Sheldon Good, but he is a Realtor. He has a Realtor's license.**
Q. Did anybody advertise the property for sale outside of whatever marketing was done for the sealed bid auction?
MR. ANGELONE: Can I have that question again.
(The last question was read back by the court reporter as follows:
"QUESTION: Did anybody advertise the property for sale outside of whatever marketing was done for the





sealed bid auction?")
Q. In 2006.
A. **Not to my knowledge.**
Q. Did Sheldon Good give you any information about their past practice of using sealed bid auctions for property in terms of the success rate in selling properties with that method?
A. **Yes.**
Q. What did they give you?
A. **I think my recollection is that they sent me an article that was written by Steven Good that was in one of the realty magazines explaining the entire process and why special properties, in their opinion, will do better if they followed this kind of a process.**
Q. What was their track record?
A. **From my personal knowledge?**
Q. Yes.
A. **I have to rely on the fact that they are a nationally known firm.**
Q. You didn't know what their track record was in terms of their success in selling property under sealed bid auctions?
A. **Oh, yes. They came -- when they first came,**





**my recollection, Brian, is when they first came, they had a -- not a portfolio, but they showed us different properties that they had sold in different parts of the country or the world. And I guess they were trying to sell themselves to us that they were experienced and knew what they were doing. And I have to say that we were impressed. They were very professional.**
Q. Did you have a way to measure their success other than the fact that you were just impressed with them?
A. **I could measure their success by the fact that Gustave White wasn't successful in obtaining a buyer for the property. We had listed it with them and they weren't successful and they tried. Melanie Delman, although we didn't have a formal listing with her, we may have had a single listing. When she would bring somebody, she wanted to be protected, something like that. But she wasn't successful. We had a lot of tire kickers. That's what I call them. But Sheldon Good, they made it happen.**





Q. The only Realtor you ever formally listed the property with for sale other than the auction, sealed bid auction process with Sheldon Good was with Gustave White, correct?
A. **Yes. Gustave White is a well-known firm in Newport, and they are the affiliate of Sotheby's.**
Q. That was back in 2004, 2005?
A. **I believe so.**
Q. You didn't relist it with Gustave White in 2006?
A. **No. We made up our minds we weren't going to do that.**
Q. Were you, in negotiating with Mr. Ford, were you going to get a commission if the property was sold without Sheldon Good's involvement to Mr. Ford?
A. **If the property was sold without Sheldon Good's involvement?**
Q. Yes.
A. **I would have been paid, yes.**
Q. Did you get a commission in any event?
A. **On which sale?**
Q. On the sale of Miramar properties to

Mr. Ford.
A. I don't know if you'd call it a commission. There was a -- I got paid, yes. It's in the settlement -- I think it's in the settlement statement.
Q. How much was it approximately?
A. I think it was 700.
Q. 700,000?
A. 700,000.
(Bills marked as Exhibit No. 6 for identification.)
(Checks marked as Exhibit No. 7 for identification.)
(Real Estate Auction Bidder's Information Packet, Miramar Estate, Newport, Rhode Island marked as Exhibit No. 8 for identification.)
Q. Mr. Salvadore, can you just identify the documents that are marked as Exhibit 6?
A. These appear to be copies of bills, invoices, checks, in connection with expenditures that were made in connection with the Miramar properties.





Q. Those are Bates stamped starting with Bates stamp 447 through 604?
A. Yes.
Q. Are those the documents that purport to be the carrying costs for the three Miramar properties by American Capital Corporation?
A. Yes.
Q. From January 17, 2006 until the property was sold to Mr. Ford in the latter part of 2006?
A. I believe so, yes.
Q. If you can just identify the checks that are marked Exhibit 7 starting with Bates Stamp Number 605 through Bates Stamp Number 771.
A. These appear to be checks of American Capital Corporation and Newport Medical Developers, Inc. in payment of, I guess, carrying costs.
Q. Now, the document that's been marked as Exhibit 8, it says, Real Estate Auction Bidder's Information Packet, Miramar Estate, Newport, Rhode Island. Can you identify this for us, please.
A. This is the so-called bidder's information package prepared by Sheldon Good & Company in connection with the sale of the Miramar





estate properties.
Q. Did you approve the bid package as a trustee for the Andrew Panteleakis Trust - 1997?
A. I worked with Michael Fine in connection with the purchase and sale agreement that was included in the bid package that was a result of our negotiations as to what it should be. And the -- if there's a brochure of some type in there, I remember that we would review that, the brochure. They would pass it by us. Nancy and myself would take a look at it. And if we had any comments, we would make them. If you want me to go through the whole thing, I will.
I would say that I reviewed this bid package except for this zoning section. That was something that they inserted as part of the bid package when they sent it to us. But we never discussed the whole zoning law. They just put it in there as a matter of information that they felt was appropriate. And I did this in my capacity as the attorney in the matter.
Q. Just going back to Exhibit Number 4, there's





a purchase and sale agreement that's part of Exhibit Number 4 for the sale of the property to David Ford by American Capital. It's Bates stamped documents 379 through 396.
A. Okay.
Q. Did you prepare that purchase and sale agreement?
A. This purchase and sale agreement is the purchase and sale agreement that is in the bid package except for the fill-ins that were made by Mr. Ford. I didn't prepare this agreement, but I would say that Michael Fine and I prior to this, what went into the bid package I had reviewed and there were changes made to this agreement back and forth until we arrived at what we both agreed upon should be in the form of the agreement.
Q. That was a joint effort by you and is it Michael Fine?
A. Michael Fine. It's a joint effort by myself and Michael Fine as to the form of this document. The actual document that was signed by Ford and what he filled in, he did all of that. All this handwriting I believe

**is Ford's.**
Q. You see on the last page that is on Page 396 of the purchase and sale agreement to Mr. Ford that is part of Exhibit Number 4 the seller is American Capital Corporation by Nancy Waddell. Do you see that?
A. **Yes.**
Q. Can you explain to us why Nancy Waddell is listed as the seller, signatory for the seller, in her personal capacity in this purchase and sale and the one with Mr. Blixseth she is listed as -- she signed Mr. Panteleakis' name as the president?
MR. ANGELONE: Object to the form.
A. **I mean, she is the vice president, and she has authority to sign. She is the vice president of American Capital.**
Q. Among the documents for the sale to Mr. Ford of the three Miramar properties, is the vote of the trustees in here? Did I ask you this before?
MR. ANGELONE: Yes.
A. **You did. I don't know if it's in there.**





MR. ANGELONE: You asked us if we would get it and we said we would.
Q. Is that it? Take a look at that document and see if that's it. I'm handing you Bates stamped document 446.
A. **No. That is not it.**
Q. Back in March of 2006, American Capital Corporation received a letter from Andrew Hawes on behalf of the Blixseths requesting the deposit of one and a quarter million dollars, correct?
A. **Yes.**
Q. The letter indicated that American Capital Corporation had failed to disclose in the real estate disclosure forms delivered to the Blixseths that the property was located within a historic district, correct?
A. **I don't -- possibly. Whatever.**
MR. ANGELONE: You are outside the scope of the 30(b)(6).
Q. It's Number 10. American Capital Corporation's reason --
MR. ANGELONE: I take it back. I'm sorry. I stand corrected. It's





only the fifth mistake I made today for the record. Go ahead.
Q. Paragraph 10 of the 30(b)(6) deposition noticed marked Number 10 says, "American Capital Corporation's reasons for refusing to return Timothy Blixseth's deposit --
MR. ANGELONE: Hang on. Let's take a five-minute break.
(Recess taken.)
Q. With respect to Paragraph 10 of the deposition notice, you are appearing as the person most knowledgeable on behalf of American Capital Corporation, correct?
A. **Correct.**
Q. Who made the decision not to return the Blixseths' deposit of one and a quarter million dollars back in March of 2006?
A. **The Blixseths were not entitled to the return of deposit because they defaulted under the agreement. The agreement says that if they are in default, they are not entitled to it.**
Q. Is it your understanding of the Rhode Island Real Estate Disclosure Act that a purchaser is entitled to receive their deposit back if





the seller fails to disclose a materially deficient condition in the real estate disclosure forms that are delivered to the prospective purchaser?
MR. ANGELONE: Object to the form.
A. **Are you saying do I understand the law provides that?**
Q. Yes.
A. **Is that what your question is?**
Q. Yes.
A. **The law doesn't provide that. I'm not aware of any such law.**
Q. You are not aware that the Rhode Island Real Estate Disclosure Act provides that if the seller fails to disclose in a real estate disclosure form delivered to a purchaser a materially deficient condition as defined by the statute, that the seller is entitled or is required to give the deposit back to the buyer if a request is made for the deposit before the property is closed on, that is the deed is exchanged?
MR. ANGELONE: Object to the

form.
A. **Brian, that is a very long and complicated question.**
Q. We'll break it down.
A. **If what you're saying is that if there's a materially deficient condition, then you're saying that the seller is in default; is that what you're saying?**
Q. We'll break it down.
A. **Okay.**
Q. Is it your understanding, sir, that American Capital Corporation was obligated to disclose in the real estate disclosure forms to the Blixseths that the three Miramar properties were located within a historic district?
A. **I don't think that you can say that they were obligated to disclose because the statute says that even if they don't give a disclosure form, it doesn't void an agreement.**
Q. You didn't feel that as the person acting on behalf of American Capital Corporation in preparing those disclosures to the Blixseths, you didn't feel that American Capital





Corporation had an obligation to disclose that the property was located within the Newport Historic District?
A. **I think my testimony is that I wasn't aware of the provisions. You asked me if I had reviewed the provisions of the statute pertaining to the disclosure forms, and I told you that I had not. I relied upon the form I had in my office. All I am saying is that after the fact, I did review and there's a provision that specifically says that even if you don't -- you don't even have to give a disclosure form at all. And if you don't give a disclosure form, it doesn't void the agreement.**
Q. Is it your understanding that there was any obligation on the part of American Capital Corporation to disclose to the Blixseths through the real estate disclosure forms provided to them that the property was located in the Newport Historic District, that's a yes or no?
A. **I can't answer it yes or no.**
Q. Okay.





A. **I think I have already explained in my prior answers.**
Q. It's your belief that American Capital Corporation could fail to include in its disclosures that the property was located within the Newport Historic District and that the Blixseths would not be entitled to receive a refund --
MR. ANGELONE: Object to the form. Can you read that question back.
Q. -- of their deposit?
MR. ANGELONE: I object to the form, but I'm asking you to read it back.
(The last question was read back by the court reporter as requested.)
Q. You will concede, sir, will you not, that American Capital Corporation did not disclose in either of the two disclosure forms provided to the Blixseths that the three Miramar properties were located within the Newport Historic District, correct?
A. **Correct.**
Q. Given that failure to disclose, it's your





understanding that that failure to disclose was not material to the Blixseths?
MR. ANGELONE: Object to the form of the question.
Q. Correct?
MR. ANGELONE: I don't know. Read the question back. Listen to the question.
(The last question was read back by the court reporter as follows:
"QUESTION: Given that failure to disclose, it's your understanding that that failure to disclose was not material to the Blixseths?")
A. **I don't know. I don't represent the Blixseths.**
Q. Would that be material to you, sir?
A. **Failing to disclose?**
MR. ANGELONE: Object to the form.
Q. Would it be material to you if you were buying a piece of property to know whether a

piece of property was located in a historic district?

A. **No. Because if I were buying a piece of property, I would do my independent investigation and find out for myself.**

Q. So it wouldn't be material to you whether you knew or not whether a piece of property was located in a historic district?

MR. ANGELONE: I object to the form.

A. **I didn't say it wouldn't be material. I said I would do my own independent investigation and find out the facts.**

Q. You would do an independent investigation because you believe that a piece of property being in a historic district is material information you would want to know?

A. **No. I would do my independent investigation because it's part of my due diligence. If I'm buying property even much less in value than this, I would do it.**

Q. Would it be important to you in representing a buyer to know whether a piece of property lay within the Newport Historic District?





MR. ANGELONE: Objection to form.

A. **I'm going to say it again.**

Q. Yes or no.

A. **I can't answer yes or no.**

Q. So you can't tell us whether if you were representing a buyer it would be important to you to know whether a piece of property was located within the Newport Historic District?

A. **I can't answer yes or no. I can answer the question, but not with a yes or no answer.**

Q. Go ahead and answer it without the yes or no.

A. **As I said, when you buy real estate, you are given the opportunity to do an independent inspection. You check the title. You check the zoning. It's all part of the routine, and I would do all of these things to protect my client.**

Q. Now, was it your understanding that there was an obligation by American Capital to disclose to the Blixseths that the property was located within the Newport Historic District?

A. **I think you have asked that question five different times.**





Q. Well, you can answer it again.

A. **And I will tell you when you say American Capital has an obligation to do what, to disclose to them?**

Q. Yes.

A. **American Capital Corporation gave them the opportunity to inspect the property, check the title, review the zoning. It was all in the agreement, and I expected them to do their due diligence. That's how the agreement was drawn.**

Q. As the representative for American Capital Corporation, you didn't feel any responsibility to make sure that American Capital Corporation complied with the Rhode Island Real Estate Disclosure Act; is that correct?

MR. ANGELONE: Object to the form of that. You can answer.

