# EXHIBIT U

UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

CA NO 06-90S

AMERICAN CAPITAL CORPORATION,

Plaintiff

vs.

TIMOTHY L. BLIXSETH; EDRA BLIXSETH; and MORTGAGE GUARANTEE & TITLE CO.,

Defendants

DEPOSITION OF GUIDO SALVADORE, a witness called on behalf of the Defendants, pursuant to Rhode Island Rules of Civil Procedure, before Susan E. Wilson, Registered Professional Reporter and Notary Public in and for Rhode Island, at the Law Offices of Hodosh, Spinella & Angelone, PC, One Turks Head Place, Providence, Rhode Island, on Thursday, November 2, 2006, commencing at 10:45 a.m.

C.J. REPORTING
A5 Colonial Drive, No. 7
Andover, Massachusetts 01810
978.409.9090
www.cjreporting.com



APPEARANCES:

THOMAS ANGELONE, ESQUIRE
Hodosh, Spinella & Angelone
1 Turks Head Place, Suite 1050
Providence, RI 02901-1516
On Behalf of the Plaintiff.

BRIAN VOKE, ESQUIRE
Campbell, Campbell, Edwards & Conroy
One Constitution Plaza
Boston, MA 02129
617-241-3000/FAX 617-241-5115
On Behalf of the Defendants.





INDEX

DEPONENT Guido Salvadore


| | PAGE |
|---|---|
| DIRECT EXAMINATION BY MR. VOKE | 5 |






EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 9 | Subagent Commission Agreement | 9 |
| 10 | Commission Agreement | 9 |
| 11 | Documents | 22 |
| 12 | E-Mail Dated November 7, 2005 | 28 |
| 13 | E-Mail Dated November 4, 2005 | 28 |
| 14 | E-Mail Dated November 4, 2005 | 28 |
| 15 | E-Mail Dated November 10, 2005 | 28 |
| 16 | E-Mail | 46 |

STIPULATIONS

It is hereby stipulated and agreed by and between counsel for the respective parties that the deponent will read and sign the deposition transcript and that the notarization of the deponent's signature is waived.

It is further stipulated and agreed that all objections, except as to form, and motions to strike are reserved until the time of trial.

GUIDO SALVADORE,

a witness called on behalf of the Defendants, having first been duly sworn, deposes and says as follows:

DIRECT EXAMINATION

BY MR. VOKE:

Q. State your full name for the record, please?
A. **Guido R. Salvadore.**
Q. Your current address?
A. **38 Sunset Drive, East Greenwich, Rhode Island 02818.**





Q. Do you have a business office?
A. **I'm at 10 Weybosset Street, Suite 303.**
Q. Are you an attorney?
A. **Yes.**
Q. For how many years approximately?
A. **Since 1954.**
Q. How old are you?
A. **79.**
Q. Are you an officer in any corporations?
A. **I don't believe so.**
Q. Do you hold stock in any corporations?
A. **Yes. Public companies.**
Q. Any corporations that Mr. Panteleakis has an ownership interest in?
A. No.
Q. How long have you been counsel to Mr. Panteleakis?
A. **I guess since 2001 and most recently.**
Q. What about previously?
A. **Previously Andy and I were -- we were grammar school students way back, and I think I started representing Andy in his companies back in 1958 probably up through the early '90s.**





Q. With respect to the three parcels of property that are at issue in this lawsuit, were you to receive a sales commission on the sale of those properties if the sale went through to the Blixseths?
A. **I was to receive a commission or a finder's fee or some type. We had an agreement, yes.**
Q. A written agreement?
A. **Yes.**
Q. For six percent of the sale price?
A. **I believe it's six percent. The agreement, I don't have it with me.**

MR. ANGELONE: We produced it.

A. **I believe it's six percent.**
Q. Were you acting as the sales agent for American Capital Corporation with respect to the sale of the three parcels of property that makeup Miramar?
A. **Well, Andy, in effect, wanted -- he wanted me to be in charge of the marketing of those properties. And what he really wanted was that instead of him dealing**





**directly with brokers, that I would be like in between him and the broker, that I engaged with a subagent, which was Gustave White.**
Q. Were you acting as the sales agent for American Capital Corporation in selling the property?
A. **I don't know how you characterize it as a sales agent or whatever, but we had an agreement and the agreement, you know, sets forth our understanding. And as I said, this is the way Andy liked to do things. Andy didn't like to deal directly with people. He always had me in between.**
Q. I'll show you documents Bates stamped 320 through 322 and ask you if you can identify those for me, please?
A. **Yes. This is the subagent commission agreement that I entered into with Gustave White dated September 27, 2004.**
Q. I'll show you documents Bates stamped 331 to 337 and ask you if you can identify that for us, please?
A. **Yes. This is the agreement between**

American Capital Corporation, Andrew
Panteleakis and myself dated September 27,
2004.
Q. That's for your six percent commission on
the sale of the property?
A. I believe that's correct. Yes.
(Subagent Commission
Agreement marked as Exhibit
No. 9 for identification.)
(Commission Agreement marked
as Exhibit No. 10 for
identification.)
Q. Exhibit 9, the Subagent Commission
Agreement, that's an agreement with Gustave
White?
A. Yes.
Q. Exhibit Number 10 is the agreement that you
had for your six percent sales commission
on the Miramar property if it was sold to
the Blixseths?
A. The Blixseths. Correct.
Q. Or anybody else during that time frame?
A. Yes. Right. Subagent Commission Agreement
Q. Have you ever had a license as a real





estate broker?
A. No.
Q. You are just licensed as an attorney?
A. Yes.
Q. Where did you attend law school?
A. I went to Harvard Law.
Q. You graduated what year, '54?
A. '54.
Q. I want to focus on any meetings that you
had with Tim Blixseth. Can you tell me how
many times you met with Tim Blixseth?
A. The first time I met Tim Blixseth was at
Miramar. There was present Nancy Waddell,
myself, Tim Blixseth, a gentleman that was
with him that I don't recall his name but
he was in the music business, and that
would have been in September of 2005.
Q. Can you tell me what discussions took place
at that time?
A. I joined the three of them at the table in
-- I mean, generally speaking, Tim Blixseth
said that he was very impressed with the
property and he had been through it. And
after we got through the usual





pleasantries, he said, Look, I'm going to
make one offer. I want the three pieces.
He said, I'm not going to make an offer for
just the Miramar mansion. He said, I want
the carriage house. I want the unimproved
lot and the mansion. I'm going to make one
offer. I'm going to write it down and
that's it. I'm not going to negotiate.
Take it or leave it and that was it.
He wrote down on a piece of
paper. I think he ripped off a piece of
paper or something and he wrote a number
down. And then he showed it to me and
said, 25M. And I said, 25 million? And he
said, Yes. And I said, All right. I'll
get back to you.
And I called him the next
day. I think it was the next day. I'm
pretty sure. And I said, Tim, the 25M is
acceptable for the three pieces. I just
have one request. He said, What is that?
And I said, I want to be able to walk out
of the closing with 25 million. If you are
going to take -- we are going to give you





the furniture and everything and, I said,
you are going to be responsible for the
stamp taxes and the closing costs. And he
said, Well, what does that involve? I
said, The stamp tax in Rhode Island is four
dollars a thousand. And I said at 25
million, I assume they will assess the 4
dollars on the 25 million. I don't know if
you will break out for the furniture or
anything like that, but it should be no
more than 100,000 for the stamps.
He said, That's fine. Not a
problem. He said, Anything else? And I
said, No, that's it. I said, Well, I'll
prepare an agreement. He gave me the name
of his -- Andrew Hawes was his attorney. I
don't know if he E-mailed or what, but I
had the information on Andrew Hawes. He
may have given me his card at the meeting
the day before. Anyway, I did draft the
agreement shortly thereafter and sent it to
Hawes.
I think I had one other
conversation. It's not in sequence. I

mean, it's after the agreement and negotiating and all of that when he had -- I was able to reach him or he called me and --
Q. After what agreement was negotiated?
**A. Well, it's easy for me to remember in sequence. We had the -- I sent Hawes the agreement about, I would say, at least two weeks past, and I had called Hawes several times during that period but he never returned my calls. Then I realized that I guess the only response is E-mails because he doesn't respond to phone calls, so I sent him an E-mail and he responded right away that he got the E-mail and it took about more than a month before they responded to my agreement. So I would say in the middle of October, sometime the middle of October he sent back his revisions to the agreement.**
And when I saw those revisions, it raised some very substantial issues. The main one was that he had included in his draft the words, in effect,





that they would buy the property so long as the property could be used for their intended use, but they didn't define what intended use was in the agreement. So I got back to him specifically and asked him what do you mean. Let me know what you mean by "intended use." He responded by saying --
Q. "He" meaning whom?
**A. Hawes. This is all Hawes so far. He responded by spelling out the intended use. He mentioned something about a world club. He said Tim wants to use the property for a world club with a membership. That was the first time that we had heard anything about a world club. The first time I heard about it. It wasn't mentioned in September when we sat down with him the first time and he said I will buy it for 25 million. He didn't say he was going to use it for a world club or anything like that. He didn't tell us. We just assumed that he was buying it as a residence. That is how I drafted the agreement.**





So this comes back and he explains his intended use. As a result of that, I then checked into the zoning to find out if R-60 zoning permitted that. It didn't. There was only one category in the list of permitted uses that talked about yachting organizations. I don't know if I'm pronouncing that right. Y-A-C-H-T-I-N-G, yachting organizations.
I recall calling Guy Weston at the Newport Building Inspector's Office. I think he is the building inspector or the zoning official. I'm not sure. I spoke to him and I asked him what does this yachting organization mean. He said that that was put in to accommodate crew members that raced in the America's Cup races so that people could house these crew members and it wouldn't be a violation. They could stay in an R-60 zoned residence and there wouldn't be any violation. And I said, That's it? And he said, That's it. That was what it was for and that is the purpose of it. There were no other categories in





there that would allow this world club that they had talked about.
So after that, I spoke to Nancy Waddell and she said absolutely not. We are not going to agree to any zone change. They either buy the property as is, residential, and that's it. She said, I'm not going to get involved with trying to get a zone change and there will be appeals and this will go on and on. They buy it as is or we don't sell it to them.
MR. ANGELONE: Let me just add for the record that these conversations are as a broker, not as the attorney. American Capital is not waiving the attorney-client privilege. Fair enough?
MR. VOKE: Fair enough.
**A. Anyway. So I prepared an agreement. If you look at the agreement that I prepared, you will see that a lot of the things that Andrew Hawes had asked for changes I went along with, but I didn't go along with this intended use of the property. That was eliminated. I specifically put in R-60**

zoning and whatever is allowed in an R-60 zone. I put that in the agreement and I sent it to him that way.

Q. You say you put whatever is allowed in an R-60 zone?

A. Yes. I think that was the language that I used that the property -- whatever is allowed in an R-60 zone, that's how they will take it. I remember E-mailing -- not E-mailing -- overnighting to him the agreement.

Q. To Andy Hawes?

A. Yes. He asked that it be sent to his home with a Saturday delivery. That's what I recall. Because he was going to be meeting with his client Sunday at the Blixseths' home, Rancho Mirage something, in California. That's what I did. It was overnighted to him. Eventually, the agreement came back signed. The agreement required our signature.

MR. ANGELONE: There's no question pending.

Q. What were you going to say?





A. The agreement required our signature as well, so I proceeded to get my people to sign it and I also went -- we had to -- they insisted on using Mortgage Title Guarantee as the escrow agent, and they had to sign as an escrow agent. I got them to sign it and I sent back a duplicate signed original to Hawes.

Q. Did you ever tell Tim Blixseth that he could use the property under the R-60 zoning for Yellowstone World Club?

A. No. What I told him -- actually, there was a telephone conversation and he was wondering -- I think he was wondering whether he could use it in an R-60 zone. And then he must have been talking to me on his cell phone because it garbled and he was gone. I sent an E-mail I think to Hawes about that saying that Tim had expressed that and I had said in my E-mail -- I think I said something to the effect that the property is residential property. It's R-60 zone, but it's his residence.

If you have a residence, you





ought to be able to invite guests to stay at your house. I mean, who is going to stop you? We were familiar for years -- I mean, so long as -- our understanding always had been that if you didn't disturb the exterior of that property, no one complains. But if you try to disturb the exterior and change the appearance of what the public sees, then you are going to have problems. You have to get permission to do that. That was the extent of it.

Q. You told me you talked to Tim Blixseth in September of 2005 and then you referenced a telephone conversation you had with him?

A. That's the one that I just referenced.

Q. Did you speak to him on any other occasions?

A. I spoke to him the next day about the 100,000 stamps.

Q. That was you talked to him in September?

A. There were two times in September.

Q. Two times in September. Once when you met with him in Newport and then you talked to him the following day about the stamps?





A. Yes.

Q. Then you had a telephone conversation with him?

A. Yes.

Q. When was the telephone conversation?

A. I'd have to refer to, you know, my E-mail because it would have been the same day I sent the E-mail to Hawes.

Q. Tell me everything that you recall about that telephone conversation you had with Tim Blixseth?

A. I think I already told you. There wasn't much at all in the conversation because he started to talk and then I didn't hear anything. I lost him.

Q. Did you tell Mr. Blixseth during that telephone conversation that it was in your opinion he could use the property for Yellowstone World Club under the existing zone?

A. No.

Q. Did you tell him that in your opinion he could not use the property for Yellowstone World Club under the existing zoning?

21

A. I don't think I -- I don't recall if I said that it was R-60 zoning. We didn't have much of a conversation because of what happened. It was just a few words and he expressed I wonder if I can do this and then he went off. And I said, Can you hear me? Can you hear me? And there was no response and then I e-mailed to Hawes.
Q. When did you speak with Guy Weston?
A. Guy Weston, I would have talked to Guy Weston right after I found out what the intended use was. Once they told me what their intended use was, then I tried to find out if the zoning permitted it.
Q. So this would have been before you talked to Mr. Blixseth on the phone?
A. Yes. I would say so, sure.
Q. Did you tell Mr. Blixseth what Guy Weston had related to you?
A. No. What I did was I sent to Andy Hawes the information that I had been given concerning the zoning for R-60 zone as well as 120 zone. I think I faxed that to Hawes to let him know what the zoning allowed.



22

Q. Is this what you are talking about? I'm going to hand you a document.
A. No. I don't think so.
Q. Not necessarily that particular document, but the R-60 zoning, is that a description of what you sent to him?
MR. ANGELONE: Off the record.
(Documents marked as Exhibit No. 11 for identification.)
Q. I'll show you a series of four documents marked Exhibit 11 for identification. Can you tell us what those are, sir?
A. Exhibit 11 is what I received from Harry Kojoian concerning the zoning data for an R-60 residential lot.
Q. Did you ask Harry Kojoian to get this information for you?
A. I mentioned to him the intended use, and I said I need to know what the zoning is. He said, I have that information. I'll fax it to you, and this is what he sent me.
Q. You discussed with him the intended use of Yellowstone World Club?



