UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| AMERICAN CAPITAL CORPORATION<br>Plaintiff | : | |
| v. | : | Case No. 06-90S |
| TIMOTHY L BLIXSETH; EDRA BLIXSETH; and MORTGAGE GUARANTEE & TITLE CO.<br>Defendants | : | |

**PLAINTIFF S, AMERICAN CAPITAL CORPORATION, OBJECTION TO BLIXSETH DEFENDANTS MOTION FOR SUMMARY JUDGMENT**

Now comes Plaintiff, ***American Capital Corporation***, and hereby objects to Defendants , ***Timothy L. Blixseth and Edra Blixseth***, motion for summary judgment. As grounds therefor, Plaintiff relies upon its memorandum in support of its objection, annexed hereto.

**AMERICAN CAPITAL CORPORATION**

By its Attorneys,

/s/ Thomas C. Angelone
Thomas C. Angelone, Esq. #1373
**HODOSH, SPINELLA & ANGELONE pc**
One Turks Head Place, Suite 810
Providence, Rhode Island 02903
(401) 274-0200
*Fax* (401) 274-7538
angelonelaw@aol.com

David Krech, Esq. #5257
Lauren E. Jones, Esq. #2141
**JONES ASSOCIATES**
72 South Main Street
Providence, Rhode Island 02903-2907
(401) 274-4446
*Fax* (401) 274-2805

Dated: July 11, 2007

**CERTIFICATION**

I hereby certify that on this 11th day of July, 2007, I caused a copy of the within ***Objection to Motion for Summary Judgment*** to be electronically transmitted to:

Brian P. Voke, Esq.
bvoke@campbell-trial-lawyers.com
Campbell Campbell Edwards & Conroy
One Constitution Plaza, 3rd Floor
Boston, MA 02129

/s/ Thomas C. Angelone
Thomas C. Angelone, Esq.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| AMERICAN CAPITAL CORPORATION<br>Plaintiff | : | |
| vs. | : | Case No. 06-90 S |
| TIMOTHY L. BLIXSETH; EDRA BLIXSETH; and MORTGAGE GUARANTEE & TITLE CO.<br>Defendants | : | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS OBJECTION TO DEFENDANTS BLIXSETHS' MOTION FOR SUMMARY JUDGMENT**

**Introduction and Statement of Facts**

This action arises from a default by defendants Timothy L. Blixseth and Edra Blixseth on a $25-million Agreement for Sale and Purchase of property owned by plaintiff American Capital Corporation [ACC]. The Agreement, signed by the Blixseths on November 21, 2005, included an inspection contingency that provided: "Purchasers * * * shall also investigate the condition of the Real Property, including, but not limited to, * * * a determination of whether the existence * * * of any local * * * ordinances, laws or restrictions would unduly interfere with the Purchasers use of the Real Property as allowed in an R-60 zone." Blixseths' Exhibit A,[1] ¶ 7. Neither during the inspection period nor at any time prior to the scheduled closing date did the Blixseths notify ACC

1. ACC refers in this memorandum to the exhibits attached to the Blixseths memorandum, namely, Exhibits A through U, as if each were attached hereto as its own exhibits.

of any objection to the "condition" of the property based on a determination that an ordinance, rule, or regulation would unduly interfere with their use of the property. Panteleakis' Exhibit 1. ACC was ready, willing, and able to close on the January 17, 2006, closing date and had delivered all necessary closing documents to the escrow agent. Furthermore, all of the closing documents, including the settlement statement, which needed to be signed and delivered by or on behalf of the Blixseths were duly signed and delivered to the escrow agent. Panteleakis' Exhibit 2. The deed was not recorded because the Blixseths never wired the money needed to pay the purchase price. Blixseths Exhibit U at 52:4 - 53:24.

Shortly after the scheduled closing, the Blixseths' attorney, Andrew Hawes, told ACC's attorney, Guido Salvadore, that the Blixseths did not wire the money because they had called the City of Newport the morning of the closing and learned that the R-60 zoning regulations precluded the Blixseths from using the property as part of their Yellowstone World Club. *Id*. On February 14, 2006, Hawes sent Salvadore a letter reiterating that reason for the Blixseths' failure to close—"one cannot use a private residence for a private club"—and stating that for that reason "our termination of the agreement was justified." Panteleakis' Exhibit 3.

On February 3, 2006, ACC commenced this action seeking both a declaration that the Blixseths had breached the agreement and equitable and/or legal relief on account of the breach. Approximately five weeks later, on March 10, 2006, Hawes sent another letter to Salvadore, this time claiming that the Blixseths had just learned that the property was in the Newport Historic District and that ACC had not disclosed that fact in its real estate disclosure forms. Blixseths' Exhibit S. Therefore, the Blixseths

were purportedly exercising their right under R.I. GEN. LAWS § 5-20.8-4 to terminate the agreement on the ground that ACC had failed to disclose a material deficient condition. *Id*.

The Blixseths now move for summary judgment on the basis of § 5-20.8-4 and also on the ground that the board of directors of ACC never voted to authorize the sale of the property. As shown below, the first proffered ground is without merit because the location of property in an historic district is not a "deficient condition" as defined in the real-estate disclosure act, and even it were a "deficient condition" it is not a "*materially* deficient condition" permitting the Blixseths to terminate the agreement. Moreover, since the statute provides a right to terminate an agreement only on the condition that a closing has not occurred, and since the closing had not occurred solely due to the Blixseths' breach of the agreement, they are precluded from relying on the non-occurrence of the closing. Finally, the Blixseths waived any right to rescind or terminate the Agreement.

