UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

AMERICAN CAPITAL CORPORATION :
vs. :
TIMOTHY L. BLIXSETH, EDRA BLIXSETH :
& MORTGAGE GUARANTEE & TITLE :
COMPANY :

Deposition of ANDREW EDWARD HAWES taken on behalf of the Plaintiff on Thursday, January 4, 2007, at the offices of Hodosh, Spinella & Angelone, One Turks Head Place, Suite 810, Providence, Rhode Island, commencing at 10:00 a.m. before Jane M. Callaghan, a duly commissioned Notary Public within and for the State of Rhode Island and Providence Plantations.

APPEARANCES

HODOSH, SPINELLA & ANGELONE
BY: THOMAS C. ANGELONE, ESQ. ........FOR PLAINTIFF

CAMPBELL, CAMPBELL, EDWARDS
& CONROY
BY: BRIAN P. VOKE, ESQ. ............FOR DEFENDANTS



I N D E X

DEPONENT PAGE

ANDREW EDWARD HAWES

EXAMINATION BY MR. ANGELONE .............. 3

E X H I B I T S

FOR PLAINTIFF (FOR ID)

#1 Copy of e-mail dated 9/28/05 ..............19
#2 Copy of e-mail dated 10/11/05..............20
#3 Copy of e-mail dated 10/18/05..............21
#4 Copy of e-mail dated 10/18/05..............22
#5 Copy of e-mail dated 10/31/05..............23
#6 Copy of e-mail dated 11/1/05...............25
#7 Copy e-mail dated 11/2/05..................26
#8 Copy of e-mail dated 11/2/05, with attachment..............................27
#9 Copy of e-mail dated 11/3/05...............41
#10 Copy of Zoning Certificate.................45
#11 Copy of e-mail dated 11/4/05...............48
#12 Copy of letter cated 2/14/06...............52
#13 Copy of letter dated 11/7/05...............55
#14 Copy of facsimile dated 11/7/05............59
#15 Copy of e-mail dated 11/10/05..............68
#16 Copy of e-mail dated 11/17/05, with attached Agreement.......................82
#17 Copy of Agreement of Sale & Purchase...............................93
#18 Copy of letter dated 3/10/06..............113
#19 Copy of e-mail dated 12/12/05.............137
#20 Copy of letter dated 8/25/05..............148

COPY



THURSDAY, JANUARY 4, 2007
(COMMENCING AT 10:00 A.M.)

ANDREW EDWARD HAWES, having been duly sworn by Notary Public, testified as follows:

EXAMINATION BY MR. ANGELONE

Q Mr. Hawes, you're here represented by counsel, so, you know what the rules are, but I will put them on the record, so forgive me for saying it, I'm going to ask you some questions and the stenographer's going to take them down and there'll be a record of this proceeding, and if in the course of this deposition I ask a question and you don't understand it, just tell me and I'll reword it. If you feel that you need to confer with counsel during the course of the deposition, I know the rules don't permit it, but I permit it, and if you want to step outside and talk to counsel concerning a matter that I asked about, feel free to do it and we'll stop the deposition and give you time to confer with counsel and I promise you I won't ask you what you and counsel discussed on the record, but if you do answer a question, I'm going to assume that you understood my question. Is this the first time you've been deposed?



A It is not.
Q How many times have you been deposed?
A I have been deposed, I've been deposed one time.
Q And was that in relation to a transaction in the course of representing the Blixseths?
A It was not.
Q Now, I'd like to know your educational background, please.
A Sure. How far back do you want to go.
Q How about college?
A Okay.
Q I'm happy with that.
A All right, thank you. I graduated from the University of Denver in 1992 where I received a Bachelor of Arts in Political Science; then I attended the University of Idaho College of Law in the Fall of 1992 and graduated in December of 1994.
Q And upon graduation from law school, what did you do next?
A After I graduated from law school I moved to Boise, Idaho, and studied for the February Bar Examination, I passed the February bar exam and soon after, in 1995, I began as an employee of a title company in Boise, Idaho.
Q And what did you do for the title company?

Page 69

paragraph?
A I do reference that, it appears to be that e-mail.
Q And you say to him, "In your response e-mail to me dated November 10, you made it clear there would be nothing that would prohibit this use and indicated that if we followed certain steps suggested by you in your e-mail, the use would be consistent to the zoning restrictions," is that right?
A That's correct.
Q Would you point out to me where he makes it clear that there would be nothing to prohibit the use.
A Sure, second, when I say second sentence, I guess it says, Tim was wondering why he could not use a private residence for a private club. "I tend to agree. If Tim and his wife buy Miramar for their private residence, they should have the right to entertain others periodically at their residence. I'm sure the details between Tim and his 'club' can be worked out in a fashion that does not violate existing R-60 zoning. My thought is that Tim and his Club would have an understanding whereby a member and his family and guests, if any, would have the privilege of visiting and staying at Miramar as guests of Tim for a specified time under certain conditions."

