EXHIBIT 12



**Andy Hawes**

**From:** Andy Hawes
**Sent:** Wednesday, November 02, 2005 11:35 AM
**To:** 'GRSALVADORE@aol.com'
**Subject:** Miramar
**Attachments:** Agreement for Sale Purchaser clean 11 2 05.doc; Agreement for Sale Purchaser redlined 11 2 05.doc

Guido:

Please find attached our proposed changes to the Miramar Purchase and Sale Agreement. I have attached both a redline version and a clean copy. I look forward to working with you to get this deal done. Tim has been tied up and he has not had a chance to review this. Although I have talked to Tim about these issues, I need his final authority to approve of these changes. In the interest of time, I wanted to forward these comments so we can work toward a final deal. There are a few things to note:

1. We are requesting that in the inspection period we be given an opportunity to investigate the physical condition of the property and to review applicable laws (ie zoning laws and ordinances) and title conditions (ie easements) that may affect our use of the property.
2. It is our policy to work with a title company for the title and escrow work.
3. We would like to close on December 20, 2005, but with an option to extend the closing date to no later than January 15, 2006. There are some contingencies in the works that may allow us to purchase the property by the December 20 date, but we want some flexibility in the event these contingencies do not materialize.
4. Tim recalls that as part of the deal we would agree to pay up to $100,000 of "closing costs."
5. We request and indemnity from Mr. Panteleakis for damages etc from his use of the carriage house.
6. We request that conveyance of the real property be through a Special Warranty Deed.
7. We would like to review your proposed Exhibit C.
8. We would like to review a copy of the Lease referred to in Section 10.
9. We would like to review the Lead Warning Statement referred to in Section 19.

Very truly yours,

Andrew E. Hawes
Counsel, The Blixseth Group/Yellowstone Club, LLC

Please Note: This message (including any attachments) contains confidential and privileged information. It is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this message by mistake, please return it to the above-mentioned e-mail address, and delete it from your computer. Thank you for your cooperation.

PLAINTIFF'S EXHIBIT
#8
1/4/07

114-34

DRAFT 11-2-05 - marked to show changes

**ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF THE SELLER AMERICAN CAPITAL CORPORATION FOR THE CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS CONTRACT**

# AGREEMENT OF SALE AND PURCHASE

## MIRAMAR

**THIS AGREEMENT OF SALE AND PURCHASE** ("Agreement") made this ___ day of ______________, 2005 between **AMERICAN CAPITAL CORPORATION, a** corporation organized and existing under the laws of the State of Rhode Island, (hereinafter called "Seller"), having a place of business at 646 Bellevue Avenue, Newport, Rhode Island 02840 and **TIM L. BLIXSETH** and **EDRA BLIXSETH**, husband and wife, (hereinafter collectively called "Purchasers" or "Buyers") of 71-534 Sahara Road, Rancho Mirage, CA 92270.

**WHEREAS,** Seller is the owner of those certain three (3) parcels of real property consisting of approximately eight (8) acres, located in Newport, Rhode Island, being more particularly described in Exhibit A attached hereto and made a part hereof,(the "Real Property") together with all easements, rights of way, privileges, appurtenances and rights to same, if any, belonging and enuring to the benefit of such real property; and

**WHEREAS,** the Seller is the owner of the following "Personal Property", to wit: the personal property described in Exhibit B attached hereto and made a part hereof; and

**WHEREAS,** all right, title and interest in and to the Real Property and the Personal Property, together with any and all of the rights and appurtenances appertaining thereto, are hereinafter collectively referred to as the "Subject Property"; and

DRAFT 11-2-05 - marked to show changes

**WHEREAS,** Purchasers desire to purchase all of the Subject Property and all right, title and interest therein, and Seller desires to sell and assign the Subject Property to Purchasers for the price and pursuant to the terms, conditions and upon the representations and warranties hereinafter set forth;

**NOW THEREFORE,** in consideration of the premises, the mutual promises herein contained and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto, each intending to be legally bound, do hereby represent, warrant, covenant and agree as follows:

1. Recitations. The recitations set forth in the preamble of this Agreement are true and correct and are incorporated herein by this reference.

