UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

AMERICAN CAPITAL CORPORATION, Plaintiff,

v. C.A. No. 06-90 S

TIMOTHY L. AND EDRA BLIXSETH, Defendants.

**AMENDED MEMORANDUM AND DECISION**

WILLIAM E. SMITH, United States District Judge.

This matter comes before the Court on the motion of Timothy and Edra Blixseth (collectively, the "Blixseths") for summary judgment on the claims of American Capital Corporation ("ACC") as well as the Blixseths' counterclaim for the termination of a real estate sales agreement and the return of funds paid as a deposit thereon. After careful consideration, and for the following reasons, the Blixseths' motion is granted.[1]

[1] On June 10, 2008 the Court issued a decision granting the Blixseths' motion for summary judgment on the claims of ACC and on Count I of the Blixseths' counterclaim requesting return of their deposit. During a conference on June 24, 2008 it was brought to the Court's attention that the Court's June 10 decision did not address ACC's waiver argument in opposition to the Blixseths' motion for summary judgment. The Court now rectifies that oversight by vacating the previous decision and entering this amended decision. In addition, in a letter received in chambers prior to the conference, ACC claimed that the June 10 decision overlooked the Blixseths' additional counterclaims. However, with respect to their counterclaims, the Blixseths moved for summary judgment only on the first. Therefore, the June 10 decision need not be supplemented in this regard.

## I. Background

On November 23, 2005, the Blixseths and ACC entered into an Agreement for Sale and Purchase ("Agreement") of three parcels of real estate in Newport, Rhode Island. The three parcels together totaled eight acres. One parcel was vacant; the second parcel had a mansion on it; the third, a carriage house. At the same time, the Blixseths provided ACC with a $1.25 million deposit.

Prior to execution of the Agreement, ACC provided the Blixseths with Real Estate Disclosure Forms[2] as mandated by Rhode Island's Real Estate Sales Disclosure Act ("REDA" or "the Act"). R.I. Gen. Laws § 5-20.8-2.[3] Section 5-20.8-2(b)(2)(xxiii) of the REDA provides, inter alia, that

> If the subject property is located in a historic district, that fact must be disclosed to the buyer, together with the notification that "property located in a historic district may be subject to construction, expansion or renovation limitations. Contact the local building inspection official for details."

It is undisputed that ACC knew all three parcels were located within the Newport Historic District and subject to the rules and regulations of the Newport Historic District Commission. Nevertheless, neither Real Estate Disclosure Form made the disclosure required by Section 5-20.8-2(b)(2)(xxiii).

---

[2]The Blixseths were provided with two disclosure forms: one form covered the mansion and vacant building lot, and the second the carriage house.

[3] Unless otherwise noted, all statutory references will be to the Rhode Island General Laws.

The closing was scheduled for January 17, 2006, but it was not attended by the Blixseths, nor did they wire money to complete the sale. ACC filed suit against the Blixseths on February 3, 2006, seeking, amongst other things, an order for specific performance to compel the Blixseths to purchase the property. Subsequently, on March 10, the Blixseths' counsel sent a letter to ACC demanding termination of the Agreement and the return of the Blixseths' deposit on the ground that ACC's failure to make the disclosure required under Section 5-20.8-2(b)(2)(xxiii) rendered the Agreement voidable at the Bixseths' election. The Blixseths also filed a counterclaim that reiterated the allegations in their letter demanding termination of the agreement and return of their deposit. The Blixseths now seek summary judgment on this claim.[4]

II. Standard of Review

Summary judgment is appropriately granted where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it has the "potential to affect the outcome of the suit."

[4] The Blixseths additionally asserted that the Agreement was void because ACC's Board of Directors never approved the sale of the property. In light of the analysis and conclusions contained herein, this Court finds it unnecessary to address this assertion.

Velazquez-Garcia v. Horizon Lines of P. R., Inc., 473 F.3d 11, 15 (1st Cir. 2007) (citations omitted).

Once the movant has made the requisite showing, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The court views all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. Torrech-Hernandez v. Gen. Elec. Co., 519 F.3d 41, 46 (1st Cir. 2008).

III. Discussion

The REDA provides that "the seller of . . . real estate shall deliver a written disclosure to the buyer . . . ." R.I. Gen. Laws § 5-20.8-2(a). The written disclosure "shall state all deficient conditions of which the seller has actual knowledge," and "shall comply with the requirements set forth in [Section 5-20.8-2(b)]." Id. The Act defines "deficient conditions" to mean "any land restrictions, defect, malfunction, breakage, or unsound condition existing on, in, across or under the real estate of which the seller has knowledge." R.I. Gen. Laws § 5-20.8-1(5). The requirements set forth in Section 5-20.8-2(b) consist of more than 30 items that, if applicable, the seller of real estate must disclose to the buyer. In short, the disclosure obligation imposed on sellers by the REDA extends to both "deficient conditions," as

defined by Section 5-20.8-1(5), and the information specified in Section 5-20.8-2(b).