A. **The Rhode Island Real Estate Disclosure Act, as I understand it from reading it after the fact, allows a seller to sell property without even giving a disclosure form. And the statute specifically says that if they**





**don't give the disclosure form, it doesn't void the agreement.**

Q. But, sir --

A. **So I don't know what we are talking about here.**

Q. American Capital Corporation did provide two disclosure forms, did they not?

A. **Yes, they did.**

Q. So it was your understanding that American Capital Corporation when you filled out those forms was obligated to comply with the law, correct?

A. **Those forms are prepared by the Board of Realtors.**

Q. That's not my question, sir.

A. **Those forms are prepared by the Board of Realtors, and those are the forms that we use. Lawyers don't draw up their independent disclosure forms.**

Q. I move to strike your answer. Mr. Salvadore, a simple question. Was it your understanding that American Capital Corporation was required to comply with the Rhode Island Real Estate Disclosure Statute when it sold --

strike that.
Was it your understanding that American Capital Corporation was required to comply with the Rhode Island Real Estate Disclosure Act in selling the three Miramar properties to the Blixseths?
A. **My understanding of the law --**
Q. That's a yes or no.
A. **No, I can't answer yes or no.**
Q. You can't answer yes or no?
A. **No, I can't. It doesn't take a yes or no answer.**
Q. You can't answer yes or no whether it was your understanding that your client or that American Capital Corporation was required to comply with Rhode Island law?
MR. ANGELONE: Object to the form. Read the question back, please.
Q. I'll state it again. You can't tell us, sir, whether American Capital Corporation -- strike that.
You can't tell us whether it was your understanding as a representative of American Capital Corporation as to whether





American Capital Corporation was expected to comply with the Rhode Island Real Estate Disclosure Act in selling the three Miramar properties to the Blixseths?
MR. ANGELONE: Object to the form. Would you read the question back, please.
(The last question was read back by the court reporter as follows:
"QUESTION: You can't tell us whether it was your understanding as a representative of American Capital Corporation as to whether American Capital Corporation was expected to comply with the Rhode Island Real Estate Disclosure Act in selling the three Miramar properties to the Blixseths?")
A. **I can answer that by saying that American Capital, through its attorney, believed that**





**it was complying with the law. There was no intention to violate any laws.**
Q. Would you agree with me that American Capital Corporation did not comply with the Rhode Island Real Estate Disclosure Law in its dealings with the Blixseths?
MR. ANGELONE: Object to the form.
A. **No. I don't agree with that because American Capital was not obligated to give a disclosure form to begin with because the statute specifically says failure to give a disclosure form does not void an agreement.**
Q. American Capital Corporation did give two disclosure forms, did it not, to the Blixseths?
A. **Yes, it did. But that doesn't void the agreement.**
Q. In giving the two disclosure forms to the Blixseths, you would agree that American Capital Corporation was required to comply with the Rhode Island Real Estate Disclosure Act in terms of those forms, correct?
A. **No. I don't agree.**





Q. What is the basis for that statement?
A. **Because the statute -- the fact that forms were given doesn't place American Capital in the position that if they did not -- a worse position than they would have been if they gave no form because the statute specifically says that failure to give the form does not void the agreement.**
Q. Is that the reason why you didn't return the Blixseths' money?
A. **No. The reason I didn't return the Blixseths' money is because they defaulted under the agreement.**
Q. Now, do you think as a representative of American Capital Corporation that it was important that the Blixseths know before they purchased the Miramar property that it was located within a historic district?
MR. ANGELONE: Object to the form. Read the question back. Listen to the question.
(The last question was read back by the court reporter as follows:

"QUESTION: Now, do you think as a representative of American Capital Corporation that it was important that the Blixseths know before they purchased the Miramar property that it was located within a historic district?")

MR. ANGELONE: He wants to know what is important to the Blixseths.

A. **I really don't know what's important to the Blixseths.**

Q. Do you think it would be important to a buyer of the three Miramar properties to know that the property is located within a historic district?

MR. ANGELONE: Object to the form.

A. **If I were buying the Miramar properties as a personal residence, I think I would be happy to know it was in a historic district.**

Q. If you were buying the three Miramar properties, you would want to know if it was in a historic district before you bought it?





A. **Yeah, because I think it increases the value of the property being in a historic district.**

Q. If you were buying the three Miramar properties, you would want to know if it was located in a historic district, right?

A. **No. No. It doesn't matter. If I am buying it as my personal residence, it just becomes a plus. If I'm protected by the fact that it's in a historic district, that's a plus to me.**

Q. So it wouldn't matter, if you were buying the Miramar property, it wouldn't matter to you whether it was involved in a historic district or not?

A. **Not if I was buying it as a residence, no. It wouldn't matter to me.**

Q. It wouldn't matter to you?

A. **No, because I'm buying it as my personal residence.**

Q. Was there any vote by the trustees of American Capital Corporation not to return the Blixseths' deposit when it was requested back in March of 2006?

A. **I don't believe that there was a formal vote,**





**but I'm the -- at that point in time, the trustees were aware of the situation, and they -- I'm not aware of any formal vote. That's my best answer. I was not a trustee at that time.**

Q. Were the trustees even advised of the Blixseths' request to receive the deposit back in March of 2006?

A. **The trustees were advised that the Blixseths did not show up for the closing and they were told that they were in default under the agreement.**

Q. The trustees of the Andrew Panteleakis Trust - 1997 were not even notified that the Blixseths requested a return of their deposit in March of 2006?

MR. ANGELONE: The form of that question is bad. Could you please read it again.

(The last question was read back by the court reporter as follows:

"QUESTION: The trustees of the Andrew Panteleakis Trust





- 1997 were not even notified that the Blixseths requested a return of their deposit in March of 2006?")

A. **I don't have any personal knowledge of that, but I think they knew about it, but I can't answer the question.**

MR. VOKE: You objected to the form?

MR. ANGELONE: Yes.

Q. You are here as the representative of American Capital Corporation, correct?

A. **Yes. You are asking me questions about the trustees.**

Q. The trustees control the voting shares of American Capital Corporation? I think we established that earlier today.

A. **I believe they have the power to vote the shares.**

Q. Mr. Salvadore, do you think it's important to any buyer of the Miramar properties to know that the three parcels are located within the Newport Historic District?

MR. ANGELONE: That's well

beyond the scope of the 30(b)(6). I finally hit upon a correct analysis. Read that question again. I may be right on this one.

(The last question was read back by the court reporter as follows:

"QUESTION: Mr. Salvadore, do you think it's important to any buyer of the Miramar properties to know that the three parcels are located within the Newport Historic District?")

MR. ANGELONE: That's beyond the scope of the 30(B)(6) depo. I'll instruct you not to answer.

MR. VOKE: I disagree because it goes to the decision-making of American Capital Corporation not to refund the Blixseths their money. And he is saying it's not material. So I am entitled to probe the basis for his understanding of that.

MR. ANGELONE: As I understand, you're saying that that's part of





the Paragraph 10 of Schedule A.

MR. VOKE: Yes.

MR. ANGELONE: That's very nice of you. I disagree and instruct you not to answer. Next question. I understand where you are coming from, but you and I have a disagreement. I respect you just the same, but I disagree. I think it's beyond the scope of Paragraph 10 of the Schedule A. Okay.

Q. Mr. Salvadore, did American Capital Corporation consult with any outside lawyers before it made the decision not to refund the Blixseths' deposit following the receipt of the March 10, 2006 letter from Andrew Hawes requesting a return of the deposit on behalf of the Blixseths?

MR. ANGELONE: You can answer that yes or no. You can answer it yes or no.

A. **I'm not sure.**

Q. Sir, the decision at American Capital Corporation not to return the Blixseths' one and a quarter million dollar deposit in March of 2006 was yours, wasn't it?





MR. ANGELONE: Object to the form of that question. Can you read that back again.

(The last question was read back by the court reporter as follows:

"QUESTION: Sir, the decision at American Capital Corporation not to return the Blixseths' one and a quarter million dollar deposit in March of 2006 was yours, wasn't it?")

MR. ANGELONE: Did you hear the question?

THE WITNESS: Yes.

MR. ANGELONE: Okay. That's in March. He wants to know in March 10 of 2006.

A. **That was partially mine, yes.**

Q. And partially who else's?

A. **I discussed it with -- I advised Nancy Waddell that the demand had been made to return the deposit.**





Q. What experience did you have with the Rhode Island Real Estate Disclosure Act prior to that time?

A. **Not much experience.**

Q. Now, the carrying costs, damages that American Capital Corporation is claiming in this case, are they all set forth in the documents that are marked as Exhibit 6 and 7?

A. **I believe so.**

Q. Who compiled those?

A. **I think they were compiled by Harry Kojoian.**

Q. The expenses associated with the sale of the Miramar property following the cancellation of the closing back in January of 2006, are those all contained in Exhibit 4?

A. **Where is Exhibit 4?**

MR. ANGELONE: Exhibit 4 is these. Do you want to know if the expenses --

MR. VOKE: The expenses.

MR. ANGELONE: No. I don't think so, but I don't know. I can't tell you. I don't mean to try to put words in his mouth.

Q. What are the expenses, then, that American Capital Corporation claims for the sale of the property following the cancellation of the closing back in January of 2006 with the Blixseths?
**A. $160,000 was paid to Sheldon Good as a marketing expense to market the property. We had to have a site plan prepared, and that amounts to $2,400. That was paid to Northeast Engineers. We had to prepare a home inspection report. That was $7,500. There were certain moving expenses that we incurred, $1,200. There was an interest expense paid to Citizens Bank totaling $268,750.60.**
Q. What was that for?
**A. Interest expense on the mortgage.**
Q. That's part of the carrying costs?
**A. Sure. We wouldn't have had it if there was a closing. For electrical work at the property we paid $11,543.89. For plumbing work, plumbing maintenance at the property cost us $19,377.23. For maintenance work at the property $3,760.**





Q. Let me stop you. What was the plumbing maintenance?
**A. We had certain plumbing problems at the property that had to be corrected.**
Q. How were they pointed out? How did they come to the notice of American Capital Corporation?
**A. American Capital owns the property.**
Q. How did you find out about the plumbing maintenance that needed to be done?
**A. Well, certain events happened and certain things had to be done to maintain the plumbing.**
Q. Is that something that was discovered during the inspection conducted by Mr. Ford's engineers?
**A. I don't believe so. This is something that had to be done.**
Q. What was the $19,000 worth of plumbing work?
**A. What was it?**
Q. Yes.
**A. Do you want me to read the whole itemization?**
MR. ANGELONE: All of the invoices are contained in Exhibit 6. You





have got everything. This was just a summary of it.
**A. This is a summary, but I'm giving you the invoices and I believe the checks.**
Q. Okay. Fair enough.
MR. ANGELONE: These are all, for the record, all given under the holding in the St. Germain case.
**A. There was maintenance work that we needed done totaling $3,760. There was more maintenance work for $3,800.**
Q. That's all listed in the documents?
**A. Yes, it is. Do you want me to continue?**
MR. ANGELONE: There's only one thing that you may have misspoke. When you gave the Citizens Bank, that could have been interest and principal.
THE WITNESS: No. I think it's just interest.
Q. When was the mortgage taken out? Was that back in 2001?
**A. This is for the period 2006. Do you mean when was the mortgage taken out?**
Q. When was the mortgage taken out, back in





2001?
**A. I'm not sure. But it was a 4 million dollar mortgage that was taken out, my recollection. I didn't handle the transaction.**
Q. So there had been no mortgage on the property prior to that?
**A. There might have been a mortgage prior to that. I'm not sure. I wasn't privy to it.**
Q. Do you know what was done with that mortgage money, the 4 million dollars? You said there was a 4 million dollar mortgage taken out on the property?
**A. Yes.**
Q. The property at that point in time had already been paid for by American Capital Corporation?
**A. I don't know.**
Q. Let me represent that to you. Let me just represent to you that the property had already been paid for by American Capital Corporation before the mortgage of 4 million dollars was taken out?
**A. Yes.**
Q. Do you know what was done with the 4 million

dollars?
A. I have no idea what was done with the 4 million dollars. It's not your argument that American Capital Corporation doesn't have the right to borrow money on its own property, is it?
Q. What did they do with the money? What did they invest it in?
A. I'm not going to answer that.
Q. Do you know?
A. No, I don't know. I can tell you what I think.
Q. What do you think?
A. I'm not going to say what I think because I'm a gentleman.
Q. I thought you said you thought where the money went.
A. I never said I thought where the money went. I don't know where the money went.
Q. That's fair enough. That's all I wanted to know.
MR. VOKE: That's all I have. Thank you.
THE WITNESS: I didn't finish





everything.
MR. ANGELONE: No. We represented that everything is in the documents.
MR. VOKE: It's all in the documents.
MR. ANGELONE: Note for the record that both parties have agreed that the exhibits, which are made part of the record of this deposition, are being held by Mr. Voke.

(Whereupon the deposition concluded at 2:05 p.m.)





CERTIFICATE

STATE OF RHODE ISLAND

I, Susan E. Wilson, Registered Professional Reporter and Notary Public in and for the State of Rhode Island, do hereby certify that the foregoing transcript of the 30(b)(6) deposition of Guido Salvadore, having been duly sworn, on Friday, March 30, 2007, is true and accurate to the best of my knowledge, skill, and ability.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 31st day of March, 2007.

SUSAN E. WILSON, CSR, RPR
My commission expires:
November 1, 2009

PLEASE NOTE: THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.