23

A. I don't know if I discussed that, Brian. All I know is I asked him if he had any zoning information on R-60 zone and he said, yes, I have that and he sent it right away. I got it right back. He also sent me -- I think he sent me R-120 as well. I don't know why but he did.
Q. Exhibit 11 is a four-page document. It looks like you have got the third page is a fax confirmation and the last page looks like it's addressed to Andrew Hawes, a fax cover sheet. If you can just look at all of that, please.
A. Yes.
Q. So you faxed this information to Andy Hawes?
A. Yes.
Q. On the top of Exhibit 11, you faxed it on November 7, 2005?
A. Yes.
Q. On the top of the first page of Exhibit 11 it looks like "Guy Weston"?
A. I wrote that.
Q. And then that's 846-9600, is that his



24

telephone number?
A. I don't know, Brian. I think I wrote it. I also wrote --
Q. Next to yachting organizations on the first page of Exhibit 11 it says "housing of crews"?
A. I wrote that.
Q. Are those notes that you wrote down when you were speaking with Guy Weston?
A. Yes.
Q. On the second page you have got R-120 written. Strike that.
R-120 is written on the second page?
A. Yes. I didn't write that R-120, and I didn't write this. It came to me like that.
Q. "New York Yacht Club" came to you?
A. Yes. I think what this is is they tried to show me what New York Yacht Club is in an R-120 zone, and I guess because I had inquired about yachting organizations, they sent me this. They said New York Yacht Club they believed was able to do something

with their property, but it had nothing to do with R-60. They are R-120. It was all informational.
Q. This document that is the second page of Exhibit 11 that says New York Yacht Club?
A. Yes.
Q. Who did you receive that from?
A. Harry Kojoian.
Q. Do you recognize that handwriting?
A. That's not mine.
Q. Do you recognize it to be Harry Kojoian's?
A. It could be his. It could be his. It could be Jeff Waddell's. It could be anybody there at that office.
Q. Did Harry Kojoian say that he had spoken to Guy Weston?
A. No. I spoke to Guy Weston.
Q. When you spoke to Guy Weston, he told you the exception under R-60 for yachting organizations was housing of crews for America's Cup?
MR. ANGELONE: I'm going to object to the use of the word "exception."
Q. Let me restate it. He said the permitted





use for yachting organizations under R-60 was for housing of crew members for America's Cup, correct?
A. What he said was that that designation came about because of the America's Cup races and they needed to provide for the housing of crews. That's what he said. I said that was interesting.
Q. He told you that clubs were not permitted under the R-60 zoning, correct?
A. No. I never talked to him about clubs. I just wanted him to explain what that meant, what does yachting organizations mean.
Q. So Guy Weston never told you that a club was not permitted?
A. I never talked to him about clubs. I looked at what seemed to be allowed, and the only thing I could see that had a possibility was yachting organizations, and I asked him about that. What does that mean? And this is what he told me and that was it.
Q. You faxed the information that consists of Exhibit 11 to Andy Hawes?





A. Yes.
Q. When you spoke with Tim Blixseth, did you tell Mr. Blixseth that he could use the property as part of Yellowstone World Club and designate it as a yachting organization?
A. Absolutely not. No.
Q. Have you told me everything that you recall about your telephone conversation that you had with Tim Blixseth?
A. I believe so. If I left anything out, it would probably be in that E-mail that I sent to Hawes.
Q. I want to know what you recall.
A. That's what I recall. If I add --
MR. ANGELONE: There's no question pending.
A. I want to add something. I do remember in my E-mail to Hawes I did say to him that the R-60 zoning needed to be modified.
Q. When did you make that determination?
A. I made it when I sent -- after this, I think immediately I faxed this to him.
Q. Exhibit 11?





A. Exhibit 11. Yes. And I E-mailed to Hawes -- and in an E-mail to Hawes, I told him that the R-60 zoning would have to be modified for what they wanted to do. As I said before, when I spoke to Nancy Waddell, she said absolutely not. We are not going to modify or get involved in any modification. We are not going to do it. They either buy it as is or they don't.
Q. I want to show you the document Bates stamped 267. Is that the E-mail that you are referring to?
A. Yes.
(E-Mail Dated November 7, 2005 marked as Exhibit No. 12 for identification.)
(E-Mail Dated November 4, 2005 marked as Exhibit No. 13 for identification.)
(E-Mail Dated November 4, 2005 marked as Exhibit No. 14 for identification.)
(E-Mail Dated November 10, 2005 marked as Exhibit

No. 15 for identification.)
Q. You sent an E-mail dated November 7, 2005, to Andy Hawes that's been marked as Exhibit 12, correct?
A. **Yes.**
Q. That was after you spoke with Guy Weston?
A. **I believe so.**
Q. Did you have a discussion with Andy Hawes after you sent this E-mail?
A. **I don't recall having any discussion at all. I sent the E-mail. I don't think -- I really don't recall whether there was any discussion in connection with that. He usually would respond to E-mails. I don't know what his response was to that E-mail whether he said anything or not. I do know that I prepared the final agreement and I put in the R-60 zoning the way Nancy wanted it. And I sent it to them and it wasn't an issue anymore. I mean, it's just sort of a nonissue.**
Q. This is an E-mail dated November 4 to Andy Hawes where you ask him about the intended use?





A. **This is prior?**
Q. Yes. November 4. Just for the record, we have marked that as Exhibit 13.
A. **Yes.**
MR. ANGELONE: Bates stamped 270.
MR. VOKE: Bates stamped 270, yes.
MR. ANGELONE: That's exhibit --
MR. VOKE: 13.
Q. I want to show you what has been marked as Exhibit 14. Is this an E-mail that you received from Andy Hawes in response to your E-mail of November 4?
A. **Yes. Yes.**
Q. I want to show you what has been marked as Exhibit 15. It's Bates stamped 263. It's an E-mail to Andy Hawes from you dated November 10?
A. **Yes.**
Q. Let me ask you a question. Did you ever tell Tim Blixseth that you believe that the R-60 zoning would not permit the use of





Yellowstone World Club on the Miramar property?
A. **Did I ever tell him that the R-60 zoning would not permit --**
Q. Yes.
A. **-- the zoning for the Yellowstone Club?**
Q. Yes.
A. **No. It was a nonissue.**
Q. Did you ever tell Tim Blixseth what Guy Weston said to you?
A. **I didn't speak to him. I only spoke with Andy Hawes. Most of my dealings were with the attorney.**
Q. Did you ever tell Tim Blixseth what Guy Weston said to you?
A. **No.**
Q. I'm going to read to you part of the E-mail marked Exhibit 15. Starting with the second sentence of the E-mail it says -- let me read the whole thing. "Andy, I couldn't reach you yesterday but I did speak with Tim. However, his cell phone cutoff before we could complete our conversation." That's the first sentence





of the E-mail. The second sentence is, "Tim did wonder why he could not use a private residence for a private club. I tend to agree."
The next sentence is, "If Tim and his wife buy Miramar for use as their private residence, they should have the right to entertain others periodically at their residence." The last sentence of the first paragraph is, "I'm sure the details between Tim and his club can be worked out in a fashion that does not violate existing R-60 zoning."
What information did you have, sir, at the time that you sent this E-mail to suggest that Tim could make arrangements with Yellowstone World Club so he could use the Miramar property and it would not violate existing R-60 zoning?
A. **What information did I have?**
Q. Yes.
A. **It was a thought. I didn't have any information. My thought was you begin with the premise that a person has a home. It's**

**his residence. It's his private home. And I didn't see why if I had my private home I couldn't invite guests to stay at my house. It's just a matter of entertaining guests. That was my thought.**

Now, as far as what arrangements he as an owner of a private residence would make with his own club, that's between him and his club. I have no idea what arrangements they make. All I know is I believed, and it was my thought, that if you have a residence, you ought to be able to entertain people. No one complains when I invite people to my house. And there, so long as I said before, if you don't disturb the exterior of the building, no one cares really what goes on there.

Q. As long as nobody knew, he would be okay --

A. **Well --**

Q. -- that was your thought?

A. **My thought was that it's a private residence and he ought to be able to entertain people. That's my thought. It may not be his thought or his lawyer's**





**thought, but that was my thought.**

Q. Did you ever tell Tim Blixseth that you were acting as a sales agent for American Capital Corporation and that you were to receive a commission on the sale of the property?

A. No.

Q. You never disclosed that?

A. **No. I never disclosed that. It wasn't any of his business.**

Q. You never told him that you had a financial stake in the outcome of the deal?

A. **No. They knew it when we signed the settlement statement and they signed it at that time. The settlement statement included the amount and it also had -- it was signed and accepted by them. When I say them, it was Mark Johnson who was accommodator who signed the settlement statement.**

Q. That was in January of 2006?

A. **That was at the closing.**

Q. Did you ever tell Andy Hawes that you had a financial stake in the outcome of the sale





of the Miramar property to the Blixseths?

A. No.

Q. Let's go to the second paragraph of the E-mail you state, "My thought is that Tim and his club would have an understanding whereby a member in his family/guests, if any, would have the privilege of visiting and staying at Miramar as guests of Tim for a specified time under specified conditions. No rent or charges made by Tim. It's all handled through his club. I assume that the visiting guests would want the exclusive use of Miramar for the specified period." What was the purpose of making that statement to Mr. Hawes?

A. **It's just my thought. It was my thought, as I said. I still believe that if it's your home, that was my thought, you ought to be able to entertain people. I don't know what arrangements he would make with his club or what requirements there would be. I have no idea.**

Q. Did you ever send an E-mail to Andy Hawes outlining what Guy Weston had said to you





about the permitted uses of the property under R-60 zoning?

A. **I sent him that fax.**

Q. Other than that fax, did you ever send him an E-mail outlining what Guy Weston had told you?

A. **You mean that Guy Weston told me that yachting organizations, that's all he told me, pertained to housing of crew members, no.**

Q. Had you ever done any legal work for any property owners in the Newport Historic District during your career?

A. No.

Q. Had you ever attended any Newport Historic District Commission hearings?

A. No.

Q. Did you have any involvement in hiring any lawyers to represent American Capital Corporation before the Newport Historic District Commission?

A. No.

Q. Would you agree, sir, that the representations that you made to Mr. Hawes

in the E-mail of November 10 were inconsistent with what Guy Weston told you was the permitted use for the Miramar property?

MR. ANGELONE: Object to the form.

A. **I didn't make any representations.**

Q. You didn't make any representations in the E-mail?

A. **Those are my thoughts. Those aren't representations.**

Q. What is the difference between a thought and a representation?

A. **In my mind, representation has legal significance. My thoughts have no legal significance.**

Q. Is that why you chose the word "thought" to put in the E-mail?

A. **I didn't choose any words. When you said I chose the word "thought," that's what it is. That's what I said. There's a big difference between what is in someone's mind and what is represented. There weren't any representations made to these**





**people.**

Q. You don't believe you were making any representations to Andy Hawes when you sent this E-mail marked Exhibit 15?

A. **Absolutely not.**

Q. When you spoke with Tim Blixseth on the telephone, did you tell him that he should have the right to entertain others periodically at Miramar if he purchased it?

A. **I don't think -- no. Because the conversation was so short and was cut off. I didn't even get to that. I didn't get to that, Brian. I told Hawes in my E-mail. That's all I said.**

Q. Did you tell Tim Blixseth that you were sure that he could work out the details between himself and his club so that Miramar could be used as part of Yellowstone World Club without violating the R-60 zoning?

A. **No, I didn't. Not to Tim Blixseth. Just what I E-mailed Hawes.**

Q. What was the purpose of sending the E-mail marked Exhibit 15 in terms of including the





first two paragraphs of the E-mail?

A. **The purpose of sending this E-mail?**

Q. The first two paragraphs of the E-mail, what was the purpose of sending those?

A. **The purpose was to let Andy Hawes know that I wasn't able to reach him and if I had reached him, I wouldn't have called Tim Blixseth. I let him know that I didn't reach him, and I let him know that I did call his client, but that I didn't have a chance to talk to his client because the phone got cut off. I don't know the reason for the cutoff, but that's what happened. That was the purpose. I wanted him to know that I did call his client. After all, he represented his client. You have to let the lawyer know if you called a client.**

Q. You are the one who initiated the call with Mr. Blixseth?

A. **Yes.**

Q. Were you concerned when Nancy Waddell said that she was not going to permit the agreement for purchase and sale to have a condition that the Blixseths receive some





type of zoning change for the property?

MR. ANGELONE: Objection to the form. Can you read that back.

(The last question was read back by the court reporter as requested.)

MR. ANGELONE: I object to the form.

Q. Nancy Waddell told you she wasn't going to allow any agreement to take place where the purchase and sale agreement allowed the Blixseths to proceed conditional upon a zoning change to the property, correct?

A. **That's correct.**

Q. When you learned of that information, you were concerned about that because you wouldn't get your commission if the deal fell apart, right?

A. **No.**

Q. You were not?

A. **Absolutely not. I agreed with her.**

Q. When did that conversation take place in relation to your calling Tim Blixseth on the telephone?

A. I actually was at Miramar in person speaking to her, and I told her about the intended use provision in the agreement that they had sent me. And I had told her that that intended use I found out -- I would find out what intended use was and then I don't know if it was the same conversation, but I know it wasn't by telephone. I saw her directly and she told me face-to-face we are not agreeing. I'm not going to agree to any condition. I don't want the property tied up in appeals. I want a straight simple sale. That's all I want. Frankly, as I said before, I agreed with her.
Q. Did you ever have any discussions with Andy Hawes about the permitted uses of the Miramar property under the R-60 zoning?
MR. ANGELONE: That's oral conversation, right?
MR. VOKE: Yes.
A. I don't think I had an oral conversation with him. I think I just -- after Nancy gave me those marching orders, I just





proceeded to redraft the agreement. And that whole section that he had sort of eliminated an entire section of the agreement, I put it all back in and then I said that it was R-60 zone and whatever is allowed in an R-60 zone, that's how you take it, in effect, and I sent it. I sent out the agreement to him with those changes.
Q. In terms of your speaking with Guy Weston at the City of Newport, did you have only one conversation with him?
A. Yes.
Q. Did you speak with anybody else for the City of Newport with respect to the zoning?
A. No.
Q. Did you tell Nancy Waddell what Guy Weston had advised you of?
A. Yes.
Q. Did you speak with Harry Kojoian as to how he had first contacted Tim Blixseth about the property?
MR. ANGELONE: Is this before November of 2005?