The second prong of the Blixseths' summary-judgment motion is equally unavailing. It is undisputed that: (1) the sole director of ACC was Andrew Panteleakis; (2) Panteleakis was at all relevant times incapacitated; (3) prior to his incapacity Panteleakis signed a durable power of attorney allowing Nancy Z. Waddell, the vice-president and general manager of ACC, to act for him in all of his business affairs, including specifically to "carry out the provisions for the sale of * * * the assets" of ACC; and (4) Waddell executed a consent to the sale on Panteleakis' behalf. Blixseths Exhibit J; Panteleakis Exhibits 8 and 10. In addition, prior to the scheduled closing, the three trustees of the sole shareholder of ACC— the Andrew Panteleakis

Trust[redacted] executed a unanimous consent to the sale. Panteleakis Exhibit 4. Further, the trustees knew that Panteleakis had given the power of attorney to Waddell, that Waddell had used it to sign Panteleakis' name to the Agreement of Sale and Purchase that they had approved, and that they understood and agreed that the power of attorney authorized Waddell to act on Panteleakis' behalf to close the transaction. Panteleakis Exhibit 5. Under these circumstances, there is absolutely no merit to the Blixseths' argument that Waddell's signing of Panteleakis' name as director to the consent to the sale was a legal nullity.

Accordingly, the Blixseths are not entitled to summary judgment.

## Argument

### I. The Blixseths are not entitled to summary judgment on the grounds that ACC's real estate disclosure forms did not state that the property was located in the Newport historic district and did not include the prescribed notice regarding historic-district limitations.

#### A. The requirements of and remedies provided by the real estate disclosure act.

Rhode Island's Real Estate Sales Disclosures Act, R.I. GEN. LAWS §§ 5-20.8-1 to -12, requires a seller to deliver a written disclosure to the buyer prior to the signing of any agreement to transfer real estate. § 5-20.8-2(a). The written disclosure must "comply with the requirements set forth in [§ 5-20.8-2(b)] *and* shall state all deficient conditions of which the seller has actual knowledge." *Id*. (emphasis added). Thus, the statute sets forth two independent requirements for the written disclosure: (1) it must comply with the requirements of § 5-20.8-2(b) and (2) it must set forth all "deficient conditions" of which the seller has actual knowledge.

The requirements of § 5-20.8(2)(b) include a list of 24 categories of information that the "disclosure form shall include." The information includes such varied matters as: "(I) Seller Occupancy — (Length of Occupancy)"; "(ii) Year Built"; "(v) Roof (Layers, Age and Defects)"; "(xxi) Easements and Encroachments"; "(xxiv) Restrictions — (Plat or Other)"; and "(xxviii) Wetlands." The provision of import in this case is subparagraph (xxiii), which reads in its entirety as follows:

> Zoning — (Permitted use, Classification) "Buyers of real estate in the state of Rhode Island are legally obligated to comply with all local real estate ordinances; including, but not limited to, ordinances on the number of unrelated persons who may legally reside in a dwelling, as well as ordinances on the number of dwelling units permitted under the local zoning ordinances." *If the subject property is located in a historic district, that fact must be disclosed to the buyer, together with the notification that "property located in a historic district may be subject to construction, expansion or renovation limitations. Contact the local building inspection official for details."*

(Emphasis added).

With regard to the second requirement—that the written disclosure set forth all deficient conditions—the act defines "deficient conditions" to be "any land restrictions, defect, malfunction, breakage, or unsound condition existing on, in, across or under the real estate of which the seller has knowledge." § 5-20.8-1(5).

While the act establishes those two separate requirements for the written disclosure, it provides a buyer with a remedy for a violation only of the second requirement. The sole rights that a buyer has under the act are those specifically provided in § 5-20.8-4: "Buyer's rights." Under that section, a buyer has rights only if "the buyer discovers that a *materially deficient condition* exists which has not been disclosed to the buyer." §§ 5-20.8-4(a) (discovery made prior to the execution of an

agreement to transfer) and -4(b) (discovery made prior to closing but after execution of an agreement to transfer) (emphasis added).[2] Thus, the act provides a buyer with a remedy for a violation of the requirement that the written disclosure include all deficient conditions of which the seller has actual knowledge (provided that the buyer can prove that the omitted deficient condition was material), but does not provide a remedy for a violation of the other requirement — that the written disclosure comply with the requirements of § 5-20.8-2(b).

Here, the Blixseths claim that they did not discover that the property was in an historic district until after the agreement was executed, so if they had any rights at all it would have been under § 5-20.8-4(b), which provides in relevant part:

> If prior to closing but after execution of an agreement to transfer, the buyer discovers that a materially deficient condition exists which has not been disclosed to the buyer, then the buyer may either elect to:
>
> (1) Terminate the agreement to transfer in which case the buyer shall receive all deposits paid by the buyer to the seller or his or her agent pursuant to the agreement; or
>
> (2) Allow the seller the opportunity to cure such deficient condition * * *.

The buyer's right to terminate the agreement or to allow the seller to cure are the buyer's only remedies under the act; the act does not provide a private right of action for damages. *Stebbins v. Wells*, 818 A.2d 711, 715-16 (R.I. 2003).

---

2. The act does not define the term "materially deficient conditions," but the limiting term "materially" establishes that not all deficient conditions are materially deficient conditions.

**B. The Blixseths have no remedy for ACC's failure to include in the real estate disclosure forms the statutorily prescribed notice regarding historic-district limitations.**

There is no dispute that the disclosure forms provided by ACC to the Blixseths did not state that the property was located in an historic district and did not include the statutorily prescribed notice, quoted above, regarding limitations on construction, expansion or renovation. These omissions occurred because the form used by ACC predated the 1999 amendment to § 5-20.8-2(b)(xxii) which added the historic-district disclosure requirements.[3] *See* P.L. 1999, ch. 419, § 1; *see also* Blixseths Exhibits C and D.