Page 70

MR. VOKE: "Under specified conditions?"
A Yeah, sorry, that's "...under specified conditions. No rent or charge is made by Tim. It's all handled through his Club. I assume that the visiting guests would want the exclusive use of Miramar for the specified period," and, so, that is my response.
Q So that language you took to mean that it is clear that there would be nothing to prohibit the use of Miramar for the Yellowstone Club World, is that right?
A Yes.
Q No question in your mind about that.
A Right.
Q Now, he didn't say it is my opinion, is that right?
A Well, I think it is an opinion. I think he didn't say my opinion but he does say, it's interesting, he does say "my thought" and anytime I heard the term "thought" I think of the term of opinion or idea or recommendation.
Q Okay. Well, I mean, it was only his thought, wasn't it?
A It appears that that was his opinion.
Q So you took the word thought to mean that he was rendering a legal opinion to you that you could base

Page 71

a $25 million transaction on, is that what you're telling us?
A That's correct.
Q You didn't think that you needed any further verification, is that right?
A That's right.
Q And, as I understand it, you were satisfied at this point that this was sufficient due diligence for your client to go forward with the transaction, is that right?
A I don't know, not necessarily. At this point we still had to do other due diligence tasks, so, at this point I could not say whether or not we were satisfied that it would continue and that we, we did not determine that we were satisfied with due diligence I guess at this point is what I'm saying, yeah.
Q Well, you'll agree with me that your responsibility in this transaction is to do the due diligence for the Yellowstone Club World, you agree with me, that's your responsibility?
A Yeah.
Q Not Guido's responsibility, your responsibility, right?
A It was my responsibility to do the due diligence.

Page 72

Q Guido was not responsible to do due diligence for your client, was he?
A He had not been retained by us to do due diligence.
Q So that wasn't his responsibility, was it?
A That was --
MR. VOKE: Objection to responsibility.
MR. ANGELONE: That's fine, you can answer the question.
A (Continued) It was not, I don't think it was his responsibility in going into it, but I think the conversations between the 7th and 8th, I don't want to say that he was retained to specifically do due diligence, but he took on some extra duty, that he had made representations concerning the applicability of R-60 as it fits into this transaction on our intended use.
Q My question is a simple one.
A Okay.
Q Guido Salvadore was not responsible to do the due diligence for the Blixseth Group or Yellowstone Club World, was he? Not his responsibility, was it?
MR. VOKE: I object to the term responsibility?
A Yeah, I'm just trying, the thing that's catching me,

Page 73

and maybe I just get tripped over the word
responsibility, I guess.
Q Well, you indicated earlier that you were
responsible to do the due diligence for Yellowstone
Club World, you've already indicated that that was
your responsibility.
A To handle that, right.
Q I'm asking you the same question, it wasn't Guido
Salvadore's responsibility to do the due diligence
for the Yellowstone Club World, was it?
MR. VOKE: Same objection.
A This is where I get a little bit confused.
Q Use the word, responsible, in the same way that I
asked you when you've already answered it, you told
me that it was your responsibility to do the due
diligence for the Yellowstone Club World and you
said yes.
A Correct.
Q Now, I'm asking you, was it Guido Salvadore's
responsibility to do due diligence for the
Yellowstone Club World?
A No, I don't think it was his responsibility to do it
but he certainly took on, especially going in,
obviously going in on the transaction, but he took
on a role of assisting due diligence that's for

Page 74

sure.
Q So you would ask questions and he would answer them.
You'd ask questions and he'd answer them, is that
right?
A Questions about...
Q Whatever you were asking about the zoning, what's
the zoning, it's R-60, right?
A Yes.
Q Guido, what's the zoning, R-60, okay, can you use
Miramar as a World Club in an R-60 zone, and he
says, well, he says, if Tim and his wife buy Miramar
for use as their private residence they should have
the right to entertain periodically at their
residence, that's what he's saying, if they buy it
as a residence, that's what he's telling you in the
November 10th e-mail, isn't he?
A That is stated as much in the November 10th e-mail.
Q So Yellowstone World Club is a club, not a private
residence, isn't that right?
A Yellowstone Club is a club.
Q Yes, but he's saying to you if they buy it as a
private residence, they can do anything they want,
isn't he?
A Well, again, I have to go back to the conversation
that I had on the 7th and the 8th where I had