2. Sale of Subject Property. Seller shall sell, transfer, assign and convey to Purchasers at the "Closing," as hereinafter defined, the Subject Property, and Purchasers shall accept such conveyance, subject to the conditions hereof and upon the warranties and representations herein made.

3. Agreement Date. The date of this Agreement shall be the latter of (i) the date on which the Purchasers sign this Agreement; or (ii) the date on which the Seller signs this Agreement, as set forth immediately under the Purchasers' and Seller's signatures below (the "Agreement Date").

4. Purchase Price. The purchase price to be paid by Purchasers to Seller for the Subject Property shall be TWENTY FIVE MILLION DOLLARS ($25,000,000.00) ("Purchase Price"). The Purchase Price shall be allocated to the Subject Property as set forth on Exhibit C attached hereto and made a part hereof.

5. Method of Payment.

DRAFT 11-2-05 - marked to show changes

(a) The Purchase Price shall be paid as follows:

(i) Simultaneously with the execution of this Agreement, Purchaser shall deliver to Escrow Agent a deposit in the amount of ONE MILLION TWO HUNDRED FIFTY THOUSAND DOLLARS ($1,250,000.00) ("Deposit"), which Deposit shall be held in escrow by Escrow Agent in an interest bearing account pending "Closing" (as hereinafter defined) or earlier termination of this Agreement;. The Deposit and any interest earned thereon, if any, shall be applied to the Purchaser Price at Closing.

(ii) At Closing, the balance of the Purchase Price shall be paid by Purchasers to Seller (subject to proration and adjustment as provided in this Agreement) payable by wire transfer of good federal funds ("Cash Portion").

6. Permitted Encumbrances. The sale of the Subject Property is being made, and Purchasers shall take title subject to the following ("Permitted Encumbrances"):

(a) Taxes for the year of Closing and subsequent years (subject, however, to adjustment pursuant to Section 13 hereof) and outstanding assessments, if any (subject, however, to adjustment pursuant to Section 14 hereof);

~~(b) Zoning and other regulatory laws and ordinances imposed by governmental authorities;~~

~~(c) The Leases referred to in Section 10 hereof;~~

~~(d) Easements appearing of record, if any.~~

~~(e) Rights of others in and to the Cliff Walk and Ynazga Court.~~

~~7. Title.~~ (b) The Leases referred to in Section 10 hereof.

DRAFT 11-2-05 - marked to show changes

7. Title Review and Condition of Property/Inspection Contingency.

Seller represents that title to the Subject Property will be good, marketable and insurable, subject only to the Permitted Encumbrances. The Purchasers, at their sole cost and expense, shall cause a title search to be conducted regarding the Subject Property within twenty one (21) days ("Title Commitment") and also investigate the condition of the Agreement Date (property to the "Title Search Date"). If the Purchasers shall have any objectionPurchaser's satisfaction, including, but not limited to defects in the statusproperty, an investigation of the title, except for environmental condition of the Property, including the Permitted Encumbrances, Purchasers shall notify Seller within five (5) days of the Title Search Dateexistence of such objections lead based paint and a determination whether the existence or defects, and the action reasonably believed by Purchasers to be required of Seller in order to render such objections and/or defects cured or acceptable to Purchasers. If such objections and/or defects to the title reflect any condition which shall render title to the Subject Property to be other than good and marketable, as herein provided, thenviolation of any local, state or federal statutes, ordinances, laws or restrictions would interfere with the Purchasers intended use of the property. Purchasers shall have thirty (30) days from Purchasers' receipt of the Title Commitment to complete their review of the Title Commitment and investigation of the condition of the Subject Property ("Inspection Period"). On or before the expiration of the Inspection Period, Purchasers shall notify Seller in writing of any objections Purchasers may have arising from Purchasers' review of the Title Commitment, except for Permitted Encumbrances, or of any objections Purchaser may have arising from Purchaser's inspection and investigation of the Subject Property ("Objection Notice"). Such Objection Notice shall include the actions reasonably believed by Purchasers to be required of Seller in order to render such objections and/or defects cured or acceptable to Purchasers. Seller shall have until fifteen (15) days of the Title Search Dateten (10) days after the end of the Inspection Period to cure the objections and/or defects and, if within said