Although the above two categories of information are disjunctively set forth in the Act, it is plain that in some cases there will be substantial overlap between them. For example, Section 5-20.8-2(b) requires that sellers disclose any basement defects. R.I. Gen. Laws § 5-20.8-2(b)(2)(iii). This particular item, it is safe to say, would also fall within the definition accorded to "deficient conditions." See R.I. Gen. Laws § 5-20.8-1(5) ("deficient conditions" includes "any . . . defect"). On the other hand, some information listed in Section 5-20.8-2(b) does not appear to relate to anything that reasonably could be called a "deficient condition." See, e.g., R.I. Gen. Laws § 5-20.8-2(b)(2)(i) (length of seller occupancy); id. § 5-20.8-2(b)(2)(xxxiv) ("[m]iscellaneous").

Among the various items listed by Section 5-20.8-2(b) is "[z]oning." R.I. Gen. Laws § 5-20.8-2(b)(2)(xxiii). Specifically, the Act provides that

> If the subject property is located in a historic district, that fact must be disclosed to the buyer, together with the notification that "property located in a historic district may be subject to construction, expansion or renovation limitations. Contact the local building inspection official for details."

Id. As noted earlier, ACC did not disclose to the Blixseths that the three parcels of land were located within Newport's Historic District. Under the Act, however, a seller's failure to disclose

certain conditions does not automatically entitle a buyer to terminate a pending sale of real estate. Rather, a sale may be terminated only if the undisclosed condition is a "materially deficient condition." R.I. Gen. Laws § 5-20.8-4(b)(1). Here, the parties dispute whether historic district zoning is a "deficient condition" at all and, if it is, whether it is a "materially deficient condition" as a matter of law.

A. Deficient Condition

The Act defines "deficient conditions" to mean "any land restrictions, defect, malfunction, breakage, or unsound condition existing on, in, across or under the real estate of which the seller has knowledge." R.I. Gen. Laws § 5-20.8-1(5). It cannot reasonably be asserted that historic zoning represents a "defect, malfunction, breakage, or unsound condition." See State v. DiCicco, 707 A.2d 251, 253 (R.I. 1998) ("It is well settled that when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings.") (quoting Accent Store Design, Inc. v. Marathon House, Inc., 674 A.2d 1223, 1226 (R.I. 1996)). Therefore, what remains is to determine whether historic zoning constitutes a "land restriction" within the meaning of the REDA.

The starting point for interpreting a statute is, of course, the language of the statute itself; absent a clearly expressed

legislative intention to the contrary, that language must ordinarily be given its plain meaning and regarded as conclusive. See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980). Here, the Act provides that "property located in a historic district may be subject to construction, expansion, or renovation limitations." R.I. Gen. Laws § 5-20.8-2(b)(2)(xxiii) (emphasis added). This by itself would appear to place historic district zoning within the meaning of "land restrictions," since a "restriction" is, most obviously, "a limitation imposed upon a person or thing." Oxford English Dictionary (2d ed. 1989) (emphasis added).

Moreover, it is widely accepted that historic or landmark zoning "restricts the owner's control over [a] parcel." Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 113 (1978) (emphasis added). In Penn Cent., for example, the Supreme Court acknowledged that, under New York City's Landmarks Preservation Law, "designation as a landmark results in restrictions upon the property owner's options concerning the use of the landmark site," and that historic zoning laws "place special restrictions on landmark properties as a necessary feature to the attainment of . . . larger objectives."[5] Id. at 110, 111; see also Cienega Gardens

[5] These "larger objectives" admittedly include "the preservation of buildings and areas with historic or aesthetic importance," which "enhance the quality of life for all." Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 107-08, 110 (1978). Thus, ACC is correct that historic district zoning may

v. United States, 503 F.3d 1266, 1283 (Fed. Cir. 2007) (recognizing law at issue in Penn Cent. as imposing "restrictions on the development of historic properties"); Van Horn v. Town of Castine, 167 F. Supp. 2d 103, 104 (D. Me. 2001) (under local historic preservation ordinance, "[p]roperty located within an historic preservation district is subject not only to generally applicable zoning laws, but also to special restrictions . . ."); People Tags, Inc. v. Jackson County Legislature, 636 F. Supp. 1345, 1358 (W.D. Mo. 1986) ("historic district ordinances are markedly more restrictive than zoning ordinances") (citing Lafayette Park Baptist Church v. Scott, 553 S.W.2d 856 (Mo. App. 1977)). Based on all the foregoing authorities, it is inescapable that historic district zoning is a "land restriction" which, for the purposes of the Act, constitutes a "deficient condition[]." R.I. Gen. Laws § 5-20.8-1(5).