## $

**$1,200** [1] - 77:13
**$10,500,000** [2] - 18:14, 18:18
**$11,543.89** [1] - 77:21
**$160,000** [2] - 43:17, 77:6
**$17,500,000** [1] - 42:23
**$19,000** [1] - 78:19
**$19,377.23** [1] - 77:23
**$2,400** [1] - 77:9
**$20** [1] - 19:17
**$25** [1] - 17:12
**$268,750.60** [1] - 77:15
**$3,760** [2] - 77:24, 79:10
**$3,800** [1] - 79:11
**$7,500** [1] - 77:11

## '

**'Purchase** [1] - 19:7

## 0

**01810** [1] - 1:23
**02129** [1] - 2:7
**02901-1516** [1] - 2:4
**0405** [1] - 24:16
**06-90S** [1] - 1:3

## 1

**1** [12] - 2:3, 4:3, 4:13, 6:10, 6:18, 13:2, 24:1, 30:7, 31:18, 38:16, 38:21, 83:19
**10** [8] - 54:21, 55:3, 55:4, 55:10, 74:1, 74:9, 74:15, 75:18
**1050** [1] - 2:3
**11** [2] - 15:11, 18:24
**11:46** [1] - 1:17
**12/31/05** [1] - 19:3
**13** [1] - 39:21
**14** [1] - 19:1
**14,250,000** [1] - 18:11
**15** [11] - 18:9, 23:16, 28:14, 28:24, 30:2, 30:21, 36:21, 39:20, 39:21, 42:20, 43:1
**16** [2] - 37:9, 43:5
**17** [4] - 31:14, 34:14, 40:20, 50:8
**17.5** [2] - 40:21, 42:18
**1956** [1] - 29:10
**1997** [9] - 8:19, 8:24, 9:2, 10:10, 13:1, 15:8, 51:3, 71:14, 72:1

## 2

**2** [5] - 4:8, 19:15, 19:16, 21:13, 42:12
**20** [8] - 17:16, 19:10, 34:15, 42:6, 42:10, 42:17, 42:20, 42:24
**2001** [2] - 79:21, 80:1
**2003** [1] - 34:12
**2004** [3] - 34:12, 34:13, 48:8
**2005** [5] - 35:4, 35:17, 36:1, 36:2, 48:8
**2006** [36] - 4:8, 10:21, 12:14, 12:15, 13:2, 18:6, 19:1, 19:13, 21:12, 31:14, 33:7, 34:3, 34:14, 34:15, 36:3, 41:23, 42:7, 44:24, 46:2, 48:11, 50:8, 50:9, 54:7, 55:17, 70:23, 71:8, 71:16, 72:4, 74:15, 74:24, 75:12, 75:19, 76:14, 77:4, 79:22
**2007** [6] - 1:17, 4:13, 38:16, 38:22, 83:11, 83:15
**2009** [1] - 83:19
**21** [4] - 4:8, 4:11, 4:12, 34:3
**22** [4] - 17:17, 20:22, 42:8, 42:13
**24** [1] - 18:6
**28** [1] - 19:1
**2:05** [1] - 82:14

## 3

**3** [2] - 4:9, 21:19
**3,500,000** [1] - 18:12
**30** [2] - 1:17, 83:10
**30(B)(6** [1] - 73:15
**30(b)(6** [8] - 1:13, 4:3, 5:23, 6:5, 6:19, 9:8, 55:3, 83:9
**30(b)(6)** [2] - 54:20, 73:1
**30-year** [1] - 21:3
**31st** [1] - 83:14
**379** [1] - 52:4
**38** [1] - 4:13
**396** [2] - 52:4, 53:2

## 4

**4** [24] - 4:12, 21:22, 24:3, 24:4, 24:10, 24:18, 28:13, 29:19, 30:10, 30:11, 34:1, 34:10, 51:24, 52:2, 53:4, 76:15, 76:16, 76:17, 80:2, 80:10, 80:11, 80:21, 80:24, 81:2
**405** [4] - 27:22, 29:19, 29:22, 30:5
**406** [4] - 28:1, 28:14, 29:21, 30:5
**409** [5] - 29:2, 29:16, 29:17, 30:12, 31:7
**446** [1] - 54:5
**447** [1] - 50:2
**49** [3] - 4:14, 4:15, 4:18

## 5

**5** [4] - 3:6, 4:13, 38:17, 38:19
**5-20.8(2** [1] - 29:8

## 6

**6** [11] - 4:7, 4:8, 4:14, 19:13, 21:12, 41:22, 41:23, 49:11, 49:20, 76:8, 78:24
**604** [1] - 50:2
**605** [1] - 50:13
**617-241-3000/FAX** [1] - 2:8
**617-241-5115** [1] - 2:8

## 7

**7** [6] - 1:22, 4:15, 18:23, 49:13, 50:12, 76:8
**700** [1] - 49:7
**700,000** [2] - 49:8, 49:9
**750,000** [1] - 18:10
**771** [1] - 50:13

## 8

**8** [3] - 4:16, 49:17, 50:18

## 9

**978.409.9090** [1] - 1:23

## A

**A-2** [1] - 19:3
**A-L-T-M-A-N** [1] - 17:12
**a.m** [1] - 1:17
**A5** [1] - 1:22
**ability** [2] - 20:3, 83:12
**able** [1] - 8:11
**abundance** [1] - 23:5
**accordance** [1] - 27:13
**accurate** [1] - 83:11
**Act** [9] - 55:23, 56:15, 63:16, 63:20, 65:5, 66:3, 66:19, 67:23, 76:2
**act** [1] - 8:5
**acting** [5] - 13:19, 13:20, 14:3, 14:21, 57:21
**actual** [1] - 52:22
**ad** [1] - 44:19
**ad-libbing** [1] - 44:19
**added** [2] - 27:17, 29:1
**Additional** [1] - 29:3
**additional** [1] - 30:12
**addressed** [1] - 19:12
**adjacent** [2] - 18:8, 27:23
**Adjacent** [2] - 4:10, 21:17
**Adler** [1] - 22:10
**admit** [1] - 15:4
**advertise** [5] - 43:12, 43:21, 45:10, 45:13, 45:22
**advertised** [1] - 45:5
**advertising** [3] - 43:23, 44:3, 44:23
**advised** [4] - 27:12, 71:6, 71:9, 75:22
**affiliate** [1] - 48:6
**affirming** [2] - 16:16, 16:18
**Africa** [2] - 17:21, 20:2
**afternoon** [1] - 20:2
**ago** [1] - 30:15
**agree** [7] - 36:24, 37:1, 44:16, 67:3, 67:9, 67:20, 67:24
**agreeable** [1] - 20:1
**agreed** [8] - 5:3, 5:9, 8:13, 40:6, 41:6, 43:17, 52:16, 82:8
**agreement** [44] - 9:4, 9:6, 10:9, 16:19, 16:21, 16:23, 17:9, 17:10, 17:18, 17:19, 18:2, 18:7, 22:1, 22:20, 32:8, 33:6, 33:13, 33:19, 34:4, 34:11, 35:18, 35:23, 37:7, 51:5, 52:1, 52:7, 52:8, 52:9, 52:12, 52:15, 52:17, 53:3, 55:20, 57:20, 58:15, 63:9, 63:11, 64:2, 67:13, 67:18, 68:8, 68:13, 71:12
**Agreement** [4] - 4:9, 21:16, 34:2, 34:9
**agreements** [1] - 33:1
**ahead** [4] - 6:3, 16:6, 55:2, 62:12
**Alan** [3] - 35:14, 38:6, 39:16
**allowed** [1] - 18:3
**allows** [1] - 63:22
**almost** [2] - 35:22, 43:8
**Altman** [5] - 17:11, 17:19, 22:5, 22:6, 22:10
**amended** [1] - 29:10
**American** [85] - 6:1, 7:11, 7:15, 11:20, 12:9, 12:10, 12:17, 12:24, 13:3, 13:11, 13:23, 14:4, 22:1, 22:3, 22:13, 22:16, 23:13, 23:24, 24:13, 25:22, 26:6, 26:20, 27:10, 31:16, 32:16, 32:19, 33:5, 33:22, 34:4, 34:20, 39:12, 41:12, 50:6, 50:14, 52:3, 53:5, 53:18, 54:7, 54:13, 54:21, 55:4, 55:13, 57:11, 57:22, 57:24, 58:17, 59:3, 59:18, 62:20, 63:2, 63:6, 63:12, 63:14, 64:6, 64:9, 64:22, 65:3, 65:15, 65:20, 65:24, 66:1, 66:14, 66:16, 66:23, 67:3, 67:9, 67:14, 67:20, 68:3, 68:15, 69:3, 70:21, 72:12, 72:16, 73:18, 74:11, 74:21, 75:8, 76:6,

77:1, 78:6, 78:8, 80:15, 80:20, 81:4
**AMERICAN** [1] - 1:5
**amortization** [2] - 21:2, 21:3
**amounts** [1] - 77:9
**analysis** [1] - 73:2
**AND/OR** [1] - 83:23
**Andover** [1] - 1:23
**Andrew** [14] - 8:18, 8:21, 8:22, 9:1, 10:9, 13:1, 13:4, 13:12, 15:7, 51:3, 54:8, 71:13, 71:24, 74:15
**ANDREW** [1] - 8:23
**Angel** [1] - 8:20
**Angelone** [3] - 1:16, 2:3, 38:21
**ANGELONE** [60] - 2:2, 7:3, 9:7, 11:16, 12:4, 12:20, 15:12, 16:1, 20:15, 24:2, 24:16, 26:24, 27:4, 28:5, 30:9, 32:22, 33:17, 33:20, 38:14, 44:15, 45:16, 53:14, 53:23, 54:1, 54:19, 54:23, 55:7, 56:5, 56:24, 59:9, 59:12, 60:3, 60:6, 60:21, 61:9, 62:1, 63:18, 65:17, 66:5, 67:7, 68:19, 69:9, 69:17, 71:17, 72:10, 72:24, 73:14, 73:23, 74:3, 74:18, 75:1, 75:14, 75:17, 76:17, 76:21, 78:23, 79:6, 79:14, 82:2, 82:7
**Angelone's** [1] - 24:9
**annual** [1] - 19:15
**annually** [2] - 18:18, 19:18
**answer** [23] - 9:10, 12:23, 58:23, 62:5, 62:10, 62:11, 62:12, 63:1, 63:19, 64:20, 65:9, 65:10, 65:12, 65:13, 66:23, 71:4, 72:7, 73:16, 74:5, 74:18, 74:19, 81:9
**answers** [1] - 59:2
**ANY** [2] - 83:22, 83:22
**anyway** [1] - 11:13
**Anyway** [1] - 21:4
**apartment** [1] - 23:6
**appear** [2] - 49:21, 50:14
**APPEARANCES** [1] - 2:1
**appearing** [2] - 5:22, 55:11
**APPLY** [1] - 83:22
**appoint** [1] - 8:4
**appointed** [1] - 12:11
**approach** [2] - 17:13, 35:6
**appropriate** [2] - 44:17, 51:22
**approve** [3] - 16:9, 16:15, 51:2
**approving** [1] - 16:22
**April** [6] - 4:8, 19:13, 21:12, 41:22, 41:23, 42:7
**area** [2] - 32:15, 34:13
**argument** [1] - 81:3
**arrangements** [1] - 32:3
**arrive** [1] - 19:24
**arrived** [1] - 52:16
**article** [1] - 46:11
**articles** [2] - 13:14, 13:15
**assent** [1] - 44:7
**assessment** [1] - 19:2
**assets** [2] - 9:14, 10:12
**associated** [2] - 15:20, 76:12
**Association** [1] - 25:1
**assume** [1] - 31:4
**assumes** [1] - 27:1
**Attached** [3] - 4:7, 6:9, 6:21
**attention** [1] - 30:11
**attorney** [8] - 7:15, 17:11, 19:8, 22:3, 22:6, 25:4, 51:23, 66:24
**attorneys** [1] - 25:5
**auction** [7] - 43:13, 45:2, 45:6, 45:15, 46:1, 48:3
**Auction** [3] - 4:16, 49:14, 50:18
**auctions** [2] - 46:6, 46:23
**August** [2] - 18:5, 18:6
**authority** [3] - 9:13, 10:13, 53:17
**authorize** [1] - 12:2
**available** [2] - 8:12, 33:3
**aware** [6] - 20:18, 56:12, 56:14, 58:4, 71:2, 71:3