MR. VOKE: At any time.
MR. ANGELONE: I think it's important because -- can you distinguish it because there may be a privilege too.
MR. VOKE: All right.
Q. You met with Tim Blixseth in September of 2005. Was it related to you that a letter had been sent to Mr. Blixseth by Harry Kojoian and that's how Mr. Blixseth became interested in the property?
A. I think I was told that Harry had sent a letter to Blixseth, yes.
Q. I'm going to show you a copy of a letter dated August 25, 2005.
A. Yes.
Q. I want to show you what was previously marked as Exhibit 4. Were you provided a copy of that at any time in 2005?
A. I believe I was, yes.
Q. When approximately?
A. I really don't recall, Brian.
Q. Before the signing of the agreement for purchase and sale?
A. I don't think so. I think I was shown it.





I did see it. I know I did see this, but I don't recall. I really don't. None of this handwriting, I don't remember seeing any -- what was shown to me didn't have all of that writing on it, I don't think.
Q. You recall seeing a copy of Exhibit 4 without any handwriting on it?
A. I don't recall that handwriting being on what I saw.
Q. What were the circumstances under which you reviewed the document?
A. I didn't review it. I was just told that Harry had sent this letter, and at some point they showed it to me. Either Harry showed it or Nancy or someone showed it to me.
Q. Was that before you spoke with Tim Blixseth that you saw that letter marked Exhibit 4?
A. I think yes. I saw that letter before I sat down with Nancy and Tim and that other fellow in September. I believe I saw that letter before then, yes.
Q. Did you ever review any zoning certificates for the Miramar property?

A. Zoning certificate?
Q. Yes.
A. The first time that I had any knowledge of a zoning certificate was when I found out that they had refinanced the property with Citizens Bank and I just knew that if they did that, that a title was done. And they had -- I called Harry and asked him about that and he said, Yes, we have a title. It's the mortgagee's title policy that was given to Citizens. And I said, Do you have a copy of it? And I believe he sent me a copy of that mortgagee's title policy that he had a copy of.
And I then looked at it, and there was a reference in my -- the other reason I wanted it, Brian, is I was in the process of drafting my agreement and I wanted to be sure that I had in the permitted exceptions I had the right permitted exceptions to my agreement. And if I had the policy that was issued, I was going to rely on that. When I looked at I think it was the exclusions in the policy,





they were all listed. And in those exclusions there was an item referred to -- I forget which item it was. It referred to a zoning certificate with a book and page. That's the first reference I had to a zoning certificate. Did I see the actual certificate? No, I didn't. All I had was the reference to it.
Then I think I E-mailed that information to Andy Hawes to let him know where my permitted exceptions were coming from basically. When I say "permitted exceptions," I think it's permitted encumbrances. I forget what I called it in the agreement.
(E-Mail marked as Exhibit No. 16 for identification.)
Q. Is that the E-mail that you are referring to, the one that has been marked as Exhibit 16?
A. Yes.
Q. That starts at Bates stamp number 272?
MR. ANGELONE: 271.
Q. 271. On Page 2 of Exhibit 16, Item Number





12 references the zoning certificate? That's what you are referring to?
A. Yes.
Q. You never sent the zoning certificate to Mr. Hawes, did you?
A. No. I never had it.
Q. Were you a sole practitioner as a lawyer?
A. Yes. You mean now at this time?
Q. No, previously?
A. No. Previously I was with Higgins, Cavanaugh & Cooney for about thirty years or more.
Q. Was there a real estate group at Higgins, Cavanaugh & Cooney?
A. They didn't label any groups like they do today. But they had -- there were some people like Chuck Hambly basically did real estate and things like that and Larry McCarthy deals with Chuck.
Q. Did any of your partners handle any matters that you are aware of before the Newport Historic District Commission?
A. I'm not aware of any of them doing that. If anybody would have, it could have been





Chuck Hambly probably. He is from Newport.
Q. You were aware that the Miramar estate was located within the Newport Historic District, correct?
A. I think I was aware of it. Was it in front of my mind, no.
Q. You were aware that there was a Newport Historic District Commission that had rules and regulations for properties within the district?
A. I know that they must have. All the towns, even Providence, has one. They have their historic district commissions, yes.
Q. What was your understanding as to the Newport Historic District Commission in terms of how they regulated property in the district?
A. I had no understanding because I never dealt with it.
Q. You had no understanding at all?
A. Not really. I knew there must be rules and regulations. I never had occasion even in Providence to go before any historic district commission.

Q. What were your thoughts as to what limitations were placed on a piece of property within the Newport Historic District?

MR. ANGELONE: I object to the form.

A. **My thoughts would be that if you wanted to change the structure, the exterior of the building, the look of the building or make an addition to the building, if you are in the historic district, you have to go before them and let them know what you plan to do. That was my thought.**

Q. That's something you knew?

A. **I think that's common knowledge. Most people know that. Most lawyers realize that, I would assume.**

Q. That's information that would be important to a buyer, isn't it?

MR. ANGELONE: Object to the form.

A. **It might be, yes. It might be. Depending upon the buyer's ideas.**

Q. Did you ever tell Tim Blixseth that the





property was within the Newport Historic District?

A. **I don't believe I ever told him that.**

Q. Did you ever tell Andy Hawes that the property was within the Newport Historic District?

A. **I don't think so. I think they knew. I didn't say anything to them about it.**

Q. Why do you think that they knew?

A. **I would think Andy Hawes through either he in his due diligence would come across it or through the title company doing the title because they would definitely know what that zoning certificate said and that would alert them.**

Q. That's if they received the zoning certificate, a copy of the zoning certificate, correct?

A. **You mean the title company?**

Q. No. Mr. Hawes or Mr. Blixseth.

A. **You mean if they received it from the title company?**

Q. Yes.

A. **I don't know.**





Q. Did you ever speak with Andy Hawes in January of 2006?

A. **Sure. I must have spoken to him in January. That was in preparation for the closing. Everything was moving along fine and going to the closing.**

Q. Do you recall how many times you spoke to him?

A. **I can't recall, Brian. There were E-mails going back and forth.**

Q. Other than E-mails, do you recall any conversations with him?

A. **I'd have to -- I'd really have to look at my E-mails. If there were conversations, I probably would have -- that would remind me of them. I don't recall right now.**

Q. Did you review your E-mails before you came here?

A. **We had so many E-mails. I can't remember them all.**

Q. What about the day of the closing, did you talk to him the day of the closing?

A. **The day of the closing?**

Q. Yes.





A. **I think, yes. Yes. You mean January 17?**

Q. Yes.

A. **Yes.**

Q. Did you speak with Andy Hawes on January 17?

A. **I think so. I think either I spoke or Nancy spoke and I was present. Because this is what happened. I went to the closing that was supposed to be at eleven o'clock. And I went to the closing at the title company and delivered everything we had to deliver. And the only thing that remained was the sending of the money.**

No one was supposed to be attending the closing. They said that they wouldn't attend it, but that Tim Blixseth was going to be flying in and we would meet him at Miramar. So after the closing, I went right to Miramar and we waited. He was supposed to be there at noontime, and at noontime he wasn't there.

We got worried about ten minutes to one, quarter to one. We really got worried about it. I said, I hope the

plane didn't crash or something. Where is he? I said, I think we'd better call and find out what happened. And I think they placed the call to Andy Hawes at that time. I think that was it.

Q. You say "they placed a call." Who was that?

A. **It would be Nancy. I think Nancy placed the call. I don't recall myself. Then I did -- I don't know if it was the same day. It may have been the same day that I did talk to him and he said to me that they had called I don't know if it was Guy Weston or whoever they talked to at the Newport Zoning and they inquired if they could use -- this is what he said. They inquired whether they could use the property in an R-60 zone for a club, a world -- whatever they called themselves -- club. And he said that they were told flat out no, you can't. And that's the reason why they didn't come to the closing. They didn't send the money and they weren't going to go through with the closing.**





I said something to the effect that you mean to tell me you called and told him that. And he said, Yes, we did. I thought that was stupid to do that.

Q. Why did you think that it was stupid?

A. **Because they are buying the property R-60 zoned. It's residential. What is the need of making that kind of call? In the agreement it was so damn specific that they were buying the property in an R-60 zone, whatever is allowed in R-60 zone. Why would you call and say when you know you can't because I had sent them -- I sent them what R-60 allowed. Why would you be calling at the last instant like that and say, Can we have a club? I don't understand. Frankly, I don't think that's the reason at all why he canceled. Maybe they didn't have the money. How do I know?**

Q. You had sent them information, you believe, that made it clear to Tim Blixseth and Andy Hawes that the property could not be used as a club?

A. **I sent them -- I forget which exhibits they**





**are. I sent them that R-60 zoning that Harry Kojoian had sent to me. I faxed that to them. I read it. And I'm sure Andy Hawes as a lawyer would read that and it doesn't say anything about having a world club like they wanted in there. The closest thing I thought was a yachting organization. But I found out that that was just for housing of crews. Frankly, Brian, I don't understand why they did it.**

Q. You thought that they were stupid to call the Newport Zoning to inquire as to whether the property could be used as part of a club?

MR. ANGELONE: I object to the form.

A. **Well, I think it's a stupid act when you know darn well it's not allowed.**

Q. You had conveyed to Tim Blixseth that using the property as part of World Club was not allowed?

A. **It's not allowed.**

Q. You had conveyed --

A. **When you say I had conveyed, he is a lawyer**





**and he knows what an R-60 zone allowed. And it was specifically put in the agreement after he attempted to change it and put intended use that was stricken and put in the way R-60 zoning allows. They never complained about that language. They approved the language. They signed the agreement. If you look at my E-mails, everything is fine. We are going along. We are going to close. I don't understand, Brian, what happened. I really don't.**

Q. You believe you made it clear to Andy Hawes that R-60 zoning would not permit use of the property for Yellowstone World Club?

A. **When you say I believe I made it clear --**

Q. Yes.

A. **As a lawyer, I believe he understood that.**

Q. You believe you represented to him that the property could not be used as part of World Club under the existing R-60 zoning?

A. **I made no representations to him. The agreement, American Capital made certain representations in the agreement. The agreement spells it out what the**

representations were.
Q. Did you tell Mr. Hawes that he should never have told the Newport Zoning Office what Tim Blixseth intended to use the property for?
A. **I believe I did.**
Q. Did you tell him that they should have just bought the property and gone ahead and used it without telling anybody at the zoning office?
A. **No, I didn't say that. They should have bought the property in an R-60 zone. It was worth the money. As a residence it was worth the money.**
Q. Have you told me all the conversations that you had with Andy Hawes?
A. **I believe I have.**
Q. Did Andy Hawes ever convey to you that Tim Blixseth intended to use the property for anything other than part of Yellowstone World Club?
A. **The only statement that I have to go on from Andy Hawes is his explanation as to what the intention was in using the words**





**"intended use of the property." And he explained what they intended to use the property for. Whatever they told me there, that's what it was.**
Q. Are you referring to any other E-mail other than Exhibit 14?
A. **Yes. That's Exhibit 14.**
Q. Are you referring to any other E-mail other than that one?
A. **I don't think so. I think this spelled out pretty much what they had in mind. I mean, it's in direct response to my E-mail which says, "In your draft, you referred to purchaser's intended use of the property. I need to know what that use is so it can be defined in the agreement." That's his response.**
Q. I'm going to show you what has been marked as Exhibit 6, and can you identify that for the record, please?
A. **This is the disclosure form for the mansion and adjacent lot.**
Q. That was approved by the Blixseths?
A. **Yes, it was.**





Q. Did you prepare that document?
A. **If you mean did I have the typewritten part filled in, yes.**
Q. Did you provide any of the information that's in that document?
A. **I provided some of the information that's in the document.**
Q. What information would that be?
A. **I really -- well, I can go through the whole document and tell you. I had my secretary type in the name of the company and the address, the property address and the fact that it covers the mansion and the adjacent unimproved lot. In answer to the questions, I either consulted with Nancy Waddell or Harry Kojoian to give me the information to respond to the questions that were asked concerning the building.**
Q. Is this a form that you provided?
A. **This is a form that -- it was in my office, yes. I provided it.**
Q. Had you filled out real estate disclosure forms previously?
A. **I may have reviewed real estate disclosure**





**forms. Filling them out, I don't have much recollection.**
Q. In what capacity had you reviewed real estate disclosure forms?
A. **As a lawyer representing a client, it would have been that way, yes.**
Q. How is it that you came into possession of this particular version of the Rhode Island Real Estate Sales Disclosure Form?
A. **I may have gotten it from the office of the Rhode Island Association of Realtors at the time. I don't think you can buy these forms anyplace. I think you have to get them through that association. You send them a check and they send you the form.**
Q. Is that what you did back in 2005?
A. **No. I know that since -- well, after this Blixseth transaction in the year 2006, I had occasion to call and ask them if they would send me real estate forms and they said -- the gal said, Are you a member of the Rhode Island Association of Realtors? And I said, No, I'm an attorney. She said, Well, we used to send them, but we have**

been told not to send the form out to anybody unless they are a member of the association.

But, when I got this one, I did get it that way, and that's back a few years. I don't know how long. It was in sort of a form file. I just took it out.

Q. Are you a trustee for Mr. Panteleakis' estate?

A. When?

MR. ANGELONE: That's important.

Q. Now.

A. I am now. Yes.

Q. Were you in 2005?

A. No.

Q. You were here yesterday when Nancy Waddell testified that you were one of the trustees that she would go and confer with when she had to make a decision to sell the Miramar property, do you recall that?

A. I do recall that.

Q. Were you a trustee back in November of 2005?





A. No. She was mistaken.

Q. Who were the trustees then?

A. The trustees were Nancy Waddell, Joan Williams and Karen DelPonte. She is an attorney, Karen.

Q. D-E-L-P-A-N-T-E?

A. I think it's P-O-N-T-E.

MR. ANGELONE: For the record, we provided the trustee document.

MR. VOKE: I know.

A. Karen DelPonte. I think it's D-E-L, capital, P-O-N-T-E.

Q. In preparing Exhibit 6 and 7, what efforts did you undertake to make sure that the real estate disclosures that you were preparing on behalf of American Capital were in compliance with Rhode Island law?

A. If you mean who did I consult with as to completing the forms, I consulted with Nancy Waddell and on some specific items also Harry Kojoian.

Q. In terms of the forms themselves, did you consult with anybody to determine whether the forms that have it looks like a date of





2/98 on the bottom of both of them Exhibit 6 and 7 --

A. Yes.

Q. Let me start over again.

MR. ANGELONE: Let me get my forms.

Q. I just want to direct your attention to Exhibit 6. Do you see it says at the bottom REV 2/98?

A. Yes.

Q. You know as a lawyer that means February of 1998 it was revised, correct?

A. Yes.

Q. What effort did you make in 2005 to determine whether the form that you were using for the real estate disclosures to be sent to the Blixseths were in compliance with Rhode Island law?