The absence of the notice regarding historic-district limitations is a failure to comply with the requirements of § 5-20.8-2(b). The legal effect of the absence of this notice is no different from the legal effect of omission of the notice required by § 5-20.8-2(b)(1) that must appear conspicuously at the top of the written disclosure:

> This is not a warranty by the seller that no other defective conditions exist, which there may or may not be. * * * The buyer is advised not to rely solely upon the representation of the seller made in this disclosure, but to conduct any inspections or investigations which the buyer deems to be necessary to protect his or her best interest.

As explained above, the act does not provide a remedy for a violation of the requirements of § 5-20.8-2(b); it provides a remedy only for the discovery of an undisclosed materially deficient condition.

The absence of the notice required by 5-20.8-2(b)(1) or the notice regarding historic-district limitations is not a "land restriction[], defect, malfunction, breakage, or

3. The form used by ACC bears a notation near the bottom of each page "Rev 2/98" indicating that it was last revised in February 1998.

unsound condition existing on, in, across or under the real estate of which the seller has knowledge." § 5-20.8-1(5). Thus, the absence of such notice is not a deficient condition or, *a fortiori*, a materially deficient condition. Indeed, had ACC disclosed that the property was in the Newport historic district but omitted the notice, the Blixseths surely could not complain that they later discovered an undisclosed materially deficient condition; they would not be able to point to any undisclosed condition existing on, in, across or under the property.

Accordingly, the Blixseths have no remedy under the act for ACC's failure to provide the prescribed notice regarding historic-district limitations.

### C. The Blixseths were not entitled to terminate the agreement on the ground that ACC failed to disclose that the property was located in the Newport historic district.

#### 1. The location of the property in the Newport historic district is not a "deficient condition" as that term is defined by R.I. GEN. LAWS § 5-20.8-1(5).

Plainly, the fact that a property is located in an historic district is not a "defect, malfunction, breakage, or unsound condition existing on, in, across or under the real estate." Those terms refer to the physical condition of the land or structures, as evidenced by the modifying clause, "existing on, in, across or under the real estate."[4] Thus, the only way in which the Blixseths could be correct that the location of the property in the Newport historic district constitutes a materially deficient condition is if

4. Whether an existing violation of an historic-district ordinance, rule, or regulation constitutes a "defect" need not be determined in this proceeding as there is no allegation of any such violation with regard to the subject property. In any event, a violation could arise only from an unauthorized change in the exterior appearance of the property and, thus, would inhere in the physical condition of the property.

the location of the property constitutes "land restrictions * * * existing on, in, across or under the real estate." Such a contention, however, is inconsistent with the language and structure of the act.

First, the *fact* that the property is located in the Newport historic district — which fact is all that the act required to be disclosed — is not itself a land restriction. Although property located in an historic district is subject to applicable rules and regulations, the act does not require disclosure of those rules and regulations, only the fact that the property is located in an historic district. Hence, the fact that property is located in an historic district is simply a fact about that property, and is not itself a land restriction that must be disclosed.

Second, the applicable rules and regulations of the historic district are not "land restrictions" within the meaning of the act. Notably, the subsection of § 5-20.8-2(b)(2) that includes the historic-district disclosure requirement is entitled "Zoning" and nowhere uses the terms "land restriction" or "restriction" to describe zoning or historic-district ordinances or regulations. § 5-20.8-2(b)(xxiv).[5] Two other subsections, however, do require disclosure of "restrictions." § 5-20.8-2(b)(xxi) requires the seller to "notify the buyer of any known easements, encroachments, covenants or *restrictions* of the seller's real estate." [Emphasis added.] And, § 5-20.8-2(b)(xxiv) requires the disclosure of "Restrictions -- (Plat or Other)." The use of the term restrictions in those, and only those, two subsections demonstrates that those restrictions are the "land

5. Similarly, neither the zoning enabling act, R.I. GEN. LAWS §§ 45-24-1 to -72, nor the historical area zoning enabling act, R.I. GEN. LAWS § 45-24.1-1 to -21, refers to a zoning ordinance, an historical area zoning ordinance, or any of the provisions of such ordinances as "land restrictions."

restrictions" that constitute deficient conditions under § 5-20.8-1(15) and are the only ones that must be disclosed.

Third, if applicable zoning and historic-district regulations did constitute "land restrictions," then they would have to be disclosed under §§ 5-20.8-2(b)(xxi) or (xxiv), rendering § 5-20.8-2(b)(xxiv) entirely superfluous. This Court, of course, should not construe the statute in a manner that would render any "sentence, clause or word * * * unnecessary or surplusage." *Ruggiero v. City of Providence*, 893 A.2d 235, 237-38 (R.I. 2006) (applying rule to conclude that "payable" and "paid" have separate and distinct meanings).

Fourth, if applicable zoning and historic-district regulations did constitute "land restrictions," then in every real estate transaction those regulations would constitute "deficient conditions." But, zoning and historic-district regulations are imposed under the police power to *advance* the public welfare. *See* R.I. GEN. LAWS § 45-24-30(1) (recognizing the promotion of the general welfare as one of the purposes of zoning); R.I. GEN. LAWS § 45-24.1-1 (declaring the preservation of structures of historic value to be a public purpose); *Hadley v. Harold Realty Co.*, 97 R.I. 403, 409, 198 A.2d 149, 152-53 (1964) (stating that the power to zone rests on the police power and may be "asserted only if the public health, the public safety, and the public welfare * * * will be thereby promoted and protected"). In light of those intended beneficial purposes, it would be absurd to ascribe to the legislature an intent to declare all applicable zoning and historic-district regulations to be "deficient conditions." This Court should not construe the statute in a manner that leads to such an absurd result. *Pastore v.*

*Samson*, 900 A.2d 1067, 1078 (R.I. 2006); *In re Abby D.*, 839 A.2d 1222, 1224-25 (R.I.2005).