Page 75

described the nature and the use of the Yellowstone
Club and how these properties fit into the mold.
So, based on those conversations, I was told that
it would fit, there would be a permitted use 'cause
it would fit within the private residence category
and also the yachting organization category.
Q Well, what he's telling you, he's memorializing the
conversations that you and he had prior to November
10th and he's putting it down on the piece of paper
on November 10th, isn't he?
MR. VOKE: Objection.
Q (Continued) Right?
A At this point you'd have to talk to Mr. Blixseth as
to how that conversation went and what issues were
discussed. I don't know. I can't testify to what Mr.
Blixseth said.
Q I understand, but the point is he's telling you, the
person responsible for doing the due diligence, that
if Tim and his wife buy Miramar for use as their
private residence, you're not telling them if they
buy it as a Yellowstone World Club, he's saying
private residence, it's crystal clear what he's
saying, do you have any question about the fact that
he's suggesting it be purchased as a private
residence, not as a club, that's what it says,

Page 76

that's what it says in the November 10th e-mail,
doesn't it?
A It does but there's some confusion to that because
if you look at the final purchase and sale agreement
of which the last wrap was prepared by Mr. Salvadore
himself, he included the word "doing business as
Yellowstone Yachting Club," so there's some
confusion how this e-mail sits with respect to the
conversations I had on the 7th and the 8th and the
conversation that I had after this date which
resulted in the final purchase and sale agreement
which referenced Yellowstone Yachting Club.
Q So, as I understand it, and you correct me if I'm
wrong, so when you received the purchase and sale
agreement back with Mr. Salvadore's comments, or you
felt that there was some confusion regarding that
particular purchase and sale agreement, that you let
your clients sign, is that what you're telling me?
MR. VOKE: Objection.
A No, that's a mischaracterizing of what I said.
Q I'm just repeating what you told me and I don't mean
to characterize it, I thought you said there was
some confusion as to the final version of the P&S
and your statement is there was no confusion as to
the final --

jurisdiction," right?
A Right.
Q Actually, this (b) has a little more teeth than the (b) that you took out; the (b) you took out says "Zoning and other regulatory laws and ordinances imposed by governmental authorities," I mean, they both say the same thing, don't they?
A Yeah.
Q But he put that back in, isn't that right?
A It appears that he did.
Q And you thought that was okay, didn't you?
A I thought it was fine, sure.
Q Now, he adds something else, if you go to page 5, and you'll see that he now puts in, "...including the existence of lead..." are you at the top?
A Yeah.
Q (Continued) "...including the existence of lead based paint, and a determination of whether the existence or violation of any local, state or federal statutes, ordinances, laws or restrictions would unduly interfere with the Purchasers use of the Real Property as allowed in an R-60 zone." This now contains the R-60 zoning, the one you sent him first of all said nothing about R-60 zoning, isn't that right?



A The draft that he sent did not, or that I included, did not include the R-60 reference.
Q And he took out the words that you put in, "...with the Purchasers intended use of the property," those words are not --
A Those words are not there but the effect is the same.
Q Well, what is your understanding of --
A Well, if you look at the bottom of page 4 --
Q (Continued) I haven't finished my question.
A Oh, I'm sorry, I apologize.
Q Go to four, bottom of four.
A Okay.
Q "Purchasers, at their sole cost and expense shall also investigate the condition of the Real Property including, but not limited to, defects in the Real Property, and an investigation of the environmental condition of the Real Property, including the existence of lead based paint," and then it goes on to say, "and a determination of whether the existence or violation of any local, state or federal statutes, ordinances, laws or restrictions would unduly interfere with the Purchasers use of the Real Property as allowed in an R-60 zone," so the responsibility is the purchaser's at their sole



costs and expense to make a determination of whether the existence or violation of any local, state or federal statutes, ordinances, laws or restrictions would unduly interfere with the purchasers use of the real property as allowed in an R-60 zone, that's what it says, doesn't it?
A It does state that.
Q And that's your responsibility 'cause that's your due diligence responsibility, isn't it?
A Zoning would be an item of number of, a number of items in my due diligence checklist, so the zoning issue would be one, sure.
Q So it's your responsibility to determine whether the existence or violation of any local, state or federal statutes, ordinances, laws or restrictions would unduly interfere with the purchaser's use of the real property as allowed in an R-60 zone, that's your responsibility, isn't it?
A The document does provide that, that at our expense that we would have an opportunity or right to investigate the condition of the property, which would include a determination whether or not the applicable zoning laws, I guess, including R-60, would unduly interfere with our intended use of the property.