period Seller shall not have cured such objections and/or defects, then Purchasers shall have the right in their sole and absolute discretion to either (i) terminate this Agreement by written notice to Seller, whereby the Escrow Agent shall immediately return the Deposit to Purchasers, together with any interest earned thereon, and this Agreement shall terminate and become null and void and the parties hereto shall be released and discharged of all further claims and objections each to the other, or (ii) accept Seller's title or the condition of the property to the Subject Property subject to such objections and/or defects with no reduction in the Purchase Price. The Seller shall have no affirmative obligation to clear the title or the conditions of the property in the event objections are raised by the Purchasers but shall cooperate with the Purchasers in an attempt to do so. Purchasers, at their sole cost and expense, have the right at all reasonable times, to conduct on site inspections of the Subject Property and physical inspections and tests of the Subject Property during the Inspection Period, including, without limitation, the right to enter and inspect all portions of the Subject Property (the "Review Items"); provided, however, Purchasers agree not to unreasonably interfere with the operations of the Seller currently occupying the Subject Property or any portion thereof. Seller hereby agrees to fully cooperate with Purchasers in providing access to any and all information requested by Purchasers. Purchasers shall indemnify Seller from any physical damage to the Subject Property and persons and injury resulting from Purchasers' entry on the premises during the Review Period. ____________________ shall be appointed as the Title Insurance Agent for purposes of preparing and issuing the title commitment and title insurance policy.

8. Use of Purchase Money Funds. To enable the Seller to make conveyance as herein provided, the Seller may at the time of the Closing use the purchase money or any portion thereof to clear the title of any or all encumbrances.

9. Representations and Warranties. As an inducement to Purchasers to

execute this Agreement and to close the transactions contemplated hereby and to pay the Purchase Price therefor, Seller represents and warrants to Purchasers as follows:

(a) Neither the entering into this Agreement nor the Closing will constitute a violation or breach by Seller of any contract, agreement, understanding or instrument to which it is a part or by which Seller or the Subject Property is bound; or will result in the violation of any applicable law, order, rule or regulation of any governmental or quasi-governmental authority. The party executing this Agreement on behalf of the Seller is authorized to do so and to consummate the terms and provisions hereof on behalf of the Seller.

(b) Seller has the full right, power and authority to execute, perform and consummate this Agreement without any further consents or joinders from any other person, firm or corporation and doing so will not violate any provision of law or result in a breach of or constitute a default under any contract or agreement to which Seller is a party or Seller and/or the Subject Property may be bound.

(c) All Personal Property set forth on Exhibit B attached hereto and made a part hereof, fixtures and equipment attached or appurtenant to the Subject Property is owned by the Seller and at Closing shall be conveyed to Purchasers free of all liens and encumbrances, other than the Permitted Encumbrances.

(d) To the best of Seller's knowledge, there is no pending litigation or claim which affects or which might affect the Subject Property. To the best of the Seller's knowledge, none of the Subject Property has been designated as wetlands by the Department of Environmental Management. To the best of Seller's knowledge, there is no threatened litigation, investigation or threatened claim which affects or might affect the Subject Property.

DRAFT 11-2-05 - marked to show changes

(e) To the best of Seller's knowledge, there is no pending or threatened condemnation or similar proceeding affecting the Subject Property or any portion thereof, nor has Seller any knowledge that any such action is presently contemplated.

(f) Seller is neither a "foreign person" nor a "foreign corporation" (as those terms are defined in Section 1445 of the Internal Revenue Code of 1954, as amended.)

(g) From and after the Agreement Date, the Subject Property will be kept in the same order and repair as exists on the Agreement Date, reasonable wear and tear and damage by fire or casualty excepted.

(h) Seller is not a party to and the Subject Property is not affected by, any service, maintenance or other property management agreements, or any contracts or other agreements or commitments of any kind which will not be cancelled prior to Closing.

(i) From and after the date hereof, Seller will refrain from making any material changes upon or about the Subject Property, other than as may be required by this Agreement.