B. Materially Deficient Condition

Although neither "material" nor "materially deficient condition" are defined by the REDA, and Rhode Island decisional law appears to offer no guidance, this Court is persuaded that the Act's explicit admonition that a seller disclose whether or not the "subject property is located in a historic district . . . together with the notification that 'property located in a historic district

---

"advance the public welfare." This objective is accomplished, however, by restricting a landowner's use of his property.

may be subject to construction, expansion, or renovation limitations,'" R.I. Gen. Laws § 5-20.8-2(b)(2)(xxiii), reflects a legislative finding that a property's location within a historic district is material information that must be communicated to a potential buyer. "[T]his court will not ascribe to the Legislature an intent to enact legislation that is devoid of any purpose, is inefficacious, or is nugatory." Cocchini v. City of Providence, 479 A.2d 108, 111 (R.I. 1984). Few other items referred to in the Act's disclosure requirements are described with such specificity. See § 5-20.8-2(b)(2). For example, the Act mandates that a seller disclose "[s]tructural conditions," yet explains this requirement by referring only to "[d]efects." See § 5-20.8-2(b)(2)(ix).[6] This suggests that, in regard to this item of the list - structural conditions - whether any particular condition is a materially deficient condition, or even a deficient condition, is a question that must be evaluated by a factfinder. The requirement that the existence of historic zoning be disclosed is palpably different. In contrast to "structural conditions" or "structural defects," historic zoning is a specific condition, not a general category.

---

[6] ACC contends that mandating disclosure of historic district zoning under Section 5-20.8-2(b)(2)(xxiii) would render Section 5-20.8-2(b)(2)(xxiv), which requires disclosure of "[r]estrictions," "superfluous." Because the Act explicitly mentions historic district zoning in Section 5-20.8-2(b)(2)(xxiii) this Court is unpersuaded by this contention.

The Legislature's attention to detail in this item is a signal as to the importance of this information.

Rhode Island's enactment of the REDA is part of a trend spreading amongst the states and imposing disclosure obligations upon sellers of real estate. Indeed, it appears the vast majority of states now mandate seller disclosure by statute. See, e.g., Pa. Stat. Ann. Tit. 68, § 7301 (2001); Del Code Ann. Tit. 6, § 2572 (1999); N.J. Stat. Ann. § 46:3C-1 (2001); Cal. Civ. Code § 1102.6 (2003). The purpose of a disclosure statute like the REDA is "to set forth a standard of disclosure for sellers and their agents before the transfer of real estate occurs." Stebbins v. Wells, 818 A.2d 711, 718 (R.I. 2003). This overarching purpose supports the conclusion that information is material when specifically required by the statute to be disclosed, and finding otherwise would defeat the Court's ultimate goal of giving effect to the purpose of the act as intended by the Legislature. See Webster v. Perrotta, 774 A.2d 68, 75 (R.I. 2001). Therefore, ACC's failure to disclose that the subject property was located within the Newport Historic District constitutes failure to disclose a "materially deficient condition" under the Act. As such, the Blixseths were entitled to terminate the sale and demand a return of their deposit.

C. Waiver

ACC contends that Paragraph 20 of the Agreement precludes the Blixseths from terminating the sale of property, notwithstanding

the existence of R.I. Gen. Laws § 5-20.8-4(b)(1). Paragraph 20 provides, in part, that "purchasers hereby waive any right to rescind . . . this agreement before or after performance hereunder." Although the Blixseths argue that Paragraph 20 is terminable under § 5-20.8-4(b)(1) along with the rest of the Agreement, there is another reason why the Blixseths are entitled to terminate the Agreement even in the face of Paragraph 20.

As already discussed, the REDA is intended "to set forth a standard of disclosure for sellers and their agents before the transfer of real estate occurs." Stebbins, 818 A.2d at 718. Under Rhode Island law, a party may generally waive a right granted by a statute. See Gallucci v. Brindamour, 477 A.2d 617, 618 (R.I. 1984) ("[A] party or parties for whose benefit a right is provided by constitution, by statute, or by principles of common law may waive such right, regardless of the plain and unambiguous terms by which such right is expressed."). But, "when a statute creates a private right for the public good, the donee of that private right lacks the power either to waive that right or to nullify it by private contract." D'Ambra v. N. Providence Sch. Comm., 601 A.2d 1370, 1372 (R.I. 1992) (quoting Berthiaume v. Sch. Comm. of Woonsocket, 397 A.2d 889, 894 (R.I. 1979)). As previously discussed, the REDA is intended to set forth a standard of disclosure, Stebbins, 818 A.2d at 718, and the specific language of the Act makes clear the importance the Legislature has placed on the disclosure of historic

district zoning. Given the uniform nature of the standards of disclosure it is apparent that the Act creates a right for the public good; to allow a party to contractually waive this right would contravene the intent of Legislature and the broader public policy underlying the REDA itself, rendering the act ineffective. In this regard, even if it was the intent of the contracting parties to waive the statutory rights afforded by § 5-20.8-4(b)(1), because the statute creates a private right for the public good that right cannot be waived.

IV. Conclusion

For the foregoing reasons, then, the defendants' motion for summary judgment is GRANTED.

IT IS SO ORDERED.

William E. Smith
United States District Judge
Date: 8/19/08