## B

**bad** [1] - 71:18
**balance** [2] - 18:18, 19:19
**balloon** [1] - 21:4
**Bank** [2] - 77:14, 79:16
**based** [1] - 21:2
**basis** [3] - 19:24, 68:1, 73:22
**Bates** [16] - 20:12, 24:7, 27:21, 28:1, 28:14, 29:1, 29:17, 29:18, 30:4, 31:7, 50:1, 50:12, 50:13, 52:4, 54:4
**becomes** [1] - 70:7
**begin** [1] - 67:11
**beginning** [1] - 41:16
**behalf** [8] - 1:13, 5:14, 23:13, 26:19, 54:9, 55:12, 57:22, 74:16
**Behalf** [2] - 2:4, 2:8
**belief** [1] - 59:3
**best** [6] - 16:12, 17:2, 39:19, 41:8, 71:4, 83:11
**better** [1] - 46:14
**between** [4] - 5:3, 22:1, 33:21
**beyond** [4] - 9:8, 73:1, 73:14, 74:8
**bid** [35] - 33:19, 37:3, 37:20, 37:23, 38:1, 39:7, 39:9, 39:14, 39:18, 39:19, 39:23, 40:2, 40:12, 40:14, 40:16, 40:17, 40:20, 40:21, 41:7, 41:8, 43:12, 45:2, 45:6, 45:15, 46:1, 46:5, 46:23, 48:3, 51:2, 51:6, 51:16, 51:18, 52:10, 52:13
**bidder's** [1] - 50:22
**Bidder's** [3] - 4:16, 49:14, 50:19
**bids** [10] - 34:3, 34:9, 38:3, 38:8, 38:10, 38:12, 38:23, 39:8, 39:17, 40:10
**big** [1] - 33:15
**bills** [1] - 49:21
**Bills** [2] - 4:14, 49:10
**bit** [1] - 19:9
**BLIXSETH** [2] - 1:8
**Blixseth** [5] - 15:24, 25:19, 35:21, 36:5, 53:12
**Blixseth's** [1] - 55:6
**Blixseths** [33] - 7:19, 17:14, 31:14, 31:24, 35:21, 54:9, 54:16, 55:18, 57:14, 57:23, 58:18, 59:7, 59:20, 60:2, 60:16, 60:18, 62:21, 65:6, 66:4, 66:22, 67:6, 67:16, 67:20, 68:16, 69:5, 69:10, 69:12, 71:9, 71:15, 72:2, 73:20, 74:17, 77:5
**Blixseths'** [8] - 55:16, 68:10, 68:12, 70:22, 71:7, 74:14, 74:22, 75:10
**Board** [2] - 64:13, 64:16
**board** [5] - 13:10, 13:12, 13:16, 13:18, 14:8
**borrow** [1] - 81:5
**Boston** [1] - 2:7
**bottom** [1] - 24:8
**bought** [2] - 42:22, 69:24
**break** [3] - 55:8, 57:4, 57:9
**Brian** [5] - 18:15, 20:20, 44:4, 47:1, 57:2
**BRIAN** [1] - 2:6
**bring** [1] - 47:20
**brochure** [3] - 37:1, 51:8, 51:10
**broker** [5] - 17:5, 25:4, 25:7, 35:11
**broker's** [1] - 35:7
**brought** [1] - 25:19
**budget** [1] - 43:20
**building** [6] - 18:3, 21:8, 23:7, 26:11, 28:21, 29:14
**buy** [1] - 62:13
**buyer** [11] - 20:7, 28:17, 40:23, 41:19, 47:15, 56:21, 61:23, 62:7, 69:13, 72:21, 73:9
**buyer's** [1] - 19:8
**buying** [12] - 20:6, 32:6, 60:24, 61:3, 61:20, 69:19, 69:22, 70:3, 70:6, 70:11, 70:15, 70:18
**BY** [3] - 3:5, 5:18, 83:22
**bylaws** [3] - 13:15, 13:16, 14:9

## C

**C.J** [1] - 1:22
**CA** [1] - 1:3
**calendar** [1] - 44:24
**Cambre** [1] - 39:3
**Campbell** [2] - 2:6
**cancellation** [2] - 76:13, 77:3
**capacity** [3] - 7:17, 51:22, 53:10
**Capital** [86] - 6:1, 7:11, 7:15, 11:21, 12:9, 12:10, 12:17, 12:24, 13:3, 13:11, 13:23, 14:4, 22:1, 22:3, 22:14, 22:17, 23:13, 23:24, 24:13, 25:22, 26:6, 26:20, 27:10, 31:17, 32:16, 32:19, 33:5, 33:22, 34:5, 34:20, 39:12, 41:12, 50:6, 50:14, 52:3, 53:5, 53:18, 54:7, 54:13, 54:21, 55:5, 55:13, 57:12, 57:22, 57:24, 58:17, 59:3, 59:18, 62:20, 63:3, 63:6, 63:12, 63:15, 64:6, 64:10, 64:22, 65:3, 65:15, 65:20, 65:24, 66:1, 66:15, 66:16, 66:24, 67:3, 67:10, 67:14, 67:21, 68:3, 68:15, 69:3, 70:21, 72:12, 72:16, 73:19, 74:11, 74:21, 75:8, 76:6, 77:2, 78:6, 78:8, 80:15, 80:20, 81:4
**CAPITAL** [1] - 1:5
**carriage** [3] - 18:8, 19:4, 23:9
**Carriage** [2] - 4:11, 21:18
**carry** [1] - 8:11
**carrying** [4] - 50:5, 50:16, 76:5, 77:18
**Carrying** [1] - 14:17
**case** [4] - 6:13, 11:14, 76:7, 79:8
**cash** [1] - 18:12
**caution** [1] - 23:6
**certain** [4] - 77:12, 78:3, 78:11
**certainly** [1] - 20:6
**certificate** [3] - 11:18,

16:8, 16:16
**CERTIFICATION** [1] - 83:21
**certify** [1] - 83:8
**CERTIFYING** [1] - 83:23
**cetera** [1] - 42:4
**chance** [1] - 40:1
**change** [1] - 19:2
**changed** [1] - 14:1
**changes** [2] - 18:21, 52:14
**Chapter** [1] - 29:8
**check** [4] - 44:7, 62:15, 63:7
**checks** [4] - 49:22, 50:11, 50:14, 79:4
**Checks** [2] - 4:15, 49:12
**Chicago** [2] - 35:13, 38:7
**Christie's** [1] - 32:15
**Citizens** [2] - 77:14, 79:16
**Civil** [1] - 1:14
**claimed** [1] - 43:20
**claiming** [1] - 76:6
**claims** [1] - 77:2
**classy** [1] - 44:6
**client** [2] - 62:18, 65:14
**Close** [1] - 18:24
**close** [3] - 31:15, 40:23, 41:5
**closed** [1] - 56:22
**closing** [6] - 18:11, 41:7, 71:10, 76:14, 77:4, 77:20
**CO** [1] - 1:9
**Colonial** [1] - 1:22
**Colorado** [1] - 39:3
**coming** [1] - 74:6
**commencing** [1] - 1:17
**comments** [1] - 51:12
**commission** [4] - 48:15, 48:22, 49:2, 83:18
**Company** [1] - 50:23
**compiled** [2] - 76:10, 76:11
**completed** [1] - 27:13
**complicated** [1] - 57:2
**complied** [1] - 63:15
**comply** [9] - 31:6, 64:11, 64:23, 65:4, 65:16, 66:2, 66:18, 67:4, 67:21
**complying** [1] - 67:1
**concede** [1] - 59:17
**concluded** [1] - 82:13
**condition** [3] - 56:2, 56:18, 57:6
**conditions** [1] - 10:5
**condo** [1] - 20:9
**conducted** [1] - 78:15
**confidentiality** [1] - 18:1
**confirm** [1] - 24:15
**connection** [4] - 49:22, 49:23, 50:24, 51:4
**Conroy** [1] - 2:6
**consider** [1] - 20:10
**considered** [2] - 7:14, 8:13
**Constitution** [1] - 2:7
**construction** [3] - 26:10, 28:20, 29:13
**consult** [1] - 74:12
**Contact** [3] - 26:11, 28:21, 29:14
**contact** [4] - 20:3, 39:24, 40:4, 40:9
**contained** [3] - 24:14, 76:15, 78:24
**contents** [1] - 16:13
**contingencies** [1] - 18:24
**continue** [1] - 79:13
**contract** [4] - 18:10, 18:22, 19:21, 34:16
**Contract'** [1] - 19:7
**CONTROL** [1] - 83:23
**control** [1] - 72:15
**conversation** [1] - 37:18
**copies** [4] - 21:10, 43:23, 44:2, 49:21
**copy** [1] - 27:20
**Corporation** [66] - 6:1, 7:11, 7:15, 11:21, 12:24, 13:4, 13:11, 13:24, 14:4, 22:2, 22:3, 22:14, 22:17, 23:14, 25:22, 26:6, 31:17, 32:16, 32:19, 33:5, 34:5, 34:20, 41:12, 50:6, 50:15, 53:5, 54:8, 54:14, 55:13, 57:12, 57:22, 58:1, 58:18, 59:4, 59:18, 63:6, 63:13, 63:15, 64:6, 64:10, 64:22, 65:3, 65:15, 65:20, 65:24, 66:1, 66:15, 66:17, 67:4, 67:14, 67:21, 68:15, 69:3, 70:21, 72:12, 72:16, 73:19, 74:12, 74:22, 75:9, 76:6, 77:2, 78:7, 80:16, 80:21, 81:4
**corporation** [4] - 14:7, 14:10, 14:14, 14:19
**CORPORATION** [1] - 1:5
**Corporation's** [2] - 54:22, 55:5
**correct** [15] - 11:22, 25:24, 30:5, 39:8, 42:8, 48:4, 54:11, 54:17, 55:13, 59:22, 63:17, 64:12, 67:23, 72:12, 73:2
**Correct** [3] - 55:14, 59:23, 60:5
**corrected** [2] - 54:24, 78:4
**cost** [1] - 77:22
**costs** [4] - 50:5, 50:16, 76:5, 77:18
**counsel** [2] - 5:3, 24:11
**counsel's** [1] - 44:7
**counter** [2] - 20:23
**countered** [1] - 17:17
**counteroffer** [1] - 42:14
**counteroffered** [2] - 42:8, 42:13
**country** [1] - 47:4
**course** [1] - 35:19
**COURT** [1] - 1:1
**court** [8] - 45:19, 59:15, 60:10, 66:9, 68:23, 71:21, 73:5, 75:5
**cover** [1] - 38:20
**coverage** [1] - 43:16
**CSR** [1] - 83:18
**current** [2] - 7:10, 7:12
**customary** [1] - 35:7
**customer** [2] - 17:7, 36:12
**customers** [2] - 32:4, 33:4

D

**damages** [3] - 7:5, 76:5
**date** [5] - 8:1, 11:2, 19:1, 19:2
**dated** [3] - 38:21, 41:22, 41:23
**Dated** [4] - 4:8, 4:13, 21:12, 38:16
**David** [8] - 17:20, 32:6, 37:8, 37:18, 40:2, 40:4, 42:2, 52:3
**days** [3] - 20:2, 40:24, 41:5
**deal** [3] - 23:6, 36:5, 36:21
**dealing** [2] - 17:4, 32:17
**dealings** [3] - 7:19, 36:4, 67:6
**dealt** [3] - 17:2, 23:18, 35:4
**decided** [1] - 23:17
**decision** [6] - 9:20, 55:15, 73:18, 74:13, 74:21, 75:7
**decision-making** [1] - 73:18
**deed** [1] - 56:23
**default** [3] - 55:21, 57:7, 71:11
**defaulted** [2] - 55:19, 68:12
**Defendants** [4] - 1:10, 1:14, 2:8, 5:15
**deficient** [3] - 56:2, 56:18, 57:6
**defined** [1] - 56:18
**definitely** [1] - 32:2
**delivered** [5] - 11:19, 26:20, 54:15, 56:3, 56:17
**delivery** [2] - 16:19, 16:20
**Delman** [8] - 31:21, 31:22, 32:10, 32:12, 32:14, 32:17, 47:17
**DelPonte** [3] - 8:2, 10:22, 12:19
**demand** [1] - 75:23
**demanded** [1] - 43:18
**demands** [2] - 8:7, 8:9
**Denver** [1] - 39:3
**depo** [1] - 73:15
**DEPONENT** [1] - 3:2
**deponent** [1] - 5:4
**deponent's** [1] - 5:6
**deposes** [1] - 5:16
**Deposit** [1] - 18:10
**deposit** [17] - 54:10, 55:6, 55:16, 55:19, 55:24, 56:20, 56:21, 59:11, 70:22, 71:7, 71:15, 72:3, 74:14, 74:16, 74:23, 75:11, 75:24
**deposition** [9] - 5:5, 5:23, 6:12, 9:8, 55:3, 55:11, 82:10, 82:13, 83:9
**Deposition** [3] - 4:4, 6:6, 6:19
**DEPOSITION** [1] - 1:13
**describe** [2] - 16:12, 17:3
**Described** [3] - 4:6, 6:8, 6:21
**DESCRIPTION** [1] - 4:2
**designated** [1] - 8:2
**details** [3] - 26:12, 28:22, 29:15
**developer** [1] - 20:8
**Developers** [1] - 50:15
**die** [1] - 8:11
**different** [5] - 27:9, 35:7, 47:3, 47:4, 62:24
**diligence** [2] - 61:19, 63:10
**DIRECT** [3] - 3:5, 5:17, 83:23
**Directing** [1] - 30:11
**DIRECTION** [1] - 83:23
**directly** [1] - 45:5
**director** [8] - 13:13, 13:19, 13:20, 13:21, 14:2, 14:3, 14:14, 14:18
**directors** [5] - 13:10, 13:12, 13:17, 13:18, 14:8
**disagree** [3] - 73:17, 74:4, 74:8
**disagreement** [1] - 74:7
**disclose** [15] - 54:14, 56:1, 56:16, 57:12, 57:17, 58:1, 58:18, 59:18, 59:24, 60:1, 60:13, 60:15, 60:20, 62:20, 63:4
**disclosed** [3] - 25:22, 26:4, 28:17
**Disclosure** [15] - 22:19, 25:11, 25:18, 26:8, 55:23, 56:15, 63:16, 63:20, 64:24, 65:5, 66:3, 66:19, 67:5, 67:22, 76:2
**disclosure** [37] - 22:22, 23:8, 23:22, 23:23, 24:12, 24:17, 24:23, 25:2, 25:8, 25:15, 25:21, 27:21, 28:2, 29:17, 29:24, 30:1, 30:3, 30:13,