A. No effort.

Q. I don't know if I included both forms, but it would be the same answer for both Exhibit 6 and 7?

A. Yes.

Q. If you were from out of state and you were





buying a piece of property such as Miramar and you didn't know it was in the Newport Historic District, would you want to know that before you bought the property?

MR. ANGELONE: Object to the form. Can you answer it in the form that it's in?

A. Well, I'll answer it this way. If I were buying property in another state, I would of course get an attorney and I would be relying on my attorney to make sure that everything that needs to be done is done.

Q. Would you want to know if you were buying the Miramar property and you were from out of state whether it was located in a historic district such as the Newport Historic District?

MR. ANGELONE: Object to the form. You can answer.

A. I would say yes because I think that would be a plus. That would be a plus. I think that's something that adds to the value of the property, between you and me. I think it's a plus.

Q. Would it be of any interest to you that there were rules and regulations that placed restrictions on any buildings that were erected on, for example, the unimproved lot at Miramar under the Newport Historic District Commission rules and regulations?

MR. ANGELONE: Object to the form. As to whether or not those regulations applied to the empty lot, is that the question? It's a little ambiguous. Is that what the question is? I'm not trying to put words in your mouth.

Q. You knew that the Newport Historic District Commission had rules and regulations, correct?

A. **I really didn't know that, but I would assume it.**

Q. You knew it from being a lawyer for 40 something years, right?

A. **52 now.**

Q. So it was 51 years you had been a lawyer, and you knew there was a Newport Historic District, right?





A. **Yes. I was aware.**

Q. You knew there was a commission that regulated --

A. **I would be aware.**

Q. -- what you could do with the exterior of the property, right?

A. **Right.**

Q. That's something you knew about Miramar that the exterior of the property in terms of any changes to the exterior that were substantial, you'd have to go before the commission? You knew that, right?

A. **I would assume that, yes.**

Q. If someone was coming in to buy the property and they didn't know that information, that would be important that they knew that, correct?

MR. ANGELONE: Object to the form.

A. **Let's put it this way. Let's talk about the Blixseth deal. That's what you are talking about, right? We are not talking generalities, are we?**

Q. We are talking generalities, anybody who is





coming to buy.

A. **I'm only interested in what Blixseth is doing.**

Q. I'm only interesting in you answering my question.

A. **My answer is if I agree to buy property that's zoned R-60 as a residence and no one is telling me that I plan to change the structure of the property, how important is it? What is important to me is that I'm buying a nice residence. I'm buying a mansion. That's what I'm buying. And that was what he was buying. At least that's what we thought he was buying.**

Q. You say we thought he was buying a mansion?

A. **American Capital, yes. We thought he was buying a mansion for a residence.**

Q. Do you deny that you knew he was buying the property for purposes of using it as part of Yellowstone World Club?

A. **Of course we deny it. He never told us that until after. He wanted to use it and we told him he couldn't. Brian, the man puts in I want to buy this property for my**





**intended use. It doesn't say what it is. We inquired and said tell me what is the intended use. The intended use I want to do what you're saying, some world club or whatever. And we go back and say in the agreement you can't do that. We are not going to agree to that. He knew he was buying a residence. He knew that.**

Q. So you told Mr. Blixseth he couldn't use the property as part of Yellowstone World Club?

A. **I told him through the agreement, yes.**

Q. You told him through the agreement?

A. **Absolutely. The agreement is clear as a bell.**

Q. And you had no knowledge as to what he intended to use the property for before you got that E-mail from Andy Hawes that's marked Exhibit 14?

A. **I don't know. Let's put it this way. I don't know what was in his head. What I did know is I drew up an agreement at the meeting. At our first meeting when he made the offer, he said absolutely nothing to us**

about what he intended to use the property
for. He knew this is a mansion. It was a
residence. It was obvious it's a
residence. And we thought he was buying a
residence. I drafted my agreement that
way. And when it came back with all of
those changes and that intended use, I was
as surprised as anybody.
When did I really know?
That's when I really knew. When should he
have said it? He should have said it to us
in September. I'm going to buy this. I'll
pay 25 million, but I want a world club.
He didn't say any of that to us.
Q. You said when did I know --
A. When did I really know?
Q. You pointed to Exhibit 14?
A. Yes.
Q. The E-mail from Andy Hawes?
A. Yes. That is the response.
Q. You have to wait until I finish. You
pointed to the E-mail from Andy Hawes of
November 4, 2005 to you?
A. Yes. I'm going to read it again. This





E-mail is in response to my E-mail to him
which says, "Andy, in your draft you
referred to 'purchaser's intended use of
the property.' I need to know what that
use is so it can be defined in the
agreement." I can't make it any clearer
than that.
Q. Did you speak with anybody from the
Blixseth Group other than Tim Blixseth and
Andy Hawes?
A. I may have spoken to Linette. Linette may
have answered the phone saying that -- when
I called that they were -- Andy wasn't
available or something like that. She
would answer.
Q. Nothing of substance?
A. No. No.
(Recess taken.)
Q. Mr. Salvadore, you believe that you
informed Tim Blixseth through the agreement
for sale and purchase dated November 18,
2005 that you drafted that the property
could not be used as part of Yellowstone
World Corporation, correct?





MR. ANGELONE: Object to the
form of that.
A. I believe that, yes.
Q. It should have been pretty clear to
Mr. Blixseth from reviewing that document
that he could not have used that property
as part of Yellowstone World Club, correct?
MR. ANGELONE: Object to the
form.
A. I would assume so, yes.
Q. You thought it was pretty clear to
Mr. Hawes from your drafting of the
agreement for sale and purchase that you
sent to Mr. Hawes that the property could
not be used for part of Yellowstone World
Club, correct?
MR. ANGELONE: Object to the
form.
A. Yes. And as I stated, I had specifically
eliminated the change in the agreement that
he wanted and put in that it was
restricted, it was R-60 zoning and whatever
you could do in R-60 zone. It should have
made them realize that they couldn't use it





for their so-called intended use.
Q. Did Mr. Hawes ever inquire with you at any
later date as to what happened to the
intended use provision in the draft
agreement?
A. No. I think what he said if you look at
the E-mails, my recollection is that in an
E-mail he said everything is fine, we are
going to go forward and everything is
working fine. That's my recollection,
Brian, if you want to look at the E-mails.
Q. Let me show you what was marked as Exhibit
Number 8 and ask if you have seen that
before?
A. I think I have seen it before.
Q. When, approximately, did you first see it?
A. I really don't recall.
Q. In 2005?
A. I don't remember.
Q. Have you seen it in the last year?
A. I have seen it, Brian. Last year, I don't
know. Could be last year. Could be two
years ago. I really don't know. I have
seen the report.

Q. That was an appraisal done for the purposes of refinancing Miramar in 2001, correct?
A. **I wasn't involved.**
Q. You weren't involved in it?
A. **No, I didn't handle that.**
Q. What documents have you reviewed in preparation for today's deposition?
A. **I reviewed my E-mails. I think I looked at the answers to interrogatories. I don't know if they were filed, but I looked at some answers.**
Q. I haven't seen any yet.
A. **I think that's about it. I may have looked at the agreement too, of course.**
Q. Did you have any discussions with anyone else at Great American Nursing Centers, Inc., about the sale of the Miramar estate to the Blixseths other than Harry Kojoian and Nancy Waddell?
A. **Yes.**
Q. Who else?
A. **Jeff Waddell would have been one that would have been aware of it. The trustees would have been aware of it. I don't recall**





**anyone else.**
Q. Do you have any knowledge one way or another as to Jeff Waddell?
A. **Did I say Harry Kojoian, too?**
Q. Yes. Do you have any knowledge as to whether Jeff Waddell ever had any conversations with Tim Blixseth?
A. **I don't have any knowledge whether he did or he did not.**
Q. Do you know whether he had any conversations with Andy Hawes?
A. **No, I don't. I doubt it.**
Q. Are you aware as to whether Nancy Waddell had any conversations with Tim Blixseth other than when you were present in September of 2005 with Mr. Blixseth and when he came on the second visit with his wife to view the Miramar property?
A. **I'm not aware of any other conversations that Nancy Waddell had other than what she said in her deposition yesterday.**
MR. VOKE: That's all I have.





(Whereupon the deposition concluded at 1 p.m.)





CERTIFICATE

STATE OF RHODE ISLAND

I, Susan E. Wilson, Registered Professional Reporter and Notary Public in and for the State of Rhode Island, do hereby certify that the foregoing transcript of the deposition of Guido Salvadore, having been duly sworn, on Thursday, November 2, 2006, is true and accurate to the best of my knowledge, skill, and ability.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 27th day of November, 2005.

SUSAN E. WILSON, CSR, RPR
My commission expires:
November 1, 2009

PLEASE NOTE: THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.

'

'54 [2] - 10:7, 10:8
'90s [1] - 6:24

0

01810 [1] - 1:23
02129 [1] - 2:7
02818 [1] - 5:24
02901-1516 [1] - 2:4
06-90S [1] - 1:3

1

1 [3] - 2:3, 75:2, 76:20
10 [8] - 4:4, 4:9, 6:2, 9:11, 9:17, 28:23, 30:20, 37:1
100,000 [2] - 12:11, 19:19
1050 [1] - 2:3
10:45 [1] - 1:17
11 [12] - 4:5, 22:10, 22:12, 22:14, 23:8, 23:18, 23:21, 24:5, 25:5, 26:24, 27:24, 28:1
12 [4] - 4:6, 28:16, 29:4, 47:1
120 [1] - 21:23
13 [4] - 4:7, 28:19, 30:3, 30:11
14 [7] - 4:8, 28:22, 30:13, 58:6, 58:7, 68:19, 69:17
15 [6] - 4:9, 29:1, 30:18, 31:18, 38:4, 38:24
16 [4] - 4:10, 46:17, 46:20, 46:24
17 [2] - 52:1, 52:5
18 [1] - 70:21
1954 [1] - 6:6
1958 [1] - 6:23
1998 [1] - 63:12

2

2 [3] - 1:16, 46:24, 76:11
2/98 [2] - 63:1, 63:9
2001 [2] - 6:18, 73:2
2004 [2] - 8:20, 9:3
2005 [25] - 4:6, 4:7, 4:8, 4:9, 10:17, 19:13, 23:19, 28:15, 28:18, 28:21, 28:24, 29:2, 42:24, 43:7, 43:14, 43:18, 60:16, 61:15, 61:24, 63:14, 69:23, 70:22, 72:18, 74:16, 76:16
2006 [5] - 1:16, 34:21, 51:2, 60:18, 76:11
2009 [1] - 76:20
22 [1] - 4:5
25 [7] - 11:14, 11:23, 12:6, 12:8, 14:19, 43:14, 69:13
25M [2] - 11:14, 11:19
263 [1] - 30:18
267 [1] - 28:11
27 [2] - 8:20, 9:2
270 [2] - 30:6, 30:8
271 [2] - 46:23, 46:24
272 [1] - 46:22
27th [1] - 76:15
28 [4] - 4:6, 4:7, 4:8, 4:9

3

303 [1] - 6:2
320 [1] - 8:15
322 [1] - 8:16
331 [1] - 8:21
337 [1] - 8:22
38 [1] - 5:23

4

4 [12] - 4:7, 4:8, 12:7, 28:17, 28:20, 29:22, 30:2, 30:15, 43:17, 44:6, 44:18, 69:23
40 [1] - 65:19
46 [1] - 4:10

5

5 [1] - 3:6
51 [1] - 65:22
52 [1] - 65:21

6

6 [5] - 58:19, 62:13, 63:2, 63:8, 63:22
617-241-3000/FAX [1] - 2:8
617-241-5115 [1] - 2:8

7

7 [8] - 1:22, 4:6, 23:19, 28:14, 29:2, 62:13, 63:2, 63:22
79 [1] - 6:8

8

8 [1] - 72:13
846-9600 [1] - 23:24

9

9 [5] - 4:3, 4:4, 9:9, 9:13
978.409.9090 [1] - 1:23

A

a.m [1] - 1:17
A5 [1] - 1:22
ability [1] - 76:13
able [8] - 11:22, 13:3, 19:1, 24:24, 33:13, 33:22, 35:19, 39:6
absolutely [3] - 16:4, 28:6, 68:24
Absolutely [4] - 27:7, 38:5, 40:21, 68:14
acceptable [1] - 11:20
accepted [1] - 34:17
accommodate [1] - 15:16
accommodator [1] - 34:19
accurate [1] - 76:12
act [1] - 55:17
acting [3] - 7:17, 8:5, 34:3
actual [1] - 46:6
add [3] - 16:13, 27:15, 27:18
addition [1] - 49:10
address [3] - 5:22, 59:12
addressed [1] - 23:11
adds [1] - 64:22
adjacent [2] - 58:22, 59:14
advised [1] - 42:18
agent [6] - 7:17, 8:5, 8:9, 18:5, 18:6, 34:3
ago [1] - 72:23
agree [6] - 16:5, 32:4, 36:23, 41:11, 67:6, 68:7
agreed [4] - 5:3, 5:9, 40:21, 41:15
agreeing [1] - 41:10
agreement [56] - 7:7, 7:9, 7:12, 8:10, 8:19, 8:24, 9:14, 9:17, 12:15, 12:21, 13:1, 13:5, 13:8, 13:17, 13:20, 14:4, 14:24, 16:18, 16:19, 17:2, 17:11, 17:20, 18:1, 29:17, 39:23, 40:10, 40:11, 41:3, 42:1, 42:4, 42:8, 43:22, 45:18, 45:21, 46:15, 54:9, 56:3, 56:8, 56:22, 56:23, 56:24, 58:16, 68:6, 68:12, 68:13, 68:14, 68:22, 69:5, 70:6, 70:20, 71:13, 71:20, 72:5, 73:14
Agreement [6] - 4:3, 4:4, 9:8, 9:10, 9:14, 9:23
ahead [1] - 57:8
alert [1] - 50:15
allow [2] - 16:1, 40:10
allowed [13] - 17:1, 17:4, 17:8, 21:24, 26:17, 40:11, 42:6, 54:11, 54:14, 55:18, 55:21, 55:22, 56:1
allows [1] - 56:5
ambiguous [1] - 65:12
America's [4] - 15:17, 25:21, 26:3, 26:5
AMERICAN [1] - 1:5
American [10] - 7:18, 8:6, 9:1, 16:15, 34:3, 36:19, 56:22, 62:16, 67:16, 73:16
amount [1] - 34:16
AND/OR [1] - 76:23
Andover [1] - 1:23
Andrew [5] - 9:1, 12:16, 12:18, 16:21, 23:11
Andy [40] - 6:20, 6:22, 7:21, 8:12, 8:13, 17:12, 21:20, 23:15, 26:24, 29:3, 29:8, 29:22, 30:14, 30:19, 31:12, 31:21, 34:23, 35:23, 38:3, 39:5, 41:16, 46:10, 50:4, 50:10, 51:1, 52:4, 53:4, 54:21, 55:3, 56:12, 57:16, 57:18, 57:23, 68:18, 69:19, 69:22, 70:2, 70:10, 70:13, 74:11
ANGELONE [29] - 2:2, 7:14, 16:12, 17:22, 22:7, 25:22, 27:16, 30:5, 30:9, 37:5, 40:2, 40:7, 41:19, 42:23, 43:2, 46:23, 49:5, 49:20, 55:15, 61:11, 62:8, 63:5, 64:5, 64:18, 65:8, 66:18, 71:1, 71:8, 71:17
Angelone [2] - 1:15, 2:3
answer [7] - 59:14, 63:21, 64:6, 64:8, 64:19, 67:6, 70:15
answered [1] - 70:12
answering [1] - 67:4
answers [2] - 73:9, 73:11
ANY [2] - 76:22, 76:22
anyplace [1] - 60:13
Anyway [2] - 12:20, 16:18
apart [1] - 40:18
appeals [2] - 16:10, 41:12
appearance [1] - 19:8
APPEARANCES [1] - 2:1
applied [1] - 65:10
APPLY [1] - 76:22
appraisal [1] - 73:1
approved [2] - 56:7, 58:23
arrangements [4] - 32:17, 33:7, 33:10, 35:20
assess [1] - 12:7
Association [2] - 60:11, 60:22
association [2] - 60:14, 61:3
assume [6] - 12:7, 35:12, 49:17, 65:18, 66:13, 71:10
assumed [1] - 14:22
attempted [1] - 56:3
attend [2] - 10:5, 52:16
attended [1] - 36:15
attending [1] - 52:15
attention [1] - 63:7
attorney [10] - 6:3, 10:3, 12:16, 16:14, 16:16, 31:13, 60:23, 62:5, 64:10, 64:11
attorney-client [1] - 16:16
August [1] - 43:14
available [1] - 70:14
aware [11] - 47:21, 47:23, 48:2, 48:5, 48:7, 66:1, 66:4, 73:23, 73:24, 74:13, 74:19