Fifth, there is simply no reason to believe that just because the legislature mandated disclosure of a particular fact that it deemed that fact to constitute a deficient condition. For example, the legislature required sellers to disclose the year that the structure was built, the age and number of layers of the roof, and the amount of property tax. §§ 5-20.8-2(b)(2)(ii), (v), and (xxii). Yet, the mere fact that those items must be disclosed does not reasonably imply that the age of the structure, or the number of layers of the roof, or the amount of property taxes imposed necessarily constitutes a deficient condition. Only if the fact constitutes a "land restriction[], defect, malfunction, breakage, or unsound condition existing on, in, across or under the real estate," when those terms are given their ordinary meaning, should that fact be deemed a deficient condition. *See Pastore v. Samson*, 900 A.2d at 1078 ("axiomatic that we should interpret statutory language in accordance with its plain and ordinary meaning"). In short, the mere fact that the legislature required disclosure of a particular matter is no substitute for the statutory definition provided by the legislature in determining whether that matter constitutes a "deficient condition."

Thus, upon examination of the language and structure of the act, and upon application of well-established rules of statutory construction, this Court should hold that the location of property in an historic district is not a "deficient condition" within the meaning of the act.

**2. The location of the property in the Newport historic district is not a "materially deficient condition" and therefore the Blixseths had no right to terminate the agreement under R.I. GEN. LAWS § 5-20.8-4.**

Even if the location of the property in the Newport historic district constituted a deficient condition under the act, which it does not as just demonstrated, the Blixseths have failed to prove as a matter of law that such fact amounts to a *materially* deficient condition. The act does not define whether the materiality of a deficient condition is to be determined by an objective or subjective standard, i.e., whether the materiality of the condition is to be determined by what a reasonable buyer would consider important or what, in fact, the buyer actually deemed important. Under either test, however, the Blixseths fail to establish their entitlement to summary judgment.

**i. The location of the property in the historic district is not a materially deficient condition because the property is, in fact, worth more than it would be if it were located outside the district.**

In other circumstances involving disclosure, materiality has been construed to require an objective evaluation. For example, in *Wilkinson v. Vesey*, 110 R.I. 606, 627-28, 295 A.2d 676, 689 (1972), the court held that a patient has a right to full disclosure of all "material" facts, and "defined materiality by an objective standard." *Miller v. Rhode Island Hosp.*, 625 A.2d 778, 783 (R.I. 1993); *see also Living Designs, Inc. v. E.I. Dupont De Nemours & Co.*, 431 F.3d 353, 370 (9th Cir. 2005) ("An omitted fact is material if there is a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable [claimant]." [Alteration in original; internal quotations omitted.]); *Harper v. Russell*, 836

A.2d 513, 513 (Del. 2003) (a fact is material "if a reasonable person would attach importance to it in determining his choice of action in the transaction in question").

Assuming that the materiality of an alleged deficient condition is governed by an objective standard, whether the location of the property in the Newport historic district constitutes a *materially* deficient condition presents a genuine issue of material fact, as shown by the report of ACC's real-estate expert. *See Deluxe Media Services, LLC v. Direct Disc Network, Inc.*, 2007 U.S. Dist. LEXIS 15618 at *27 (N.D. Ill. 2007) (stating that materiality is generally an issue of fact); *Harper v. Russell*, 836 A.2d at 513 (same); *see,e.g., Gregory v. City of Louisville*, 444 F.3d 725, 743-44 (6th Cir. 2006) (stating that the "materiality" of exculpatory evidence is a mixed question of law and fact).

The Appraisal Consulting Report by Webster A. Collins of CB Richard Ellis addresses the issue: "What effect does being in a historic district have on the subject property and is that designation a material deficient condition?" Panteleakis' Exhibit 6. Collins concluded that "not only is there no deficiency being in a historic district but being in a historic district is an enhancement to the property." *Id*. Collins reached this conclusion by examining sale prices of single-family residential properties in a neighborhood of Newport—the Point—that is partly within and partly outside the historic district. *Id*. Upon examination, Collins found that properties within the historic district carried both an absolutely higher average sales price ($554,842 vs. $343,630) and also a higher average sales price per square foot ($405.42 vs. $289.96). *Id*. The report concludes: Overall, we have concluded that not only is there no deficiency being in a historic district but being in a historic district is an enhancement to the property. *Id.*

Since the property would be worth less, all other things being equal, if it were *not* in the historic district, its location in the district cannot be considered a materially deficient condition. No reasonable person would consider a characteristic that adds value to a property a materially deficient condition. Accordingly, if materiality is to be determined by an objective standard, there is a genuine issue of material fact precluding an award of summary judgment to the Blixseths.

**ii. The provisions of the agreement and the due diligence carried out by the Blixseths evidence that whether the property was in an historic district was not material to the Blixseths.**

Even if materiality ought to be determined under a subjective standard, which ACC believes is not the appropriate test, the provisions of the agreement and the due diligence carried out— or, more accurately, not carried out— by the Blixseths raise a genuine issue whether the location of the property in the historic district was, in fact, material, to the Blixseths.

Paragraph 6 of the agreement provides that "the sale of the Subject Property is being made, and Purchasers shall take title subject to the following ("Permitted Encumbrances"): * * * (b) Provisions of existing building and zoning laws, restrictions and regulations of all governmental authorities having jurisdiction." Thus, in the agreement itself the Blixseths agreed to take title to the property notwithstanding any restrictions or regulations of any governmental authority having jurisdiction and, thus, notwithstanding any applicable historic-district rules and regulations. The fact that the Blixseths agreed to take title subject to any applicable historic-district rules and

regulations is evidence that the Blixseths did not deem any such rules and regulations material. *Compare* Panteleakis Exhibit 12 (Blixseths proposed elimination of zoning and other regulatory ordinances from the definition of Permitted Encumbrances ) *with* Blixseths Exhibit A (including such as permitted encumbrance in final executed agreement).