Q So you assumed that responsibility once your client signs this document, don't you?
A Yeah, that would be correct.
Q What did you do after the 23d of November to fulfill that responsibility?
A Well, at that point there was nothing further to do because I had already looked into that issue with Guido on the 7th and the 8th, so there was no need to continue to do due diligence as it relates to the R-60.
Q So you did nothing after the 23d of November.
A I did, not with respect to additional due diligence.
Q The question is you did nothing respecting, "...a determination of whether the existence or violation of any local, state or federal statutes, ordinances, laws or restrictions would unduly interfere with the Purchasers use of the Real Property as allowed in an R-60 zone," you did nothing.
MR. VOKE: Objection.
A I didn't get a chance to finish my statement.
Q I'm sorry.
A Due diligence with respect to the zoning issue, so, I did not conduct anymore due diligence with respect to the zoning issue.
Q So you did nothing, that's the word, isn't it?

Page 89

A I didn't --
Q You did nothing.
A (Continued) -- pursue any, however you want to characterize it, but...
Q You didn't do anything.
A I didn't, no, I didn't, I didn't do anything.
Q If you did something, you'd tell us about it, wouldn't you?
A Right.
Q You didn't do anything, therefore, you did nothing, fair statement?
A Fair statement.
Q And you had a time period within which to do this due diligence, didn't you?
A Correct.
Q And that time period expired, didn't it?
A It did.
Q Now, of course, when you received this particular document you read it and saw that the language --
A Exhibit 16?
Q Yes, I'm sorry.
A Okay.
Q You read it and saw that he had put back the language in Section 6 on page 3, didn't you?
A I did, yes.

Page 90

Q And that was okay with you 'cause you had your client sign it with this language in it, wasn't it?
A The document as presented was signed by the client.
Q Yes, with your approval, you wouldn't have let him sign this document if you didn't approve of the words.
A No, I would not have.
Q And also on page 5 you approved of that language and let your client sign it, didn't you?
A I did.
Q Now, of course, with your experience and expertise in transactions in real estate, you knew the legal ramifications of the language which is contained on page 3, Section 6 subparagraph (b), you knew that, didn't you?
MR. VOKE: Objection.
A What page?
Q Three.
A Page 3, okay.
Q Section 6, subparagraph (b), you knew what the legal significance of that language was, didn't you?
A You're just asking what I thought? I don't understand the question.
Q In other words, when you read the language which is contained in Section 6 in "Permitted Encumbrances," subparagraph (b), you knew the legal significance of that language, didn't you, because you're an expert in this?
MR. VOKE: Objection.
A What I interpreted it to mean that when we close the transaction, when it got to the closing, after an opportunity to do the due diligence and finalize the purchase and sale agreement and closing documents, that once we get to that point, then we close, that we will take the title subject to all existing building and zoning laws and their restrictions, that's what I took that to mean.
Q So you knew the exact legal significance of those words in subparagraph (b), 'cause you're an expert on this.
MR. VOKE: Objection.
A Again, I'm just talking in terms of what I interpret that clause to mean and that's how I interpret it.
Q That's not bad.
A So, I mean --
Q I'm not an expert in real estate transactions, you are, and you read this and understand -- you read Section 6, subparagraph (b) and you know exactly what those words mean, don't you?
A Well, again, I just testified what I believe what they meant in my opinion.
Q I mean, as an expert --
MR. VOKE: Objection.
A Just based on the experience in real estate transactions.
Q And you knew the legal effect of the words used in Section 6, subparagraph (b), too, didn't you?
MR. VOKE: Objection.
A Again, I'm going to stand behind my previous testimony that it was my interpretation after that, we've had an opportunity to do the due diligence, after final purchase and sale agreement has been executed and that at closing where the deed had been conveyed and moneys disbursed, it was my opinion in reading this that we would take the subject property subject to whatever zoning ordinances, regulations, et cetera.
Q And this is without ever checking into what the zoning statutes said, isn't that right?
A That's incorrect.
Q Okay, other than the zoning material given to you by Mr. Salvadore, is that right?
A Incorrect. That was an incorrect.
Q What is incorrect about that?
A Not only the materials but there were conversations

Page 91

Page 92