10. Closing Date. The Closing Date shall be ~~November 10~~December 20, 2005, but may be extended at the option of the Purchaser to a date no later than January 15, 2006, or such other date as mutually agreed upon by the parties. The Closing shall take place at 10:00 o'clock a.m. on the Closing Date, at the office of the Registry of Deeds in Newport, Rhode Island, or at such other time and place as may be agreed to by the parties in writing, time being of the essence.

A. At the Closing, Seller shall:

DRAFT 11-2-05 - marked to show changes

(i) deliver a ~~Quitclaim~~Special Warranty Deed conveying the Subject Property to Purchasers or their nominee in substantially the form attached hereto as Exhibit D;

(ii) deliver a Bill of Sale conveying the Personal Property to Purchasers or their nominee.

(iii) deliver to Purchasers an assignment of all outstanding leases pertaining to PARCEL II of the Subject Property (See Exhibit A).

(iv) deliver to Purchasers or their nominee a certification of non-foreign status of Seller under Section 1445 of the Internal Revenue Code.

B. At the Closing, Seller shall:

(i) deliver to Purchasers (a) a Certificate of Good Standing issued by the Rhode Island Secretary of State and the Rhode Island Division of Taxation (b) the Certificate of the Secretary of Seller certifying as to the resolutions adopted by the Board of Directors and/or the Stockholders of Seller authorizing the execution of this Agreement, the Deed and Bill of Sale, all in form and substance satisfactory to counsel to Purchasers.

C. At the Closing, Purchaser shall pay all Closing Costs up to an amount not to exceed $100,000.00. Closing Costs shall be limited to escrow fees, title insurance fees and recording fees.

D. The closing of the transaction is contingent upon the Escrow Agent being ready and able to issue an Standard Owners Title Insurance Policy, subject only to the permitted exceptions and the conditions of title not objected to during the Inspection Period.

11. Insurance. Seller shall keep the Subject Property insured, at its expense, until the delivery of the Deed, against loss by fire with extended coverage provisions in the presently insured sum. In case of any loss, the Seller shall pay over or assign to the Purchasers upon payment of the balance of the Purchase Price in cash, all sums recovered on account of said insurance, or the Purchasers may, at their option, terminate this Agreement and the Deposit shall be refunded to the Purchasers, unless the Seller shall have restored the Subject Property to its former condition.

12. Water and Utilities; Adjustments. All charges for water, electric and gas supplied to the Subject Property prior to Closing, shall be paid by the Seller. Water charges are to be pro-rated as of the Closing Date.

13. Taxes. Real estate taxes assessed against the Subject Property as of December 31 of the calendar year immediately preceding the calendar year in which the delivery of the Deed occurs are to be pro-rated on a calendar year basis; the Seller paying pro rata for the period from the beginning of the agreed upon adjustment year to the date of delivery of the Deed and Buyer paying or assuming the balance of these taxes. All other taxes which are a lien upon the Subject Property shall be paid by the Seller at the time of the delivery of the Deed.

14. Assessments. Any assessments constituting a lien on the Subject Property are payable over a period of more then one (1) year shall be apportioned in such manner that the Seller shall pay installments due during the calendar years prior to the year in which the Deed is delivered and the installments due for the year in which the Deed is delivered shall be apportioned in the same manner as provided with respect to the Subject Property tax apportionment.

15. Notices. All notices as required in this Agreement must be in writing. All notices shall be by certified mail, by telegram, or by delivering it personally. The telegram or certified letter will be effective upon sending. The personal certified

letter will be effective upon delivery to the other party. Each party must accept the certified mail or telegram sent by the other party. Notices to the Purchasers and Seller shall be addressed to the address that appears in this Agreement.

16. Notices to Purchasers. Purchasers of real estate in the State or Rhode Island are legally obligated to comply with all local real estate ordinances.

17. Seller's Inability. If the Seller shall fail to give titleDefault:

A. Purchasers' Default. If Purchasers breach any of their representations, warranties, covenants, or obligations under this Agreement, Seller may give ten (10) days' written notice to Purchasers of such breach. If Purchasers' default is not cured within ten (10) days of receipt of such notice, the Seller shall have the right to terminate this Agreement and to make convey-ance as provided for above, all payments made to Seller under this Agreement shall be refunded and all obligations of either party hereto shall cease; provided, however, that the Purchasers at their option may waive any defects and take such title as the Seller is able to convey, without warranty as to those defects and without reduction in the Purchase Price, and the acceptance of a deed and possession by the Purchasers shall be deemed a full performance and discharge hereof.