31:12, 54:15, 56:3, 56:17, 57:13, 57:19, 58:7, 58:13, 58:14, 58:19, 59:19, 63:23, 64:1, 64:7, 64:19, 67:11, 67:13, 67:15, 67:19
disclosures [6] - 23:10, 26:17, 27:9, 31:9, 57:23, 59:5
discount [3] - 41:1, 41:2, 41:5
discovered [1] - 78:14
discussed [3] - 39:17, 51:19, 75:22
Discussion [2] - 15:6, 16:7
discussion [2] - 39:12, 40:3
District [11] - 29:8, 30:18, 58:3, 58:21, 59:6, 59:22, 61:24, 62:9, 62:22, 72:23, 73:13
district [21] - 25:24, 26:4, 26:9, 28:4, 28:16, 28:19, 29:12, 54:17, 57:15, 61:2, 61:8, 61:16, 68:18, 69:8, 69:16, 69:21, 69:24, 70:2, 70:5, 70:9, 70:14
DISTRICT [2] - 1:1, 1:2
document [14] - 10:15, 11:8, 11:11, 26:13, 26:15, 33:24, 34:8, 38:20, 39:5, 50:17, 52:22, 54:3, 54:5
documents [15] - 7:4, 8:15, 15:9, 15:20, 16:21, 24:6, 24:14, 49:20, 50:4, 52:4, 53:19, 76:8, 79:12, 82:4, 82:6
Documents [2] - 4:12, 21:21
DOES [1] - 83:22
dollar [7] - 23:17, 42:6, 42:10, 74:23, 75:11, 80:2, 80:11
dollars [9] - 42:9, 42:18, 42:19, 54:11, 55:17, 80:10, 80:22, 81:1, 81:3
done [12] - 37:12, 44:23, 45:1, 45:14, 45:24, 78:10, 78:12, 78:18, 79:10, 80:9, 80:24, 81:2
down [6] - 19:14, 24:8, 29:2, 42:18, 57:4, 57:9
draft [5] - 17:18, 18:22, 19:6, 19:23
drafted [1] - 32:8
draw [1] - 64:18
drawn [1] - 63:11
Drive [1] - 1:22
drop [2] - 42:17, 42:20
dropped [1] - 42:24
due [2] - 61:19, 63:10
dug [1] - 20:16
duly [2] - 5:15, 83:10
during [4] - 31:17, 34:14, 44:24, 78:14
During [2] - 34:7, 35:19
duties [6] - 9:3, 9:13, 9:16, 10:8, 14:17, 14:22

## E

E-mail [1] - 20:4
early [3] - 35:3, 35:16, 36:3
EDRA [1] - 1:8
Edwards [1] - 2:6
effect [1] - 28:3
effort [2] - 52:18, 52:20
efforts [3] - 31:16, 43:18, 43:24
either [1] - 59:19
electrical [1] - 77:20
Enclosed [1] - 38:22
encourage [1] - 20:10
end [1] - 18:19
ends [1] - 39:2
Engineers [1] - 77:10
engineers [2] - 17:23, 78:16
entire [1] - 46:13
entitled [6] - 55:18, 55:21, 55:24, 56:19, 59:7, 73:21
Eric [2] - 17:11, 17:19
ESQUIRE [2] - 2:2, 2:6
established [1] - 72:17
Estate [22] - 4:16, 4:17, 22:19, 25:10, 25:18, 26:8, 31:22, 49:14, 49:16, 50:18, 50:19, 55:23, 56:15, 63:16, 63:20, 64:24, 65:5, 66:2, 66:19, 67:5, 67:22, 76:2
estate [21] - 9:18, 10:12, 10:13, 12:22, 19:2, 19:3, 19:6, 22:22, 23:22, 23:23, 24:12, 25:21, 29:17, 42:4, 51:1, 54:15, 56:2, 56:16, 57:13, 58:19, 62:13
et [1] - 42:4
Europe [1] - 17:21
event [2] - 22:12, 48:22
events [1] - 78:11
eventually [2] - 17:9, 42:22
exact [1] - 8:1
EXAMINATION [2] - 3:5, 5:17
example [2] - 27:20, 45:4
except [4] - 5:9, 7:7, 51:16, 52:10
exchanged [1] - 56:23
Excuse [2] - 24:4, 32:12
execution [2] - 16:19, 16:20
Exhibit [34] - 6:10, 6:18, 21:13, 21:19, 21:22, 24:1, 24:3, 24:4, 24:10, 24:18, 28:13, 29:19, 30:7, 30:9, 30:11, 34:1, 34:10, 38:17, 38:19, 42:12, 49:10, 49:12, 49:17, 49:20, 50:12, 50:18, 51:24, 52:2, 53:4, 76:8, 76:15, 76:16, 76:17, 78:24
exhibit [1] - 24:5
exhibits [1] - 82:9
expansion [3] - 26:10, 28:20, 29:13
expected [3] - 63:9, 66:1, 66:17
expenditures [1] - 49:22
expense [3] - 77:7, 77:14, 77:17
expenses [5] - 76:12, 76:19, 76:20, 77:1, 77:12
experience [2] - 76:1, 76:4
experienced [1] - 47:6
expires [1] - 83:18
explain [3] - 7:22, 38:8, 53:8
explained [2] - 43:6, 59:1
explaining [1] - 46:13

## F

fact [12] - 14:13, 28:16, 31:6, 37:24, 39:7, 46:19, 47:11, 47:13, 58:10, 63:22, 68:2, 70:8
facts [1] - 61:13
fail [1] - 59:4
failed [2] - 36:6, 54:14
Failing [1] - 60:20
fails [2] - 56:1, 56:16
failure [6] - 59:24, 60:1, 60:13, 60:15, 67:12, 68:7
Fair [1] - 79:5
fair [2] - 45:3, 81:20
familiar [1] - 25:13
family [1] - 8:7
famous [1] - 35:9
far [3] - 9:5, 42:16, 44:22
father [1] - 8:8
felt [3] - 22:7, 40:8, 51:21
fiancée [1] - 42:3
fifth [1] - 55:1
fill [1] - 52:10
fill-ins [1] - 52:10
filled [2] - 52:23, 64:10
filling [1] - 25:11
final [2] - 19:8, 36:24
finally [1] - 73:1
financing [3] - 20:24, 42:11, 42:14
Fine [11] - 35:14, 38:6, 39:16, 44:12, 45:9, 45:10, 51:4, 52:12, 52:19, 52:20, 52:21
fine [1] - 44:14
finish [2] - 43:8, 81:24
firm [3] - 35:9, 46:20, 48:5
first [13] - 5:15, 17:24, 18:14, 18:15, 18:16, 19:9, 20:20, 20:21, 25:17, 35:4, 38:24, 46:24, 47:1
five [12] - 19:17, 20:24, 22:24, 23:1, 23:4, 23:22, 24:17, 26:16, 27:9, 42:11, 55:8, 62:23
Five [1] - 23:2
five-minute [1] - 55:8
folks [1] - 39:12
followed [1] - 46:15
following [4] - 18:21, 74:14, 76:13, 77:3
follows [8] - 5:16, 45:20, 60:11, 66:10, 68:24, 71:22, 73:6, 75:6
Ford [51] - 9:23, 9:24, 10:4, 11:17, 12:1, 12:3, 14:5, 14:15, 15:13, 15:14, 15:23, 16:2, 16:3, 16:10, 16:24, 17:4, 17:5, 17:20, 22:2, 22:7, 22:13, 22:18, 22:20, 22:23, 23:24, 24:13, 25:21, 27:10, 29:18, 32:6, 36:18, 36:19, 36:21, 37:8, 37:18, 39:7, 40:2, 40:4, 40:19, 41:3, 42:2, 42:22, 48:14, 48:17, 49:1, 50:9, 52:3, 52:11, 52:23, 53:4, 53:19
Ford's [4] - 22:4, 41:9, 53:1, 78:15
Fords [1] - 26:20
foregoing [1] - 83:8
FOREGOING [1] - 83:21
form [48] - 5:10, 12:5, 12:21, 22:18, 23:8, 25:16, 27:1, 27:3, 27:11, 27:13, 27:14, 27:16, 28:6, 30:3, 31:4, 32:23, 52:17, 52:21, 53:15, 56:6, 56:17, 57:1, 57:19, 58:9, 58:13, 58:14, 59:10, 59:13, 60:4, 60:22, 61:10, 62:2, 63:19, 63:23, 64:1, 65:18, 66:6, 67:8, 67:11, 67:13, 68:6, 68:7, 68:20, 69:18, 71:17, 72:9, 75:2
formal [4] - 19:21, 47:18, 70:24, 71:3
formally [1] - 48:1
Forms [1] - 22:19
forms [27] - 22:22, 23:22, 23:23, 24:12, 24:17, 24:23, 25:3, 25:8, 25:12, 25:21, 27:8, 54:15, 56:3, 57:13, 58:7, 58:19, 59:19, 64:7, 64:11, 64:13, 64:16, 64:17, 64:19, 67:15, 67:19, 67:23, 68:2

forth [4] - 7:1, 42:12, 52:15, 76:7
forward [2] - 43:7, 44:9
four [4] - 22:24, 23:9, 23:10, 31:8
Friday [2] - 1:17, 83:10
friend [1] - 25:7
full [1] - 5:19
functioning [2] - 14:13, 14:16
functions [1] - 8:12
fund [1] - 36:14
furnished [2] - 38:12, 38:13

G

General [1] - 29:10
Generally [1] - 9:3
generally [1] - 16:13
gentleman [1] - 81:15
Germain [1] - 79:8
Given [2] - 59:24, 60:12
given [5] - 25:16, 26:15, 62:14, 68:3, 79:7
Goldman [1] - 36:13
Good's [2] - 48:16, 48:19
Gorham [5] - 17:6, 31:19, 36:12, 41:18, 41:20
Group [2] - 4:12, 21:21
group [2] - 24:10, 24:14
GUARANTEE [1] - 1:9
guess [4] - 14:6, 35:16, 47:5, 50:16
Guido [3] - 3:2, 5:21, 83:9
GUIDO [2] - 1:13, 5:13
Gustave [13] - 17:5, 17:6, 19:13, 31:19, 32:13, 34:11, 41:10, 41:11, 41:13, 47:14, 48:4, 48:5, 48:10

H

halfway [1] - 29:2
hand [1] - 83:14
handing [1] - 54:4
handle [2] - 22:8, 80:4
handling [1] - 40:8
handwriting [1] - 52:24
Hang [1] - 55:7
happy [1] - 69:20
hard [1] - 44:4
Harry [2] - 38:5, 76:11
Hawes [2] - 54:9, 74:15
Head [2] - 1:16, 2:3
hear [1] - 75:14
hedge [1] - 36:14
held [2] - 13:4, 82:10
hereby [3] - 5:2, 29:11, 83:7
hereunto [1] - 83:13
highest [1] - 41:8
himself [1] - 36:10
historic [21] - 25:23, 26:3, 26:9, 28:4, 28:16, 28:19, 29:12, 54:17, 57:15, 61:1, 61:8, 61:16, 68:18, 69:8, 69:15, 69:21, 69:24, 70:2, 70:5, 70:9, 70:13
Historic [11] - 29:7, 30:18, 58:3, 58:21, 59:6, 59:22, 61:24, 62:9, 62:22, 72:23, 73:12
hit [1] - 73:2
Hodosh [2] - 1:16, 2:3
hold [1] - 18:13
holding [1] - 79:7
home [1] - 77:11
house [4] - 18:9, 19:4, 20:9, 23:9
House [2] - 4:11, 21:18

I

idea [2] - 33:16, 81:2
identification [8] - 6:11, 21:14, 21:20, 21:23, 38:18, 49:11, 49:13, 49:18
identify [4] - 6:17, 49:19, 50:11, 50:20
ill [1] - 8:8
important [9] - 61:22, 62:7, 68:16, 69:4, 69:10, 69:11, 69:13, 72:20, 73:8
impressed [2] - 47:8, 47:12
improve [1] - 20:8
IN [1] - 83:13
Inc [1] - 50:16
incapacitated [1] - 14:24
incentive [1] - 40:22
include [3] - 26:14, 30:19, 59:4
included [5] - 15:8, 26:13, 27:15, 30:20, 51:6
Including [2] - 4:11, 21:17
including [1] - 18:8
increases [1] - 70:1
incurred [1] - 77:13
independent [9] - 8:3, 10:16, 11:5, 61:4, 61:12, 61:14, 61:18, 62:14, 64:18
indicated [1] - 54:13
indicting) [1] - 30:2
informal [1] - 19:24
Information [3] - 4:17, 49:15, 50:19
information [10] - 28:2, 29:1, 29:4, 30:13, 39:13, 44:11, 46:4, 50:22, 51:21, 61:17
inserted [1] - 51:18
inspect [3] - 17:24, 21:8, 63:7
inspected [1] - 43:2
inspection [9] - 18:23, 21:8, 26:12, 28:22, 29:15, 42:15, 62:15, 77:11, 78:15
inspections [1] - 37:12
instruct [2] - 73:16, 74:4
intends [1] - 40:11
intention [1] - 67:2
interest [6] - 18:17, 32:5, 42:11, 77:13, 79:17, 79:19
Interest [2] - 19:17, 77:17
interested [4] - 15:23, 36:15, 43:9, 43:11
interior [1] - 19:5
internationally [1] - 35:8
interrupted [1] - 41:17
introduction [1] - 41:9
invest [1] - 81:8
investigation [4] - 61:5, 61:12, 61:14, 61:18
investigations [1] - 37:13
invoices [3] - 49:21, 78:24, 79:4
involved [7] - 9:19, 10:2, 31:23, 31:24, 36:5, 43:4, 70:13
involvement [2] - 48:16, 48:19
ISLAND [2] - 1:2, 83:3
Island [28] - 1:14, 1:15, 1:17, 4:18, 13:17, 22:18, 25:10, 25:17, 26:7, 29:9, 31:2, 35:15, 38:7, 49:16, 50:20, 55:22, 56:14, 63:16, 63:20, 64:23, 65:4, 65:16, 66:2, 66:18, 67:5, 67:22, 76:2, 83:7
issued [2] - 23:23, 24:12
item [1] - 30:2
Item [1] - 30:21
itemization [1] - 78:22