## B

Bank [1] - 45:6
Bates [7] - 8:15, 8:21, 28:10, 30:5, 30:7, 30:18, 46:22
became [1] - 43:9
begin [1] - 32:23
Behalf [2] - 2:4, 2:8
behalf [3] - 1:12, 5:14, 62:16
bell [1] - 68:15
best [1] - 76:12
better [1] - 53:2
between [10] - 5:3, 8:2, 8:14, 8:24, 32:11, 33:9, 37:12, 37:22, 38:17, 64:23
big [1] - 37:21
Blixseth [48] - 10:10, 10:11, 10:12, 10:14, 10:21, 18:9, 19:12, 20:11, 20:16, 21:16, 21:18, 27:2, 27:3, 27:10, 30:23, 31:9, 31:14, 34:2, 38:6, 38:15, 38:21, 39:8, 39:19, 40:23, 42:21, 43:6, 43:8, 43:9, 43:12, 44:17, 49:24, 50:20, 52:16, 54:21, 55:19, 57:4, 57:19, 60:18, 66:21, 67:2, 68:9, 70:9, 70:20, 71:5, 74:7, 74:14, 74:16
BLIXSETH [2] - 1:8
Blixseths [9] - 7:5, 9:20, 9:21, 35:1, 39:24, 40:12, 58:23, 63:17, 73:18
Blixseths' [1] - 17:16
book [1] - 46:4
Boston [1] - 2:7
bottom [2] - 63:1, 63:9
bought [3] - 57:8, 57:12, 64:4
break [1] - 12:9
BRIAN [1] - 2:6
Brian [11] - 23:1, 24:2, 38:13, 43:21, 45:17, 51:9, 55:10, 56:11, 67:23, 72:11, 72:21
broker [3] - 8:2, 10:1, 16:14
brokers [1] - 8:1
Building [1] - 15:11
building [6] - 15:12, 33:16, 49:9, 49:10, 59:18
buildings [1] - 65:3
business [3] - 6:1, 10:16, 34:10
buy [12] - 14:1, 14:19, 16:6, 16:11, 28:9, 32:6, 60:12, 66:14, 67:1, 67:6, 67:24, 69:12
buyer [1] - 49:19
buyer's [1] - 49:23
buying [16] - 14:23, 54:6, 54:10, 64:1, 64:9, 64:13, 67:11, 67:12, 67:13, 67:14, 67:15, 67:17, 67:18, 68:8, 69:4
BY [3] - 3:5, 5:18, 76:22

## C

C.J [1] - 1:22
CA [1] - 1:3
California [1] - 17:18
Campbell [2] - 2:6
canceled [1] - 54:18
capacity [1] - 60:3
CAPITAL [1] - 1:5
Capital [9] - 7:18, 8:6, 9:1, 16:15, 34:4, 36:19, 56:22, 62:16, 67:16
capital [1] - 62:12
card [1] - 12:19
career [1] - 36:13
cares [1] - 33:17
carriage [1] - 11:5
categories [1] - 15:24
category [1] - 15:5
Cavanaugh [2] - 47:11, 47:14
cell [2] - 18:17, 31:22
Centers [1] - 73:16
certain [1] - 56:22
certificate [10] - 45:1, 45:4, 46:4, 46:6, 46:7, 47:1, 47:4, 50:14, 50:17, 50:18
certificates [1] - 44:23
CERTIFICATION [1] - 76:21
certify [1] - 76:8
CERTIFYING [1] - 76:23
chance [1] - 39:11
change [9] - 16:6, 16:9, 19:8, 40:1, 40:13, 49:8, 56:3, 67:8, 71:20
changes [4] - 16:21, 42:9, 66:10, 69:7
characterize [1] - 8:8
charge [1] - 7:22
charges [1] - 35:10
check [1] - 60:15
checked [1] - 15:3
choose [1] - 37:19
chose [2] - 37:17, 37:20
Chuck [3] - 47:17, 47:19, 48:1
circumstances [1] - 44:10
Citizens [2] - 45:6, 45:11
City [2] - 42:11, 42:15
Civil [1] - 1:13
clear [6] - 54:21, 56:12, 56:15, 68:14, 71:4, 71:11
clearer [1] - 70:6
client [8] - 16:16, 17:16, 39:10, 39:11, 39:15, 39:16, 39:17, 60:5
close [1] - 56:10
closest [1] - 55:7
closing [14] - 11:23, 12:3, 34:22, 51:5, 51:6, 51:21, 51:22, 51:23, 52:9, 52:10, 52:15, 52:18, 53:22, 53:24
club [22] - 14:12, 14:14, 14:16, 14:21, 16:1, 26:14, 32:3, 32:11, 33:8, 33:9, 35:5, 35:11, 35:21, 38:17, 53:18, 53:19, 54:16, 54:23, 55:6, 55:14, 68:4, 69:13
Club [21] - 18:11, 20:19, 20:24, 22:24, 24:18, 24:20, 24:24, 25:5, 27:4, 31:1, 31:6, 32:17, 38:19, 55:20, 56:14, 56:20, 57:21, 67:20, 68:11, 71:7, 71:16
clubs [3] - 26:9, 26:11, 26:16
CO [1] - 1:9
Colonial [1] - 1:22
coming [3] - 46:11, 66:14, 67:1
commencing [1] - 1:16
Commission [13] - 4:3, 4:4, 9:7, 9:10, 9:13, 9:23, 36:16, 36:21, 47:22, 48:8, 48:15, 65:6, 65:15
commission [11] - 7:3, 7:6, 8:18, 9:4, 9:18, 34:5, 40:17, 48:24, 66:2, 66:12, 76:19
commissions [1] - 48:13
common [1] - 49:15
companies [2] - 6:12, 6:23
company [5] - 50:12, 50:19, 50:22, 52:11, 59:11
complained [1] - 56:6
complains [2] - 19:7, 33:14
complete [1] - 31:23
completing [1] - 62:19
compliance [2] - 62:17, 63:17
concerned [2] - 39:21, 40:16
concerning [3] - 21:22, 22:15, 59:18
concluded [1] - 75:2
condition [2] - 39:24, 41:11
conditional [1] - 40:12
conditions [1] - 35:10
confer [1] - 61:19
confirmation [1] - 23:10
connection [1] - 29:13
Conroy [1] - 2:6
consists [1] - 26:23
Constitution [1] - 2:7
consult [2] - 62:18, 62:23
consulted [2] - 59:15, 62:19
contacted [1] - 42:21
CONTROL [1] - 76:23
conversation [17] - 12:24, 18:13, 19:14, 20:2, 20:5, 20:10, 20:13, 20:17, 21:3, 27:9, 31:24, 38:11, 40:22, 41:8, 41:20, 41:22, 42:12
conversations [8] - 16:13, 51:12, 51:14, 57:15, 74:7, 74:11, 74:14, 74:19
convey [1] - 57:18
conveyed [3] - 55:19, 55:23, 55:24
Cooney [2] - 47:11, 47:14
copy [7] - 43:13, 43:18, 44:6, 45:12, 45:13, 45:14, 50:17
Corporation [6] - 7:18, 8:6, 9:1, 34:4, 36:20, 70:24
CORPORATION [1] - 1:5
corporations [3] - 6:9, 6:11, 6:13
correct [15] - 9:6, 26:3, 26:10, 29:4, 40:13, 40:14, 48:4, 50:18, 63:12, 65:16, 66:17, 70:24, 71:7, 71:16, 73:2
Correct [1] - 9:21
costs [1] - 12:3
counsel [2] - 5:3, 6:16
course [3] - 64:10, 67:21, 73:14
COURT [1] - 1:1
court [1] - 40:5
cover [1] - 23:12
covers [1] - 59:13
crash [1] - 53:1
crew [4] - 15:16, 15:18, 26:2, 36:9
crews [4] - 24:6, 25:20, 26:7, 55:9
CSR [1] - 76:19
Cup [4] - 15:17, 25:21, 26:3, 26:5
current [1] - 5:22
cut [2] - 38:11, 39:12
cutoff [2] - 31:23, 39:13

## D

damn [1] - 54:9
darn [1] - 55:18
data [1] - 22:15
date [2] - 62:24, 72:3
dated [7] - 8:20, 9:2, 29:2, 29:22, 30:19, 43:14, 70:21
Dated [8] - 4:6, 4:7, 4:8, 4:9, 28:14, 28:17, 28:20, 28:23
deal [4] - 8:13, 34:12, 40:17, 66:21
dealing [1] - 7:24
dealings [1] - 31:12
deals [1] - 47:19
dealt [1] - 48:19
decision [1] - 61:20
Defendants [4] - 1:10, 1:13, 2:8, 5:15
define [1] - 14:3
defined [2] - 58:16,

70:5
**definitely** [1] - 50:13
**DEL** [1] - 62:11
**deliver** [1] - 52:12
**delivered** [1] - 52:11
**delivery** [1] - 17:14
**DELPANTE** [1] - 62:6
**DelPonte** [2] - 62:4, 62:11
**deny** [2] - 67:18, 67:21
**DEPONENT** [1] - 3:2
**deponent** [1] - 5:4
**deponent's** [1] - 5:7
**deposes** [1] - 5:16
**DEPOSITION** [1] - 1:12
**deposition** [5] - 5:5, 73:7, 74:21, 75:1, 76:9
**description** [1] - 22:5
**DESCRIPTION** [1] - 4:2
**designate** [1] - 27:5
**designation** [1] - 26:4
**details** [2] - 32:11, 38:16
**determination** [1] - 27:21
**determine** [2] - 62:23, 63:15
**difference** [2] - 37:12, 37:22
**diligence** [1] - 50:11
**DIRECT** [3] - 3:5, 5:17, 76:23
**direct** [2] - 58:12, 63:7
**DIRECTION** [1] - 76:23
**directly** [3] - 8:1, 8:13, 41:9
**disclosed** [2] - 34:8, 34:9
**disclosure** [4] - 58:21, 59:22, 59:24, 60:4
**Disclosure** [1] - 60:9
**disclosures** [2] - 62:15, 63:16
**discussed** [2] - 22:23, 23:1
**discussion** [3] - 29:8, 29:10, 29:13
**discussions** [3] - 10:18, 41:16, 73:15
**distinguish** [1] - 43:3
**district** [6] - 48:10, 48:13, 48:17, 48:24, 49:11, 64:16
**District** [15] - 36:13, 36:16, 36:21, 47:22, 48:4, 48:8, 48:15, 49:4, 50:2, 50:6, 64:3, 64:17, 65:6, 65:14, 65:24
**DISTRICT** [2] - 1:1, 1:2
**disturb** [3] - 19:5, 19:7, 33:16
**document** [12] - 22:2, 22:4, 23:8, 25:4, 28:10, 44:11, 59:1, 59:5, 59:7, 59:10, 62:9, 71:5
**Documents** [2] - 4:5, 22:9
**documents** [4] - 8:15, 8:21, 22:11, 73:6
**DOES** [1] - 76:22
**dollars** [2] - 12:6, 12:8
**done** [5] - 36:11, 45:7, 64:12, 73:1
**doubt** [1] - 74:12
**down** [6] - 11:7, 11:10, 11:13, 14:18, 24:8, 44:20
**draft** [5] - 12:20, 13:24, 58:13, 70:2, 72:4
**drafted** [3] - 14:24, 69:5, 70:22
**drafting** [2] - 45:18, 71:12
**drew** [1] - 68:22
**Drive** [2] - 1:22, 5:23
**due** [1] - 50:11
**duly** [2] - 5:15, 76:10
**duplicate** [1] - 18:7
**during** [4] - 9:22, 13:10, 20:16, 36:13