In addition, paragraph 7 of the agreement provides that the "Purchasers, at their sole cost and expense, shall also investigate the condition of the Real Property including, but not limited to, * * * a determination of whether the existence or violation of any local, state or federal statutes, ordinances, laws or restrictions would unduly interfere with the Purchasers [sic] use of the Real Property as allowed in an R-60 zone."[6] Further, paragraph 7 allowed the Blixseths 5 days from the completion of their title search, which had to be completed within 10 days of the signing of the agreement, to notify ACC of any objection that they had arising from their inspection and investigation of the property. Yet, it is undisputed that the Blixseths did not notify ACC of any objection within the allowed time and, in fact, never conducted any independent investigation after the agreement was executed to determine whether the property was located in an historic district or was otherwise subject to zoning limitations that would interfere with their intended use of the property. Panteleakis Exhibit 1; Panteleakis Exhibit 7 at 86:14 - 89:25. The Blixseths' failure to conduct any independent due diligence with regard to applicable zoning and other regulations, such as the historic-

6. The provision for an inspection period that would give the Blixseths an opportunity to review applicable zoning laws and ordinances that might affect their use of the property was included at the Blixseths request. *See* Panteleakis Exhibit 12.

district regulations at issue here, despite their contractual obligation to undertake such an investigation, is evidence that the Blixseths did not deem any such rules and regulations material.

The Blixseths have attempted to explain their lack of due diligence based upon alleged pre-agreement representations of agents of ACC. The attorney for the Blixseths admitted in his deposition, however, that it was his responsibility, not Salvadore s, to do the Blixseths due diligence. Panteleakis Exhibit 7 at 71:18 - 74:1. Moreover, paragraph 20 of the agreement precludes the Blixseths from asserting any reliance on such alleged representations. Paragraph 20 provides, in part:

> PURCHASERS ACKNOWLEDGE THAT THE SALE IS WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY TYPE EXPRESS OR IMPLIED (INCLUDING WITHOUT LIMITATION THE FACT THAT NO REPRESENTATIONS OR WARRANTIES ARE BEING MADE IN CONNECTION WITH THE SUBJECT PROPERTY, * * * OR THE COMPLIANCE OF THE SUBJECT PROPERTY WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS) * * *. * * * SELLER HEREBY DISCLAIMS ALL WARRANTIES WITH RESPECT TO THE SUBJECT PROPERTY, INCLUDING, WITHOUT LIMITATION, WARRANTIES AS TO * * * SUITABILITY * * *.

In addition, the agreement contains a merger clause: "This Agreement and the documents referred to herein contain the entire agreement between the parties with respect to the transactions contemplated hereby, * * *." Blixseths' Exhibit A, ¶ 27.

The merger clause together with the comprehensive disclaimer provision, which includes a specific disclaimer of any warranties as to the suitability of the property, precludes the Blixseths from relying on any alleged precontractual representation of any agent of ACC that the property was suitable for use as part of the Blixseths' Yellowstone World Club. *See LaFazia v. Howe*, 575 A.2d 182 (R.I. 1990); *compare*

*Travers v. Spidell*, 682 A.2d 471 (R.I. 1996) (general disclaimer clause[7] not sufficient to bar action based on alleged misrepresentation).

Likewise, the Blixseths cannot reasonably explain away their lack of due diligence on the basis that the disclosure forms did not indicate that the property was in an historic district. The disclosure forms included the legislatively mandated notice that the written disclosure "is not a warranty by the seller that no other defective conditions exist" and advised the Blixseths "not to rely solely upon the representation of the seller made in this disclosure, but to conduct any inspections or investigations which the buyer deems to be necessary to protect his or her best interest."

Thus, the provisions of the agreement and the failure of the Blixseths to carry out the due-diligence inspections called for by the agreement evidence a genuine issue of material fact whether the property s location in an historic district was material to the Blixseths.

**D. In all events, the Blixseths had no right to terminate the agreement under § 5-20.8-4 on March 10, 2006, because they had breached the agreement by failing to close on January 17, 2006.**

Even if the property s location in the Newport historic district constituted a materially deficient condition, which as just shown it did not, the Blixseths were precluded from terminating the agreement on that basis after the scheduled closing

7. The disclaimer clause in *Travers v. Spidell* provided in its entirety that the agreement "is subject to no understandings, conditions or representations other than those expressly stated therein." 682 A.2d at 472.

date because they caused, without justification, the failure of the transaction to close on that date.

It is undisputed that the only reason the closing of the transaction did not occur on the scheduled closing date was the Blixseths' failure to deliver the balance of the purchase price. *See* Panteleakis' Exhibit 2; Blixseths Exhibit U at 52:6 - 53:24. Moreover, the agreement expressly made time of the essence for *all* of its provisions, thus including the agreed closing date. *See* Blixseths' Exhibit A, ¶¶ 10 (closing date)[8] and 31 (time of the essence). Therefore, the Blixseths were not entitled to a delay in the closing for any reason. Moreover, the Blixseths' asserted reason for not closing, as initially stated in Hawes's letter of February 14, 2006, (Panteleakis Exhibit 3) that they could not use the property for their intended purpose under the R-60 zoning, was *not* a legitimate reason for refusing to close and terminating the agreement. As shown above, the Blixseths agreed to accept title subject to all applicable zoning regulations and had waived any objection arising from application of the zoning ordinance by failure to object within the period provided by the inspection contingency.

Under § 5-20.8-4 of the disclosure act, a purchaser may terminate an agreement for nondisclosure of a materially deficient condition only if the closing has not occurred. Thus, that the scheduled and time-of-the-essence closing had not yet occurred was a condition precedent to the Blixseths' right to terminate. Here, the fact that the closing had not yet occurred when the Blixseths purported to terminate the agreement on March 10, 2006— after the initiation of this action— was entirely the unjustified fault of the

---

8. The agreement called for a closing on January 16, 2006, but the parties orally agreed to change the closing to January 17, 2006.