18. Default:

A. Purchasers' Default. Upon default by the Purchasers, the Seller shall have the right to retain the Deposit together with the interest earned thereon, if any, such right to be without prejudice to the right of Seller to require specific performance or the payment of other damages, or to pursue any remedy, legal or equitable, which shall accrue by reason of such default.

B. Seller's Default. UponIf Seller breaches any of its representations,

warranties, covenants, or obligations under this Agreement, Purchaser may give ten (10) days' written notice to Seller of such breach. If Seller's default by the Seller, is not cured within ten (10) days of receipt of such notice, the Purchasers shall have the right to terminate this Agreement and retain the Deposit together with the interest earned thereon, if any, such right to be without prejudice to the right of Purchasers to require specific performance or the payment of other damages, or to pursue any remedy, legal or equitable, which shall accrue by reason of such default.

18. Wetland Disclosure Pursuant to R.I.G.L. Section 2-1-26. All or part of the Subject Property may have been previously determined by the Rhode Island Department of Environmental Management to be a coastal wetland, a fresh water wetland, pond, marsh, riverbank or swamp, as those terms are defined in Chapter 1 of Title 2 of the Rhode Island General Laws. (See Addendum A).

19. Lead Warning. Purchasers acknowledge that they have been notified that the Subject Property was built prior to 1978 and that such property may present exposure to lead from lead based paint that may place young children at risk of developing lead poisoning. The Seller has provided to Purchasers and Purchasers acknowledge receipt from Seller of the Lead Warning Statement. Except as set forth in the Lead Warning Statement, it is understood that no representations have been made by or on behalf of Seller concerning the presence or absence of such lead based materials. Purchasers acknowledge that, in certain circumstances, Purchaser may incur obligations to remove such lead-based materials pursuant to the laws of the State of Rhode Island and/or local law, by-law, ordinance or regulation. Purchasers hereby acknowledge and agree to accept and assume any such obligations as of the Closing Date.

20. Condition of the Subject Property.

(a) Full possession of the Subject Property, free of all tenants and

occupants, except as otherwise provided herein, is to be delivered at the Closing in the same condition as it now is, reasonable wear and tear and damage by fire or casualty excepted. PURCHASERS ACKNOWELDGE THAT PURCHASERS HAVE INSPECTED, HAVE CAUSED TO BE INSPECTED, OR WILL CAUSE TO BE INSPECTED PRIOR TO CLOSING THE SUBJECT PROPERTY, ARE FULLY AWARE OF ITS PRESENT CONDITION, UNDERSTAND THAT THE SALE IS WITHOUT ANY REPRESENATION OR WARRANTY OF ANY TYPE EXPRESS OR IMPLIED (INCLUDING WITHOUT LIMITATION THE FACT THAT NO REPRESENTATIONS OR WARRANTIES ARE BEING MADE IN CONNECTION WITH THE SUBJECT PROPERTY, THE CONDITION OF ANY IMPROVEMENTS THEREON, THE SOIL CONDITION, COMPACTION OR BEARING ABILITY THEREOF, ANY ENVIRONMENTAL OR HAZARDOUS WASTE MATERIAL CONDITION, THE INCOME TO BE DERIVED FROM THE SUBJECT PROPERTY, OR THE COMPLIANCE OF THE SUBJECT PROPERTY WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS), AND ARE PURCHASING THE SUBJECT PROPERTY AS IS, WHERE IS, AND WITH ALL FAULTS, WITHOUT ANY OBLIGATION ON THE PART OF SELLER TO TAKE ANY ACTIONS OR DO ANY THINGS. SELLER HEREBY DISCLAIMS ALL WARRANTIES WITH RESPECT TO THE SUBJECT PROPERTY, INCLUDING, WITHOUT LIMITATION, WARRANTIES AS TO MERCHANTABILITY, QUALITY AND SUITABILITY; AND PURCHASERS HEREBY WAIVE ANY RIGHT TO RESCIND OR REFORM THIS AGREEMENT BEFORE OR AFTER PERFORMANCE HEREUNDER.