J

January [9] - 10:21, 13:2, 15:11, 31:14, 33:7, 34:14, 50:8, 76:14, 77:4
Jeff [1] - 38:5
Jersey [1] - 39:1
Joan [3] - 10:20, 10:22, 12:18
job [1] - 44:1
joint [2] - 52:18, 52:20
July [2] - 34:3, 34:15
June [1] - 31:18

K

Karen [3] - 8:2, 10:22, 12:19
Kentucky [1] - 35:11
kickers [1] - 47:23
kind [1] - 46:15
knowledge [5] - 38:13, 46:3, 46:17, 72:5, 83:12
Knowledgeable [3] - 4:5, 6:7, 6:20
knowledgeable [1] - 55:12
known [3] - 35:8, 46:20, 48:5
Kojoian [1] - 76:11
Kravitz [3] - 35:14, 38:6, 39:16

L

language [11] - 27:8, 27:17, 28:7, 28:15, 29:16, 29:20, 30:14, 30:19, 30:20, 31:10
last [11] - 9:21, 33:8, 45:18, 53:2, 59:14, 60:9, 66:8, 68:22, 71:20, 73:4, 75:4
latter [1] - 50:9
law [10] - 13:17, 31:2, 51:20, 56:7, 56:12, 56:13, 64:11, 65:7, 65:16, 67:1
Law [2] - 1:15, 67:5
Laws [1] - 29:10
laws [1] - 67:2
lawsuit [1] - 25:19
lawyer [4] - 22:4, 22:8, 22:12, 27:5
Lawyers [1] - 64:18
lawyers [2] - 19:22, 74:12
lay [1] - 61:24
learned [1] - 31:20
less [1] - 61:20
Letter [4] - 4:8, 4:13, 21:12, 38:16
letter [9] - 19:12, 20:18, 38:20, 41:22, 41:23, 42:1, 54:8, 54:13, 74:15
libbing [1] - 44:19
license [1] - 45:12
Life [1] - 19:3
Lila [3] - 31:21, 32:14, 32:17
limitations [3] - 26:11, 28:21, 29:14
limited [1] - 20:3
list [2] - 34:6, 38:12
listed [6] - 41:12, 47:16, 48:1, 53:9, 53:12, 79:12
Listen [2] - 60:7, 68:20
listing [12] - 33:1, 33:6, 33:11, 33:13, 34:4, 34:11, 34:17, 35:8, 35:18, 38:24, 47:18, 47:19
live [1] - 20:7
local [3] - 26:11, 28:21, 29:14
located [24] - 25:23, 26:3, 26:9, 28:15, 28:18, 29:7, 29:11, 30:16, 54:16, 57:15,

58:2, 58:21, 59:5, 59:21, 61:1, 61:8, 62:9, 62:22, 68:18, 69:7, 69:15, 70:5, 72:22, 73:11
**location** [1] - 28:24
**look** [6] - 13:14, 13:15, 14:8, 24:6, 51:11, 54:3
**looking** [1] - 21:6

## M

**MA** [1] - 2:7
**magazines** [2] - 43:15, 46:12
**magnificent** [1] - 44:1
**mail** [1] - 20:4
**maintain** [1] - 78:12
**maintenance** [6] - 77:22, 77:23, 78:2, 78:10, 79:9, 79:11
**manage** [3] - 9:18, 10:11, 10:13
**manager** [1] - 36:14
**mansion** [7] - 17:13, 23:15, 27:23, 29:6, 30:4, 30:15, 31:12
**March** [17] - 1:17, 4:13, 38:16, 38:21, 54:7, 55:17, 70:23, 71:8, 71:16, 72:4, 74:15, 74:23, 75:12, 75:18, 83:10, 83:14
**Marion** [1] - 32:10
**mark** [1] - 6:3
**marked** [18] - 6:10, 6:17, 21:13, 21:18, 21:21, 24:1, 24:9, 33:24, 38:17, 38:19, 49:10, 49:12, 49:17, 49:20, 50:12, 50:17, 55:4, 76:8
**market** [6] - 31:23, 32:21, 33:1, 33:8, 37:17, 77:7
**marketing** [6] - 37:2, 43:4, 43:18, 45:14, 45:24, 77:7
**Massachusetts** [1] - 1:23
**material** [8] - 60:2, 60:16, 60:19, 60:23, 61:6, 61:11, 61:16, 73:21
**materially** [3] - 56:1, 56:18, 57:6
**matter** [9] - 37:24, 40:2, 51:21, 51:23, 70:6, 70:11, 70:12, 70:16, 70:17
**matters** [1] - 7:1
**Matters** [3] - 4:6, 6:8, 6:21
**mean** [10] - 9:9, 9:22, 11:8, 14:16, 14:24, 20:17, 29:21, 53:16, 76:23, 79:22
**MEANS** [1] - 83:22
**measure** [2] - 47:10, 47:13
**Medical** [1] - 50:15
**meeting** [5] - 38:4, 38:6, 39:15, 40:3
**Melanie** [6] - 31:21, 32:11, 32:12, 32:17, 47:17
**met** [1] - 35:15
**method** [1] - 46:7
**Michael** [10] - 35:14, 38:6, 39:16, 45:9, 45:10, 51:4, 52:12, 52:19, 52:20, 52:21
**might** [1] - 80:7
**Mike** [1] - 44:12
**million** [36] - 17:12, 17:16, 17:17, 18:9, 19:10, 19:15, 19:16, 19:17, 20:22, 23:16, 36:22, 37:9, 39:20, 39:21, 39:22, 40:21, 42:6, 42:9, 42:10, 42:18, 42:20, 42:21, 43:1, 43:5, 54:10, 55:17, 74:23, 75:11, 80:2, 80:10, 80:11, 80:21, 80:24, 81:3
**mind** [2] - 16:5, 41:16
**minds** [1] - 48:12
**mine** [2] - 25:8, 75:20
**minute** [1] - 55:8
**Miramar** [41] - 4:10, 4:17, 9:20, 10:5, 11:15, 11:21, 12:1, 14:4, 16:9, 17:1, 18:7, 21:16, 31:16, 32:21, 34:17, 36:15, 38:23, 42:3, 44:24, 48:24, 49:15, 49:23, 50:5, 50:19, 50:24, 53:20, 57:14, 59:21, 65:6, 66:3, 66:20, 68:17, 69:6, 69:14, 69:19, 69:22, 70:3, 70:12, 72:21, 73:9, 76:13
**misspoke** [1] - 79:15
**mistake** [1] - 55:1
**mitigation** [1] - 7:5
**moment** [1] - 30:15
**money** [9] - 68:10, 68:12, 73:20, 80:10, 81:5, 81:7, 81:17, 81:18, 81:19
**months** [2] - 34:22, 35:2
**mortgage** [13] - 18:14, 18:15, 18:16, 77:17, 79:20, 79:23, 79:24, 80:3, 80:5, 80:7, 80:9, 80:11, 80:21
**MORTGAGE** [1] - 1:9
**Most** [3] - 4:4, 6:6, 6:20
**most** [3] - 25:2, 27:11, 55:12
**mother** [1] - 8:7
**motions** [1] - 5:10
**mouth** [1] - 76:24
**move** [1] - 64:20
**moving** [1] - 77:12
**MR** [76] - 3:6, 5:18, 6:3, 7:3, 7:9, 9:7, 11:16, 11:17, 12:4, 12:20, 15:5, 15:12, 15:15, 15:19, 16:1, 16:6, 20:14, 20:15, 21:9, 24:2, 24:16, 26:24, 27:4, 28:5, 30:9, 32:22, 33:17, 33:20, 38:14, 44:15, 45:16, 53:14, 53:23, 54:1, 54:19, 54:23, 55:7, 56:5, 56:24, 59:9, 59:12, 60:3, 60:6, 60:21, 61:9, 62:1, 63:18, 65:17, 66:5, 67:7, 68:19, 69:9, 69:17, 71:17, 72:8, 72:10, 72:24, 73:14, 73:17, 73:23, 74:2, 74:3, 74:18, 75:1, 75:14, 75:17, 76:17, 76:20, 76:21, 78:23, 79:6, 79:14, 81:22, 82:2, 82:5, 82:7
**must** [1] - 28:16
**mutually** [1] - 20:1

## N

**name** [3] - 5:19, 13:1, 53:13
**names** [2] - 7:20, 12:18
**Nancy** [11] - 10:18, 10:20, 10:23, 12:18, 32:18, 36:9, 38:4, 51:11, 53:6, 53:8, 75:22
**nationally** [1] - 46:20
**necessary** [1] - 8:14
**need** [4] - 10:16, 11:4, 14:7, 22:8
**needed** [3] - 14:7, 78:10, 79:9
**negotiate** [1] - 35:17
**negotiated** [1] - 17:7
**negotiating** [2] - 17:8, 48:14
**negotiations** [7] - 34:21, 34:23, 35:1, 35:19, 35:22, 37:5, 51:7
**never** [5] - 32:24, 41:12, 45:5, 51:19, 81:18
**New** [3] - 17:11, 22:8, 39:1
**Newport** [16] - 4:18, 29:7, 30:18, 48:6, 49:16, 50:15, 50:20, 58:3, 58:21, 59:6, 59:22, 61:24, 62:9, 62:22, 72:23, 73:12
**newspapers** [1] - 43:13
**Next** [1] - 74:5
**nice** [1] - 74:4
**nine** [1] - 19:15
**NO** [2] - 1:3, 4:2
**Northeast** [1] - 77:10
**NOT** [1] - 83:22
**notarization** [1] - 5:6
**Notary** [2] - 1:15, 83:6
**Note** [1] - 82:7
**NOTE** [1] - 83:21
**nothing** [2] - 14:1, 17:20
**Notice** [3] - 4:3, 6:5, 6:19
**notice** [9] - 5:23, 26:7, 30:13, 30:22, 30:24, 31:3, 31:5, 55:11, 78:6
**noticed** [1] - 55:4
**notices\disclosure** [1] - 29:3
**notifications** [1] - 28:18
**notified** [3] - 29:11, 71:14, 72:1
**November** [2] - 33:8, 83:19
**number** [1] - 20:12
**Number** [19] - 18:22, 18:23, 18:24, 24:1, 24:3, 24:4, 24:18, 27:22, 30:7, 30:9, 30:11, 34:1, 50:13, 51:24, 52:2, 53:4, 54:21, 55:4

## O

**object** [2] - 59:12, 61:9
**Object** [17] - 12:4, 12:20, 28:5, 32:22, 53:14, 56:5, 56:24, 59:9, 60:3, 60:21, 63:18, 65:17, 66:5, 67:7, 68:19, 69:17, 75:1
**objected** [1] - 72:8
**objection** [1] - 28:9
**Objection** [2] - 26:24, 62:1
**objections** [1] - 5:9
**obligated** [4] - 57:12, 57:17, 64:11, 67:10
**obligation** [4] - 58:1, 58:17, 62:20, 63:3
**obtaining** [1] - 47:15
**OF** [6] - 1:2, 1:13, 83:3, 83:21, 83:22, 83:23
**offer** [8] - 19:9, 20:7, 20:11, 21:7, 23:17, 41:4, 42:6, 42:10
**offered** [3] - 17:16, 36:21, 43:5
**office** [2] - 24:9, 58:9
**Offices** [1] - 1:16
**official** [2] - 28:22, 29:15
**officials** [1] - 26:12
**one** [18] - 10:17, 11:5, 23:15, 32:5, 32:7, 38:24, 39:20, 39:21, 41:1, 46:12, 53:11, 54:10, 55:16, 73:3, 74:22, 75:10, 79:15
**One** [3] - 1:16, 2:7, 10:18
**operates** [1] - 14:10
**opinion** [2] - 39:17, 46:14
**opportunity** [2] - 62:14, 63:7
**original** [2] - 13:16, 41:9
**outfit** [1] - 44:6
**Outline** [2] - 4:9, 21:15
**outline** [2] - 18:6, 18:21

**outside** [5] - 45:6, 45:14, 45:23, 54:20, 74:12
**outstanding** [1] - 19:19
**overnight** [1] - 40:17
**own** [2] - 61:12, 81:5
**owned** [2] - 9:14, 11:21
**owner** [2] - 34:2, 34:9
**owns** [1] - 78:8