## E

**E-mail** [54] - 4:6, 4:7, 4:8, 4:9, 4:10, 13:14, 13:15, 18:18, 18:20, 20:6, 20:8, 27:12, 27:19, 28:2, 28:11, 28:14, 28:17, 28:20, 28:23, 29:2, 29:9, 29:11, 29:16, 29:22, 30:13, 30:15, 30:19, 31:17, 31:19, 32:1, 32:16, 35:4, 35:23, 36:5, 37:1, 37:9, 37:18, 38:4, 38:13, 38:23, 39:1, 39:2, 39:3, 46:16, 46:18, 58:5, 58:8, 58:12, 68:18, 69:19, 69:22, 70:1, 72:8
**E-mailed** [4] - 12:17, 28:1, 38:22, 46:9
**e-mailed** [1] - 21:8
**E-mailing** [2] - 17:9, 17:10
**E-mails** [11] - 13:12, 29:14, 51:9, 51:11, 51:14, 51:17, 51:19, 56:8, 72:7, 72:11, 73:8
**early** [1] - 6:24
**East** [1] - 5:23
**easy** [1] - 13:6
**EDRA** [1] - 1:8
**Edwards** [1] - 2:6
**effect** [5] - 7:21, 13:24, 18:21, 42:7, 54:2
**effort** [2] - 63:14, 63:19
**efforts** [1] - 62:13
**Either** [1] - 44:14
**either** [5] - 16:6, 28:9, 50:10, 52:6, 59:15
**eleven** [1] - 52:9
**eliminated** [3] - 16:24, 42:3, 71:20
**empty** [1] - 65:10
**encumbrances** [1] - 46:14
**engaged** [1] - 8:3
**entered** [1] - 8:19
**entertain** [5] - 32:8, 33:13, 33:23, 35:19, 38:8
**entertaining** [1] - 33:4
**entire** [1] - 42:3
**erected** [1] - 65:4
**escrow** [2] - 18:5, 18:6
**ESQUIRE** [2] - 2:2, 2:6
**Estate** [1] - 60:9
**estate** [12] - 10:1, 47:13, 47:18, 48:2, 59:22, 59:24, 60:4, 60:20, 61:9, 62:15, 63:16, 73:17
**Eventually** [1] - 17:19
**EXAMINATION** [2] - 3:5, 5:17
**example** [1] - 65:4
**except** [1] - 5:9
**exception** [2] - 25:19, 25:23
**exceptions** [4] - 45:20, 45:21, 46:11, 46:13
**exclusions** [2] - 45:24, 46:2
**exclusive** [1] - 35:13
**Exhibit** [42] - 9:8, 9:11, 9:13, 9:17, 22:9, 22:12, 22:14, 23:8, 23:18, 23:21, 24:5, 25:5, 26:24, 27:24, 28:1, 28:15, 28:18, 28:21, 28:24, 29:3, 30:3, 30:13, 30:18, 31:18, 38:4, 38:24, 43:17, 44:6, 44:18, 46:16, 46:19, 46:24, 58:6, 58:7, 58:19, 62:13, 63:1, 63:8, 63:22, 68:19, 69:17, 72:12
**exhibit** [1] - 30:10
**exhibits** [1] - 54:24
**existing** [5] - 20:19, 20:24, 32:13, 32:19, 56:20
**expires** [1] - 76:19
**explain** [1] - 26:12
**explained** [1] - 58:2
**explains** [1] - 15:2
**explanation** [1] - 57:23
**expressed** [2] - 18:20, 21:5
**extent** [1] - 19:11
**exterior** [7] - 19:6, 19:8, 33:16, 49:8, 66:5, 66:9, 66:10

## F

**face** [2] - 41:10
**face-to-face** [1] - 41:10
**fact** [1] - 59:13
**Fair** [2] - 16:16, 16:17
**familiar** [1] - 19:3
**family/guests** [1] - 35:6
**far** [2] - 14:10, 33:6
**fashion** [1] - 32:12
**fax** [5] - 22:21, 23:10, 23:11, 36:3, 36:4
**faxed** [6] - 21:23, 23:15, 23:18, 26:23, 27:23, 55:2
**February** [1] - 63:11
**fee** [1] - 7:7
**fell** [1] - 40:18
**fellow** [1] - 44:21
**few** [2] - 21:4, 61:5
**file** [1] - 61:7
**filed** [1] - 73:10
**filled** [2] - 59:3, 59:22
**Filling** [1] - 60:1
**final** [1] - 29:17
**financial** [2] - 34:11, 34:24
**finder's** [1] - 7:6
**fine** [5] - 12:12, 51:5, 56:9, 72:8, 72:10
**finish** [1] - 69:21
**first** [16] - 5:15, 10:12, 14:15, 14:16, 14:18, 23:21, 24:4, 31:24, 32:10, 39:1, 39:3, 42:21, 45:3, 46:5, 68:23, 72:16
**flat** [1] - 53:20
**flying** [1] - 52:17
**focus** [1] - 10:9
**following** [1] - 19:24
**follows** [1] - 5:16
**foregoing** [1] - 76:8
**FOREGOING** [1] - 76:21
**forget** [3] - 46:3, 46:14, 54:24
**Form** [1] - 60:9
**form** [22] - 5:10, 37:6, 40:3, 40:8, 49:6, 49:21, 55:16, 58:21, 59:19, 59:20, 60:15, 61:1, 61:7, 63:15, 64:6, 64:19, 65:9, 66:19, 71:2, 71:9, 71:18
**forms** [10] - 59:23, 60:1, 60:4, 60:13, 60:20, 62:19, 62:22, 62:24, 63:6, 63:20
**forth** [2] - 8:11, 51:10
**forward** [1] - 72:9
**four** [3] - 12:5, 22:11, 23:8
**four-page** [1] - 23:8
**frame** [1] - 9:22
**Frankly** [3] - 41:14, 54:17, 55:9
**front** [1] - 48:5
**full** [1] - 5:19
**furniture** [2] - 12:1, 12:9

## G

**gal** [1] - 60:21
**garbled** [1] - 18:17
**generalities** [2] - 66:23, 66:24
**generally** [1] - 10:21
**gentleman** [1] - 10:14
**given** [3] - 12:19, 21:21, 45:11
**graduated** [1] - 10:7
**grammar** [1] - 6:21
**Great** [1] - 73:16
**Greenwich** [1] - 5:23
**group** [1] - 47:13

Group [1] - 70:9
groups [1] - 47:15
GUARANTEE [1] - 1:9
Guarantee [1] - 18:5
guess [3] - 6:18, 13:12, 24:21
guests [5] - 19:1, 33:3, 33:4, 35:8, 35:12
GUIDO [2] - 1:12, 5:13
Guido [3] - 3:2, 5:21, 76:9
Gustave [3] - 8:3, 8:19, 9:14
Guy [21] - 15:10, 21:9, 21:10, 21:18, 23:22, 24:9, 25:16, 25:17, 25:18, 26:14, 29:6, 31:9, 31:14, 35:24, 36:5, 36:7, 37:2, 42:10, 42:17, 53:13

H

Hambly [2] - 47:17, 48:1
hand [2] - 22:2, 76:15
handle [2] - 47:20, 73:5
handled [1] - 35:11
handwriting [4] - 25:9, 44:3, 44:7, 44:8
Harry [16] - 22:14, 22:17, 25:8, 25:11, 25:15, 42:20, 43:8, 43:11, 44:13, 44:14, 45:8, 55:2, 59:16, 62:21, 73:18, 74:4
Harvard [1] - 10:6
Hawes [60] - 12:16, 12:18, 12:22, 13:7, 13:9, 14:10, 16:21, 17:12, 18:8, 18:19, 20:8, 21:8, 21:20, 21:23, 23:11, 23:16, 26:24, 27:13, 27:19, 28:1, 28:2, 29:3, 29:8, 29:23, 30:14, 30:19, 31:12, 34:23, 35:15, 35:23, 36:24, 38:3, 38:13, 38:22, 39:5, 41:17, 46:10, 47:5, 50:4, 50:10, 50:20, 51:1, 52:4, 53:4, 54:22, 55:4, 56:12, 57:2, 57:16, 57:18, 57:23, 68:18, 69:19, 69:22, 70:10, 71:12, 71:14, 72:2, 74:11
head [1] - 68:21
Head [2] - 1:15, 2:3
hear [3] - 20:14, 21:6, 21:7
heard [2] - 14:15, 14:16
hearings [1] - 36:16
hereby [2] - 5:2, 76:8
hereunto [1] - 76:15
Higgins [2] - 47:10, 47:13
himself [1] - 38:17
hiring [1] - 36:18
historic [4] - 48:13, 48:23, 49:11, 64:16
Historic [15] - 36:12, 36:15, 36:20, 47:22, 48:3, 48:8, 48:15, 49:3, 50:1, 50:5, 64:3, 64:17, 65:6, 65:14, 65:23
Hodosh [2] - 1:15, 2:3
hold [1] - 6:11
home [6] - 17:13, 17:17, 32:24, 33:1, 33:2, 35:18
hope [1] - 52:24
house [5] - 11:5, 15:18, 19:2, 33:3, 33:14
housing [6] - 24:5, 25:20, 26:2, 26:6, 36:9, 55:9

I

idea [2] - 33:10, 35:22
ideas [1] - 49:23
identification [9] - 9:9, 9:12, 22:10, 22:12, 28:16, 28:19, 28:22, 29:1, 46:17
identify [3] - 8:16, 8:22, 58:19
immediately [1] - 27:23
important [6] - 43:3, 49:18, 61:12, 66:16, 67:9, 67:10
impressed [1] - 10:22
IN [1] - 76:14
Inc [1] - 73:17
included [3] - 13:24, 34:16, 63:20
including [1] - 38:24
inconsistent [1] - 37:2
information [19] - 12:18, 21:21, 22:18, 22:21, 23:3, 23:15, 26:23, 32:14, 32:20, 32:23, 40:15, 46:10, 49:18, 54:20, 59:4, 59:6, 59:8, 59:17, 66:16
informational [1] - 25:3
informed [1] - 70:20
initiated [1] - 39:18
inquire [2] - 55:12, 72:2
inquired [4] - 24:22, 53:15, 53:16, 68:2
insisted [1] - 18:4
inspector [1] - 15:12
Inspector's [1] - 15:11
instant [1] - 54:15
instead [1] - 7:24
intended [29] - 14:3, 14:4, 14:7, 14:11, 15:2, 16:23, 21:12, 21:13, 22:19, 22:23, 29:23, 41:3, 41:5, 41:6, 56:4, 57:4, 57:19, 58:1, 58:2, 58:14, 68:1, 68:3, 68:17, 69:1, 69:7, 70:3, 72:1, 72:4
intention [1] - 57:24
interest [2] - 6:14, 65:1
interested [2] - 43:10, 67:2
interesting [2] - 26:8, 67:4
interrogatories [1] - 73:9
invite [3] - 19:1, 33:3, 33:14
involve [1] - 12:4
involved [4] - 16:8, 28:7, 73:3, 73:4
involvement [1] - 36:18
ISLAND [2] - 1:2, 76:3
Island [11] - 1:13, 1:15, 1:16, 5:24, 12:5, 60:8, 60:11, 60:22, 62:17, 63:18, 76:7
issue [2] - 7:2, 29:20
issued [1] - 45:22
issues [1] - 13:23
item [2] - 46:2, 46:3
Item [1] - 46:24
items [1] - 62:20

J

January [5] - 34:21, 51:2, 51:4, 52:1, 52:4
Jeff [4] - 25:13, 73:22, 74:3, 74:6
Joan [1] - 62:3
Johnson [1] - 34:18
joined [1] - 10:20

K

Karen [3] - 62:4, 62:5, 62:11
kind [1] - 54:8
knowledge [7] - 45:3, 49:15, 68:16, 74:2, 74:5, 74:8, 76:12
knows [1] - 56:1
Kojoian [11] - 22:15, 22:17, 25:8, 25:15, 42:20, 43:9, 55:2, 59:16, 62:21, 73:18, 74:4
Kojoian's [1] - 25:11

L

label [1] - 47:15
language [3] - 17:6, 56:6, 56:7
Larry [1] - 47:18
last [6] - 23:10, 32:9, 40:4, 54:15, 72:20, 72:22
Last [1] - 72:21
law [3] - 10:5, 62:17, 63:18
Law [2] - 1:15, 10:6
lawsuit [1] - 7:2
lawyer [9] - 39:17, 47:7, 55:4, 55:24, 56:17, 60:5, 63:11, 65:19, 65:22
lawyer's [1] - 33:24
lawyers [2] - 36:19, 49:16
learned [1] - 40:15
least [2] - 13:8, 67:13
leave [1] - 11:9
left [1] - 27:11
legal [3] - 36:11, 37:14, 37:15
letter [7] - 43:7, 43:12, 43:13, 44:13, 44:18, 44:19, 44:22
license [1] - 9:24
licensed [1] - 10:3
limitations [1] - 49:2
Linette [2] - 70:11
list [1] - 15:6
listed [1] - 46:1
located [2] - 48:3, 64:15
look [7] - 16:19, 23:12, 49:9, 51:13, 56:8, 72:6, 72:11
Look [1] - 11:1
looked [6] - 26:17, 45:15, 45:23, 73:8, 73:10, 73:13
looks [4] - 23:9, 23:10, 23:22, 62:24
lost [1] - 20:15

M

MA [1] - 2:7
mail [44] - 13:14, 13:15, 18:18, 18:20, 20:6, 20:8, 27:12, 27:19, 28:2, 28:11, 29:2, 29:9, 29:11, 29:16, 29:22, 30:13, 30:15, 30:19, 31:17, 31:19, 32:1, 32:16, 35:4, 35:23, 36:5, 37:1, 37:9, 37:18, 38:4, 38:13, 38:23, 39:1, 39:2, 39:3, 46:18, 58:5, 58:8, 58:12, 68:18, 69:19, 69:22, 70:1, 72:8
Mail [10] - 4:6, 4:7, 4:8, 4:9, 4:10, 28:14, 28:17, 28:20, 28:23, 46:16
mailed [5] - 12:17, 21:8, 28:1, 38:22, 46:9
mailing [2] - 17:9, 17:10
mails [11] - 13:12, 29:14, 51:9, 51:11, 51:14, 51:17, 51:19, 56:8, 72:7, 72:11, 73:8
main [1] - 13:23
makeup [1] - 7:20
man [1] - 67:23
mansion [8] - 11:4, 11:6, 58:21, 59:13, 67:12, 67:15, 67:17, 69:2
marching [1] - 41:24
Mark [1] - 34:18
marked [22] - 9:8, 9:10, 22:9, 22:12, 28:15, 28:18, 28:21, 28:24, 29:3, 30:3, 30:12, 30:17, 31:18, 38:4, 38:24, 43:17, 44:18, 46:16, 46:19,