Blixseths. A party, however, cannot rely on a condition the occurrence of which that party has frustrated. *See Bradford Dyeing Association, Inc. v. J. Stog Tech GmbH*, 765 A.2d 1226, 1238 (R.I. 2005). Thus, the Blixseths may not rely on the fact that a closing had not taken place in asserting that they still had a right to terminate the agreement approximately two months after their default on the time-of-the-essence closing date.

**E. The Blixseths waived any right to terminate the agreement.**

A waiver is a voluntary, intentional relinquishment of a known right, and the existence of a waiver is a question of fact. *Fracassa v. Doris*, 876 A.2d 506, 510 (R.I. 2005). An implied waiver results where a party pursues "such a course of conduct as to sufficiently evidence an intention to waive a right or where his conduct is inconsistent with any other intention than to waive it." *Sturbridge Home Builders, Inc. v. Downing Seaport, Inc.*, 890 A.2d 58, 65 (R.I. 2005). For example, "negligence in asserting a known right is an implied waiver of such a right." *Mitchell v. State*, 1195 WL 941497 at *2 (R.I. Super. Ct. 1995).

Here, the Blixseths waived any right to terminate the agreement under § 5-20.8-4 of the disclosure act in paragraph 20 of the agreement, which expressly provides that "Purchasers hereby waive any right to rescind * * * this agreement before or after performance hereunder." In addition, the Blixseths impliedly waived any right to terminate the agreement under § 5-20.8-4 by (1) failing to lodge any objection under the inspection contingency within the time required, leading ACC to reasonably conclude that the there was no materially deficient condition with regard to the property, (2) by purportedly terminating the agreement on January 17 on one and only asserted

ground: that the R-60 zoning interfered with their intended use of the property, and (3) by negligently not discovering that the property was located in the historic district until close to two months after the scheduled closing date and one month after ACC had commenced this action.[9] Those acts constitute an implied waiver of the Blixseths' right to terminate the agreement on the ground that the property is located in an historic district.

Accordingly, for all of these reasons, the Blixseths are not entitled to summary judgment on the grounds that ACC's real estate disclosure forms did not state that the real estate was located in the Newport historic district and did not include the statutorily prescribed notice regarding historic-district limitations.

## II. The Agreement for Sale and Purchase was properly authorized by Panteleakis, who, through his agent and attorney in fact, approved the sale of the property to the Blixseths and, in any event, his approval was not required since the sale was authorized by ACC s sole shareholder.

The Blixseths second argument for summary judgment is that the directors of ACC failed to approve the sale as required by law. Blixseths Mem. at 20-24. Although referring to the directors of ACC, the Blixseths concede in their Statement of Undisputed Facts [ SUF ] that Panteleakis was elected sole director of ACC in 1970

---

9. The Blixseths claim that they did not learn that the property was in the historic district until shortly before March 10, 2006. Blixseths Statement of Undisputed Facts ¶ 22. However, their title agent knew that the property was located in the historic district (Panteleakis Exhibit 2) and his knowledge should be imputed to the Blixseths. *See Mancini v. Yorkshire Ins. Co.*, 54 R.I. 79, 170 A. 82, 83 (1934) ( The knowledge of the agent thus acquired, while he was acting within the scope of his authority and in the course of the particular transaction which the information affected, is in law the knowledge of the respondents. The respondents cannot hide behind their agent's negligence in failing to communicate that fact. ).

and continued to be the sole director in 2005 and 2006. Blixseths SUF ¶¶ 14 and 20.[10] And, the Blixseths acknowledge that in anticipation of the closing of the Agreement for Sale and Purchase ACC prepared an Unanimous Consent of Directors and Stockholders to Action Without a Meeting, dated January 11, 2006. *Id.* ¶ 21; Panteleakis Exhibit 8.[11] The January 11, 2006, Unanimous Consent specifically (a) authorized ACC to enter into the Agreement of Sale and Purchase with the Blixseths; (b) ratified, approved and affirmed the execution and delivery of the Agreement of Sale and Purchase by Andrew Panteleakis as President; and © authorized Panteleakis as President of ACC and Waddell as Vice President and each of them to take such action and to execute and deliver such documents as may be necessary or appropriate to effectuate the sale * * * pursuant to the provisions of the said **AGREEMENT OF SALE AND PURCHASE**. The Unanimous Consent bears the signature of Andrew Panteleakis as sole director and sole stockholder. *Id.* Thus, the Unanimous Consent is, on its face, evidence that the agreement with the Blixseths was approved and authorized by ACC s sole director.

While the January 11 Unanimous Consent also purports to give Panteleakis consent as sole stockholder, he was not, in fact, the sole stockholder of ACC; Panteleakis transferred all of his stock to the Andrew Panteleakis Trust in 1997. *See* Blixseths Exhibit L. Nevertheless, the Blixseths do not argue that the Trust, as sole

10. Blixseths Exhibit J shows that ACC s board of directors may be composed of only one director.

11. The Blixseths cite to page 12 of the transcript of the deposition of Nancy Waddell taken November 1, 2006 (Exhibit M). Page 12 of the transcript was omitted from Exhibit M, presumably inadvertently, but is included as Panteleakis Exhibit 9.

stockholder; did not authorize the sale to the Blixseths. Undoubtedly, they do not do so because, also on January 11, 2006, the three trustees of the trust executed a Unanimous Consent of Trustees. Panteleakis Exhibit 4. By that Unanimous Consent, the trustees ratified and affirmed the execution and delivery of the Agreement of Sale and Purchase, and agreed that:

> Andrew Panteleakis as President and/or Nancy Z. Waddell as Vice President be and they hereby are authorized on behalf of **AMERICAN CAPITAL CORPORATION** to take such action and to execute and deliver such documents as may be necessary or appropriate to effectuate the sale * * * pursuant to the provisions of the said **AGREEMENT OF SALE AND PURCHASE**.