(b) The provisions of this Section 21 shall survive the Closing.

21. ~~Purchasers' Right to Inspect Subject Property. Purchasers, at their sole cost and expense, have the right at all reasonable times, to conduct on site inspections of the Subject Property and physical inspections and tests of the Subject Property during the Review Period, including, without limitation, the right to enter and~~

inspect all portions of the Subject Property (the "Review Items"), provided, however, Purchasers agree not to unreasonably interfere with the operations of the Seller currently occupying the Subject Property or any portion thereof. Seller hereby agrees to fully cooperate with Purchasers in providing access to any and all information requested by Purchasers. Purchasers shall indemnify Seller from any physical damage to the Subject Property and persons and injury resulting from Purchasers' entry on the premises during the Review Period.

23. Review Period. Purchasers shall have from the date of this Agreement until 5:00 p.m. on Friday, October 14, 2005 (the "Review Period") to review and approve the Review Items and to conduct such inspections and tests as Purchasers, in Purchasers' sole discretion, deem appropriate, including without limitation, environmental and engineering inspections and investigations and those matters related to title to the Subject Property.

If Purchasers, acting reasonably, determine that the results of such inspections and tests with respect to the Subject Property reveal a material defect or defects in the construction of the buildings included as part of the Subject Property, then in such event, and only such event, Purchasers shall have the right to terminate this Agreement by giving Seller written notice thereof (the "Purchasers' Notice") on or before the expiration of the Review Period, and, unless Seller refuses to agree, the Agreement shall thereupon be immediately terminated upon Purchasers' delivery of the Purchasers' Notice to Seller. The Purchasers' Notice must set forth in detail the reason or reasons for such termination. Purchasers' failure to deliver the Purchasers' Notice on or before the expiration of the Review Period shall be deemed a waiver of Purchasers' right to terminate this Agreement. If Purchasers elect to Terminate this Agreement for any reason, other than a material defect in construction as aforesaid or other than a material defect of title, Seller shall be entitled to retain the entire Deposit together with the interest earned thereon, if any, such right to be

~~without prejudice to the right of the Seller to require specific performance or the payment of other damages, or to pursue any remedy, legal or equitble, which shall accrue by reason of termination..~~

~~24. Occupation of Subject Property by Seller After Closing. Apartment Unit No. 1 located in the so-called "Carriage House" portion of the Subject Property is presently occupied by Seller and/or its stockholder, Andrew Panteleakis. It is agreed that for a period of two (2) years from and after the date of the delivery of the Deed, Seller and/or Andrew Panteleakis shall be allowed to continue to occupy said Apartment Unit No. 1 at no cost or expense to Seller or Andrew Panteleakis.~~

Occupation of Subject Property by Seller After Closing. Apartment Unit No. 1 located in the so-called "Carriage House" portion of the Subject Property is presently occupied by Seller and/or its stockholder, Andrew Panteleakis. It is agreed that for a period of two (2) years from and after the date of the delivery of the Deed, Seller and/or Andrew Panteleakis shall be allowed to continue to occupy said Apartment Unit No. 1 at no cost or expense to Seller or Andrew Panteleakis. If at any time during this two-year period Seller and/or its stockholder, Andrew Panteleakis, vacates the property, the provisions of this Section 24 shall no longer apply. Seller and/or its stockholder, Andrew Panteleakis, agree not to unreasonably interfere with the operations of the Purchasers relating to Subject Property or any portion thereof during this two-year period and shall indemnify and hold free and harmless Purchasers and its affiliates or assigns from any loss, damage and liability (including court costs and attorney's fees) arising from any claim made against Seller and or its Stockholder as a result of or in any way arising from, relating to, or connected with Seller's acts or omissions while occupying the Subject Property.

22. No Assignment; Nominees. This Agreement may not be assigned by Purchasers without the Seller's prior written consent, excepting however, that Purchasers upon seven (7) days prior notice to Seller, may request Seller to execute

DRAFT 11-2-05 - marked to show changes

and deliver the Quitclaim Deed to Purchasers' nominee.