**P**

**P-A-N-T-E-L-E-A-K-I-S** [1] - 8:23
**p.m** [1] - 82:14
**package** [12] - 7:8, 33:15, 37:4, 40:18, 40:22, 50:23, 51:2, 51:6, 51:16, 51:18, 52:10, 52:14
**packages** [1] - 38:1
**Packet** [3] - 4:17, 49:15, 50:19
**Page** [7] - 28:1, 29:2, 29:16, 29:18, 30:5, 30:12, 53:2
**PAGE** [2] - 3:4, 4:2
**page** [4] - 29:2, 38:20, 39:2, 53:2
**pages** [1] - 38:24
**Pages** [1] - 28:14
**paid** [10] - 19:5, 19:18, 48:21, 49:3, 77:6, 77:9, 77:14, 77:21, 80:15, 80:20
**Panteleakis** [19] - 7:16, 7:23, 8:10, 8:19, 8:23, 9:2, 9:15, 10:10, 13:1, 13:5, 13:13, 14:3, 14:13, 14:20, 15:8, 36:9, 51:3, 71:13, 71:24
**Panteleakis'** [3] - 12:2, 12:22, 53:13
**paperwork** [1] - 22:16
**Paragraph** [10] - 18:22, 18:23, 18:24, 19:1, 28:14, 28:24, 55:3, 55:10, 74:1, 74:9
**parcels** [4] - 26:2, 32:20, 72:22, 73:11
**part** [22] - 24:1, 24:18, 27:3, 27:14, 30:7, 33:24, 34:10, 35:4, 36:3, 36:16, 39:8, 45:1, 50:9, 51:18, 52:1, 53:4, 58:17, 61:19, 62:16, 73:24, 77:18, 82:9
**partially** [2] - 75:20, 75:21
**particular** [1] - 29:20
**parties** [2] - 5:4, 82:8
**partner** [2] - 36:13
**parts** [1] - 47:4
**pass** [1] - 51:10
**past** [2] - 36:13, 46:5
**pay** [3] - 37:9, 43:17, 43:18
**Payable** [2] - 18:11
**payable** [2] - 18:17, 18:19
**payment** [2] - 19:14, 50:16
**payments** [1] - 19:15
**PC** [1] - 1:16
**people** [2] - 17:23, 38:2
**percent** [8] - 18:17, 19:18, 21:1, 40:24, 41:1, 41:4, 42:11
**performing** [1] - 14:22
**period** [5] - 31:17, 34:7, 34:14, 41:7, 79:22
**permission** [1] - 10:3
**person** [3] - 6:23, 55:12, 57:21
**Person** [3] - 4:4, 6:6, 6:20
**personal** [7] - 8:6, 46:17, 53:10, 69:20, 70:7, 70:18, 72:5
**pertaining** [1] - 58:7
**phone** [1] - 37:8
**picture** [1] - 22:9
**piece** [7] - 60:24, 61:1, 61:3, 61:7, 61:15, 61:23, 62:8
**Place** [2] - 1:16, 2:3
**place** [1] - 68:3
**Plaintiff** [2] - 1:6, 2:4
**plan** [2] - 41:15, 77:8
**planned** [1] - 37:17
**play** [1] - 27:5
**Plaza** [1] - 2:7
**PLEASE** [1] - 83:21
**plumbing** [7] - 77:21, 77:22, 78:1, 78:3, 78:9, 78:13, 78:19
**plus** [2] - 70:8, 70:9
**point** [5] - 32:7, 35:23, 37:19, 71:1, 80:14
**pointed** [1] - 78:5
**Pollock** [1] - 22:10
**portfolio** [1] - 47:2
**position** [2] - 68:4, 68:5
**possibilities** [1] - 20:4
**possibly** [1] - 54:18
**potential** [1] - 41:18
**power** [3] - 8:4, 9:17, 72:18
**powers** [2] - 9:12, 9:16
**practice** [1] - 46:5
**preparation** [2] - 20:17, 25:11
**prepare** [4] - 22:16, 52:6, 52:11, 77:10
**prepared** [11] - 16:23, 17:10, 24:20, 24:21, 26:19, 39:5, 39:6, 50:23, 64:13, 64:16, 77:8
**preparing** [1] - 57:23
**present** [1] - 38:5
**presented** [1] - 22:17
**presenting** [2] - 19:21, 45:7
**president** [3] - 53:13, 53:16, 53:18
**pretty** [1] - 25:13
**previously** [3] - 6:13, 7:6, 36:16
**price** [5] - 18:9, 19:17, 42:17, 42:20, 42:24
**principal** [2] - 18:18, 79:17
**printed** [2] - 27:3, 27:14
**privy** [1] - 80:8
**probe** [1] - 73:21
**problems** [1] - 78:3
**Procedure** [1] - 1:14
**proceed** [1] - 37:16
**proceeded** [3] - 17:17, 17:18, 35:17
**process** [9] - 17:8, 37:21, 39:14, 43:21, 45:2, 45:7, 46:13, 46:15, 48:3
**produce** [1] - 7:8
**produced** [8] - 6:23, 7:7, 15:9, 15:17, 16:3, 24:7, 24:8
**production** [1] - 15:10
**Professional** [2] - 1:15, 83:6
**professional** [1] - 47:9
**properties** [25] - 17:1, 31:15, 34:17, 35:6, 35:10, 44:24, 46:7, 46:14, 47:3, 48:24, 49:24, 50:6, 51:1, 53:20, 57:14, 59:21, 65:6, 66:4, 66:21, 69:14, 69:19, 69:23, 70:4, 72:21, 73:10
**Property** [1] - 26:8
**property** [86] - 9:20, 10:4, 11:21, 12:3, 14:5, 14:15, 16:10, 17:24, 20:8, 25:23, 26:3, 28:3, 28:8, 28:15, 28:18, 29:11, 31:18, 31:20, 31:23, 32:1, 32:4, 32:20, 33:2, 33:8, 33:9, 34:6, 37:2, 37:10, 37:17, 37:21, 37:22, 38:3, 39:8, 41:13, 42:7, 42:22, 43:2, 43:4, 43:10, 43:11, 45:4, 45:10, 45:13, 45:22, 46:6, 46:22, 47:15, 48:2, 48:15, 48:18, 50:8, 52:2, 54:16, 56:22, 58:2, 58:20, 59:5, 60:24, 61:1, 61:4, 61:7, 61:15, 61:20, 61:23, 62:8, 62:21, 63:7, 63:22, 68:17, 69:7, 69:15, 70:2, 70:12, 76:13, 77:3, 77:7, 77:20, 77:22, 77:24, 78:4, 78:8, 80:5, 80:12, 80:14, 80:19, 81:5
**proposal** [4] - 19:23, 20:20, 20:21, 23:17
**proposed** [2] - 18:22, 19:7
**proposing** [1] - 19:14
**prospective** [1] - 56:4
**protect** [1] - 62:17
**protected** [2] - 47:21, 70:8
**provide** [5] - 13:16, 27:8, 31:2, 56:12, 64:6
**provided** [10] - 22:23, 23:10, 25:21, 26:6, 27:9, 31:9, 33:14, 39:14, 58:20, 59:20
**Providence** [2] - 1:16, 2:4
**provides** [2] - 56:8, 56:15
**provision** [5] - 10:15, 16:18, 31:7, 40:22, 58:11
**provisions** [3] - 37:3, 58:5, 58:6
**Public** [2] - 1:15, 83:6
**Purchase** [2] - 4:9, 21:15
**purchase** [13] - 16:24, 18:7, 18:9, 19:16, 20:1, 21:24, 51:5, 52:1, 52:6, 52:8, 52:9, 53:3, 53:11
**purchased** [3] - 10:5, 68:17, 69:6
**purchaser** [3] - 55:23, 56:4, 56:17
**purport** [1] - 50:4
**pursuant** [2] - 1:14, 5:22
**put** [7] - 26:22, 27:2, 29:19, 32:20, 32:24, 51:20, 76:23
**putting** [1] - 31:7

**Q**

**quarter** [4] - 54:10, 55:16, 74:23, 75:10
**QUESTION** [7] - 45:21, 60:12, 66:11, 69:1, 71:23, 73:7, 75:7
**questions** [1] - 72:13
**quick** [1] - 40:22
**Quickly** [1] - 24:6
**quoted** [1] - 30:14

**R**

**R.C** [1] - 39:2
**rate** [1] - 46:7
**Rather** [1] - 19:20
**reached** [1] - 32:7
**Read** [4] - 60:7, 65:18, 68:20, 73:2
**read** [19] - 5:5, 27:5, 30:2, 30:17, 30:21, 45:18, 59:10, 59:13, 59:14, 60:9, 66:6, 66:8, 68:22, 71:18, 71:20, 73:4, 75:2, 75:4, 78:22
**reading** [2] - 27:19, 63:21
**Real** [20] - 4:16, 19:2, 22:18, 25:10, 25:18, 26:8, 31:22, 49:14, 50:18, 55:23, 56:14, 63:16, 63:20, 64:23, 65:4, 66:2, 66:19, 67:5, 67:22, 76:2
**real** [12] - 22:22, 23:22, 23:23, 24:12, 25:20, 29:17, 54:15,

56:2, 56:16, 57:13, 58:19, 62:13
**really** [2] - 32:5, 69:11
**Realtor** [8] - 33:6, 34:5, 34:16, 45:6, 45:9, 45:12, 48:1
**Realtor's** [1] - 45:12
**Realtors** [3] - 25:1, 64:14, 64:17
**realty** [1] - 46:12
**reason** [4] - 42:16, 54:22, 68:9, 68:11
**reasons** [1] - 55:5
**receipt** [1] - 74:14
**receive** [3] - 55:24, 59:8, 71:7
**received** [9] - 18:4, 18:6, 35:20, 37:8, 38:8, 38:10, 44:8, 54:8
**recent** [2] - 25:2, 27:11
**Recess** [2] - 21:11, 55:9
**recollection** [8] - 9:16, 10:6, 16:17, 17:15, 18:2, 46:10, 47:1, 80:3
**recommendation** [1] - 38:9
**record** [12] - 5:19, 7:4, 15:5, 15:6, 16:4, 16:7, 46:16, 46:21, 55:2, 79:7, 82:8, 82:9
**reference** [1] - 28:23
**referred** [3] - 10:9, 22:10, 35:11
**refund** [3] - 59:8, 73:19, 74:13
**refusing** [1] - 55:5
**Regarding** [3] - 4:5, 6:7, 6:20
**Registered** [2] - 1:15, 83:5
**reject** [1] - 23:18
**rejected** [2] - 36:22, 42:7
**relationship** [1] - 7:22
**relative** [1] - 7:4
**relied** [1] - 58:8
**relist** [2] - 41:14, 48:10
**rely** [1] - 46:19
**remember** [1] - 51:9
**renovation** [3] - 26:10, 28:20, 29:13
**repairs** [1] - 19:5
**replace** [1] - 8:14
**replaced** [1] - 8:1
**report** [1] - 77:11
**REPORTER** [1] - 83:23
**Reporter** [2] - 1:15, 83:6
**reporter** [8] - 45:19, 59:15, 60:10, 66:9, 68:23, 71:21, 73:5, 75:5
**REPORTING** [1] - 1:22
**represent** [3] - 60:17, 80:18, 80:19
**representative** [8] - 32:13, 32:15, 63:12, 65:23, 66:14, 68:14, 69:2, 72:11
**represented** [3] - 17:10, 22:12, 82:3
**representing** [3] - 22:13, 61:22, 62:7
**REPRODUCTION** [1] - 83:22
**request** [4] - 15:10, 44:17, 56:21, 71:7
**requested** [5] - 17:22, 59:16, 70:22, 71:15, 72:2
**requesting** [2] - 54:9, 74:16
**required** [8] - 26:7, 29:8, 31:2, 56:20, 64:23, 65:4, 65:15, 67:21
**reserved** [1] - 5:10
**residence** [4] - 69:20, 70:7, 70:15, 70:19
**respect** [7] - 11:20, 21:24, 23:16, 25:20, 28:13, 55:10, 74:7
**respective** [1] - 5:4
**response** [2] - 6:24, 20:11
**responsibilities** [3] - 9:3, 10:8, 14:18
**responsibility** [1] - 63:14
**result** [3] - 21:5, 21:7, 51:6
**return** [12] - 55:6, 55:15, 55:18, 68:9, 68:11, 70:21, 71:15, 72:3, 74:16, 74:22, 75:9, 75:24
**review** [6] - 19:8, 25:10, 25:17, 51:9, 58:10, 63:8
**reviewed** [4] - 25:15, 51:15, 52:14, 58:6
**RHODE** [2] - 1:2, 83:3
**Rhode** [28] - 1:14, 1:15, 1:16, 4:18, 13:17, 22:18, 25:10, 25:17, 26:7, 29:9, 31:2, 35:15, 38:7, 49:16, 50:20, 55:22, 56:14, 63:15, 63:20, 64:23, 65:4, 65:16, 66:2, 66:18, 67:4, 67:22, 76:1, 83:7
**RI** [1] - 2:4
**River** [1] - 39:1
**role** [3] - 7:10, 7:12, 23:21
**routine** [1] - 62:16
**RPR** [1] - 83:18
**Rule** [1] - 5:23
**rules** [2] - 6:15, 44:19
**Rules** [1] - 1:14