58:18, 68:19, 72:12
**marketing** [1] - 7:22
**Massachusetts** [1] - 1:23
**matter** [1] - 33:4
**matters** [1] - 47:20
**McCarthy** [1] - 47:19
**mean** [19] - 10:21, 13:1, 14:6, 14:7, 15:15, 19:2, 19:4, 26:13, 26:21, 29:20, 36:7, 47:8, 50:19, 50:21, 52:1, 54:2, 58:11, 59:2, 62:18
**meaning** [1] - 14:9
**means** [1] - 63:11
**MEANS** [1] - 76:22
**meant** [1] - 26:12
**meet** [1] - 52:17
**meeting** [4] - 12:19, 17:15, 68:23
**meetings** [1] - 10:9
**member** [3] - 35:6, 60:21, 61:2
**members** [4] - 15:16, 15:18, 26:2, 36:9
**membership** [1] - 14:14
**mentioned** [3] - 14:12, 14:17, 22:19
**met** [4] - 10:11, 10:12, 19:22, 43:6
**middle** [2] - 13:18, 13:19
**might** [2] - 49:22
**million** [6] - 11:14, 11:23, 12:7, 12:8, 14:19, 69:13
**mind** [4] - 37:14, 37:23, 48:6, 58:11
**mine** [1] - 25:10
**minutes** [1] - 52:23
**Mirage** [1] - 17:17
**Miramar** [27] - 7:20, 9:19, 10:13, 11:4, 31:1, 32:6, 32:18, 35:1, 35:8, 35:13, 37:3, 38:9, 38:18, 41:1, 41:18, 44:24, 48:2, 52:18, 52:19, 61:20, 64:1, 64:14, 65:5, 66:8, 73:2, 73:17, 74:18
**mistaken** [1] - 62:1
**modification** [1] - 28:8
**modified** [2] - 27:20, 28:4
**modify** [1] - 28:7
**money** [5] - 52:13, 53:23, 54:19, 57:13, 57:14
**month** [1] - 13:16
**Mortgage** [1] - 18:4
**MORTGAGE** [1] - 1:9
**mortgagee's** [2] - 45:10, 45:13
**most** [1] - 6:18
**Most** [3] - 31:12, 49:15, 49:16
**motions** [1] - 5:10
**mouth** [1] - 65:13
**moving** [1] - 51:5
**MR** [38] - 3:6, 5:18, 7:14, 16:12, 16:17, 17:22, 22:7, 25:22, 27:16, 30:5, 30:7, 30:9, 30:11, 37:5, 40:2, 40:7, 41:19, 41:21, 42:23, 43:1, 43:2, 43:5, 46:23, 49:5, 49:20, 55:15, 61:11, 62:8, 62:10, 63:5, 64:5, 64:18, 65:8, 66:18, 71:1, 71:8, 71:17, 74:22
**music** [1] - 10:16
**must** [4] - 18:16, 48:11, 48:21, 51:3

**N**

**name** [4] - 5:19, 10:15, 12:15, 59:11
**Nancy** [20] - 10:13, 16:4, 28:5, 29:18, 39:21, 40:9, 41:23, 42:17, 44:15, 44:20, 52:7, 53:8, 59:15, 61:17, 62:3, 62:20, 73:19, 74:13, 74:20
**necessarily** [1] - 22:4
**need** [4] - 22:20, 54:7, 58:15, 70:4
**needed** [2] - 26:6, 27:20
**needs** [1] - 64:12
**negotiate** [1] - 11:8
**negotiated** [1] - 13:5
**negotiating** [1] - 13:2
**never** [14] - 13:10, 26:11, 26:14, 26:16, 34:8, 34:9, 34:11, 47:4, 47:6, 48:18, 48:22, 56:6, 57:2, 67:21
**New** [4] - 24:18, 24:20, 24:23, 25:5
**Newport** [23] - 15:11, 19:23, 36:12, 36:15, 36:20, 42:11, 42:15, 47:21, 48:1, 48:3, 48:7, 48:15, 49:3, 50:1, 50:5, 53:14, 55:12, 57:3, 64:2, 64:16, 65:5, 65:14, 65:23
**Next** [1] - 24:4
**next** [4] - 11:17, 11:18, 19:18, 32:5
**nice** [1] - 67:11
**NO** [2] - 1:3, 4:2
**nobody** [1] - 33:18
**None** [1] - 44:2
**nonissue** [2] - 29:21, 31:8
**noontime** [2] - 52:20, 52:21
**NOT** [1] - 76:22
**notarization** [1] - 5:6
**Notary** [2] - 1:14, 76:6
**NOTE** [1] - 76:21
**notes** [1] - 24:8
**Nothing** [1] - 70:16
**nothing** [2] - 25:1, 68:24
**November** [23] - 1:16, 4:6, 4:7, 4:8, 4:9, 23:19, 28:14, 28:17, 28:20, 28:23, 29:2, 29:22, 30:2, 30:15, 30:20, 37:1, 42:24, 61:23, 69:23, 70:21, 76:11, 76:16, 76:20
**Number** [3] - 9:17, 46:24, 72:13
**number** [3] - 11:12, 24:1, 46:22
**Nursing** [1] - 73:16

**O**

**o'clock** [1] - 52:10
**Object** [9] - 37:5, 49:20, 64:5, 64:18, 65:8, 66:18, 71:1, 71:8, 71:17
**object** [4] - 25:23, 40:7, 49:5, 55:15
**Objection** [1] - 40:2
**objections** [1] - 5:9
**obvious** [1] - 69:3
**occasion** [2] - 48:22, 60:19
**occasions** [1] - 19:17
**October** [2] - 13:18, 13:19
**OF** [6] - 1:2, 1:12, 76:3, 76:22, 76:22, 76:23
**offer** [4] - 11:2, 11:3, 11:7, 68:24
**Office** [2] - 15:11, 57:3
**office** [6] - 6:1, 25:14, 57:10, 59:20, 60:10
**officer** [1] - 6:9
**Offices** [1] - 1:15
**official** [1] - 15:13
**old** [1] - 6:7
**Once** [2] - 19:22, 21:12
**One** [2] - 1:15, 2:7
**one** [23] - 11:2, 11:6, 11:21, 12:23, 13:23, 15:5, 19:6, 19:15, 33:13, 33:17, 39:18, 42:12, 46:19, 48:12, 52:14, 52:23, 58:9, 61:4, 61:18, 67:7, 73:22, 74:2
**opinion** [2] - 20:18, 20:22
**oral** [2] - 41:19, 41:22
**orders** [1] - 41:24
**organization** [3] - 15:15, 27:6, 55:8
**organizations** [9] - 15:7, 15:9, 24:4, 24:22, 25:20, 26:1, 26:13, 26:19, 36:8
**original** [1] - 18:8
**ought** [4] - 19:1, 33:12, 33:22, 35:18
**outcome** [2] - 34:12, 34:24
**outlining** [2] - 35:24, 36:5
**overnighted** [1] - 17:19
**overnighting** [1] - 17:10
**own** [1] - 33:8
**owner** [1] - 33:7
**owners** [1] - 36:12
**ownership** [1] - 6:14

**P**

**P-O-N-T-E** [2] - 62:7, 62:12
**p.m** [1] - 75:2
**page** [9] - 23:8, 23:9, 23:10, 23:21, 24:5, 24:11, 24:14, 25:4, 46:4
**Page** [1] - 46:24
**PAGE** [2] - 3:4, 4:2
**Panteleakis** [3] - 6:13, 6:17, 9:2
**Panteleakis'** [1] - 61:8
**paper** [2] - 11:11, 11:12
**paragraph** [2] - 32:10, 35:3
**paragraphs** [2] - 39:1, 39:3
**parcels** [2] - 7:1, 7:19
**part** [13] - 27:4, 31:17, 38:18, 55:13, 55:20, 56:19, 57:20, 59:2, 67:19, 68:10, 70:23, 71:7, 71:15
**particular** [2] - 22:4, 60:8
**parties** [1] - 5:4
**partners** [1] - 47:20
**past** [1] - 13:9
**pay** [1] - 69:13
**PC** [1] - 1:15
**pending** [2] - 17:23, 27:17
**people** [10] - 8:14, 15:18, 18:2, 33:13, 33:14, 33:23, 35:19, 38:1, 47:17, 49:16
**percent** [5] - 7:11, 7:12, 7:16, 9:4, 9:18
**period** [2] - 13:10, 35:14
**periodically** [2] - 32:8, 38:9
**permission** [1] - 19:10
**permit** [4] - 30:24, 31:4, 39:22, 56:13
**permitted** [14] - 15:4, 15:6, 21:14, 25:24, 26:9, 26:15, 36:1, 37:3, 41:17, 45:20, 45:21, 46:11, 46:12, 46:13
**person** [2] - 32:24, 41:1
**pertained** [1] - 36:9
**phone** [6] - 13:13, 18:17, 21:16, 31:23, 39:12, 70:12
**piece** [4] - 11:10, 11:11, 49:2, 64:1
**pieces** [2] - 11:2, 11:20
**Place** [2] - 1:16, 2:3
**place** [3] - 10:18, 40:10, 40:22
**placed** [5] - 49:2, 53:4, 53:6, 53:8, 65:3
**Plaintiff** [2] - 1:6, 2:4
**plan** [2] - 49:12, 67:8
**plane** [1] - 53:1
**Plaza** [1] - 2:7
**pleasantries** [1] - 11:1
**PLEASE** [1] - 76:21

**plus** [3] - 64:21, 64:24
**point** [1] - 44:14
**pointed** [2] - 69:17, 69:22
**policy** [4] - 45:10, 45:13, 45:22, 45:24
**possession** [1] - 60:7
**possibility** [1] - 26:19
**practitioner** [1] - 47:7
**premise** [1] - 32:24
**preparation** [2] - 51:4, 73:7
**prepare** [2] - 12:15, 59:1
**prepared** [3] - 16:18, 16:19, 29:17
**preparing** [2] - 62:13, 62:16
**present** [3] - 10:13, 52:7, 74:15
**pretty** [4] - 11:19, 58:11, 71:4, 71:11
**previously** [4] - 6:19, 43:16, 47:9, 59:23
**Previously** [2] - 6:20, 47:10
**price** [1] - 7:11
**private** [7] - 32:3, 32:7, 33:1, 33:2, 33:7, 33:21
**privilege** [3] - 16:16, 35:7, 43:4
**problem** [1] - 12:13
**problems** [1] - 19:10
**Procedure** [1] - 1:13
**proceed** [1] - 40:12
**proceeded** [2] - 18:2, 42:1
**process** [1] - 45:18
**produced** [1] - 7:14
**Professional** [2] - 1:14, 76:6
**pronouncing** [1] - 15:8
**properties** [3] - 7:4, 7:23, 48:9
**property** [76] - 7:2, 7:20, 8:7, 9:5, 9:19, 10:23, 14:1, 14:2, 14:13, 16:6, 16:23, 17:7, 18:10, 18:22, 19:6, 20:18, 20:23, 25:1, 27:4, 31:2, 32:18, 34:6, 35:1, 36:1, 36:12, 37:4, 40:1, 40:13, 41:12, 41:18, 42:22, 43:10, 44:24, 45:5, 48:16, 49:3, 50:1, 50:5, 53:17, 54:6, 54:10, 54:22, 55:13, 55:20, 56:14, 56:19, 57:4, 57:8, 57:12, 57:19, 58:1, 58:3, 58:14, 59:12, 61:21, 64:1, 64:4, 64:9, 64:14, 64:23, 66:6, 66:9, 66:15, 67:6, 67:9, 67:19, 67:24, 68:10, 68:17, 69:1, 70:4, 70:22, 71:6, 71:14, 74:18
**provide** [2] - 26:6, 59:4
**provided** [5] - 43:17, 59:6, 59:19, 59:21, 62:9
**Providence** [4] - 1:16, 2:4, 48:12, 48:23
**provision** [2] - 41:3, 72:4
**public** [1] - 19:9
**Public** [3] - 1:14, 6:12, 76:6
**purchase** [5] - 39:23, 40:11, 43:23, 70:21, 71:13
**purchased** [1] - 38:9
**purchaser's** [2] - 58:14, 70:3
**purpose** [7] - 15:23, 35:14, 38:23, 39:2, 39:4, 39:5, 39:14
**purposes** [2] - 67:19, 73:1
**pursuant** [1] - 1:13
**put** [14] - 15:16, 16:24, 17:2, 17:4, 29:18, 37:18, 42:4, 56:2, 56:4, 56:5, 65:13, 66:20, 68:20, 71:21
**puts** [1] - 67:24

**Q**

**quarter** [1] - 52:23
**questions** [2] - 59:15, 59:17

**R**

**R-120** [6] - 23:6, 24:11, 24:13, 24:15, 24:21, 25:2
**R-60** [44] - 15:4, 15:20, 16:24, 17:1, 17:5, 17:8, 18:10, 18:15, 18:23, 21:2, 21:22, 22:5, 22:16, 23:3, 25:2, 25:19, 26:1, 26:10, 27:20, 28:3, 29:18, 30:24, 31:3, 32:13, 32:19, 36:2, 38:20, 41:18, 42:5, 42:6, 53:18, 54:6, 54:10, 54:11, 54:14, 55:1, 56:1, 56:5, 56:13, 56:20, 57:12, 67:7, 71:22, 71:23
**raced** [1] - 15:17
**races** [2] - 15:17, 26:5
**raised** [1] - 13:22
**Rancho** [1] - 17:17
**reach** [4] - 13:3, 31:21, 39:6, 39:9
**reached** [1] - 39:7
**read** [8] - 5:5, 31:17, 31:20, 40:3, 40:4, 55:3, 55:4, 69:24
**real** [9] - 9:24, 47:13, 47:17, 59:22, 59:24, 60:3, 60:20, 62:15, 63:16
**Real** [1] - 60:9
**realize** [2] - 49:16, 71:24
**realized** [1] - 13:11
**really** [16] - 7:23, 29:12, 33:17, 43:21, 44:2, 48:21, 51:13, 52:23, 56:11, 59:9, 65:17, 69:9, 69:10, 69:16, 72:17, 72:23
**Realtors** [2] - 60:11, 60:22
**reason** [4] - 39:12, 45:17, 53:21, 54:18
**receive** [5] - 7:3, 7:6, 25:7, 34:5, 39:24
**received** [4] - 22:14, 30:14, 50:16, 50:21
**recently** [1] - 6:18
**Recess** [1] - 70:18
**recognize** [2] - 25:9, 25:11
**recollection** [3] - 60:2, 72:7, 72:10
**record** [6] - 5:19, 16:13, 22:8, 30:2, 58:20, 62:9
**redraft** [1] - 42:1
**refer** [1] - 20:6
**reference** [3] - 45:16, 46:5, 46:8
**referenced** [2] - 19:13, 19:15
**references** [1] - 47:1
**referred** [4] - 46:2, 46:3, 58:13, 70:3
**referring** [5] - 28:12, 46:18, 47:2, 58:5, 58:8
**refinanced** [1] - 45:5
**refinancing** [1] - 73:2
**Registered** [2] - 1:14, 76:5
**regulated** [2] - 48:16, 66:3
**regulations** [6] - 48:9, 48:22, 65:2, 65:7, 65:10, 65:15
**related** [2] - 21:19, 43:7
**relation** [1] - 40:23
**rely** [1] - 45:23
**relying** [1] - 64:11
**remained** [1] - 52:13
**remember** [6] - 13:6, 17:9, 27:18, 44:3, 51:19, 72:19
**remind** [1] - 51:15
**rent** [1] - 35:10
**report** [1] - 72:24
**REPORTER** [1] - 76:23
**Reporter** [2] - 1:14, 76:6
**reporter** [1] - 40:5
**REPORTING** [1] - 1:22
**represent** [1] - 36:19
**representation** [2] - 37:13, 37:14
**representations** [9] - 36:24, 37:7, 37:8, 37:11, 37:24, 38:3, 56:21, 56:23, 57:1
**represented** [3] - 37:23, 39:16, 56:18
**representing** [2] - 6:22, 60:5
**REPRODUCTION** [1] - 76:22
**request** [1] - 11:21
**requested** [1] - 40:6
**required** [2] - 17:21, 18:1
**requirements** [1] - 35:21
**reserved** [1] - 5:11
**residence** [19] - 14:23, 15:20, 18:23, 18:24, 32:3, 32:7, 32:9, 33:1, 33:8, 33:12, 33:22, 57:13, 67:7, 67:11, 67:17, 68:8, 69:3, 69:4, 69:5
**residential** [4] - 16:7, 18:22, 22:16, 54:7
**respect** [3] - 7:1, 7:18, 42:15
**respective** [1] - 5:4
**respond** [3] - 13:13, 29:14, 59:17
**responded** [4] - 13:14, 13:17, 14:7, 14:11
**response** [8] - 13:12, 21:8, 29:15, 30:14, 58:12, 58:17, 69:20, 70:1
**responsible** [1] - 12:2
**restate** [1] - 25:24
**restricted** [1] - 71:22
**restrictions** [1] - 65:3
**result** [1] - 15:2
**returned** [1] - 13:11
**REV** [1] - 63:9
**review** [3] - 44:12, 44:23, 51:17
**reviewed** [5] - 44:11, 59:24, 60:3, 73:6, 73:8
**reviewing** [1] - 71:5
**revised** [1] - 63:12
**revisions** [2] - 13:20, 13:22
**RHODE** [2] - 1:2, 76:3
**Rhode** [11] - 1:13, 1:14, 1:16, 5:23, 12:5, 60:8, 60:11, 60:22, 62:17, 63:18, 76:7
**RI** [1] - 2:4
**ripped** [1] - 11:11
**RPR** [1] - 76:19
**rules** [5] - 48:8, 48:21, 65:2, 65:6, 65:15
**Rules** [1] - 1:13