*Id.* Thus, the Unanimous Consent of Trustees would preclude any contention that the sole stockholder of ACC the Trust, acting through its trustees did not acknowledge, approve, and authorize the sale of the property to the Blixseths pursuant to the terms of the Agreement of Purchase and Sale.

Given the unanimous consent of the trustees, the Blixseths argue only that Panteleakis signature on the Unanimous Consent form was a nullity because it was made by Waddell. *See* Blixseths Mem. at 21-24; SUF ¶ 21.[12] The Blixseths acknowledge, however, that Panteleakis had executed a durable power of attorney authorizing Waddell to act as his attorney in fact and agent with regard to all his

12. The Blixseths also assert in their Statement of Undisputed Facts that Waddell signed Panteleakis name to the Certificate of Corporate Authority and Incumbency dated January 11, 2006. *See* Blixseths SUF ¶ 22; Blixseths Mem. at 20-24. However, the Blixseths advance no argument that the Certificate was *necessary* for ACC to convey good title. Nor, do they contend that the title company would have refused to insure the Blixseths title at closing by reason of Waddell having signed Panteleakis name to the Certificate. Thus, the fact that Waddell signed Panteleakis name to the Certificate is without significance.

business affairs. Blixseths SUF ¶ 19; *see* Panteleakis Exhibit 10.[13] In particular, the power of attorney provides, in relevant parts, as follows:

> 1. **GENERAL GRANT OF POWER.** I grant my agent full power and authority to do everything necessary in exercising any of the powers herein granted as fully as I might or could do if personally present, * * * hereby ratifying and confirming all that my agent shall do or cause to be done by virtue of this power of attorney and the powers herein granted.
>
> * * * * *
>
> (e) **BUSINESS INTERESTS.** To conduct or participate in any lawful business conducted by * * * American Capital Corporation * * * for me and in my name; carry out the provisions for the sale of the aforesaid business[] or the stock therein or the assets thereof[.]

Thus, Panteleakis specifically authorized Waddell, at the time that he was the sole director of ACC, to carry out the provisions for the sale of * * * the assets of ACC. Further, the power of attorney provides that [t]he enumeration of specific powers herein is not intended to, nor does it, limit or restrict the general powers herein granted to my agent. Panteleakis Exhibit 10. In light of those expansive provisions, the Blixseths make no argument that it was not the express intent of Panteleakis to fully authorize Waddell to act on his behalf as the sole director of ACC.

Rather, notwithstanding Panteleakis plain intent to authorize Waddell to act on his behalf as the sole director of ACC, the Blixseths assert that [u]nder Rhode Island law Waddell * * * had no authority to vote as a director of [ACC] as she was never elected as a director as required by Rhode Island law. Blixseths Mem. at 24. Notably, the Blixseths provide no citation to any Rhode Island authority for this purported

13. The Blixseths did not include a copy of the power of attorney among their exhibits, but instead cited to the transcript of the deposition of Waddell, including the omitted page 12. *See, supra,* n.11.

statement of Rhode Island law. In fact, there is no provision in the Rhode Island general laws which explicitly prohibits a director from delegating authority to an agent or attorney in fact. Likewise, there is no Rhode Island case law holding that a director s delegation of authority to an agent or attorney in fact is invalid. There is simply no support for Blixseths naked assertion that [u]nder Rhode Island law Waddell had no authority to give Panteleakis consent to the transaction pursuant to the power of attorney.

Unable to cite to any authority for their assertion regarding Rhode Island law, the Blixseths simply argue that [n]othing in Rhode Island statutes regarding corporate directors provides for an individual with power of attorney to act as a proxy for a director of a corporation. Blixseths Mem. at 24. Again, however, the Blixseths fail to cite any Rhode Island authority for the proposition that a director cannot appoint an agent or attorney in fact to act in his or her place absent explicit authorization by the statutes governing corporations. Indeed, construing the Rhode Island statutes governing corporations to implicitly by silence on the subject prohibit a director from ever delegating authority to an agent and attorney in fact would conflict with other Rhode Island law. R.I. Gen. Laws §18-16-7 provides that the language in a statutory short form power of attorney conferring general authority with respect to business operating transactions shall be construed to mean that the principal authorizes the agent:

> (3) With respect to any business enterprise which is owned solely by the principal:
>
> * * * * *
>
> (ii) To determine the policy of the enterprise *** as to the nature and extent of the business to be undertaken by it ***; to agree and

contract, in any manner, and with any person and on any terms which the agent deems desirable or necessary for effectuating any or all of these decisions of the agent as to policy ***;

* * * * *

(4) To prepare, sign, file and deliver all *** papers with respect to any business operating transaction of the principal *** which the agent deems desirable or necessary for any purpose;

* * * * *

(7) To execute, acknowledge, seal and deliver any *** consent, agreement, authorization, *** or other instrument which the agent deems useful for the accomplishment of any of the purposes enumerated in this section ***.

Hence, when a statutory short form power of attorney confers general business operating transactions the agent of the sole shareholder can act in his stead as the director of the corporation.[14] Thus, §18-16-7 demonstrates that there is no implied blanket prohibition against a director delegating authority through a power of attorney. Furthermore, in this case, we have a director who, being the sole beneficiary of the trust, certainly had the authority to delegate to his agent and attorney in fact the right to act in his stead as a director because of the inherent authorization granted in the power of attorney.