23. No Recording of Agreement. The Parties hereto agree that neither this Agreement nor any memorandum or notice thereof shall be recorded in any registry of land evidence records or other filing place. Purchasers further agree that the recording of this Agreement, or any memorandum or short form thereof, by or at the instance of Purchasers or any agent of Purchasers shall constitute, at Seller's election, a default by Purchasers hereunder. Upon Seller's giving notice of such default to Purchasers, this Agreement shall terminate and be of no further force or effect and the recording of such notice shall be deemed sufficient and ad equate notice to third parties that this Agreement is void and of no further force and effect.

24. Appointment of Escrow. Seller and Purchasers hereby constitute ~~Guido R. Salvadore, Esq., 10 Weybosset Street, Suite 303, Providence, Rhode Island 02903~~ ______________________________ as Escrow Agent, and Escrow Agent by signing the acceptance set forth below agrees to assume and perform the duties of Escrow Agent under and pursuant to the provisions of this Agreement. The Escrow Agent shall deposit all sums received by him in an interest bearing account in a national bank having an office in Providence, Rhode Island.

The Escrow Agent shall not be held liable for any action taken or omitted under this Section so long as he has acted in good faith and without negligence. The Escrow Agent shall have no responsibility to inquire into or determine the genuineness, authenticity, or sufficiency of any documents or instruments submitted to him in connection with his duties under and pursuant to the Escrow.

The Escrow Agent shall be entitled to deem the signatories of any documents or instruments submitted to him pursuant to the Escrow as being those purported to be authorized to sign such documents or instruments and shall be entitled to rely upon the genuineness of the signature of such signatories without inquiry and without

requiring substantiating evidence of any kind. The Escrow Agent shall be entitled to refrain from taking any action contemplated by this Escrow in the event that she becomes aware of any disagreement between Seller and Purchasers as to any material facts or as to the happening of any contemplated event precedent to such action.

The Escrow Agent may resign as such following the giving of fifteen (15) days prior written notice to Seller and Purchasers. Similarly, the Escrow Agent may be removed and replaced following the giving of fifteen (15) days prior written notice to the Escrow Agent by Seller and Purchasers, acting jointly. In either event, the Escrow Agent shall deliver the property then comprising the Escrow to a successor Escrow Agent appointed by Seller and Purchasers by a written notice executed by Seller and Purchasers and filed with the Escrow Agent.

25. Like Kind Exchange. Anything herein to the contrary notwithstanding, Seller instead of selling the Subject Property as a direct sale or Purchaser instead of purchasing the Subject Property as a direct purchase, may each elect to do a so-called Section 1031 like kind exchange. ~~Purchasers~~The parties agree to cooperate with ~~Seller~~the other to effect such like kind exchange but ~~at no cost~~ neither party shall be required to ~~Purchasers~~incur any cost or liability as a result of such cooperation. The failure of any such exchange to qualify as an exchange under Section 1031 shall not constitute grounds for rescission by either party and shall not be deemed to be a failure of consideration.

25. Confidentiality. Purchasers and Seller each mutually covenant and agree to keep this Agreement and the transactions contemplated hereby confidential and shall not disclose the same to any third parties. This provisions shall survive the termination of this Agreement.

26. Joint Effort. The drafting of this Agreement represents the joint effort of Seller and Purchasers and nothing herein shall be construed or weighed more

heavily against any of the parties on the basis that such party may have been responsible for the drafting of such provision.

27. Entire Agreement. This Agreement and the documents referred to herein contain the entire agreement between the parties with respect to the transactions contemplated hereby, and no modification hereof shall be effective unless in writing and signed by the party against which it is sought to be enforced.

28. Further Action. Each of the parties hereto shall use such party's best efforts to take such actions as may be necessary or reasonably requested by the other parties hereto to carry out and consummate the transactions contemplated by this Agreement.

29. Expenses. Purchasers agree to pay the cost of recording the Deed and the deed stamps. Each of the parties hereto shall otherwise bear such party's own expenses in connection with this Agreement and the transactions contemplated hereby.

30. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Rhode Island applicable in the case of agreements made and to be performed entirely within such State.