**S**

**S-A-L-V-A-D-O-R-E** [1] - 5:21
**Sachs** [1] - 36:13
**Saddle** [1] - 39:1
**sale** [43] - 10:2, 11:14, 15:13, 15:21, 15:22, 15:23, 15:24, 16:2, 16:3, 16:9, 16:15, 16:22, 16:23, 17:8, 22:1, 23:21, 31:20, 33:3, 33:19, 34:2, 34:6, 34:9, 34:18, 40:9, 44:23, 45:5, 45:13, 45:23, 48:2, 48:23, 48:24, 50:24, 51:5, 52:1, 52:2, 52:6, 52:8, 52:9, 53:3, 53:11, 53:19, 76:12, 77:2
**Salvadore** [16] - 3:2, 5:21, 6:12, 7:10, 16:8, 21:24, 25:20, 33:23, 38:19, 49:19, 64:20, 72:20, 73:7, 74:11, 83:9
**SALVADORE** [2] - 1:13, 5:13
**SAME** [1] - 83:22
**saw** [1] - 43:24
**Schedule** [7] - 4:7, 6:9, 6:22, 6:24, 9:11, 74:1, 74:9
**schedule** [1] - 21:2
**scope** [5] - 9:8, 54:20, 73:1, 73:15, 74:9
**seal** [1] - 83:14
**sealed** [14] - 33:19, 34:1, 34:2, 34:9, 39:8, 39:14, 43:12, 45:2, 45:6, 45:15, 46:1, 46:5, 46:23, 48:3
**second** [1] - 39:2
**secretary** [1] - 24:21
**section** [1] - 51:17
**see** [11] - 14:9, 16:17, 17:2, 19:24, 20:19, 39:3, 41:19, 43:9, 53:2, 53:6, 54:4
**seeing** [1] - 36:15
**sell** [10] - 9:14, 9:20, 10:3, 11:24, 12:3, 31:18, 33:9, 35:9, 47:5, 63:22
**seller** [8] - 53:5, 53:9, 53:10, 56:1, 56:16, 56:19, 57:7, 63:22
**seller/holder** [1] - 19:5
**selling** [8] - 35:6, 35:10, 37:22, 46:7, 46:22, 65:5, 66:3, 66:20
**sent** [5] - 17:19, 32:8, 38:1, 46:10, 51:19
**separate** [3] - 23:7, 23:23, 26:2
**September** [3] - 19:1, 36:1, 36:2
**serious** [1] - 20:5
**serve** [1] - 7:16
**Served** [1] - 6:1
**set** [5] - 7:1, 16:24, 42:12, 76:7, 83:14
**settlement** [2] - 49:4
**seven** [2] - 18:17, 21:1
**several** [1] - 32:2
**shares** [8] - 12:2, 12:16, 12:23, 13:3, 13:8, 16:14, 72:15, 72:19
**Sheehan** [1] - 22:11
**Sheldon** [35] - 23:18, 33:12, 33:21, 34:21, 35:1, 35:5, 35:12, 36:4, 36:7, 36:11, 36:23, 36:24, 37:6, 37:14, 37:18, 37:21, 39:6, 41:15, 43:3, 43:6, 43:12, 44:5, 44:12, 45:1, 45:7, 45:11, 46:4, 47:24, 48:4, 48:16, 48:18, 50:23, 77:6
**shortly** [1] - 41:24
**show** [2] - 32:3, 71:10
**showed** [2] - 32:5, 47:3
**Sid** [5] - 17:6, 31:19, 36:11, 41:18, 41:20
**sign** [2] - 5:5, 53:17
**signatory** [1] - 53:9
**signature** [1] - 5:7
**signed** [7] - 8:14, 18:1, 34:3, 37:7, 37:14, 52:23, 53:12
**signing** [3] - 18:10, 34:8, 35:23
**simple** [2] - 37:11, 64:21
**single** [1] - 47:19
**site** [1] - 77:8
**situation** [1] - 71:2
**skill** [1] - 83:12
**so-called** [2] - 8:18, 50:22
**sold** [9] - 9:21, 14:5, 14:15, 33:8, 47:4, 48:16, 48:18, 50:9, 64:24
**sole** [7] - 13:13, 13:19, 13:20, 13:21, 13:22, 14:2, 14:12
**someplace** [1] - 27:18
**sorry** [3] - 40:14, 41:1, 54:24
**sort** [1] - 31:22
**Sotheby's** [3] - 32:14, 41:13, 48:7
**special** [2] - 35:10, 46:13
**special-type** [1] - 35:10
**specifically** [5] - 25:14, 58:11, 63:24, 67:12, 68:6
**spectacular** [1] - 42:4
**Spinella** [2] - 1:16, 2:3
**St** [1] - 79:8
**stage** [1] - 18:15
**stamp** [2] - 20:12, 50:2
**Stamp** [7] - 27:21, 28:1, 29:1, 29:17, 29:18, 50:12, 50:13
**stamped** [3] - 50:1, 52:4, 54:5
**Stamped** [2] - 28:14, 30:4
**stamps** [1] - 24:8
**stand** [1] - 54:24
**started** [1] - 7:24
**starting** [3] - 27:21, 50:1, 50:12
**starts** [5] - 29:18, 29:22, 29:24, 30:15, 38:24
**STATE** [1] - 83:3
**state** [2] - 5:19, 65:19

State [1] - 83:7
statement [3] - 45:3, 49:5, 68:1
STATES [1] - 1:1
statute [7] - 56:19, 57:17, 58:6, 63:24, 67:12, 68:2, 68:6
Statute [4] - 25:11, 25:18, 26:8, 64:24
statutory [1] - 26:7
stepped [1] - 22:9
Steven [1] - 46:11
still [3] - 14:1, 36:23, 40:12
stipulated [2] - 5:2, 5:8
stock [3] - 12:9, 12:17, 13:23
stockholder [2] - 13:22, 14:12
stockholders [5] - 12:7, 12:8, 14:11, 14:21, 14:22
stop [1] - 78:1
stopped [2] - 35:22, 35:24
strike [4] - 5:10, 64:20, 65:1, 65:21
stroke [2] - 14:20, 15:1
structure [1] - 20:11
Stuart [2] - 39:1, 39:18
stuff [1] - 16:2
subdivide [1] - 20:9
subject [6] - 19:7, 26:9, 28:15, 28:19, 29:12, 42:15
Subject [3] - 4:6, 6:8, 6:21
submit [2] - 37:23, 40:16
subsequent [1] - 20:21
Subsequent [1] - 11:2
success [4] - 46:6, 46:22, 47:10, 47:13
successful [3] - 47:14, 47:17, 47:22
successor [2] - 8:5, 8:6
Suite [1] - 2:3
summary [2] - 79:1, 79:3
supposed [2] - 30:21, 31:5
Susan [2] - 1:14, 83:5
SUSAN [1] - 83:18
suspended [1] - 44:20
sworn [2] - 5:15, 83:10

**T**

taxes [1] - 19:2
team [3] - 17:23, 18:1, 21:8
technically [2] - 9:10, 14:6
ten [7] - 18:16, 18:19, 20:2, 21:3, 40:23, 41:5, 41:7
ten-day [1] - 41:7
ten-year [1] - 21:3
term [1] - 7:6
terms [14] - 10:3, 10:4, 11:4, 18:14, 18:16, 19:6, 20:1, 35:18, 36:24, 42:11, 42:14, 46:6, 46:22, 67:23
testified [2] - 32:9, 36:16
testimony [1] - 58:4
THE [11] - 15:14, 15:16, 15:22, 16:4, 75:16, 79:18, 81:24, 83:21, 83:22, 83:23, 83:23
themselves [1] - 47:6
Therefore [1] - 20:10
third [1] - 15:9
THIS [1] - 83:22
THOMAS [1] - 2:2
three [18] - 26:2, 31:15, 32:20, 34:17, 38:20, 44:23, 50:5, 53:20, 57:14, 59:20, 65:5, 66:3, 66:20, 69:14, 69:22, 70:3, 72:22, 73:11
three-page [1] - 38:20
throughout [1] - 44:20
TIMOTHY [1] - 1:8
Timothy [2] - 35:21, 55:6
tire [1] - 47:22
title [3] - 9:1, 62:15, 63:8
Title [1] - 29:9
TITLE [1] - 1:9
TO [1] - 83:22
today [5] - 5:22, 7:7, 42:2, 55:1, 72:17
together [1] - 28:17
took [5] - 11:1, 12:16, 13:2, 27:11, 36:23
top [1] - 27:22
total [1] - 19:16
totaling [2] - 77:14, 79:10
track [2] - 46:16, 46:21
transaction [3] - 36:17, 37:11, 80:4
transactions [1] - 17:3
TRANSCRIPT [1] - 83:22
transcript [2] - 5:5, 83:8
transferred [1] - 13:23
treated [1] - 14:2
tremendous [1] - 43:16
trial [1] - 5:11
tried [2] - 31:6, 47:17
trouble [1] - 27:19
true [1] - 83:11
Trust [9] - 8:19, 9:2, 10:10, 13:1, 13:5, 15:8, 51:3, 71:13, 71:24
trust [9] - 9:5, 9:13, 10:8, 12:8, 12:10, 13:24, 14:23, 16:8, 16:24
trustee [18] - 7:16, 7:18, 7:22, 8:3, 8:16, 8:17, 8:18, 9:4, 9:19, 9:24, 10:17, 11:5, 11:18, 12:11, 12:16, 16:16, 51:2, 71:4
trustees [26] - 7:20, 9:17, 10:2, 10:11, 10:14, 10:17, 10:18, 10:21, 11:6, 11:24, 12:6, 12:7, 12:22, 13:7, 14:20, 15:7, 16:14, 53:21, 70:20, 71:2, 71:6, 71:9, 71:13, 71:23, 72:14, 72:15
try [1] - 76:23
trying [3] - 23:20, 31:23, 47:5
Turks [2] - 1:16, 2:3
turn [1] - 28:1
Two [2] - 4:10, 21:17
two [15] - 10:17, 10:18, 11:5, 17:3, 17:4, 18:8, 19:4, 22:22, 38:23, 40:24, 41:4, 59:19, 64:6, 67:14, 67:19
type [2] - 35:10, 51:8
typed [1] - 24:21

**U**

uncommon [1] - 14:11
under [14] - 9:4, 9:13, 10:4, 10:5, 10:8, 14:22, 16:21, 28:1, 30:21, 46:23, 55:19, 68:13, 71:11, 79:7
Under [2] - 13:17, 29:2
UNDER [1] - 83:23
unimproved [4] - 27:23, 29:6, 30:4, 30:16
unit [1] - 23:8
UNITED [1] - 1:1
units [2] - 19:4, 23:9
UNLESS [1] - 83:22
up [11] - 16:24, 24:22, 30:3, 31:18, 33:7, 40:2, 40:3, 41:16, 48:12, 64:18, 71:10
uses [1] - 37:22
Utilities [1] - 19:4

**V**

valid [1] - 20:7
value [2] - 61:20, 70:1
various [1] - 44:20
versus [1] - 20:8
vice [2] - 53:16, 53:17
violate [1] - 67:2
voice [1] - 20:4
void [6] - 57:19, 58:14, 64:2, 67:13, 67:17, 68:8
VOKE [18] - 2:6, 3:6, 5:18, 6:3, 7:9, 11:17, 15:5, 15:15, 15:19, 16:6, 20:14, 21:9, 72:8, 73:17, 74:2, 76:20, 81:22, 82:5
Voke [1] - 82:11
vote [17] - 10:14, 10:16, 11:4, 11:7, 11:24, 12:1, 12:2, 12:3, 13:7, 15:7, 16:14, 53:20, 70:20, 70:24, 71:3, 72:18
voting [2] - 16:9, 72:15
vs [1] - 1:7

**W**

Waddell [9] - 10:19, 10:20, 10:23, 12:18, 32:18, 36:9, 53:6, 53:8, 75:23
waited [1] - 41:19
waived [1] - 5:7
wants [3] - 20:7, 69:9, 75:18
well-known [1] - 48:5
WHEREOF [1] - 83:13
White [13] - 17:6, 19:13, 31:19, 32:13, 34:12, 41:10, 41:11, 41:13, 47:14, 48:4, 48:5, 48:10
whole [3] - 51:14, 51:20, 78:22
Williams [3] - 10:20, 10:22, 12:18
willing [2] - 20:24, 37:9
WILSON [1] - 83:18
Wilson [2] - 1:14, 83:5
WITNESS [8] - 15:14, 15:16, 15:22, 16:4, 75:16, 79:18, 81:24, 83:13
witness [3] - 1:13, 5:14, 27:5
word [1] - 35:20
words [2] - 16:13, 76:23
works [1] - 45:11
world [1] - 47:5
worse [1] - 68:4
worth [1] - 78:19
writes [1] - 19:3
writing [6] - 11:6, 11:9, 11:12, 11:13, 11:14, 19:11
written [1] - 46:11
www.cjreporting.com [1] - 1:24

**X**

XXIII [1] - 29:9

**Y**

year [5] - 9:21, 12:12, 18:19, 21:3, 44:24
years [2] - 18:17, 19:16
York [2] - 17:11, 22:8

**Z**

Zimmer [1] - 39:1
Zimmer's [1] - 39:18
Zoning [1] - 28:2
zoning [4] - 51:16, 51:20, 62:16, 63:8