**S**

**sale** [14] - 7:4, 7:11, 7:19, 9:5, 34:5, 34:24, 39:23, 40:11, 41:13, 43:23, 70:21, 71:13, 73:17
**Sales** [1] - 60:9
**sales** [6] - 7:3, 7:17, 8:5, 8:9, 9:18, 34:3
**Salvadore** [4] - 3:2, 5:21, 70:19, 76:10
**SALVADORE** [2] - 1:12, 5:13
**SAME** [1] - 76:22
**sat** [2] - 14:18, 44:20
**Saturday** [1] - 17:14
**saw** [6] - 13:21, 41:9, 44:9, 44:18, 44:19, 44:21
**school** [2] - 6:21, 10:5
**seal** [1] - 76:15
**second** [7] - 24:11,

24:14, 25:4, 31:19, 32:1, 35:3, 74:17
secretary [1] - 59:11
section [2] - 42:2, 42:3
see [8] - 16:20, 26:18, 33:2, 44:1, 46:6, 63:8, 72:16
seeing [2] - 44:3, 44:6
sees [1] - 19:9
sell [2] - 16:11, 61:20
selling [1] - 8:6
send [8] - 35:23, 36:4, 53:23, 60:14, 60:15, 60:20, 60:24, 61:1
sending [4] - 38:23, 39:2, 39:4, 52:13
sent [41] - 12:21, 13:7, 13:14, 13:19, 17:3, 17:13, 18:7, 18:18, 20:8, 21:20, 22:6, 22:22, 23:4, 23:5, 23:6, 24:23, 27:13, 27:22, 29:2, 29:9, 29:11, 29:19, 32:15, 36:3, 38:3, 41:4, 42:7, 43:8, 43:11, 44:13, 45:12, 47:4, 54:13, 54:20, 54:24, 55:1, 55:2, 63:17, 71:14
sentence [5] - 31:19, 31:24, 32:1, 32:5, 32:9
September [12] - 8:20, 9:2, 10:17, 14:17, 19:13, 19:20, 19:21, 19:22, 43:6, 44:21, 69:12, 74:16
sequence [2] - 12:24, 13:7
series [1] - 22:11
set [1] - 76:15
sets [1] - 8:10
settlement [3] - 34:14, 34:15, 34:19
several [1] - 13:9
sheet [1] - 23:12
short [1] - 38:11
shortly [1] - 12:21
show [11] - 8:15, 8:21, 22:11, 24:20, 28:10, 30:12, 30:17, 43:13, 43:16, 58:18, 72:12
showed [4] - 11:13, 44:14, 44:15
shown [2] - 43:24, 44:4
sign [4] - 5:5, 18:3, 18:6, 18:7
signature [3] - 5:7, 17:21, 18:1
signed [7] - 17:20, 18:7, 34:13, 34:14, 34:17, 34:19, 56:7
significance [2] - 37:15, 37:16
signing [1] - 43:22
simple [1] - 41:13
six [5] - 7:11, 7:12, 7:16, 9:4, 9:18
skill [1] - 76:13
so-called [1] - 72:1
sold [1] - 9:19
sole [1] - 47:7
someone [2] - 44:15, 66:14
sometime [1] - 13:18
sort [3] - 29:21, 42:2, 61:7
speaking [4] - 10:21, 24:9, 41:2, 42:10
specific [2] - 54:9, 62:20
specifically [4] - 14:5, 16:24, 56:2, 71:19
specified [3] - 35:9, 35:14
spelled [1] - 58:10
spelling [1] - 14:11
spells [1] - 56:24
Spinella [2] - 1:15, 2:3
spoken [3] - 25:15, 51:3, 70:11
stake [2] - 34:12, 34:24
stamp [3] - 12:3, 12:5, 46:22
stamped [6] - 8:15, 8:21, 28:11, 30:5, 30:7, 30:18
stamps [3] - 12:11, 19:19, 19:24
start [1] - 63:4
started [2] - 6:22, 20:14
Starting [1] - 31:18
starts [1] - 46:22
state [4] - 35:4, 63:24, 64:9, 64:15
STATE [1] - 76:3
State [2] - 5:19, 76:7
statement [5] - 34:14, 34:15, 34:20, 35:15, 57:22
STATES [1] - 1:1
stay [3] - 15:20, 19:1, 33:3
staying [1] - 35:8
still [1] - 35:17
stipulated [2] - 5:2, 5:8
stock [1] - 6:11
stop [1] - 19:3
straight [1] - 41:13
Street [1] - 6:2
stricken [1] - 56:4
Strike [1] - 24:12
strike [1] - 5:10
structure [2] - 49:8, 67:9
students [1] - 6:21
stupid [4] - 54:4, 54:5, 55:11, 55:17
subagent [2] - 8:3, 8:18
Subagent [4] - 4:3, 9:7, 9:13, 9:23
substance [1] - 70:16
substantial [2] - 13:22, 66:11
suggest [1] - 32:16
Suite [2] - 2:3, 6:2
Sunday [1] - 17:16
Sunset [1] - 5:23
supposed [3] - 52:9, 52:14, 52:20
surprised [1] - 69:8
Susan [2] - 1:13, 76:5
SUSAN [1] - 76:19
sworn [2] - 5:15, 76:10

## T

table [1] - 10:20
tax [1] - 12:5
taxes [1] - 12:3
telephone [11] - 18:13, 19:14, 20:2, 20:5, 20:10, 20:17, 24:1, 27:9, 38:7, 40:24, 41:9
ten [1] - 52:22
tend [1] - 32:4
terms [5] - 38:24, 42:10, 48:16, 62:22, 66:9
testified [1] - 61:18
THE [4] - 76:21, 76:22, 76:23, 76:23
themselves [2] - 53:19, 62:22
thereafter [1] - 12:21
third [1] - 23:9
thirty [1] - 47:11
THIS [1] - 76:22
THOMAS [1] - 2:2
thoughts [4] - 37:10, 37:15, 49:1, 49:7
thousand [1] - 12:6
three [5] - 7:1, 7:19, 10:20, 11:2, 11:20
Thursday [2] - 1:16, 76:11
tied [1] - 41:12
Tim [44] - 10:10, 10:11, 10:12, 10:14, 10:21, 11:19, 14:13, 18:9, 18:19, 19:12, 20:11, 27:2, 27:10, 30:23, 31:9, 31:14, 31:22, 32:2, 32:6, 32:11, 32:16, 34:2, 35:4, 35:8, 35:11, 38:6, 38:15, 38:21, 39:7, 40:23, 42:21, 43:6, 44:17, 44:20, 49:24, 52:16, 54:21, 55:19, 57:4, 57:18, 70:9, 70:20, 74:7, 74:14
TIMOTHY [1] - 1:8
title [9] - 45:7, 45:9, 45:10, 45:13, 50:12, 50:13, 50:19, 50:21, 52:11
Title [1] - 18:4
TITLE [1] - 1:9
TO [1] - 76:22
today [1] - 47:16
today's [1] - 73:7
took [3] - 10:18, 13:15, 61:7
top [2] - 23:18, 23:21
towns [1] - 48:11
transaction [1] - 60:18
transcript [2] - 5:5, 76:9
TRANSCRIPT [1] - 76:22
trial [1] - 5:11
tried [2] - 21:13, 24:19
true [1] - 76:11
trustee [3] - 61:8, 61:23, 62:9
trustees [4] - 61:18, 62:2, 62:3, 73:23
try [1] - 19:7
trying [2] - 16:8, 65:13
Turks [2] - 1:15, 2:3
two [5] - 13:8, 19:21, 39:1, 39:3, 72:22
Two [1] - 19:22
type [3] - 7:7, 40:1, 59:11
typewritten [1] - 59:2

## U

UNDER [1] - 76:23
under [12] - 18:10, 20:19, 20:24, 25:19, 26:1, 26:10, 35:9, 36:2, 41:18, 44:10, 56:20, 65:5
understood [1] - 56:17
undertake [1] - 62:14
unimproved [3] - 11:5, 59:14, 65:5
UNITED [1] - 1:1
UNLESS [1] - 76:23
unless [1] - 61:2
up [3] - 6:23, 41:12, 68:22
uses [3] - 15:6, 36:1, 41:17
usual [1] - 10:24

## V

value [1] - 64:22
version [1] - 60:8
view [1] - 74:18
violate [2] - 32:13, 32:19
violating [1] - 38:19
violation [2] - 15:19, 15:21
visit [1] - 74:17
visiting [2] - 35:7, 35:12
VOKE [11] - 2:6, 3:6, 5:18, 16:17, 30:7, 30:11, 41:21, 43:1, 43:5, 62:10, 74:22
vs [1] - 1:7

## W

Waddell [16] - 10:13, 16:4, 28:5, 39:21, 40:9, 42:17, 59:16, 61:17, 62:3, 62:20, 73:19, 73:22, 74:3, 74:6, 74:13, 74:20
Waddell's [1] - 25:13
wait [1] - 69:21
waited [1] - 52:19
waived [1] - 5:7
waiving [1] - 16:15
walk [1] - 11:22
wants [1] - 14:13
weeks [1] - 13:9
Weston [21] - 15:10, 21:9, 21:10, 21:11, 21:18, 23:22, 24:9,

25:16, 25:17, 25:18, 26:14, 29:6, 31:10, 31:15, 35:24, 36:5, 36:7, 37:2, 42:10, 42:17, 53:13
**Weybosset** [1] - 6:2
**whereby** [1] - 35:6
**WHEREOF** [1] - 76:14
**White** [3] - 8:4, 8:20, 9:15
**whole** [3] - 31:20, 42:2, 59:10
**wife** [2] - 32:6, 74:18
**Williams** [1] - 62:4
**WILSON** [1] - 76:19
**Wilson** [2] - 1:14, 76:5
**WITNESS** [1] - 76:14
**witness** [2] - 1:12, 5:14
**wonder** [2] - 21:5, 32:2
**wondering** [2] - 18:14
**word** [3] - 25:23, 37:17, 37:20
**words** [5] - 13:24, 21:4, 37:19, 57:24, 65:13
**World** [17] - 18:11, 20:19, 20:24, 22:24, 27:4, 31:1, 32:17, 38:19, 55:20, 56:14, 56:19, 57:21, 67:20, 68:10, 70:24, 71:7, 71:15
**world** [9] - 14:12, 14:14, 14:16, 14:21, 16:1, 53:18, 55:5, 68:4, 69:13
**worried** [2] - 52:22, 52:24
**worth** [2] - 57:13, 57:14
**write** [3] - 11:7, 24:15, 24:16
**writing** [1] - 44:5
**written** [3] - 7:9, 24:12, 24:13
**wrote** [7] - 11:10, 11:12, 23:23, 24:2, 24:3, 24:7, 24:8
**www.cjreporting.com** [1] - 1:24

**Y**

**Yacht** [4] - 24:18, 24:20, 24:23, 25:5
**yachting** [12] - 15:7, 15:9, 15:14, 24:4, 24:22, 25:19, 26:1, 26:13, 26:19, 27:5, 36:8, 55:7
**YACHTING** [1] - 15:9
**year** [5] - 10:7, 60:18, 72:20, 72:21, 72:22
**years** [7] - 6:5, 19:3, 47:11, 61:6, 65:20, 65:22, 72:23
**Yellowstone** [16] - 18:11, 20:19, 20:23, 22:24, 27:4, 31:1, 31:6, 32:17, 38:19, 56:14, 57:20, 67:20, 68:10, 70:23, 71:7, 71:15
**yesterday** [3] - 31:21, 61:17, 74:21
**York** [4] - 24:18, 24:20, 24:23, 25:5

**Z**

**zone** [20] - 16:5, 16:9, 17:2, 17:5, 17:8, 18:15, 18:23, 20:20, 21:22, 21:23, 23:3, 24:21, 42:5, 42:6, 53:18, 54:10, 54:11, 56:1, 57:12, 71:23
**zoned** [3] - 15:20, 54:7, 67:7
**Zoning** [4] - 45:1, 53:15, 55:12, 57:3
**zoning** [44] - 15:3, 15:4, 15:13, 17:1, 18:11, 20:24, 21:2, 21:14, 21:22, 21:24, 22:5, 22:15, 22:20, 23:3, 26:10, 27:20, 28:3, 29:18, 30:24, 31:3, 31:6, 32:13, 32:19, 36:2, 38:20, 40:1, 40:13, 41:18, 42:15, 44:23, 45:4, 46:4, 46:6, 47:1, 47:4, 50:14, 50:16, 50:17, 55:1, 56:5, 56:13, 56:20, 57:9, 71:22