The only statutory limitation on the discharge of the duties of a director is the requirement of R.I. Gen. Laws §7-1.2-801 that the director discharge his duties in good

---

14. The power of attorney given by Panteleakis to Waddell was not a statutory form power of attorney, and thus §18-16-7 is not directly applicable. In particular, it cannot be argued that §18-16-7 limits the authority granted by Panteleakis because he was not the sole shareholder of ACC at the time he executed the power of attorney. Rather than using a short form that simply provided authority with regard to business operating transactions without further elaboration, Panteleakis used a form that specifically authorized Waddell to carry out the provisions for the sale of *** the assets of ACC, which would necessarily require her to take actions on his behalf as a director.

faith ; with the care that a person in like position would reasonably believe appropriate under similar circumstances ; and in a manner he or she reasonably believes to be in the best interests of the corporation. Certainly, Panteleakis, as the sole director, could have concluded in good faith that, in light of his age and health, it was appropriate and in the best interests of the corporation to grant a durable power of attorney to Waddell. Waddell was an officer and the general manager of ACC, one of the trustees of the sole shareholder, and was known to and trusted by the other two trustees. Blixseths Exhibit M at 7:12-18, 9:6-10; Blixseths Exhibit T at 12:6 - 13:9; Blixseths Exhibit U at 61:23 - 62:12; Pnateleakis Exhibit 5. Further, Panteleakis could have revoked the power of attorney at any time prior to his incapacity if he was dissatisfied with how Waddell was exercising her authority under the power of attorney. And, the other two truestees could have replaced Panteleakis as sole director after his incapacity if they were dissatisfied with how Waddell was exercising her authority. Thus, in the circumstances of this case, Panteleakis granting a power of attorney to Waddell was in accord with the requirements of §7-1.2-801.

Not only can the Blixseths not cite to any Rhode Island authority, but even their citation to secondary authority is equivocal: directors of a corporation *generally* cannot vote at directors meetings by proxy, but must be personally present and act themselves. Blixseths Mem. at 22 (emphasis added) (citing *Fletcher Cyclopedia of the Law of Corporations*, CH. 11 §427). The Blixseths presume that the basis of this general rule is that directors of a corporation stand in a fiduciary relationship towards its stockholders. Blixseths Mem. at 22. But, here, the sole shareholder, the Trust acting through its trustees, at all relevant times knew that Panteleakis was incapacitated

and that Waddell was acting on his behalf pursuant to the power of attorney. Panteleakis Exhibit 5. Thus, even assuming that the asserted general rule might have some application in Rhode Island, there is no basis for its application in the instant circumstances, where the sole director is the beneficiary of the Trust that is the sole shareholder, the trustees of the Trust know that the sole director is incapacitated and that his agent and attorney in fact is and has been acting on his behalf pursuant to a valid, durable power of attorney, and the shareholder continues the sole director in office.

Accordingly, there is no statute, case law, or public policy which invalidates Panteleakis consent as sole director given by his agent and attorney in fact, to whom Panteleakis gave full power to act with regard to all of his business affairs and, in particular, to carry out the provisions for the sale of *** the assets of ACC.

Moreover, contrary to the Blixseths reading of Rhode Island law, this transaction did *not* require the authorization of the sole director of ACC. While the sale of all or substantially all the assets of a corporation in the regular course of business of that corporation does require the authorization of the board of directors of the corporation, §7-1.2-1101, the sale of all or substantially all the assets of a corporation other than in the regular course of business requires the authorization only of the shareholders. *See* §7-1.2-1102. While §7-1.2-1102 provides that the board of directors adopt a resolution recommending the sale and directing the submission of the resolution to a vote of the shareholders, the authorization of the sale comes from the shareholders.

Even assuming there was some defect in, or even total absence of, a recommendation by the directors (here, the sole director), such is irrelevant as the

Blixseths have no standing to assert the alleged defect. *See* R.I. Gen. Laws §7-1.2-303 (stating that no conveyance of property by a corporation is invalid because the corporation lacked the capacity or power to make the conveyance, and limiting who may assert the defense of ultra vires to a shareholder, the corporation, or the attorney general); *Pacheco v. August Bus Co. Lines*, 75 R.I. 293, 295, 65 A.2d 705, 705 (1949) (holding that complainants lacked standing to raise questions concerning the validity of certain corporate acts because they have not shown themselves to be either creditors or stockholders of the corporation ).

Since the only authorization required was that of the shareholder(s), and since such authorization was given unanimously by the trustees of the sole shareholder, the Blixseths argument regarding Waddell s signature of Panteleakis name to the Unanimous Consent is unavailing. *Cf. DePasquale v. Mason Mfg. Co.,* 39 R.I. 114, 97 A.816, 817 (1916) (holding that act of officer of corporation that was not properly authorized by the directors but made with their knowledge and concurrence, or with their subsequent acquiescence, may properly be regarded as the act of the corporation).

Accordingly, the Court should deny the Blixseths motion for summary judgment on the ground that the Blixseths have not and cannot establish as a matter of law that the Agreement of Purchase and Sale was not authorized by ACC.

## Conclusion

For all of the foregoing reasons, the Blixseths motion for summary judgment should be denied.

**AMERICAN CAPITAL CORPORATION**

By its Attorneys,

/s/ Thomas C. Angelone
Thomas C. Angelone, Esq. #1373
**HODOSH, SPINELLA & ANGELONE pc**
One Turks Head Place, Suite 810
Providence, Rhode Island 02903
(401) 274-0200
*Fax* (401) 274-7538
angelonelaw@aol.com

David Krech, Esq. #5257
Lauren E. Jones, Esq. #2141
**JONES ASSOCIATES**
72 South Main Street
Providence, Rhode Island 02903-2907
(401) 274-4446
*Fax* (401) 274-2805

Dated: July 11, 2007

## CERTIFICATION

I hereby certify that on this 11th day of July, 2007, I caused a copy of the within ***Memorandum in Support of Objection to Motion for Summary Judgment*** to be electronically transmitted to :

Brian P. Voke, Esq.
bvoke@campbell-trial-lawyers.com
Campbell Campbell Edwards & Conroy
One Constitution Plaza, 3rd Floor
Boston, MA 02129

/s/ Thomas C. Angelone
Thomas C. Angelone, Esq.