31. TIME IS OF THE ESSENCE. THE PARTIES HERETO ACKNOWELDGE THAT FOR ALL PROVISONS OF THIS AGREEMENT, TIME IS OF THE ESSENCE.

32. Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

33. Real Estate Broker. The parties warrant to each other that no real

estate broker is involved in this transaction.

**IN WITNESS WHEREOF**, the parties have hereunto set their hands and seals on the date set forth beside their respective signatures.

~~SELLER:~~ ~~BUYER:~~

~~AMERICAN CAPITAL CORPORATION~~

~~By~~

~~Tim L. Blixseth~~

~~Date~~ ~~Date~~

~~Edra Blixseth~~

~~Date~~

| SELLER: | PURCHASERS: |
| --- | --- |
| AMERICAN CAPITAL CORPORATION | Timothy L. Blixseth |
| By ____ Its ____ | Date: ____ |
| Date: ____ | Edra Blixseth |
| ESCROW AGENT: | Date: ____ |
| By ____ Its ____ | |

DRAFT 11-2-05 - marked to show changes

| | |
|---|---|
| Date: ____________________ | |

DRAFT 11-2-05 - marked to show changes

## ADDENDUM A

**<u>An Explanation of the Wetlands Disclosure Requirements</u>:** Rhode Island law requires that the Purchasers be notified prior to the sale of real estate if it has been designated as wetlands by the Department of Environmental Management. Each city and town has maps of designated wetlands. These maps are of a scale that makes it very difficult to identify an individual parcel of real estate. There are many properties which contain wetlands, but about which no previous determination has been made. Wetlands are defined according to the type of plant life which is present, or according to whether the Subject Property is subject to flooding. The legal definition of wetlands also includes a buffer area ranging from 50 feet to 200 feet from edge of a biological wetlands. It is a highway runoff, drainage ditch effluent, earth, rock, burrow, gravel, sand, clay, peat or other materials of effluent upon; divert water flows into or out of; dike; dam; divert; change; add to or take from or OTHERWISE ALTER a wetland without a written approval from the State.

Purchasers should be particularly concerned with the wetlands designation if they plan to build, or add onto, a building on the real estate WHEN THE REAL ESTATE IS SERVED BY AN INDIVIDUAL SEPTIC DISPOSAL SYSTEM. If you are buying an existing building that is served by a municipal sewage system, this disclosure may only be a concern to you if the Subject Property is designated as being in a wetland and you are building an addition or a new structure on the Subject Property.

DRAFT 11-2-05 - marked to show changes

## EXHIBIT A

Certain real estate situated on the easterly side of Bellevue Avenue in the City of Newport, State of Rhode Island, and certain tangible personal property located thereon, all more particularly described as follows:

PARCEL I: That certain lot or parcel of land, all with buildings and improvements thereon. situated in the City of Newport, State of Rhode Island, and known as "Edgecliff" located on the "Cliffs" and bounded northerly partly by a court leading to Bellevue Avenue, and partly by land now or lately of Helen A.P. Merriman; easterly by the Atlantic Ocean; southerly by Parcel III, hereinafter described, and westerly by Parcel II, hereinafter further described, and containing about 49,493 square feet of land, be the same more or less, or however otherwise bounded and described. Together with a one half of the fee of the land embraced in what is designated as "Court Extension" on that plat referred to in, and made a part of, that certain deed from Joseph I. Bailey to George W. Wales, dated July 21, 1869, and recorded in the Land Evidence Records of said City of Newport in Deed Book 40 at page 445.

PARCEL II: That certain lot or parcel of land, all with buildings and improvements thereon. situated in the City of Newport, State of Rhode Island, and bounded westerly in front by Bellevue Avenue, northerly by Yznaga Avenue, easterly partly by a court and partly by Parcel I, hereinafter described, and southerly by Parcel III, hereinafter described, or however otherwise bounded and described.

PARCEL III: That certain lot or parcel of land, all with buildings and improvements thereon. situated in the City of Newport, State of Rhode Island, and bounded westerly by Bellevue Avenue, southerly by land now or lately of Garnett C. Douglas; easterly by the Atlantic Ocean; and northerly by Parcels I and II, hereinabove described.